# LICENSE AGREEMENT

**AGREEMENT** made as of the 26th day of June 2007 (this "<u>Agreement</u>") by and among Transcience Corporation, a Maryland corporation with offices and a principal place of business at 6200 Chapman's Landing Road, Indian Head, Maryland 20640 and Yolanda von Braunhut whose principal place of residence is the same ("<u>Transcience</u>" and "<u>von Braunhut</u>", respectively, and individually as a "<u>Licensor</u>" or collectively as the "<u>Licensors</u>", as appropriate) and Big Time Toys, LLC, a Tennessee limited liability company with offices and principal place of business at 8005 Church Street East, Brentwood, Tennessee 37027 ("<u>Licensee</u>").

## R E C I T A L S:

**WHEREAS**, Licensors are the sole and exclusive owners of methods, materials and properties, including intellectual properties, for hatching, growing and sustaining live microcrustaceans (Artemia nyos), a hybrid brine shrimp known and sold under the United States registered trademark "Sea-Monkeys<sup>®</sup>", and hatched egg and design, and have manufactured and sold a line of products and accessories, including tanks and pouches, in conjunction therewith since 1960, all as more fully described on <u>Exhibit A</u> (the "<u>Licensed Products</u>"); and

**WHEREAS**, Transcience is the owner of registered and unregistered United States and foreign trademarks, including "Instant Life", "Instant Pets" and "Sea-Monkeys", a current list of which is set forth on <u>Exhibit B</u> (including any other trademarks licensed hereunder, the "<u>Licensed Trademarks</u>"); and

**WHEREAS**, von Braunhut and Transcience are each owners of certain copyrights registered in the United States Copyright Office, and unregistered, and von Braunhut is the copyright owner of an instruction book titled "It's Fun To Raise Pet Sea-Monkeys", a current list of which is set forth on <u>Exhibit C</u> (including any other copyrights licensed hereunder, the "<u>Licensed Copyrights</u>"); and

**WHEREAS**, Transcience is the owner of certain United States and foreign patents and patent applications, a current list of which is set forth on <u>Exhibit D</u> (including any other patents licensed hereunder, the "<u>Licensed Patents</u>"); and

**WHEREAS**, Licensee is desirous of obtaining an exclusive worldwide license to make, have made, use, sell, distribute and advertise the Licensed Products, and to utilize the Licensed Trademarks, Licensed Copyrights and Licensed Patents, worldwide under the terms hereof; and

**WHEREAS**, Licensors agree to grant such license upon the terms and conditions hereinafter set forth;

**NOW, THEREFORE**, in consideration of the mutual covenants and premises herein set forth, it is agreed as follows:

**1.   TERM; CANCELLATION; GRANT OF LICENSE; REPRESENTATIONS AND WARRANTIES OF LICENSORS**

A.      <u>Term; Renewals</u>.

(i)  <u>Term</u>.   The term of the license granted hereunder (the "<u>License</u>") shall commence on January 1, 2008 (the "<u>Effective Date</u>") and, unless terminated in accordance with the terms hereof, shall continue through and including December 31, 2012.

(ii)  <u>Renewal</u>.   Licensee shall have the option to renew this Agreement for two (2) additional periods of five (5) years each by giving Licensors notice of intent to renew at least twelve (12) months prior to the scheduled expiration of the License.

B.      <u>Cancellation</u>.   In addition to any other cancellation rights provided herein, Licensee shall have the right to cancel this Agreement, without any further obligation of Licensee; (i) at any time on or before January 15, 2008 in the event that, between the date hereof and January 1,

2008, there is a Material Adverse Change (defined below); or (ii) at any time, provided that Licensee gives at least six (6) months prior written notice to Licensors and such cancellation is effective on or after January 1, 2011. For purposes hereof, "Material Adverse Change" shall mean a material adverse change in the Sea-Monkeys business, assets or operations, as proposed to be licensed to Licensee hereunder, and shall include any threatened or filed litigation material to the transactions contemplated hereby and any material disruption in the manufacturing or shipping processes with respect to the Licensed Products.

C.      Grant. Except as expressly set forth in this paragraph C, this License grants to Licensee the exclusive right and license to make, have made, use, sell, distribute and advertise the Licensed Products worldwide. This License includes, but is not limited to, a license under any and all patents, trademarks and copyrights and any applications therefor, which have been filed or may be filed in the future with respect to the Licensed Products.

(i)      Empire Agreement. An agreement, entitled "The Amazing Live Sea-Monkeys - Binding Deal Memorandum", dated May 9, 2005 (the "Empire Agreement"), was entered into by and among Transcience and Empire Pictures Incorporated (the "Empire Licensee"). A complete copy of the Empire Agreement is attached hereto as Exhibit E. Licensor shall not amend, modify or supplement the Empire Agreement in a manner that could adversely affect Licensee without the prior written consent of Licensee (but Licensor shall be permitted to extend the Empire Agreement without Licensee's consent on the condition that in any such extension Empire shall agree, in an enforceable writing, that (i) its rights are limited to visual entertainment in the form of motion picture, television and home video, (ii) under no circumstances does the Empire Agreement grant to Empire the right, directly or indirectly, to manufacture, sell or distribute Sea Monkey's pouches or tanks and that such rights shall not be considered "ancillary and subsidiary" to the entertainment rights, and (iii) Transcience's "Reserved Rights" (as such term is used in the Empire Agreement) shall mean all rights with respect to the Products, including all existing copyrights and trademarks, other than those entertainment rights explicitly granted to Empire, and Transcience's "Reserved Rights" shall specifically include the right to advertise on television and other video means). Each Licensor represents, jointly

and severally, that the Empire License (x) is limited to certain "entertainment rights", and does not, directly or indirectly, permit the manufacture, sale or distribution of Sea-Monkeys pouches or tanks, and (y) does not conflict with the rights granted to Licensee hereunder. Licensor acknowledges that its use of any characters created under the Empire Agreement on tanks will require a separate movie royalty license agreement. In the event that a movie or other theatrical event is released under the Empire Agreement during the first twelve (12) months of the term of this Agreement, Licensor shall be entitled to retain all compensation payable under the Empire Agreement; provided, however, that (x) if Licensee's gross sales of Licensed Products exceed six million dollars ($6,000,000.00) in any twelve (12) month period, and a movie or other theatrical event is released after the conclusion of such twelve (12) month period, and (y) in all events after December 31, 2009, fifty percent (50%) of all compensation payable under the Empire Agreement shall be paid to Licensee.

(ii) <u>IGT Agreement</u>. This License is subject to a "License Agreement ("Sea-Monkeys")", dated May 15, 2002 (the "<u>IGT Agreement</u>"), by and between Educational Insights, Inc., as licensor ("<u>IGT Licensor</u>"), and IGT, as licensee (the "<u>IGT Licensee</u>"), with respect to the use of the mark "Sea-Monkeys" and certain related properties on gaming machines. A complete copy of the IGT Agreement is attached as <u>Exhibit F</u>. The IGT Agreement shall not be amended, modified or supplemented in a manner that could adversely affect Licensee without the prior written consent of Licensor (but Licensor shall be permitted to extend the IGT Agreement without Licensee's consent). Each Licensor represents, jointly and severally, that the IGT Agreement does not, directly or indirectly, permit the manufacture, sale or distribution of Sea-Monkeys pouches or tanks, or conflict with the rights granted to Licensee hereunder. All royalties from the IGT Agreement shall be split 75% for Licensors and 25% for Licensee up to the amount earned during the twelve months preceding the Effective Date. Thereafter, all royalties under the IGT Agreement shall be split 75% for Licensee and 25% for Licensors.

D.     Each Licensor represents and warrants, jointly and severally, that:

(i)  It has the right and power to grant the licenses granted herein and that, except for the Empire Agreement, the IGT Agreement, and the "License to Manufacture Certain Articles Known as Sea-Monkeys® and Bubble Making Device Under United States and Foreign Patent and Trademarks and To Use Copyrighted Printed Materials and Copyrighted Artwork Relating Thereto", dated September 22, 2000, and related agreements among Transcience, von Braunhut and Educational Insights, Inc. ("EI"), a complete copy of which, including all other agreements among such parties or any of them (collectively, the "EI Agreement"), is attached hereto as Exhibit G, there are no other agreements with regard to the subject matter hereof;

(ii)  It has no knowledge that the Licensed Products, the Licensed Trademarks, the Licensed Copyrights and/or the Licensed Patents infringe any rights of any third party;

(iii)   It has the right and power to enter into this Agreement, and that together they are the owners of all of the intellectual properties licensed in this Agreement, and that this Agreement shall be a valid and binding obligation of each Licensor, enforceable against each of them in accordance with its terms;

(iv)  The execution and delivery of this Agreement, the grant of the license hereunder and compliance with the provisions hereof, do not conflict with or constitute, on the part of any Licensor, a breach of or default under any agreement (including the Empire Agreement, the IGT Agreement and the EI Agreement) or other instrument to which any Licensor is a party or any existing law, administrative regulation, court order or consent decree to which any Licensor is subject;

(v)    The EI Agreement, and all rights of EI and any other parties thereto, shall terminate on or before December 31, 2007, and after such date neither EI nor any other party shall have any rights to make, have made, use or sell Licensed Products or any intellectual property in connection therewith (except IGT pursuant to the IGT Agreement);

(vi)   Licensors shall indemnify and hold Licensee harmless from any breach of the representations and warranties herein, including all claims, litigation, expenses, loss or penalty including reasonable attorneys fees and costs relating to a claim by any third party relative to the intellectual property rights licensed herein; and

(vii)   EI's sales of Licensed Products over the twelve (12) months ended December 31, 2006 exceeded $3,400,000.

## 2.  CHANNELS OF DISTRIBUTION AND RIGHTS RESERVED TO THE LICENSORS

A.      The rights granted hereunder shall be for all classes of trade and channels of distribution, including, but not limited to, retail (mass, specialty, gifts, pet, drug, supermarkets, etc.), educational, wall digital, Internet (with the exception of aftermarket pouches and components in the current Transcience mail order form, a copy of which is attached as Exhibit H hereto), international and other, except for any sales by Transcience by direct mail.  Transcience specifically reserves to itself the right to sell the Licensed Products throughout the world direct to consumers via mail-order.  The rights reserved to Transcience in the preceding sentence are personal to Transcience and shall not be, directly or indirectly, sublicensed, assigned or otherwise transferred to any other person without the prior written consent of Licensee, except that Transcience may continue to supply or sell directly to international distributors to fill Licensor's mail order sales.  Product developed for the school market may not present

SeaMonkeys® as experiments or biological specimens to be dissected, starved, mistreated or examined in any way that would be harmful to them.

## 3. SUBLICENSES

A.       The license granted by Licensors to Licensee hereunder shall include the exclusive right of the Licensee, subject to Licensors' Creative Control as specified in paragraph 9/1 below, to grant sublicenses to third parties to make, have made, use, sell, distribute and advertise the Licensed Products worldwide, and to enter into joint venture agreements.  Licensors agree to produce Sea-Monkeys formulas for sale only to (i) the Licensee, (ii) an approved sublicense of Licensee, and (iii) for direct mail pursuant to certain rights reserved by Transcience under paragraph 2A hereof.

B.       Each such sublicense, or any amendment or modification thereto, by Licensee shall be subject to the express prior written approval of Licensor, which shall not be unreasonably withheld, conditioned or delayed.  Minimum royalties shall be established by Licensee based upon the sublicensee's sublicensed territory and anticipated sales volume.  The royalty rate, time and manner of payment shall be consistent with the terms hereof and any such sublicense shall provide for termination by Licensee (as sublicensor) for any material breach of the terms thereof by sublicensee.

C.       Licensee agrees that it will indemnify Licensors and hold them harmless from any liabilities, expenses, loss or penalty, including reasonable attorneys' fees and costs of investigations, incurred by Licensor in defending against any claims that arise out of any sublicenses and/or agreements made by Licensee with third parties, except to the extent such claims arise out of actions taken at the direction of, or with the approval of, Licensors.

## 4. ROYALTY PAYMENTS

A.   Licensee agrees to pay to Licensors a royalty of ten percent (10%) of "Gross Sales" of Licensed Products sold by Licensee to third parties.  If Licensee sells any Licensed Product to any party affiliated with Licensee prior to such third party sale, or in any way directly or indirectly related to or under the common control with Licensee, at a price less than the regular price charged to other parties, the royalty payable to Licensor shall be computed on the basis of the regular price charged to other parties.  "Gross Sales" shall mean billed-out gross shipments to third parties less deductions for trade discounts and merchandise returns.  In the event that Licensee grants any approved sublicensee the right to make, have made, use and sell Licensed Products, Licensee shall pay Licensor twenty-five percent (25%) of the gross income received by Licensee from such sublicensees.

B.        Commencing with the Effective Date, a minimum royalty shall be paid by Licensee in the amount of $400,000 for the first twelve (12) month period following the Effective Date, and a minimum royalty of $500,000 per year for each twelve (12) month period thereafter that this License is in effect (the "Minimum Royalty").  The Minimum Royalty shall be paid in equal monthly installments, on or before the tenth day of each month.  The Minimum Royalty shall be a nonrefundable advance against any amounts due to Licensors hereunder.  In the event that EI, any affiliate thereof, or any other party (other than Transcience under paragraph 2.A. hereof) makes any sales of Licensed Products after the Effective Date, in addition to any other remedies available to Licensee hereunder, Licensee shall be entitled to take an amount equal to ten percent (10%) of such "Gross Sales" (as defined above) as a credit by Licensee against any amounts due to Licensors hereunder, including the Minimum Royalty.  Licensors will cooperate with Licensee to obtain and provide to Licensee any documentation required to evidence any such sales.

C.        The Licensed Products shall be considered as "sold" when billed out, or, if not

previously billed out, when shipped, mailed or otherwise delivered to the recipient of the goods by any means.

D.        Promptly following the date Licensee closes its books for each month during the term hereof, but in no event later than thirty (30) days following the close of such month, Licensee shall deliver to Licensors and/or their designee, a statement signed by a duly authorized officer of Licensee, listing the quantity, description of goods and gross sales price, itemized deductions from gross sales price and the net sales price of the Licensed Products sold by Licensee and its sublicensees during the preceding month (the "Royalty Statement").  Payments of any royalties due to Licensors shall accompany the Royalty Statement.

E.        All payments due to Licensors hereunder shall be made to Yolanda von Braunhut, who shall receive the same as agent for, and on behalf, of all Licensors.

F.        Licensee agrees to pay for continued maintenance, modification and repair of Licensors' tooling and molds listed on Exhibit H.  Licensors represent and warrant that on the date hereof, such tooling is in good working condition.

### 5. POUCH PRODUCTION:

A.        Licensors shall be the sole supplier of all Sea-Monkeys pouches (which shall include, but not be limited to, numbers 1, 2, 3, 4 and Sea-Diamonds).  Licensors failure to supply Sea-Monkeys pouches, in accordance with the terms hereof, shall be deemed a material breach of this Agreement by Licensors.

B.        Licensee shall provide projected needs in units at least three (3) months before delivery.

C.        Licensee shall provide purchase orders to Transcience which, unless agreed to by Transcience, shall provide for a delivery date at least sixty (60) days after the date of the

purchase order.  Licensors shall use its best efforts to ship the purchased products within one hundred and twenty (120) days of receipt of each purchase order.

D.      Payment terms shall be fifty percent (50%) with purchase order and the balance due fifteen (15) days after the Licensors invoice for verified delivery of pouches.  Partial shipments of orders are acceptable and payable upon such invoicing.

E.      The price shall be F.O.B. Warminster Pennsylvania, $0.21 per pouch (the quantity of the contents in each pouch shall not change) for each unit.  In the event the cost of ingredients is increased, such increase will be passed on to Licensee, provided, however, that documented price increases to Licensors are shown to Licensee and reasonable efforts have been made by Licensors to find alternate sources for ingredients that can be readily purchased from reliable alternate sources.  When providing price increase documentation (which shall include at least two written competitive quotes if reasonably available for the same item from different vendors), Licensors may redact such parts of the invoice or quotation as may be necessary to ensure the confidentiality of the supplier and items related to the formulation of the pouch.

F.      Licensors shall provide pouches to EI only with respect to products that EI will ship on or before December 31, 2007, pursuant to purchase orders held by EI requiring shipment on or before such date.  Licensors shall use their best efforts to cause EI to provide documentation reasonably satisfactory to Licensors and Licensee that will allow Licensors to monitor such EI purchase orders.  Licensors shall direct EI that any pouches held by EI on January 1, 2008 shall be transferred to, or at the direction, of Licensors.

## 6. ADVANCE PAYMENT

A.      Upon execution and delivery of this License by the last person to sign, Licensee shall advance the sum of one hundred thousand dollars ($100,000.00) (the "Advance").  The Advance

shall be delivered to, and held in an interest bearing escrow account by, a mutually acceptable third party, and shall be released to Licensors promptly upon the fulfillment of all Advance Release Conditions (defined below).  Following its release to Licensors, the Advance shall be credited against Licensee's payment obligations to Licensors hereunder, including the Minimum Royalty, at the rate of $5,555.56 per month (the "Advance").  Investment earnings on such amount held in escrow shall be paid to the person receiving the escrowed amount.  The "Advance Release Conditions" are as follows:  (1)  Licensors shall provide to Licensee, in writing, (x) a letter (in the form of Exhibit I) advising EI of its obligation to comply with Section 16.D  of the EI Agreement (which right shall be exercised by Licensors in at the direction of Licensee and any purchase price shall be paid by Licensee) and advising of the cost to purchase such items, and (y) a letter from Licensors' counsel, in the form attached hereto as Exhibit I, addressed to EI, advising that the effective date of termination of the EI Agreement is December 31, 2007 and that EI shall have no selloff or other rights with respect to the products licensed thereunder after such date; and (2) all factories have entered into binding written agreements with Licensee to:  (x) continue to make the same products for Licensee at the same or  lower price and delivery terms as offered to EI, with no price increase before January 1, 2009; (y) confirm to Licensee the balance, if any, remaining owed to purchase and own the tooling along with the amounts charged for tooling per-unit built on to the current prices; and (z) allow Licensee to move the tooling on no more than one week notice if it is unable to match a valid written quote from a different factory, provided that Licensee has paid off the balance of the cost of the tooling, for up to one year after the Effective Date and, thereafter allow Licensee to move the tooling for any reason, as long as the tooling is paid for.  Licensee acknowledges that some of the tooling is owned by factories in China and cannot be transferred unless first paid for.

Licensee shall make reasonable efforts to continue to utilize the existing Chinese factories, unless and until the volume increases to the extent that additional factories are needed (subject to the above the items (x), (y) and (z) in this section).  Licensee shall have the right to work directly with the Chinese factories to negotiate the lowest possible costs for the goods, consistent with the quality of the products.

## 7.  LICENSED PRODUCTS GUARANTEE

A.       Licensors, and each of them jointly and severally, guarantee the viability, quality, performance and fitness for the particular purpose of each pouch supplied to Licensee for sale in Licensee's kits according to the claims made for each respective product (which claims shall not be changed without the prior written consent of Licensee) (the "Licensor Guarantee").

B.         Licensors, and each of them jointly and severally, accept full and unconditional responsibility for the viability, quality and performance of any and all pouches made by them, under their direction, or under their supervision, and will promptly and in a commercially prudent manner handle all consumer complaints with respect thereto at their expense.  Licensors shall maintain, during the term hereof, and operate a consumer service bureau (the "Consumer Service Bureau").   In the event of a claimed failure of a kit to hatch live Sea-Monkeys that grow and survive for at least one (1) year, Licensor's shall replace the "Water Purifier" and "Instant-Life®" pouches according to terms and conditions printed in the Sea-Monkeys® Growth Guarantee and the Sea-Monkeys® Life Insurance Policies, attached thereto (which shall not be changed without the prior written consent of Licensee).  Licensee agrees to print on all kits, packaging and any Licensee internet site that offers Licensed Products for sale, Guarantee information with the Transcience name and address for consumers to contact if they desire to make a claim for replacement as herein specified.

C.        Licensors disclaim responsibility or liability for damage claims resulting from the

manufacture, sale and distribution of the Licensed Products, including for missing parts or

supplies, mispacked kits, broken, damaged, defective or pilfered parts, materials and lost or

missing components, or defective packaging.

D.        Licensee agrees to not recycle pouches from any returned shipments without the

approval of Licensors nor include it in any new merchandise offered for sale.    Samples of

pouches from returned shipments must be sent to the Licensors' laboratory for viability tests

before such approval can be given.

## 8. ADVERTISING CONSIDERATION FOR GRANT OF LICENSE

A.        Licensee shall produce and film a Sea-Monkeys® television commercial and perform a

television test with respect thereto in at least one major market before Christmas 2009, which

shall involve Wal-Mart, Toys "R" Us, K-Mart or Target.  Licensee agrees to continue to

reasonably promote the Licensed Products to consumers and to the trade during the term of the

License.  The contents of all advertising shall be subject to the reasonable prior approval of

Transcience, which shall be provided in writing within seven (7) days of the date requested, and

shall not be unreasonably conditioned, withheld or delayed.  After such contents are approved, it

shall be deemed approved for all uses and all purposes during the term hereof.

B.        As additional and essential consideration for the license hereunder, Licensee agrees that it

will insert advertising materials supplied by Licensors into the Licensed Products packaging,

provided, however, that such materials directly relate to the Licensed Products, are reasonably

acceptable in form and substance to Licensee, adhere to the quality standards of Licensee and do

not impose any material additional costs on Licensee.  Licensee shall print replacement parts and

supply coupons on packaging and shall publish such coupons on any Licensee internet site that

offers Licensed Products for sale, to assist Licensors in their direct-to-consumer sales of the Licensed Products and related items by mail order and other means of direct to consumer marketing, and to assist Licensee by providing consumers the instrument with which to address complaints in order to obtain satisfaction under the Licensor Guarantee.  Licensee further agrees to manufacture for and sell to Licensors, Licensors' requirements of the Licensed Products for mail-order and other mutually agreed purposes at Licensee's direct cost of materials and labor, plus ten percent (10%) of such amount.  The terms of such purchase shall be as set forth in Paragraph 5.B through E. hereof.  No royalties shall be payable on any sales by Licensee to Licensor or any person affiliated therewith or related thereto.

9. **ADDITIONAL AGREEMENTS AND COVENANTS FOR GRANT OF LICENSE**

9/1      **CREATIVE CONTROL**

Licensors reserve all rights of creative control over the type, appearance, design, presentation and usage ("Creative Control") to be used by Licensee and all sublicensees and persons with whom Licensee has a joint venture agreement with respect to any and all Licensed Products.  It is further agreed that Creative Control shall not be relinquished by Licensors to any advertising agency, marketing agency, television production company, agent or any others engaged by Licensee for goods or services performed for, or delivered to Licensee in conjunction with any Sea-Monkeys® product or products manufactured or sold under this License by Licensee.  If Licensee does not receive approval from Licensors of submissions made by Licensee within ten (10) business days after receipt of same by Licensors, then any such submission shall be deemed approved.  Licensors agree not to unreasonably withhold, delay or condition approval of submissions.  Licensee acknowledges and agrees that Creative Control is a material part of this License agreement and a violation of this provision shall be considered to be

a material breach of this License agreement.

## 9/2  TRADEMARK AND COPYRIGHT RIGHTS AND USAGES

A.       All use by Licensee of the Licensed Trademarks and of any other trademarks associated with the Licensed Products (other than trademarks owned by Licensee) shall inure to the benefit of Licensors.  All rights in said trademarks other than those specifically granted herein are reserved.  Licensee shall, at any time, whether during or after the term of this Agreement, at no out-of-pocket expense to Licensee, execute any documents reasonably required by Licensors to confirm their ownership of all such rights.

B.       Any and all copyrights which may arise or be acquired at any time in any of the Licensed Products, package design, label or the like, whether created by the Licensors and/or the Licensee (other than copyrights owned by Licensee), shall be the property of the Licensors, but Licensee shall have the right to use such material during the term hereof.

C.       Licensee agrees to cooperate with Licensors or their designee in the prosecution of any trademark or copyright applications that the Licensors may determine should be filed, and for that purpose Licensee shall supply to Licensors from time-to-time, such samples, containers, packages, labels and similar materials as may reasonably be required in connection with any such application used only for that purpose.

D.       Licensee shall, and shall cause each sublicensee and joint venturer to agree to, mark each Licensed Product manufactured and/or distributed by it with the legend: "Copyright ©, the copyright year and Yolanda von Braunhut or Transcience Corp.", as and to the extent appropriate, or if patents are pending, such notice shall also appear.  Licensee shall also mark all catalogs, promotional material, advertising and other materials and presentations applicable to the Licensed Products with any and all such legends as may in each case be appropriate.

E.      Licensee shall, whenever using the Licensed Trademarks, to the extent required by law, use the appropriate trademark symbols: "®" to indicate a registered trademark and a "™" to indicate an unregistered trademark. All use by Licensee of the Licensed Trademarks shall inure to the benefit of the Licensors. All rights in said trademarks other than those specifically granted herein are reserved.   Licensee shall, at any time, whether during or after the term of this Agreement, at no out-of-pocket expense to it, execute any documents reasonably required by Licensors to confirm their ownership of all such rights.

F.      The Licensee shall use the Licensed Products, Licensed Trademarks and Licensed Copyrights only in the form authorized by Licensors and only in connection with Licensed Products as specified, and shall not place or use the same in connection with merchandise of any kind, nature or description other than the Licensed Products.

G.      Licensee agrees that it will not, during the term of this Agreement or thereafter, attack the ownership and validity of the Licensed Trademarks and/or the Licensed Copyrights or any registration thereof issued by any country or dominion throughout the world.

H.      Licensee agrees to display the Licensed Products, Licensed Copyrights and Licensed Trademarks only in such form and manner as are specifically approved in writing by Licensors, causing or allowing same to appear on the Licensed Products produced hereunder, and/or on their containers, tags, boxes, packages, product cards, labels and the like, and on all catalogs, advertising or promotional material used in connection therewith, such additional legends, marking and notices as Licensors may reasonably request.  Before releasing such materials, or causing or allowing such materials to be released whether by Licensee or sublicensee, Licensee shall submit specimen of same to Licensor for its approval to permit Licensee to edit, modify or otherwise amend such markings, legends and notices, and the form and manner in which the

Licensed Products are displayed.  If approval from Licensors is not received in writing within ten

(10) business days after receipt of specimens and/or samples by Licensors, approval of the form,

nature and/or the appearance of the Licensed Products are thereby deemed approved.  Licensors

agree that such approval shall not be unreasonably withheld, conditioned or delayed.

I.          Licensee agrees that it will not use or associate the Licensed Products and Licensed

Trademarks with any other trademark without the written consent of the Licensors.

### 10.  LABORATORY AND RESEARCH FACILITY MAINTENANCE

A.          Licensee recognizes that the continuance of laboratory testing of the Licensed

Product is essential to determine viability, quality and performance of the unique characteristics

of the Licensed Products line in kits and packages offered for sale by Licensee, and that the

continuance of research and development programs that has enhanced and improved the

evolution of the Sea-Monkeys as a unique biological phenomena, and will continue to upgrade

the Licensed Product, agrees to pay, weekly, a supplemental laboratory fee of seven hundred and

fifty dollars ($750.00) per week.  Licensee may, at its option, make such payments quarter-

annually, in advance, on the first day of each calendar quarter, in the amount of nine thousand

seven hundred and fifty dollars ($9,750.00) per quarter.  Payments shall be made to Licensors'

designee, Dr. Anthony D'Agostino, Ph.D., Senior Research Scientist.  If Licensee exercises its

option to purchase all of the Sea-Monkeys assets, it shall have the right to discontinue such

payments.

B.          Pouches from each item in a production run shall be tested and certified by the

laboratory as filling all criteria of performance as represented to, and accepted by Licensee, prior

to delivery to Licensee's designated assemblers.  If all criteria are not met for any reason

whatsoever, the pouches will be destroyed and replaced at Licensors' sole cost and expense.

C.      Licensee agrees to send samples of all pouches taken from any returned merchandise to the laboratory for testing prior to resale or reissue to determine the existing viability, performance and condition of the formulas.  The laboratory director will provide a report to the Licensee to insure that all redistributed kits or goods will match the criteria established for the product by Licensors and delivered in good faith and good condition to the Licensee.  If said pouches fail to pass the criteria tests through no fault of the Licensors, Licensee agrees to destroy any unsalvageable goods at its own expense.

## 11.  TRADEMARKS,  AND COPYRIGHT MAINTENANCE

A.      Inasmuch as international trademark and copyright laws require periodic fees or payments in amounts determined separately by each country where trademarks have been granted, Licensors shall bear sole responsibility to make payments required by law to establish and renew said rights from time to time in the countries where the trademarks for the Licensed Products are registered, and to protect any and all rights to same.  If trademarks are due to expire or have expired in certain countries, or if no sales activity is warranted or undertaken in said countries, then Licensors may, at will, but with no less than four (4) months notice to Licensee, abandon the trademarks at expiration.

B.      Should Licensee wish the Licensed Products to be registered in countries not covered by the Licensors, Licensors agree to register and file trademarks and copyrights where required, but Licensee agrees to pay filing and maintenance fees in those countries during the term hereof. Ownership shall, at all times, inure to the Licensors, and will not be transferred to Licensee. Licensee shall have full benefit and protection for same in those countries, for the term hereof.

C.      Licensee shall have the right, at its own discretion, to institute or prosecute any action or proceeding against any party for or by reason of any unlawful infringing of the rights granted

to it by this Agreement; provided, however, that any suit or suits will be instituted, maintained or prosecuted solely at the cost and expense of Licensee, and any and all sums collected or recovered in any such suit or suits, whether by decree, judgment, settlement or otherwise, belong exclusively to Licensee and such sums, after deducting the actual costs and expenses incurred by Licensee in such proceeding, shall be treated as Gross Sales or sublicense revenues, whichever may be the case, hereunder; provided, further, however, that Licensor will have the right to promptly elect to share equally the expense of any such action or proceeding brought by Licensee, and in that event, Licensor will share equally in any and all sums recovered in such suit or suits. Upon request of Licensee, Licensor will execute all papers, testify on all matters and otherwise cooperate in every way necessary and desirable for the prosecution of any such suits, actions or proceedings including appearing as a party plaintiff if requested by Licensee. Licensee will reimburse Licensor for the reasonable out-of-pocket expenses incurred as a result of such cooperation unless Licensor has elected to share the costs as aforesaid. Licensee will promptly notify Licensor of the institution of any action or proceeding against third parties for or by reason of any such unlawful infringements. If Licensee elects not to prosecute any infringement suit, Licensor may do so at Licensor's own expense after notice to Licensee of that intention. Licensee will cooperate in every way necessary and desirable for the prosecution of any such suits, actions or proceedings. Any sums recovered will belong exclusively to Licensor, after first reimbursing Licensee for its reasonable expenses incurred as a result of such cooperation.

## 12. RECORDS

Licensee agrees to maintain appropriate books of account in which accurate entries shall be made concerning all transactions within the scope of this agreement.   Licensors shall have

the right, to be exercised during business hours and no more than two times per calendar year, through any authorized representatives of its choice, on not less than ten (10 ) business days prior written notice to Licensee, to examine and take extracts from such books of account and other records, documents and materials in the possession of, or under the control of Licensee, with respect to royalties payable under this agreement.  Licensee shall keep all such books of account and records available for at least two (2) years or as required by the United States Internal Revenue Service after the close of each reporting year.  Any information obtained shall be treated by Licensors, and its authorized representatives, as confidential information.

## 13.  CONTROL OF USE

A.        Each Licensed Product shall be subject to the reasonable approval of Licensors, which shall not be unreasonably withheld, delayed or conditioned, and upon approval thereof, Licensee agrees to manufacture the same as approved.  During the term thereof, Licensee shall, from time-to-time, upon request, submit samples of the current productions of the Licensed Products as evidence of the maintenance of quality standards as set forth herein.  If written approval from Licensors relative to submissions made by Licensee is not received by Licensee within ten (10) business days after delivery to Licensors, such submission shall be deemed approved.

## 14.  BEST EFFORTS

A.        During the term of this License agreement, Licensee shall use its reasonable best efforts to exploit the rights and license granted hereby.

B.        Licensee shall use reasonable efforts to promote and conclude suitable arrangements, sublicenses and other agreements for the manufacture and/or sale of the Licensed Products in major United States markets.

C.        Licensee shall exercise due diligence in the enforcement of the terms of any and all

sublicenses and agreements relating to any of the Licensed Products negotiated by it.

## 15. RENEWAL, EXPIRATION AND TERMINATION

A.      If the Licensee fails to render statements or to make payment of royalties and the consideration set forth in paragraphs 3 and 4 or observe the requirements regarding Creative Control as set forth in paragraph 9/1 in any material respect, the Licensors, may on thirty (30) day written notice to the Licensee, terminate this Agreement.  If such default is not cured within such thirty (30) days, this Agreement shall terminate upon the date set forth in such notice, without prejudice to the moneys due to Licensors hereunder up until the date of such termination. If the Licensee shall correct such default during the notice period, the notice shall be of no further force or effect.

B.      If the Licensee shall abandon the exploitation and stop attempting to sell the Licensed Product for a period of three (3) consecutive months, the Licensors may, on thirty (30) days written notice to the Licensee, terminate this Agreement.  If such default is not cured within such thirty (30) days, this Agreement shall terminate upon the date set forth in such notice, without prejudice to the moneys due to Licensors hereunder up until the date of such termination.

C.      If any party makes any assignment of assets or business for the benefit of creditors, or if a trustee or receiver is appointed to administer or conduct its business, or if any voluntary or involuntary petition in bankruptcy is filed against, or by such party, then the rights granted herein shall forthwith cease and terminate without prior notice or legal action by the other party; and provided, further, that in the event that the any party fails to comply with any material provision of this Agreement in any material respect, or any representation or warranty made herein is incorrect or untrue in any material respect when made, or becomes untrue or incorrect in any material respect during the term hereof, the other party may terminate this Agreement upon not

less than thirty (30) days written notice to the breaching party, but, if such breaching party shall correct such default during the notice period, the notice shall be of no further force or effect.

D.        Upon the termination of this Agreement for any reason set forth in subdivisions A through C herein, Licensee shall, at its sole cost and expense, furnish Licensors with all artwork, plates, dies and printing material furnished to Licensee by Licensors. Licensee shall also offer to sell Licensor all new artwork, molds, tools and/or dies and other materials and/or equipment built or purchased by Licensee for the Licensed Products at Licensee's then book value.

E.        In the event of cancellation, Licensee shall have 120 days after termination to fill then existing purchase orders and sell inventory to current customers at prices that will not damage the brand.

## 16. INSURANCE

A.        Licensee shall procure and maintain at its expense, in full force and effect at all times during the term hereof, at least five million dollars ($5,000,000.00) of products liability insurance coverage for the Licensed Products with responsible insurance carrier or carriers reasonably acceptable to Licensors. Licensors shall be listed as an additional insured on Licensee's policy, and such policy shall provide for at least ten (10) days prior written notice to Licensors of any cancellation or substantial modification thereof.

B.        Licensee shall, from time to time, upon reasonable written request by the other, promptly furnish or cause to be furnished to Licensors, evidence in form and substance satisfactory to Licensors, of the maintenance of the insurance required by paragraph A above, including but not limited to copies of policies, certificates of insurance (with applicable riders and endorsement) and proof of premium payments.

## 17. OPTION TO PURCHASE

A.        At any time during the term of the Agreement, Licensee shall have the right to purchase all right, title and interest, free of all liens, claims and encumbrances, in and to any and all of the Licensed Products, including Sea-Monkeys and related assets (which shall specifically include all intellectual property rights, including trade secrets) for an amount not to exceed $10,000,000, payable as follows: (i) $5,000,000 upon exercise of the option, upon which all right, title and interest in and to all such assets, free and clear of any and all liens, claims and encumbrances shall be transferred to Licensee, including the secret formula, and (ii) up to $5,000,000 shall be payable thereafter from (x) royalties comprised of 5% of merchandising sales, and (y) entertainment related revenue comprised of 25% of all entertainment related revenue received by Licensee for the first three years following exercise of the option, and 10% of all entertainment related revenue received by Licensee thereafter, until the balance of the purchase price is fully paid. If Licensee exercises the purchase option, and thereafter elects to resell the assets before the balance of the purchase price has been paid, the balance of the purchase price shall become fully due upon Licensee's consummation of the resale.

B.        If the purchase option is exercised, Licensee shall own all aftermarket sales. Licensors shall cause the lab to transfer to, or otherwise disclose to, Licensee, at no out-of-pocket expense to Licensee, all right, title and interest (free and clear of any and all liens, claims and encumbrances) in and to all information, know-how, and trade secrets needed to continue proper performance of its services and also shall cause the lab to sign a reasonable confidentiality agreement (at no additional cost to Licensee) at that time. At any time prior to the exercise date of the option, Licensors shall, upon request by Licensee, cause the lab to deposit all such information, know how and trade secrets with an independent escrow agent, to be released to Licensee upon exercise of the option.

C.        Payment of the balance owed will be secured by a UCC-1 on all Sea-Monkeys assets.

D.        If prior to the exercise of this option by Licensee, another company with the approval of Licensors seeks to purchase all of the Sea-Monkeys assets, Licensee shall be given a copy of the third party's (buyer's) executed letter of intent to purchase Sea-Monkeys and thereafter the Licensee shall have a thirty (30) day right of first refusal to purchase the assets at the price and terms set forth in subparagraph 17 A above or at such lower price and/or better terms as set forth in such executed letter of intent.  If Licensee elects not to do so, Licensors shall be free to consummate the sale to the other company upon the terms and conditions in the executed letter of intent, which sale shall be subject to all of the terms and conditions of Licensors' agreements with Licensee, including this License agreement.

## 18. NOTICES

A.        Notices under this Licensee agreement shall be in writing and shall be sufficient if sent by Certified Mail or  Priority Overnight Mail and addressed to the address set forth above or to such other address as one party shall designate to the other in writing.

B.        Reports, payments and notices hereunder shall be delivered at the respective address set forth above, except that a moving party shall, in writing, notify the other party that a specified new address shall thereafter be used.

C.        All consents, approvals, notices and/or acts required in this agreement to be given or made on behalf of the Licensors shall be given and made to von Braunhut who shall secure the consent of herself and Transcience.

## 19. ARBITRATION

In the event of a disagreement between the parties with respect to this Agreement, either party, if they wish to adjudicate such disagreement, shall submit the issue in dispute for

arbitration under the rules of the American Arbitration Association, the election to be by written notice to the other party. Upon service of the notice, the issue shall be submitted to a single arbitrator in accordance with the rules. The arbitration shall be at a location within New York County, the State of New York, at a place selected by the arbitrator. The decision by the arbitrator on any matter submitted shall be final, conclusive and binding on the parties. Each of the parties by executing this Agreement unconditionally submits to the jurisdiction of the courts of the State of New York and of the United States District Court for the Southern District of New York and other federal courts, for the purpose of enforcement of any arbitration award.

## 20. MISCELLANEOUS

A.      Nothing contained herein shall be construed to place either party in the relationship of legal representative, partner, joint venturer or agent of the other, and neither party shall have the power to obligate or bind the other in any manner.

B.      The failure of a party to insist upon strict adherence to any term of this Agreement on any occasion shall not be considered a waiver, or deprive that party of the right thereafter to insist, upon strict adherence to that term or any other term of this Agreement.  Any waiver must be in writing.

C.      This Agreement contains the complete statement of all of the arrangements among the parties with respect to its subject matter, and cannot be changed or terminated orally. This Agreement is intended to replace and supersede all other prior agreements and understandings between the parties.

D.      Each party shall have the right to setoff amounts due to it against any amounts due by it to the other party.

E.      If any provision or portion of this Agreement shall at any time be determined by any

Court of competent jurisdiction to be invalid, illegal or unenforceable, and such determination

shall become final, such provision or portion shall be deemed to be severed and deleted

heretofore, and the remaining provisions and portions shall survive and be enforced to give effect

to the intentions of the parties insofar as that is possible.

F.     Neither this Agreement nor any interest herein may be assigned in whole or in part by the

Licensee without the prior written consent of the Licensors, except that without securing such

prior written consent, Licensee may assign this Agreement to (a) a bona fide successor of all or

substantially all of its business and /or  (b) any publicly held business entity which (1) has a

provable net worth in excess of $15,000,000.00 and (2) is in the toy, educational or novelty or

similar business, all on condition only that any such transferee(s) also concurrently assume all of

Licensee's obligations with respect to the interest transferred. No assignment shall be valid and

binding until and unless Licensors shall be provided with a signed copy of the Assignment and

the assignee shall have assumed in writing all of the duties and obligations of the Licensee.

Licensors may assign this Agreement by giving written notice of such assignment with

trademark symbols and Copyright notices.

G.     It is understood and agreed that, in the event of an act of the government, war conditions,

fire, flood or other natural disaster, or labor or manufacturing problems which prevent the

performance by Licensee of the provisions of this agreement, such nonperformance by Licensee

will not be considered a breach of this agreement, and such nonperformance will be excused

while, but not longer than, the conditions described herein prevail.

## 21. GOVERNING LAW

A.     This agreement shall be governed by the laws of the State of New York.

B.     This Agreement constitutes the entire understanding and agreement of the parties and

may not be modified except by writing signed by them.

IN WITNESS WHEREOF, the parties have executed this Agreement on the date above written.

BIG TIME TOYS, LLC                           TRANSCIENCE CORPORATION

By _____                   By:_____
Sam K. Harwell, Chief Manager                   Yolanda von Braunhut, CEO

WITNESSETH:                                   YOLONDA VON BRAUNHUT,

_____                       _____
                                              Yolanda von Braunhut, individually

                                              WITNESSETH:

                                              _____

may not be modified except by writing signed by them.

    IN WITNESS WHEREOF, the parties have executed this Agreement on the date

above written.

BIG TIME TOYS, LLC

By_____
Sam K. Harwell, Chief Manager

WITNESSETH:

_____

TRANSCIENCE CORPORATION          6/18/2007

By *Yolanda von Braunhut*
Yolanda  von Braunhut, CEO

YOLONDA VON BRAUNHUT,

*Yolanda*
*Yolanda von Braunhut*
Yolanda von Braunhut, individually

WITNESSETH:

_____

# EXHIBIT A

## LICENSED PRODUCTS

"Licensed Products" shall mean all Products, including tanks and pouches, devices, methods, processes and services embodying, comprising, using, consisting of, derived from or based on all or any part of the Sea-Monkeys brand or Licensor's Intellectual Property Rights, in whole or in part, and all manifestations, derivatives and extensions thereof, and all materials sold for use with, on or in connection therewith, all future improvements, embodiments, additions and components of or relating thereto, used for any purpose whatsoever anywhere in the world, whether or not any patents, trademarks or copyrights actually issue related thereto.

"Licensor's Intellectual Property Rights" means any and all intellectual property rights owned or controlled by Licensor which are embodied in or related to Sea-Monkeys, including, without limitation, modifications thereof; applications for or patents; patents issued; copyrights; trademarks either previously used in commerce by Licensor in connection with the item, or with respect to which Licensor has officially, and in a manner sanctioned by applicable laws, indicated its intent to use (it being understood that the mere creation or coining of a trademark by Licensor without such use does not create rights therein); proprietary or confidential data or information or trade secrets relating to Sea-Monkeys its design or manufacture, including but not limited to know how, but specifically excluding trade secret formulas for products sold in pouches; any invention derived from or substantially similar in purpose or function to Sea-Monkeys, regardless of the materials or operational systems used in the invention; all ideas, know how, trade secrets (other than trade secret formulas for products sold in pouches), methods, designs, developmental or experimental work, improvements, discoveries, product or research plans, products, inventions, business and marketing plans, techniques, manufacturing and other processes, data, source, object and executables codes, programs, diagrams, formats, technology, needs and specifications, technical information, reports, and documentation relating thereto; and all of Licensors' existing and future right, title and interest in and to Sea-Monkeys and intellectual property rights, and all versions thereof, now or hereafter created, whether or not patentable or registrable under patent, copyright or similar statutes including but not limited to (A) the undivided rights in patents, copyrights, trademarks, service marks, and all applications, registrations, extensions, substitutions, renewals, divisions, reissues, continuations, continuations in part and other filings related thereto, and all other proprietary rights of any kind therein, whether now known or hereafter created and throughout the world, (B) any and all claims, demands, and causes of action for infringement or otherwise of the same, past, present and future, and (C) all of the proceeds from the foregoing, accrued and unpaid and hereafter accruing.

# EXHIBIT B

## LICENSED TRADEMARKS

(The following trademarks, in addition to all trademarks referred to in Exhibit A)

## Transcience Corporation - Due Date List

| COUNTRY | TRADEMARK | REG. NO. | EXPIRES |
|---|---|---|---|
| Argentina | SEA-MONKEYS (Stylized) | 1.744.137 (Old Reg. No. 1.340.083) | 7/12/2009 |
| Australia | SEA-MONKEYS | 260449 | 7/20/2010 |
| Canada | SEA-MONKEYS | 630,098 | 1/13/2020 |
| Canada | SEA-MONKEYS | 552,029 | 10/5/2016 |
| European Union | SEA-MONKEYS | 000563155 | 6/30/2017 (Renewal appl. filed; waiting for Cert. Of Renewal, old expiration date: 6/30/2007) |
| France | SEA-MONKEYS | 1.626.432 | 11/8/2010 |
| Germany | SEA-MONKEYS | 899238 | 12/31/2010 |
| Italy | SEA-MONKEYS | 870677 | 5/20/2009 |
| Mexico | SEA-MONKEYS | 726034 | 8/10/2011 |
| Mexico | SEA-MONKEYS | 753394 | 8/10/2011 |
| New Zealand | SEA-MONKEYS | 277925 | 6/9/2018 |
| South Africa | SEA-MONKEYS | 1972/03452 | 7/4/2012 |
| South Korea | SEA-MONKEYS | 0569293 | 12/19/2013 |
| Spain | SEA-MONKEYS | 756685M | 6/14/2014 |
| Switzerland | SEA-MONKEYS | Not filed yet | |
| United Kingdom | SEA-MONKEYS | 967346 | 11/6/2015 |
| United States | SEA-MONKEYS | 2485247 | 9/4/2011 |
| United States | INSTANT LIFE | 769330 | 5/12/2014 |
| United States | SEA-MONKEYS | 769332 | 5/12/2014 |
| United States | HATCHED EGG DESIGN | 769331 | 5/12/2014 |

| COUNTRY | TRADEMARK | REG. NO. | EXPIRES |
|---|---|---|---|
| United States | OCEAN ZOO | 2509518 | 11/20/2011 |
| United States | X-RAY SPEX | 1003937 | 2/4/2015 |
| United States | INSTANT PETS | 999873 | 12/17/2014 |
| United States | TC & Design | 999872 | 12/17/2014 |

# TRANSCIENCE CORPORATION - STATUS REPORT

Report Date:  5/31/2007    Page:  1

| Country | ID | Mark | Classes | Reg. Owner | App. # | App. Dt | Reg. # | Reg. Dt | Allow. Dt | ITU |
|---|---|---|---|---|---|---|---|---|---|---|
| Argentina | 9372 | SEA-MONKEYS (STYLIZED) | 29 | TRANSCIENCE CORPORATION | 2.211.676 | | 1.744.137 | 7/12/1999 | | No |
| Australia | 8784 | SEA-MONKEYS | 31 | TRANSCIENCE CORPORATION | 260449 | 7/20/1972 | 260449 | 7/20/1972 | | No |
| Canada | 8786 | SEA-MONKEYS | 28, 31 | HAROLD VON BRAUNHUT | 1,117,342 | 10/2/2001 | TMA630.098 | 1/13/2005 | | No |
| | 8785 | SEA-MONKEYS | 31, 35 | HAROLD VON BRAUNHUT | 1,046,688 | 2/21/2000 | TMA552.029 | 10/5/2001 | | No |
| European Union | 8797 | SEA-MONKEYS | 1, 31 | TRANSCIENCE CORPORATION | 000563155 | 6/30/1997 | 000563155 | 11/23/1999 | | No |
| France | 8787 | SEA-MONKEYS | 31 | TRANSCIENCE CORPORATION | 248.375 | 11/8/1990 | 1.626.432 | 11/8/1990 | | No |
| Germany | 8788 | SEA-MONKEYS | 1, 5, 31 | TRANSCIENCE CORPORATION | T1411431WZ | 12/2/1970 | 899238 | 11/8/1972 | | No |
| Italy | 8789 | SEA-MONKEYS | 31 | TRANSCIENCE CORPORATION | 257299RM | 5/20/1999 | 870677 | 7/2/2002 | | No |

Printed by gcanciltoro on 5/31/2007 4:33:00 PM

# TRANSCIENCE CORPORATION - STATUS REPORT

Report Date: 5/31/2007          Page: 2

| ID | Mark | Classes | Reg. Owner | App. # | App. Dt | Reg. # | Reg. Dt | Allow. Dt | ITU |
|---|---|---|---|---|---|---|---|---|---|
| 9388 | SEA-MONKEYS | 31 | TRANSCIENCE CORPORATION | 99C/002572 | 5/20/1999 | | | | No |
| **Country:** Mexico | | | | | | | | | |
| 8792 | SEA-MONKEYS | 28 | HAROLD VON BRAUNFHUT | 0500763 | 8/10/2001 | 726034 | 11/30/2001 | | No |
| 8793 | SEA-MONKEYS | 31 | HAROLD VON BRAUNFHUT | 0500762 | 8/10/2001 | 753394 | 6/28/2002 | | No |
| **Country:** New Zealand | | | | | | | | | |
| 8790 | SEA-MONKEYS | 31 | HAROLD VON BRAUNFHUT | 277925 | 6/9/1997 | 277925 | 10/15/1998 | | No |
| **Country:** South Africa | | | | | | | | | |
| 8791 | SEA-MONKEYS | 31 | TRANSCIENCE CORPORATION | 72/3452 | 7/4/1972 | 1972/03452 | 7/4/1972 | | No |
| **Country:** South Korea | | | | | | | | | |
| 8794 | SEA-MONKEYS | 31 | HAROLD VON BRAUNFHUT | 2002-0027346 | 6/12/2002 | 0569293 | 12/19/2003 | | No |
| **Country:** Spain | | | | | | | | | |
| 8795 | SEA-MONKEYS | 31 | TRANSCIENCE CORPORATION | 756685M | 6/14/1974 | 756685M | 3/30/1977 | | No |
| **Country:** Switzerland | | | | | | | | | |
| 8842 | SEA-MONKEYS | 28 | TRANSCIENCE CORPORATION | | | | | | No |
| **Country:** United Kingdom | | | | | | | | | |
| | | | | | | | | | ITU |

# TRANSCIENCE CORPORATION - STATUS REPORT

Report Date: 5/31/2007     Page: 3

| 8796 | SEA-MONKEYS | 31 | TRANSCIENCE CORPORATION | 967346 | 11/6/1970 | 967346 | 11/6/1991 | | No |

| Country/ID | Mark | Classes | Reg. Owner | App. # | App. Dt | Reg. # | Reg. Dt | Allow. Dt | ITU |
|---|---|---|---|---|---|---|---|---|---|
| | United States | | | | | | | | |
| 9117 | SEA-MONKEYS | 28 | HAROLD VON BRAUNHUT | 76135804 | 9/28/2000 | 2485247 | 9/4/2001 | | No |
| 9370 | INSTANT LIFE | 31 | TRANSCIENCE CORPORATION | 72161789 | 1/31/1963 | 769330 | 5/12/1964 | | No |
| 9332 | "SEA-MONKEYS" | 31 | HAROLD VON BRAUNHUT | 72161791 | 1/31/1963 | 769332 | 5/12/1964 | | No |
| 9331 | HATCHED EGG DESIGN | 31 | HAROLD VON BRAUNHUT | 72161790 | 1/31/1963 | 769331 | 5/12/1964 | | No |
| 9229 | OCEAN-ZOO | 16 | HAROLD VON BRAUNHUT | 76137530 | 9/29/2000 | 2509518 | 11/20/2001 | | No |
| 9328 | X-RAY SPEX | 28 | TRANSCIENCE CORPORATION | 72455190 | 4/20/1973 | 1003937 | 2/4/1975 | | No |
| 9327 | INSTANT PETS | 31 | TRANSCIENCE CORPORATION | 72456406 | 5/3/1973 | 999873 | 12/17/1974 | | No |
| 8964 | TC & DESIGN | 31 | TRANSCIENCE CORPORATION | 72452952 | 3/29/1973 | 999872 | 12/17/1974 | | No |

# TRANSCIENCE CORPORATION - DOCKET

Report Date: 5/31/2007    Page: 2

| Item Dt | Due Dt | Action | Mark | Country | Classes | Application # | Registration # | Status | Client | ID |
|---|---|---|---|---|---|---|---|---|---|---|
| 7/4/2012 | 7/4/2012 | Renewal | SEA-MONKEYS | South Africa | 31 | 72/3452 | 1972/03452 | Registered | TRANSCIENCE CORPORATION | 8791 |
| 12/19/2012 | 12/19/2013 | Renewal | SEA-MONKEYS | South Korea | 31 | 2002-0027346 | 0569293 | Registered | YOLANDA VON BRAUNHUT | 8794 |
| 6/14/2009 | 6/14/2010 | Use Required | SEA-MONKEYS | Spain | 31 | 756685M | 756685M | Registered | TRANSCIENCE CORPORATION | 8795 |
| 6/14/2014 | 6/14/2014 | Renewal | SEA-MONKEYS | Spain | 31 | 756685M | 756685M | Registered | TRANSCIENCE CORPORATION | 8795 |
| 11/6/2009 | 11/6/2010 | Use Required | SEA-MONKEYS | United Kingdom | 31 | 967346 | 967346 | Registered | TRANSCIENCE CORPORATION | 8796 |
| 5/6/2015 | 11/6/2015 | Renewal | SEA-MONKEYS | United Kingdom | 31 | 967346 | 967346 | Registered | TRANSCIENCE CORPORATION | 8796 |
| 11/12/2013 | 5/12/2014 | Renewal Prior Nov 16, 1989 | HATCHED EGG DESIGN | United States | 31 | 72161790 | 769331 | Registered | YOLANDA VON BRAUNHUT | 9331 |
| 5/12/2014 | 11/12/2014 | Renewal Prior Nov 16, 1989 Ext #1 | HATCHED EGG DESIGN | United States | 31 | 72161790 | 769331 | Registered | YOLANDA VON BRAUNHUT | 9331 |
| 11/12/2013 | 5/12/2014 | Renewal Prior Nov 16, 1989 | "SEA-MONKEYS" | United States | 31 | 72161791 | 769332 | Registered | YOLANDA VON BRAUNHUT | 9332 |
| 5/12/2014 | 11/12/2014 | Renewal Prior Nov 16, 1989 Ext #1 | "SEA-MONKEYS" | United States | 31 | 72161791 | 769332 | Registered | YOLANDA VON BRAUNHUT | 9332 |
| 11/20/2010 | 11/20/2011 | Renewal | OCEAN-ZOO | United States | 16 | 76137530 | 2509518 | Registered | YOLANDA VON BRAUNHUT | 9329 |
| 6/17/2014 | 12/17/2014 | Renewal Prior Nov 16, 1989 | INSTANT PETS | United States | 31 | 72456406 | 999873 | Registered | TRANSCIENCE CORPORATION | 9327 |
| 12/17/2014 | 6/17/2015 | Renewal Prior Nov 16, 1989 Ext #1 | INSTANT PETS | United States | 31 | 72456406 | 999873 | Registered | TRANSCIENCE CORPORATION | 9327 |
| 8/4/2014 | 2/4/2015 | Renewal Prior Nov 16, 1989 | X-RAY SPEX | United States | 28 | 72455190 | 1003937 | Registered | TRANSCIENCE CORPORATION | 9328 |
| 2/4/2015 | 8/4/2015 | Renewal Prior Nov 16, 1989 Ext #1 | X-RAY SPEX | United States | 28 | 72455190 | 1003937 | Registered | TRANSCIENCE CORPORATION | 9328 |
| 5/12/2014 | 11/12/2014 | Renewal Prior Nov 16, 1989 | INSTANT LIFE | United States | 31 | 72161789 | 769330 | Registered | TRANSCIENCE CORPORATION | 9370 |
| 11/12/2013 | 5/12/2014 | Renewal Prior Nov 16, 1989 | INSTANT LIFE | United States | 31 | 72161789 | 769330 | Registered | TRANSCIENCE CORPORATION | 9370 |
| 9/4/2010 | 9/4/2011 | Renewal | SEA MONKEYS | United States | 28 | 76136804 | 2485247 | Registered | YOLANDA VON BRAUNHUT | 9117 |
| 6/17/2014 | 12/17/2014 | Renewal Prior Nov 16, 1989 | TC & DESIGN | United States | 31 | 72452952 | 999872 | Registered | TRANSCIENCE CORPORATION | 8664 |
| 12/17/2014 | 6/17/2015 | Renewal Prior Nov 16, 1989 Ext #1 | TC & DESIGN | United States | 31 | 72452952 | 999872 | Registered | TRANSCIENCE CORPORATION | 8664 |

# EXHIBIT C

## LICENSED COPYRIGHTS

(The following copyrights, in addition to all copyrights referred to in Exhibit A)

1.   von Braunhut Copyright – "Its Fun to Raise Pet Sea-Monkeys Instruction Handbook".

**EXHIBIT D**

**LICENSED PATENTS**

(The following patents, in addition to all patents referred to in Exhibit A)

1.      U.S. Patent No.

United States Patent: 6416217

Page 1 of 10



**United States Patent**                                    6,416,217
**Von Braunhut**                                          July 9, 2002

## Aquarium watch

### Abstract

A timepiece has a removably attachable aquarium adapted to support aquatic life. Living aquatic pets are introduced into the aquarium prior to attaching the aquarium to the timepiece. A wearer of such timepiece is then able to contemporaneously tell time and enjoy watching the living aquatic pets. A kit is also provided with a timepiece, an aquarium and aquatic life adapted to be supported in said aquarium.

Inventors: **Von Braunhut; Harold** (Bryans Rd., MD)
Appl. No.: **09/761,366**
Filed:      **January 16, 2001**

| | |
|---|---|
| **Current U.S. Class:** | **368/278** ; 368/10; 368/223; 368/226; 368/285; 368/62; 368/67 |
| **Current International Class:** | G04B 47/04 (20060101); G04B 47/00 (20060101); G04B 037/00 (); G04B 037/12 () |
| **Field of Search:** | 368/10,62,65,67,76,77,80,116,223-227,240,278,285 |

### References Cited [Referenced By]

#### U.S. Patent Documents

| | | |
|---|---|---|
| 410808 | September 1889 | Schelker |
| 947937 | February 1910 | Porter |
| 1006965 | October 1911 | Matalene |
| 2746237 | May 1956 | Anderson |
| 4945523 | July 1990 | Lam |
| 5272681 | December 1993 | Lee |
| 5305292 | April 1994 | Reynoso |

United States Patent: 6416217

| | | |
|---|---|---|
| 5652736 | July 1997 | Lee |
| 5751667 | May 1998 | Nunes |
| 5850373 | December 1998 | Lee |
| 5923623 | July 1999 | Lee |

*Primary Examiner:* Martin; David
*Assistant Examiner:* Lindinger; Michael L.
*Attorney, Agent or Firm:* Katten Muchin Zavis Rosenman

---

### *Claims*

---

I claim:

1. A wristwatch comprising:

a) a watch face, and

b) an aquarium removably attached to said watch face,

c) wherein said aquarium further comprises a plug member adapted to permit the introduction of aquatic life into said aquarium and further adapted to seal said aquatic life within said aquarium.

2. A wristwatch in accordance with claim 1, wherein said plug member is positioned adjacent said watch face when said aquarium is attached to said watch face.

3. A wristwatch in accordance with claim 1, wherein said aquarium is rotatingly removably attached to said watch face.

4. A wristwatch in accordance with claim 1, wherein said watch face further comprises a time display.

5. A wristwatch in accordance with claim 4, wherein said time display is digital.

6. A wristwatch in accordance with claim 4, wherein said time display is viewable through said aquarium when said aquarium is attached to said watch face.

7. A wristwatch in accordance with claim 4, wherein said time display is viewable through said aquarium when said aquarium is attached to said watch face and filled with aquatic life.

8. A wristwatch in accordance with claim 1, further comprising aquatic life adapted for insertion into said aquarium.

9. A wristwatch in accordance with claim 8, wherein said aquatic life is hybrid brine shrimp.

10. A wristwatch in accordance with claim 8, further comprising a transport member adapted to introduce said aquatic life into, and remove said aquatic life from, said aquarium.

11. A wristwatch in accordance with claim 1, further comprising a decorative element adapted for insertion between said aquarium and said watch face.

United States Patent: 6416217

12. A wristwatch in accordance with claim 11, wherein said decorative element is a phosphorescent disc.

13. A wristwatch in accordance with claim 4, further comprising an interchangeable watch face.

14. An aquarium watch system comprising:

a) a wristwatch,

b) an aquarium removably attachable to said wristwatch,

c) a transport member for introducing aquatic life into said aquarium.

15. An aquarium watch system in accordance with claim 14, wherein said aquarium further comprises a plug member adapted to permit the introduction of aqueous fluid into said aquarium and further adapted to seal said aqueous fluid within said aquarium.

16. An aquarium watch system in accordance with claim 15, further comprising aquatic life adapted to survive in said aquarium.

17. An aquarium watch system in accordance with claim 16, wherein said aquatic life is adapted to survive for at least 12 hours in said aquarium.

18. An aquarium watch system in accordance with claim 16, wherein said aquatic life is hybrid brine shrimp.

19. An aquarium watch system in accordance with claim 16, further comprising means for coloring said aquatic life.

20. An aquarium watch kit comprising:

a) a watch for telling time,

b) an aquarium removably attachable to said watch, said aquarium adapted to support aquatic life,

c) aquatic life adapted to survive in said aquarium,

d) a water purifier for preparing a separate living environment for said aquatic life,

e) growth food for nourishing said aquatic life, and

f) a transport member adapted to transport said aquatic life between said separate environment and said aquarium.

21. A method in accordance with claim 20, wherein said growth food further comprises coloring means for imparting color to said aquatic life.

22. A method in accordance with claim 21, wherein said coloring means further comprises dried algae.

23. A method of contemporaneously telling time and enjoying aquatic pets, comprising the steps of:

a) providing a timepiece having a time display,

b) providing an aquarium constructed for removable attachment to said timepiece, said aquarium having a plug member adapted to permit the introduction aquatic pets into said aquarium and further adapted to seal said aquatic pets within said aquarium, and

c) introducing aquatic pets into said aquarium.

24. A method in accordance with claim 23, further comprising the step of attaching said aquarium to said timepiece.

25. A method in accordance with claim 23, wherein said time display is viewable through said aquarium when said aquarium is attached to said timepiece.

26. A method in accordance with claim 23, wherein said aquarium is further rotatably attachable to said timepiece.

27. A method in accordance with claim 23, further comprising the step of introducing a phosphorescent element to said timepiece or said aquarium for illuminating said timepiece or said aquarium.

28. A combination timepiece and aquarium comprising:

a) a timepiece having a time display, and

b) an aquarium removably attached to said timepiece,

c) wherein said aquarium further comprises a plug member adapted to permit the introduction of aquatic life into said aquarium and further adapted to seal said aquatic life within said aquarium.

29. A combination timepiece and aquarium in accordance with claim 28, wherein said aquarium is rotatingly removably attached to said timepiece.

30. A combination timepiece and aquarium in accordance with claim 28, wherein said timepiece is adapted to be worn on a human wrist.

31. A combination timepiece and aquarium in accordance with claim 28, wherein said timepiece is adapted to be carried in a user's pocket.

32. A combination timepiece and aquarium in accordance with claim 28, further comprising aquatic life adapted for insertion into said aquarium.

33. A combination timepiece and aquarium in accordance with claim 32, wherein said aquatic life is hybrid brine shrimp.

34. A combination timepiece and aquarium in accordance with claim 28, further comprising a transport member adapted to introduce said aquatic life into, and remove said aquatic life from, said aquarium.

35. A combination timepiece and aquarium in accordance with claim 28, further comprising a decorative element provided on said timepiece or said aquarium for modifying the appearance of said combination timepiece and aquarium.

# TRANSCIENCE CORPORATION - DOCKET

Report Date:  5/31/2007   Page:  1

| Rem. Dt | Due Dt | Action | Mark | Country | Classes | Application # | Registration # | Status | Client | ID |
|---|---|---|---|---|---|---|---|---|---|---|
| 7/12/2014 | 7/12/2014 | Use Required | SEA-MONKEYS (STYLIZED) | Argentina | 29 | 2,211,676 | 1,744,137 | Registered | TRANSCIENCE CORPORATION | 9372 |
| 1/12/2009 | 7/12/2009 | Renewal | SEA-MONKEYS (STYLIZED) | Argentina | 29 | 2,211,676 | 1,744,137 | Registered | TRANSCIENCE CORPORATION | 9372 |
| 1/20/2010 | 7/20/2010 | Use Required | SEA-MONKEYS | Australia | 31 | 260449 | 260449 | Registered | TRANSCIENCE CORPORATION | 8784 |
| 1/20/2010 | 7/20/2017 | Renewal | SEA-MONKEYS | Australia | 31 | 260449 | 260449 | Registered | TRANSCIENCE CORPORATION | 8784 |
| 1/13/2007 | 1/13/2008 | Use Required | SEA-MONKEYS | Canada | 28, 31 | 1,117,342 | TMA630,098 | Registered | YOLANDA VON BRAUNHUT | 8786 |
| 7/13/2019 | 7/13/2020 | Renewal | SEA-MONKEYS | Canada | 28, 31 | 1,117,342 | TMA630,098 | Registered | YOLANDA VON BRAUNHUT | 8786 |
| 4/5/2016 | 10/5/2016 | Renewal | SEA-MONKEYS | Canada | 31, 35 | 1,046,688 | TMA552,029 | Registered | YOLANDA VON BRAUNHUT | 8785 |
| 10/5/2007 | 10/5/2007 | Use Required | SEA-MONKEYS | Canada | 31, 35 | 1,046,688 | TMA552,029 | Registered | YOLANDA VON BRAUNHUT | 8785 |
| 12/30/2006 | 6/30/2007 | Renewal | SEA-MONKEYS | European Union | 1, 31 | 000563155 | 000563155 | Registered | TRANSCIENCE CORPORATION | 8797 |
| 11/23/2012 | 11/23/2012 | Use Required | SEA-MONKEYS | European Union | 1, 31 | 000563155 | 000563155 | Registered | TRANSCIENCE CORPORATION | 8797 |
| 11/8/2010 | 11/8/2010 | Renewal | SEA-MONKEYS | France | 31 | 248.375 | 1.626.432 | Registered | TRANSCIENCE CORPORATION | 8787 |
| 11/8/2015 | 11/8/2015 | Use Required | SEA MONKEYS | France | 31 | 248.375 | 1.626.432 | Registered | TRANSCIENCE CORPORATION | 8787 |
| 12/31/2014 | 12/31/2015 | Use Required | SEA MONKEYS | Germany | 1, 5, 31 | T141143IWZ | 899238 | Registered | TRANSCIENCE CORPORATION | 8788 |
| 12/31/2010 | 12/31/2010 | Renewal | SEA-MONKEYS | Germany | 1, 5, 31 | T141143IWZ | 899238 | Registered | TRANSCIENCE CORPORATION | 8788 |
| 5/20/2008 | 5/20/2009 | Renewal | SEA-MONKEYS | Italy | 31 | 257299RM | 870677 | Registered | TRANSCIENCE CORPORATION | 8789 |
| 5/20/2008 | 5/20/2009 | Renewal | SEA-MONKEYS | Italy | 31 | 99C/002572 | | Registered | TRANSCIENCE CORPORATION | 9388 |
| 7/2/2012 | 7/2/2012 | Use Required | SEA-MONKEYS | Italy | 31 | 257299RM | 870677 | Registered | TRANSCIENCE CORPORATION | 8789 |
| 6/28/2008 | 6/28/2008 | Use Required | SEA-MONKEYS | Mexico | 31 | 0560762 | 753394 | Registered | TRANSCIENCE CORPORATION | 8793 |
| 2/10/2011 | 8/10/2011 | Renewal | SEA-MONKEYS | Mexico | 31 | 0500762 | 753394 | Registered | YOLANDA VON BRAUNHUT | 8793 |
| 2/10/2011 | 8/10/2011 | Renewal | SEA-MONKEYS | Mexico | 28 | 0500763 | 726034 | Registered | YOLANDA VON BRAUNHUT | 8792 |
| 11/30/2006 | 11/30/2007 | Use Required | SEA-MONKEYS | Mexico | 28 | 0500763 | 726034 | Registered | YOLANDA VON BRAUNHUT | 8792 |
| 6/9/2018 | 6/9/2018 | Renewal | SEA-MONKEYS | New Zealand | 31 | 277925 | 277925 | Registered | YOLANDA VON BRAUNHUT | 8790 |
| 6/9/2009 | 6/9/2009 | Use Required | SEA-MONKEYS | New Zealand | 31 | 277925 | 277925 | Registered | YOLANDA VON BRAUNHUT | 8790 |

36. A combination timepiece and aquarium in accordance with claim 35, wherein said decorative element is a phosphorescent disc removably attachable to said aquarium.

37. A combination timepiece and aquarium in accordance with claim 35, wherein said decorative element is an interchangeable timepiece face.

---

### *Description*

---

FIELD OF THE INVENTION

This invention relates to watches and aquariums in general, and more specifically to a combination watch and aquarium for housing and displaying living creatures.

BACKGROUND OF THE INVENTION

Kids love pets. For some children, pets serve as friends, confidants, items of affection and items of consolation. For other children, pets take the place of brothers or sisters they never had or will have.

One of the easiest types of pets to take care of are fish. Fish will generally live for a long time as long as they are fed regularly and provided with a clean and healthy environment. One example of an aquatic pet that has been providing children with years of enjoyment is the inventor's own Sea Monkeys.RTM..

Aquatic pets, however, tend to have one major drawback to providing round the clock enjoyment. They must be kept in a large tank sufficient to support their life. Such tank is usually stationary, kept in one particular location. Thus, children, and also some adults for that matter, are usually left to dreaming about fish playtime when sitting at school or congregating at a friend's house. Often times, children are left to fixate on their watch, counting down the hours, minutes and finally seconds until they can get back to playtime with the fishes.

There is a need, therefore, for a means to allow fish lovers and the like to enjoy their aquatic friends "round the clock," so to speak. Such need is met by the watch of the present invention, which is adapted to contain and display live aquatic pets while worn on the wrist of the user, while at the same time providing the user with the time of day. Such need is more particularly met by the watch system of the invention, which is provided with a watch and aquatic pet life adapted to be displayed in such watch.

The watch system of the present invention differs significantly from the prior art, which is limited to supporting and displaying ornamental life, not actual life. For example, U.S. Pat. No. 5,652,736 to Lee discloses a sealed, fluid-filled container detachably attached to a wristwatch for housing ornamental objects. Similarly, in U.S. Pat. No. 5,305,292 to Reynoso, the watch dials are immersed in a fluid adapted to contain ornamental floating articles such as fake divers and fake fish. Neither the Lee nor Reynoso aquatic environments are suitable for the introduction and continued support of aquatic pet life. Ornamental aquatic life in a timepiece is also displayed in U.S. Pat. Nos. 5,272,681 and 5,850,373 both to Lee.

OBJECTS OF THE INVENTION

It is an object of the present invention, therefore, to provide a watch that is constructed and adapted to support aquatic pet life.

United States Patent: 6416217

It is a further object of the present invention to provide a watch having an aquarium that is adapted to support aquatic pet life.

It is a still further object of the present invention to provide a watch having an aquarium whereby a user can view the time displayed on the watch through the living environment of the aquarium.

It is a still further object of the present invention to provide a watch having a detachable aquarium that is adapted for the introduction and removal of aquatic life therefrom.

It is a still further object of the present invention to provide a watch system having a time piece, a detachable aquarium and aquatic pet life adapted to be housed within said aquarium.

It is a still further object of the present invention to provide a life-supporting aquarium adapted for engagement with a wristwatch.

Still other objects and advantages of the invention will become clear upon review of the following detailed description in conjunction with the appended drawings.

SUMMARY OF THE INVENTION

A timepiece is provided with a removably attachable aquarium adapted to support aquatic life. The aquarium is provided with a plug that seals the aquarium and permits the introduction of aquatic life into the aquarium. Once aquatic life is introduced into the aquarium, the aquarium is attached to the timepiece and a wearer of such timepiece is then able to contemporaneously tell time and enjoy watching the aquatic life. A kit is also provided with a timepiece, an aquarium and aquatic life adapted to be supported in said aquarium.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is an exploded view of the aquarium watch of the present invention.

FIG. 2 illustrates the application of a water purifier to an aqueous environment in preparation for the introduction of aquatic life.

FIG. 3 illustrates the introduction of aquatic life to the purified aqueous environment of FIG. 2.

FIG. 4 illustrates aquatic life in an aqueous environment.

FIG. 5A illustrates the introduction of growth food to the aquatic life in an aqueous environment.

FIG. 5B illustrates the introduction of an alternative growth food to the aquatic life in an aqueous environment.

FIG. 6 is an assembled view of the aquarium watch of the present invention.

FIG. 7 illustrates the removal of the aquarium from the watch of FIG. 6.

FIG. 8 illustrates the use of a transport member to withdraw aquatic life from a separate, aqueous environment.

FIG. 9 illustrates the use of a transport member to introduce aquatic life into an aquarium.

FIG. 10 illustrates the attachment of an aquarium containing aquatic life to a timepiece.

FIG. 11 illustrates an aquarium containing aquatic life attached to a timepiece.

FIG. 12 is a kit containing the aquarium watch of the present invention.

FIG. 13 is an exploded view of an aquarium watch of the present invention with optional phosphorescent elements attachable thereto.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

The present inventor is also the owner of U.S. Pat. No. 3,673,986 and the creator of the Sea Monkey.RTM. phenomenon. For purposes of illustration and explanation, the inventor's own Sea Monkeys.RTM. will be used as an example of aquatic life or aquatic pets capable of being contained and displayed within the aquarium watch of the present invention. Clearly other aquatic life forms may be usable with the present invention. However, the use of Sea Monkeys.RTM. is preferable to other aquatic life because of their size, their constant movement and their history of providing children around the world with hours of entertainment.

The following detailed description is of the best mode or modes of the invention presently contemplated. Such description is not intended to be understood in a limiting sense, but to be an example of the invention presented solely for illustration thereof, and by reference to which in connection with the following description and the accompanying drawings one skilled in the art may be advised of the advantages and construction of the invention. In the various views of the drawings, like reference characters designate like or similar parts.

FIG. 1 is an exploded view of the aquarium watch 25 of the present invention, which comprises a timepiece 30 having a wrist strap 32 and a display 35, and an aquarium 40 attachable to said timepiece 30. For purposes of explanation, the timepiece 30 will be described as a wrist watch preferably having a digital display 35, although other portable timepieces such as stop watches, or analog time pieces such as pocket watches will be sufficiently operable. The aquarium 40 of the invention is generally hemispherical and is provided with an inner chamber 43 sealed between a dome-shaped upper surface 42 and a relatively flat lower surface 44. A plug member 45 is removably attachable to said lower surface 44 for permitting the introduction of aquatic life into said chamber 43 of said aquarium 40 and for sealing aquatic life within said chamber 43. Also, the aquarium 40 is preferably attached to the timepiece 30 so that the lower surface 44 is adjacent the time display 35 for contemporaneous viewing of the time and the inhabitants of the aquarium. However, it will be understood that the aquarium 40 could also attach to the side of the watch opposite. the display side (not shown), in which case the user could view the time on one side of the watch, and the inhabitants of the aquarium on the other side of the watch. Such an embodiment might be useful for individuals that wear watches with the display side adjacent their inner wrist.

As noted above, the inventor's own Sea Monkeys.RTM. will be used to demonstrate the use and enjoyment of the aquarium watch 25 of the present invention. In this regard, FIG. 12 illustrates a kit 20 containing an aquarium watch 25 as well as means to grow, nourish and manipulate aquatic life which will be displayed in such watch 25. Use of the components of the kit 20 of FIG. 12 will now be explained.

As shown in FIG. 2, a separate living environment, such as a drinking glass 50 or the like 50, is filled with an aqueous solution such as tap water 55. A water purifier and conditioner package 60 (contained

within the kit 20) is added to the water 55 to prepare the water 55 for introduction of aquatic life. The purifier 60 preferably contains materials, which when dissolved in the tap water 55 create the necessary environment in which the aquatic life, and in this case Sea Monkeys.RTM. or hybrid brine shrimp, will hatch and develop. The purifier 60 also contains a material to remove any harmful chemicals, such as chlorine contained in the ordinary tap water, chlorine being harmful to aquatic life, and in the case of Sea Monkeys.RTM. hybrid brine shrimp. The purifier package 60 may also contain some dried eggs of small aquatic life, such as, but not limited to, hybrid brine shrimp. In order to maintain the contents of the purifier package 60 in a dry moisture-free condition and thus inhibit premature hatching of the brine shrimp, a drying agent may be included therein. This dry mixture may be kept preferably in a moisture-proof package for an indefinite period of time with little or no loss of its properties.

After the tap water 55 has been purified, conditioned and aged as hereinbefore described, a second package 70 (contained within the kit 20 of FIG. 12) is added to the treated water 55 as shown in FIG. 3. The second package 70 contains additional salts for the maintenance of the required saline environment, food material such as yeast for the hatched and developing aquatic life, or in this case Sea Monkeys.RTM. or hybrid brine shrimp, as well as additional dried eggs of small marine life or hybrid brine shrimp. The brine shrimp will be viewable in the water 55 upon the introduction of the contents of the second package 70 to the environment 50, although such shrimp will appear very small and thus difficult to ascertain for at least a couple of days. The contents of the second package 70 are also preferably sealed in a moisture-proof container so that it may be kept dry for an indefinite period of time with little or no loss of its properties.

FIG. 4 illustrates aquatic life 75, and in this case Sea Monkeys.RTM. or hybrid brine shrimp, happily swimming and frolicking in its aqueous environment 50. In order to maintain and nourish the aquatic life 75 in its environment 50, the user may introduce a small amount of food from the food package 80 (contained within the kit 20) into the water 55 of the environment 50 as shown in FIG. 5A, preferably with the feeding spoon 90 contained within the kit 20 of FIG. 12. Alternatively, as shown in FIG. 5B, the user may introduce a food package 80A containing dried algae, which results in the appearance of colored aquatic life 75A upon the consumption of such food 80A. In this case, it is preferable, for example, if the aquatic life 75A appears red, which may highlight the presence of such aquatic life 75A against a dark background. The use of other additives that result in other colored appearances are also contemplated.

After the aquatic life 75 has been nourished and fed, they may be introduced into the aquarium 40 and viewed and enjoyed separately while in the aquarium 40. It is preferable if the aquarium 40 containing aquatic life 75 is attached to the timepiece 30 of the present invention, so that a user may also enjoy the aquatic life 75 while being able to tell time at the same time.

The introduction of aquatic life into the aquarium watch of the present invention will now be described in connection with FIGS. 6-11. It will be understood that the preceding discussion is specific to the cultivation of Sea Monkeys.RTM. or hybrid brine shrimp as used in connection with the kit of FIG. 12. However, it will also be understood that the aquarium watch of the present invention may be used with aquatic life other than Sea Monkeys.RTM. or hybrid brine shrimp. Thus, the introduction of aquatic life into the aquarium watch of the present invention as described in connection with FIGS. 6-11 will not necessarily be dependent on the use of the kit of FIG. 12 to cultivate and grow such aquatic life.

Prior to introducing aquatic life 75 into the aquarium 40, the aquarium must be separated and freed from the timepiece 30 as shown in FIGS. 6 and 7. If the aquarium timepiece of the present invention is sold in an assembled condition as shown in FIG. 6, then the aquarium 40 must be separated from the timepiece 30 as shown in FIG. 7. The aquarium 40 is preferably attached to the timepiece 30 by means of a bayonet-type lock, which is a fairly secure type of removable, rotatable interlock. Of course, other

connection methods may be used for attaching the aquarium 40 to the timepiece 30.

FIG. 8 illustrates the use of a transport member 100 to withdraw aquatic life 75 from its separate, aqueous environment 50, while FIG. 9 illustrates the use of said transport member 100 to introduce aquatic life 75 into the aquarium 40 of the invention. The transport member 100 has a bellows-type handle 105 which, when expanded as shown in FIG. 8, causes the aquatic life 75 and its aqueous environment 55 to be sucked through an opening 107 at the end of the transport member 100 opposite the handle 105 and into a transport chamber 108 between the handle 105 and opening 107. As shown in FIG. 8, the transport member 100 is then inserted into the aquarium 40 through the plug opening 46 and the handle 105 is compressed, forcing the contents of the transport chamber 108 into the aquarium 40. While the transport member 100 of the invention happens to be sold with the kit 20 of FIG. 12, other types of transport members may be used as desired to convey aquatic life 75 to the aquarium 40 of the invention.

Once the aquarium 40 is filled with aquatic life 75, the aquarium 40 is sealed with the plug member 45 and attached to the timepiece 30 as shown in FIGS. 10 and 11. The sealing of the aquarium 40 may result in the presence of an air bubble 110 near the top of the aquarium 40, which the aquatic life 75 can access if desired. After the aquarium 40 has been attached to the timepiece 30 as shown in FIG. 11, the user may view the time display 35 while contemporaneously watching the aquatic life 75 frolic around the aquarium 40. Thus, when asked the time of day, an owner of the aquarium watch of the present invention can either give the correct time indicated on the display 35, or exclaim with great wit, "half past a Sea Monkey.RTM.!"

Due to the limited space provided by the aquarium of the present invention, it may be necessary to return the aquatic life to their original environment for nourishment and oxygen after a certain period of time. The aquarium of the present invention is adapted to retain Sea Monkeys.RTM. or hybrid brine shrimp for a period of twelve hours before it becomes necessary to return them to their separate environment. Of course, this time period may vary depending on the size and quantity of aquatic pets held within the aquarium. For example, if it was desired to introduce a tadpole or the like into the aquarium, it may be necessary to return to the tadpole to a larger living environment after only a couple of hours, depending of course on the sizes of the tadpole and the aquarium.

FIG. 13 illustrates two possible methods for increasing the ability to view the contents of the aquarium 40. For example, a phosphorescent piece 46 may be snapped into the bottom surface 44 of the aquarium 40 to impart a glow to the aquarium 40 and its contents. Such piece 46 may be adapted to glow for a considerable period of time depending on its material composition and the extent to which such piece 46 is exposed to light. Such glow piece 46 is preferably configured and dimensioned for removable attachment to the aquarium 40, and more particularly the outer bottom surface 44 of the aquarium 40. Furthermore, depending on its material composition, the piece 46 may inhibit viewing of the time display 35 if and when the aquarium 40 is attached to the timepiece 30. Thus, the user of the invention may also be provided with the option of an interchangeable watch face 48, which is also preferably composed of phosphorescent material. Again, such phosphorescent material may be adapted to glow for a considerable period of time depending on its material composition, and preferably has a cutout for exposure of the time display 35 therethrough. The phosphorescent elements illustrated by way of example in FIG. 13 are particularly visually enhancing when used in conjunction with colored aquatic life as discussed in connection with FIG. 5B.

While FIG. 13 illustrates the addition of phosphorescent elements to the aquarium watch of the present invention, other viewing enhancements are contemplated. For example, the phosphorescent piece 46 may instead comprise a set of pieces having different colors or designs for creating unique visual environments. Thus, for example, the aquarium environment can be blue one day and red the next, or it

could be a solid color one day and stripped or dotted the next. Alternative watch faces 48 may also be used, with ornamental possibilities being endless. Also, while FIG. 13 illustrates the use of phosphorescent material, which provides a residual glow upon an exposure to an ambient light source, other illuminating elements may be introduced or added to certain aspects of the invention to create even greater visual effects. Thus, for example, a LED element may be provided between the aquarium 40 and timepiece 30 that illuminates the contents of the aquarium 40 and/or timepiece 30 upon the activation of a switch or the push of a button. Similarly, other static and dynamically powered devices may be incorporated into the aquarium watch of the invention to increase the viewing environment and overall enjoyment to the user.

While the present invention has been described at some length and with some particularity with respect to the several described embodiments, it is not intended that it should be limited to any such particulars or embodiments or any particular embodiment, but it is to be construed with references to the appended claims so as to provide the broadest possible interpretation of such claims in view of the prior art and, therefore, to effectively encompass the intended scope of the invention.

* * * * *

