**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____x
:
TRANSCIENCE CORPORATION &
YOLANDA VON BRAUNHUT (individual)     :
                        Plaintiffs     :
:
           -against-     :     Index No.:     13 CV 6642
:
:
BIG TIME TOYS, LLC     :
                Defendant.     :
_____ x


**MEMORANDUM of POINTS and AUTHORITIES**


**in SUPPORT of**


**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTIVE RELIEF**


*Plaintiffs Transcience Corporation & Yolanda von Braunhut*


February 18, 2014

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .……………………………………………………....…..3

PRELIMINARY STATEMENT .……………………………………………………......4

LEGAL BASIS FOR MOTION .……………………………………………………......4

BACKGROUND .……………………………………………………………….…...5

PLAINTIFFS' MOTION FOR INJUNCTIVE RELIEF SHOULD BE GRANTED….…………....6
    **A. Introduction**………………………………………………………….......6

    **B. Irreparable harm will likely be visited upon the Plaintiffs**
    **should the relief requested not be granted;** …………………………………….......8
        a.  Irreparable harm as related to the Plaintiff corporation………………………9
        b.  Irreparable harm as related to the individual named as a Plaintiff……………9

    **C. Plaintiffs will likely succeed on the merits;** ……………………………………12
        **1.** Defense of *force majeure* insufficient to excuse payment obligation …………..12
        **2.** Allegation of ambiguity is unfounded …………………………………….......13
            **i.** Placement of phrase in question in contract………………………….15
            **ii.** $4,500,000 + 500,000 = 5,000,000$………………………………………15
            **iii.** Separate costs incurred for the manufacture of pouches……………..16
            **iv.** Sole purpose of phrase is to modify the 2007 agreement…………….17
        **3.** Defendant's actions are inconsistent with its current posture……………..…….18
        **4.** To apply the trade secret pouch purchase payments to the
        Initial Purchase Price is in essence a contract without consideration…………..20

    **D. The presence of sufficiently serious questions going to the**
    **merits of the *defense* AND a balancing of the hardships tipping**
    **in favor of the Plaintiffs;** ………………………………………………….......23

    **E. The inapplicability of any equitable defenses** ………………………………….24

    **F. Security interest** …………………………………………………….…...25

CONCLUSION………………………………………………………………..…......26

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>                                                                                                          <u>Page(s)</u>

*Sonesta* International *Hotels* Corp. *v. Wellington Associates*,
483 F.2d 247 (2d Cir. 1973) ..…………………………………………….………...…6, 7, 23

*Hanson Trust PLC v. ML SCM Acquisition, Inc.*,
781 F.2d 264, 273 (2d Cir. 1986)...……………………………………….……………6

*Jack Kahn Music Co., Inc. v. Baldwin Piano &Organ Co.*,
604 F.2d 755, ;758 (2d Cir. 1979)...………………………………….………...6, 7

*Jackson Dairy, Inc. v. HP Hood*,
596 F.2d 70: (2d Cir. 1979) …………………...…………………………...….7, 8

*Winter v. Natural Resources Defense Council*,
555 U.S.S.C. 7 (2008)...…………………………………………………………….. 7

*Southside Fair Housing Committee v. City of New York*,
928 F.2d 1336, 1354 (2d Cir.1991)…………………….………………………….7, 24

*Lottie Joplin Thomas Trust v. Crown Publishers, Inc.*,
592 F.2d 651, 655 & n.4 (2d Cir.1978)……………………….…………………8, 24

*King v. Innovation Books*,
976 F.2d 824 (1992) ……………………...……………………………...…….….8

*Tucker Anthony Realty Corp. v. Schlesinger*,
<u>888 F.2d 969</u>, 974-75 (2d Cir.1989);...……………………………………….…8

*Loveridge v. Pendleton Woolen Mills, Inc.*,
<u>788 F.2d 914</u>, 917-18 (2d Cir.1986)...……………………………….……….…..8

*Triebwasser & Katz v. American Tel. & Tel. Co.*,
<u>535 F.2d 1356</u>, 1359 (2d Cir.1976)…………………………………...……...…8

*JSG Trading Corp. Tray- Wrap, Inc.*,
9l7 F. 2d 75, 79 (2d Cir. l990) ……………………………………………….…..8

*Langham-Hill Petroleum, Inc. v. S. Fuels Co.*,
813 F.2d 1327 (4th Cir.1987)……………………………………………...…13

*N. Ind. Pub. Serv. Co. v. Carbon County Coal Co.*,
799 F.2d 265, 275 (7th Cir.1986)……………………………………….……..13

## <u>Rules</u>

Federal Rules of Civil Procedure (**FRCP**) Rule 65...…………………………….……4, 5, 25

## Preliminary Statement

**This memorandum is respectfully submitted to the United States District Court for the Southern District of New York on behalf of Plaintiffs Transcience Corporation & Yolanda von Braunhut (individual) in support of Plaintiffs' Motion for Preliminary Injunctive Relief.  This memorandum will petition the Court to GRANT the motion with particular attention toward**:

1. **the irreparable harm that will likely be visited upon the Plaintiffs should the relief requested not be granted;**

2. **the likelihood of success on the merits in the action by the Plaintiffs;**

3. **the presence of sufficiently serious questions going to the merits of the *defense* in the action AND a balancing of the hardships tipping in favor of the Plaintiffs; and**

4. **the inapplicability of any equitable defenses.**

## LEGAL BASIS FOR MOTION

Federal Rule of Civil Procedure 65 provides that a party may file a motion for a preliminary injunction.

### Rule 65:  Injunctions and Restraining Orders

(a) Preliminary Injunction.
  (1) *Notice.* The court may issue a preliminary injunction only on notice to the adverse party.
  (2) *Consolidating the Hearing with the Trial on the Merits.* Before or after beginning the hearing on a motion for a preliminary injunction, the court may advance the trial on the merits and consolidate it with the hearing. Even when consolidation is not ordered, evidence that is received on the motion and that would be admissible at trial becomes part of the trial record and need not be repeated at trial. But the court must preserve any party's right to a jury trial.

(c) Security. The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained. The United States, its officers, and its agencies are not required to give security.

(d) Contents and Scope of Every Injunction and Restraining Order.
  (1) *Contents.* Every order granting an injunction and every restraining order must:
    (A) state the reasons why it issued;
    (B) state its terms specifically; and
    (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required.
  (2) *Persons Bound.* The order binds only the following who receive actual notice of it by personal service or otherwise:
    (A) the parties;
    (B) the parties' officers, agents, servants, employees, and attorneys; and

(C) other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B).

(f) Copyright Impoundment. This rule applies to copyright-impoundment proceedings.

## **BACKGROUND**

Plaintiffs are the owners of the US trademarked and US copyrighted intellectual property entitled Sea-Monkeys®.  This action, alleging trademark infringement *inter alia*, was commenced by Plaintiffs against the Defendant on September 19th of 2013.  Plaintiffs brought the suit to stop the Defendant from selling Plaintiffs' Sea-Monkeys® product and for the recovery of profits unjustly obtained by Defendant at Plaintiffs' expense.  Defendant had previously sold the trademarked and copyrighted product under a prior license but continued (*and continues*) to sell the product after the license was terminated pursuant to the terms of the license.

Plaintiffs duly served the Summons and Complaint on Defendant in October of 2013.  Defendant requested an extension of time with which to answer and Plaintiffs agreed to such.  The Plaintiffs and Defendant attempted to settle the matter independent of court intervention on several occasions but were unsuccessful.

Defendant filed an Answer on November 25th of 2013.  Plaintiffs filed an Amended Complaint on December 13th of 2013.  Defendant filed an Answer to the Amended Complaint on January 6th of 2014.

Plaintiffs requested and the Court granted a pre-motion conference on February 11th upon which to discuss a motion seeking preliminary relief.  At the pre-motion conference the Court granted Plaintiffs request to file the motion and fashioned a February 18th 2014 deadline upon which to file such.  The Plaintiffs now hereby petition the Court for an Order that will allow the Plaintiffs to profit from its intellectual property, forestall harm to Plaintiffs' intellectual property,

recover lost market share, prevent further immediate and ongoing harm to Plaintiffs' finances, and, most importantly, prevent irreparable harm from occurring to the Plaintiffs.

The Plaintiffs petition the Court for an Order, effective for the duration of the current action, preventing the Defendant from continuing to sell Plaintiffs' US trademarked Sea-Monkeys® product.

<u>ARGUMENT</u>
<u>PLAINTIFFS' MOTION FOR INJUNCTIVE RELIEF SHOULD BE GRANTED</u>

**A. _Introduction_;**

Preliminary injunctive relief is an extraordinary form of relief that will only be issued after careful consideration by a court of the facts of a case and conformity of such to a short list of settled principles of law.  Equitable relief has its origins in the Court of Chancery in England and Wales dating back to about the time of King Henry VII and was developed to address shortfalls in the strict and sometimes harsh application of legal or monetary remedies.[1]

The law on standards for granting or denying preliminary injunctions varies among the several circuits of the district courts of the United States.  The Second Circuit has settled upon the "two alternative tests" approach as enunciated by the United States Court of Appeals, Second Circuit in the holding of _Sonesta Int'l Hotels Corp. V. Wellington Associates_, 483 F.2d 247 (**2d** Cir. 1973).  _Sonesta_ requires the moving party after first showing irreparable harm, to show _either_ likelihood of success on the merits OR "sufficiently serious questions going to the merits "AND a balance of harms "tipping strongly in plaintiff's favor." see _Hanson Trust PLC v. ML_ **SCM** _Acquisition, Inc.,_ 781 F.2d 264,273 (2d Cir. 1986); _Jack Kahn Music Co., Inc. v. Baldwin Piano &Organ Co_., 604 F.2d 755, ;758 (2d Cir. 1979).

---

[1] http://en.wikipedia.org/wiki/Equity_(legal_concept)

Rather than quoting the old Second Circuit rule as stated in *Sonesta International Hotels Corp.,* the following rule, established in 1979 by the Second Circuit's opinion in *Jackson Dairy, Inc. v. HP Hood* 596 F.2d 70: (2d Cir. 1979) was quoted in *Jack Kahn Music* as follows:

> Preliminary injunctive relief in this Circuit calls for a showing of "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief."[2]

The United States Supreme Court in *Winter v. Natural Resources Defense Council*, 555 U.S.S.C. 7 (2008) qualified the standards for the showing of irreparable harm for all the circuits in the year 2008.  In that case a preliminary injunction was issued after a finding in the initial courts that plaintiffs had satisfactorily showed the "possibility" of suffering irreparable harm. The majority opinion in *Winter* held that as an initial matter the "possibility" of irreparable harm for the issuance of a preliminary injunction is too lenient.  Plaintiffs must show that irreparable injury is "likely" in the absence of an injunction.  In the light of the foregoing, the Supreme Court reversed the decision below and vacated the preliminary injunction.  Parenthetically, the Supreme Court intimated that the same balancing factor requiring vacatur of the preliminary injunction would also bear on a challenge to any future permanent injunction.

Finally, the issuance of a preliminary injunction is subject to survival of any equitable defenses, most notably in the current instance, laches or equitable estoppel.  A party asserting the equitable defense of laches must establish both plaintiff's unreasonable lack of diligence under the circumstances in initiating an action, as well as prejudice from such a delay. *See Southside Fair Housing Committee v. City of New York,* 928 F.2d 1336, 1354 (2d Cir.1991) (citation

---

[2] Jack Kahn Music Co., Inc. v. Baldwin Piano &Organ Co., 604 F.2d 755, ;758 (2d Cir. 1979).

omitted); *Lottie Joplin Thomas Trust v. Crown Publishers, Inc.,* 592 F.2d 651, 655 & n. 4 (2d Cir.1978).[3]

**B.** ***Irreparable harm will likely be visited upon the Plaintiffs should the relief requested not be granted;***

Irreparable injury is one that cannot be redressed through a monetary award.  Where money damages are adequate compensation a preliminary injunction should not issue. *See id.; Tucker Anthony Realty Corp. v. Schlesinger,* 888 F.2d 969, 974-75 (2d Cir.1989); *Loveridge v. Pendleton Woolen Mills, Inc.,* 788 F.2d 914, 917-18 (2d Cir.1986); *Triebwasser & Katz v. American Tel. & Tel. Co.,* 535 F.2d 1356, 1359 (2d Cir.1976).[4]

> It is now familiar law in this Circuit that in order to obtain a preliminary injunction a party not only must make an appropriate showing with regard to the merits of the litigation, but also must show the likelihood of irreparable injury if the requested relief is not granted.[5]

The first gauntlet a movant must therefore traverse on the way toward the GRANT of preliminary injunctive relief is to make a clear showing to the court that irreparable harm will like**y** be visited upon the Plaintiffs should the relief requested not be granted.  As noted in the attached affidavit of the **CEO** of the *Transcience Corporation* the Plaintiffs are reliant on the Sea-Monkeys® product for their collective solvency.  As is noted, the Defendant in this case ceased to perform its payment obligation to Plaintiffs very abruptly.  Four days before payment was due on December 10th of the year 2012 the Defendant made a telephone call to the Plaintiffs to inform the Plaintiffs that the December payment would not be forthcoming.  There was no

---

[3] King v. Innovation Books; 976 F.2d 824 (1992)

[4] *JSG Trading Corp. Tray- Wrap, Inc.,* 9l7 F. 2d 75, 79 (2d Cir. l990)

[5] *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979)

written warning or written notice.  The sudden abbreviation of compensation severely compromised the financial posture of both *Transience* and its **CEO**, Yolanda Von Braunhut.

### a.   Irreparable harm as related to the Plaintiff corporation:

It is, admittedly lacking, at this point, to present a showing of irreparable harm as to the Plaintiff corporation at this stage of the litigation.  The Plaintiffs have not only been cut off from the monetary proceeds of ongoing sales of their Sea-Monkeys® product but have also been cut off from an accounting of the ongoing sales.  From its perspective the Plaintiffs have no data to suggest that the Sea-Monkeys® product is NOT as robust and lively as it was since the parties first became associated with each other in the year 2007 when gross annual sales of the previous year (2006) stood at 3.4 million dollars.  Both the short term and long term remedies for the Plaintiff corporation are therefore admittedly money damages, which after the lawsuit has run its course can be tabulated and assessed as against the Defendant.  That being said, the Plaintiffs reserve the right if evidence is produced during Discovery that shows that the Sea-Monkeys® product has suffered setbacks regarding its market share, shelf presence, or sales posture due to Defendant's mismanagement or neglect to bring forth a petition for injunctive relief on those grounds should the relief requested in this petition be denied.

### b.   Irreparable harm as related to the individual named as a Plaintiff:

The issue of whether or not irreparable harm is likely to occur should the relief requested not be granted needs to be also analyzed from the perspective of the individual named as a Plaintiff in the lawsuit.  The individual, namely Yolanda von Braunhut the **CEO** of the corporation, is notably not only the individual named in the current action but is also a party named, in addition to the corporation, in the contract made between the parties.  As noted in Yolanda's affidavit, the corporation is now, due to the actions of the Defendant, no longer able to

compensate her for her performance as **CEO**.  Yolanda is therefore quite directly dependent on the Sea-Monkeys® product for her continuing solvency.  As a result the harms that are likely to be visited upon her should the relief not be granted must be considered by the Court in determining whether or not to grant the relief.  As detailed in her affidavit, as attached to this petition for injunctive relief, it is clear that Yolanda will *likely* be harmed should the relief requested not be granted.

Yolanda has chronicled that she has not been able to pay the real estate taxes due on her residence.  Yolanda has provided in her affidavit how Charles County, MD addresses issues of tax arrears.  If the taxes which are due on September 30th of every year are not paid in full by the following March then a letter is sent to the owner of the property informing the owner of the arrears.  In April, if the arrears remain unpaid, Charles County places ads in the local media advertising a tax sale in May.  If the arrears are still unaccounted for by the second week of May the property will then be sold at auction.  Once a real estate transaction is completed by a *bona fide* purchaser for value it is not likely that the property can be retrieved.  Additionally, Yolanda has not made mortgage payments due on her property.  The process of foreclosure, though somewhat more protracted, will also ultimately lead to a non-retrievable loss.  Both of these issues if not dealt with in short order are therefore not only likely to lead to the loss of her property but WILL in fact lead to such loss.

The fiscal difficulty precipitated upon Yolanda is a direct product of the actions of the Defendant.  As is evident in the terms of the agreement between the parties, even if the Defendant did realize the first 5 million dollar "Initial Purchase Price" (and by no measure of means do the Plaintiffs sanction this notion of pure fiction) the Defendant would still be obligated to pay the Plaintiffs an "Additional Purchase Price" of 5 million dollars payable

monthly albeit over a longer installment period.  The Defendant, by all accounts, has completely withheld its entire payment obligation to the Plaintiffs.  This is akin to inducing submission by starvation.  This is a contingency for which the Plaintiffs not only did anticipate but one which they should NOT have had to anticipate.

Yolanda has also presented that she has issues relating to the health of her teeth that she has not been able to attend to since the Defendant decided to cease payment for use of Plaintiffs property.  She has also testified that her pet and her companion parrot, named Josephine, has health issues that have been unable to be addressed.  Moreover, she has brought forth credible testimony to the effect that her residence has been compromised relative to heat, electricity, and security.  As time has worn on she has now been reduced to applying for food stamps and for assistance to heat her home.  Her ability to survive has been and is being compromised.

These are all harms that not only have been visited but are continuing to be visited upon her personally with more yet on the way.  Plaintiffs will make the argument at trial to the trier of fact, in their call for punitive damages to be assessed as against the Defendant, that it is precisely because of the personal vulnerabilities of Yolanda that the Defendant had ceased to perform its payment obligation.  The cessation of payment was a strategy designed to revisit the terms of the contract in Defendant's power play to orchestrate a better deal.

The threshold question for the Court to decide as it relates to the nature of irreparable harm is whether or not the harm is likely to occur should the relief requested not be granted.  It is clear that while she has till now been able to withstand the sudden suspension of entitlement from her company's Sea-Monkeys® product that she faces a high likelihood of the occurrence of irreparable harm in the very near future.  Once her property is lost it is unlikely that she will be able to repurchase the property in the future even if she is successful in the current action and is

awarded substantial monetary compensation at a later date.  For all the aforementioned reasons, Yolanda, as the individual Plaintiff named in the current action, will more than likely suffer irreparable harm if the relief requested is not granted.

**C.  _Plaintiffs will likely succeed on the merits_;**

Defendant in the case currently before the Court was a previous holder of a license pursuant to a written contract to manufacture (in part) and sell Plaintiffs' US trademarked Sea-Monkeys® product.  Defendant breached the contract by failing to pay royalty payments.  The contract was terminated in accordance with terms provided for in the contract in the month of January of 2013.  Defendant through its own actions operated in such a way so as to unequivocally terminate the contract.  Defendant, however, continues to manufacture and sell Plaintiffs' US trademarked Sea-Monkeys® product.  Such continuance has prevented Plaintiff from forming and entering into contracts of significant monetary value with third parties.

The Defendant has set forth 2 primary defenses to the current action.  First, the Defendant claims the defense of _force majeure_ whereby outside factors had acted to temporarily excuse its payment obligation.  Second, and apart from the first, the Defendant makes an unfounded, and outrageous on its face, claim that it had already by the date of December 10th of the year 2012 satisfied its payment obligation to the Plaintiffs.

**1.   Defense of _force majeure_ insufficient to excuse payment obligation:**

The Defendant presents a defense of _force majeure_.  This defense can have the effect of delaying performance and forgiving non-performance during the duration of an external event.  It does not, however, have the effect of excusing performance.  Additionally, it cannot be successfully applied to delay or temporarily forgive non-payment unless the external event is such that it compromises the ability of the paying party to pay.  Plaintiffs allege that expansive and extensive Discovery of Defendant's fiscal posture at the time of the breach, relative not only

to the product in play here but to its business model at large, will show that the external event brought forth by the Defendant did not rise to a level that it seriously compromised the Defendant's ability to meet its contracted for obligation.

As is acknowledged in *Seaboard Lumber Company and Capital Development Company v.United States of America*; 308 F.3d 1283 decided in 2002 by the United States Court of Appeals, Federal Circuit:

> "Our sister circuits have held that government policies that affect the profitability of a contract but do not preclude performance should not be considered "acts of government" for force majeure clause purposes. *See, e.g., Langham-Hill Petroleum, Inc. v. S. Fuels Co.,* 813 F.2d 1327 (4th Cir.1987) (rejecting claim for relief under force majeure where the government of Saudi Arabia acted to cause a collapse in world oil prices, making a contract unprofitable for one party);
>
> *N. Ind. Pub. Serv. Co. v. Carbon County Coal Co.,* 799 F.2d 265 (7th Cir.1986) (holding that a government order denying a request from a utility to pass increased coal prices along to its customers did not excuse utility from a long-term contract to buy coal even though contract was unprofitable).
>
> "A force majeure clause is not intended to buffer a party against the normal risks of a contract." *N. Ind. Pub. Serv. Co.,* 799 F.2d at 275."

Even more importantly as discussed at length below, Defendant fictitiously presents to the Court (via Defendant's own deliberate misrepresentation of the agreement between the parties) that the Defendant had already paid the "Initial Purchase Price".  This argument of course renders the presentation of a defense of *force majeure* instantly moot.  How can you argue simultaneously that an external event interfered with your ability to pay and then also argue that you had already paid?

## 2.  __Defendant's allegation of ambiguity is unfounded__;

The Defendant attempts to proffer that there is a *bona fide* dispute of a material fact; that there is contained within the contractual agreement between the parties an ambiguity that has created the current impasse.  Defendant is primarily reliant, for its defense of the current action

and for its corruptible posture overall, upon a singular phrase that when taken out of context can be misconstrued to mean something that, when taken in context, it clearly does not. The Defendant, without remorse or apparent contemplation of the consequences, continues to present this untenable position.

As is noted in the record, the Defendant and the Plaintiffs entered into a contractual relationship in the year 2007. This contract was a license agreement whereby Defendant paid a 10% royalty of gross worldwide sales to Plaintiffs for the right to manufacture (in part), market, and sell Plaintiffs Sea-Monkeys® product. The 2007 contract gave the Defendant the option to purchase the Sea-Monkeys® intellectual property "at any time during the term of the Agreement" by tendering 5 million dollars to the Plaintiffs (the "Initial Purchase Price") where after a second 5 million dollars (the "Additional Purchase Price") would be paid out over a period of years. The parties modified the agreement in the year 2009 by agreeing to raise the monthly royalty payment to 20% of gross worldwide sales and by expressly agreeing to apply that royalty payment toward the "Initial Purchase Price". As noted throughout, the Sea-Monkeys® product is dependent upon a trade secret developed many years ago by the progenitor of the product, namely Harold von Braunhut. While many have tried to duplicate this secret formula none have succeeded. The secret formula permits the "sea monkey", a species of animal aquatic life, to immediately spring to life after long periods of arid dormancy. The control and maintenance of this trade secreted secret formula has always been in the domain of *Transcience*. The trade secret is used to produce pouches upon which the Sea-Monkeys® product is based. These pouches were sold to the Defendant as detailed in depth in both the 2007 and 2009 agreements.

Defendant proffers that the phrase "all payments hereunder" on page 4 of the 2009

Purchase Agreement and Amendment to License Agreement of paragraph 2.2 <u>Purchase Price</u>

infers that the payments made for the pouch payments should somehow be counted as royalty

payments and as such should be counted toward the realization of the "Initial Purchase Price".

**i.**     **<u>Placement of phrase in question in contract</u>**

<u>The phrase in question (in boldface) in the context of wherein it lies reads as follows:</u>

> **All payments hereunder** and under the License Agreement, including the Minimum
> Royalty, shall be a nonrefundable advance against any amounts due to Transcience and
> YvB.  It is expressly agreed that all such payments due on and after the Effective Date
> shall be applied to the payment of the Purchase Price.

This sentence however, appears at the tail end of Paragraph 2.2 (a) <u>Initial Purchase Price</u>

of the 2009 Amendment that details how the royalty payments in conjunction with an "Initial

Cash Payment" of $500,000 Purchase Price" shall be used to realize the "Initial Purchase Price"

of 5 million dollars.

<u>Paragraph 2.2 (a) Initial Purchase Price reads as follows:</u>

(a)     <u>Initial Purchase Price</u>.     Five Million Dollars ($5,000,000) of the Purchase Price (the
"Initial Purchase Price") shall be payable as follows:

(i)     $500,000 shall be paid upon execution of this Agreement (the "<u>Initial Cash</u>
<u>Payment</u>" . . . . .
and

(ii)     $4,500,000 shall be paid in the form of royalties payable under the License
Agreement, except that effective January 1, 2010, (x) the royalty rate under Section 4.A. of the
License Agreement shall be twenty percent (20%) and not ten percent (10%) . . . . .

**ii.**     **<u>4,500,000 + 500,000 = 5,000,000</u>**

Since it is a product of pure math that 500,000 + 4,500,000 equals the sum of 5,000,000

the Defendant is essentially and irrationally arguing that the payments made for the purchases of

the trade secreted pouches are considered to be a royalty payment.  As noted throughout, the Sea-

Monkeys® product is a toy like no other.  The product requires the utilization of a trade secret to

be brought to market.  A royalty, in accordance, with Merriam-**Webster Online**: Dictionary and Thesaurus, is "a payment to an author or composer for each copy of a work sold or to an inventor for each item sold under a patent."[6]  It is clear, without further inquiry, that the payments made for the pouches payable upon demand are separate and distinct from the royalty payments that were due monthly on the 10th.

Because 500,000 plus 4,500,000 equals 5,000,000, because the paragraph wherein it is placed is discussing the use of the royalty payments, and because, by no measure of means, can the payments made toward the purchase of the trade secreted pouches by construed as royalty payments it stands to all notions of logic and reason that the phrase "all payments hereunder" in the context of the paragraph to which it sits clearly and without question refers to all "royalty" payments hereunder or all "such" payments as the second sentence in the grouping intones.

### iii.    <u>Separate costs incurred for the manufacture of trade secret pouches</u>

The Sea-Monkeys® product is dependent upon the manufacture of trade secret pouches. The trade secret pouches upon which the Sea-Monkeys® product is based are manufactured exclusively by the Plaintiffs.  The 2007 License Agreement provided that the Licensors will continue to manufacture, produce, and sell (at a controlled and reduced cost) to the Licensee the trade secret pouches upon which the Sea-Monkeys® product is based.  The 2007 License Agreement provided that the Licensees would procure and otherwise produce other parts of the final Licensed Product, including but not limited to the water tank and packaging materials, from outside sources.  The cost of manufacture and production (including but not limited to labor, purchase of raw materials, and factory expenses) of the trade secret pouches upon which the Sea-Monkeys® product is based is incorporated into the price paid for the purchases of the pouches.

---

[6] http://www.merriam-webster.com/dictionary/royalty?show=0&t=1390942667

iv.     <u>**Sole purpose of phrase is to modify the 2007 agreement**</u>

The trade secret, as provided for in the 2007 and 2009 agreements, is held in escrow by Escrow Holder Sichenzia Ross Friedman Ference, LLP.  The 2007 License Agreement provided that the 10 million dollar purchase price would be realized in 2 segments; namely an initial lump sum 5 million dollar payment followed by an application of a 5% royalty payment per year from merchandising sales (and a per year percentage of entertainment related revenue) from that point thereafter until the remaining 5 million dollar sum was attained.  The 2007 License Agreement provided that after the first 5 million dollars was paid that the Licensor would release/reveal the trade secret formula to Licensee.

In May of the year 2009 Plaintiffs and Defendant modified their existing agreement as evidenced by "Purchase Agreement and Amendment to License Agreement".  The 2009 Amendment Agreement provided that Defendant Licensee "pay to the Licensor a royalty of twenty percent (20%) of 'Gross Sales' of Licensed Products sold by Licensee to third parties". The 2009 Amendment Agreement expressly provided that the royalty payments would be applied to the "Initial Purchase Price" to realize the first 5 million dollars of the 10 million dollar purchase price.  The 2009 Amendment Agreement "expressly agreed that all such payments due on and after the Effective Date shall be applied to the payment of the Purchase Price."

It is abundantly clear in the immediate context of Paragraph 2.2(a)1 of the 2009 Amendment and in the greater context of how the 2009 Agreement modifies the 2007 Agreement that the phrase "all payments hereunder" refers to "all royalty payments hereunder", or "all such royalty payments", or more abstractly "all such payments hereunder" ("such" referring to royalty payments since the phrase appears at the end of the paragraph where the application of royalty payments to the "Initial Purchase Price" is expressly addressed).

The Defendant in the current instance is pushing forth a deliberately nearsighted and feigned interpretation of the phrase.  It is notable that nowhere else in the contract is there even a hint that the pouch payments are to be applied to the "Initial Purchase Price".

### 3.   Defendant's actions are inconsistent with its current posture

Defendant's failure to provide without pause payments for the "Additional Purchase Price" indicates monetary malice and ill will.  Defendant on or about December 10th of the year 2012 abruptly stopped its payment of royalties to the Plaintiffs.  The contractual relationship between the parties provided for a 10 million dollar final purchase price.  Even if the first 5 million dollars were deemed to be realized by combining the royalty payments with the purchases made for the trade secreted pouches (noting that Plaintiffs deem such as nonsense) a second 5 million dollars, presumptively payable without hitch or delay, was still due.  Even if the Defendant could claim that the trade secret pouch purchase orders were to be counted toward the realization of the Initial Purchase Price (and they cannot) the Defendant would still be obligated to pay a royalty to realize the "Additional Purchase Price".  Such a transition from "Initial Purchase Price" rate of 20% to the "Additional Purchase Price" of 5% would be foreseeable and would/should be a seamless transition.  However, Defendant has not paid any monies whatsoever to Plaintiffs for over 1 year.  The lack of proffering monthly payment for the "Additional Purchase Price" (Plaintiffs noting again that the Defendant never realized the "Initial Purchase Price") is, by itself and independent of the breach relating to the non-payment of the "Initial Purchase Price", clear evidence of breach of contract by the Defendant on independent grounds.

The Defendant admits in its Answer to the Amended Complaint in paragraph 73 that it has not initiated "legal process of any sort against Plaintiffs between December 10th of the year 2012 and the current date."  If the Defendant in good faith did in fact believe that it had realized

the 5 million dollar "Initial Purchase Price" why then did it not initiate legal process to clarify such and further so to gain access and sole ownership of the trade secret?  The answer to such can be found in the Defendant's own admission that it "did Not pay to Plaintiffs 4.5 million dollars in the form of royalty payments" as revealed in paragraph 80 of Defendant's Answer.

It must be noted that Defendant's actions all throughout the period of impasse as presented to the Court both in the Amended Complaint and in Defendant's Answer reveal fatal inconsistencies with Defendant's assertion that the pouch payments were to be counted toward the realization of the "Initial Purchase Price".  Defendant does NOT dispute that it has NOT compensated Plaintiffs for continuing sales of Plaintiffs Sea-Monkeys® product over the past year.  If Defendant, in good faith (mindful that Plaintiffs assert that Defendant is lacking such), had operated under the misperception that the pouch payments were to be counted toward the "Initial Purchase Price" why then did not Defendant give advance notice to Plaintiffs that the "Initial Purchase Price" had been achieved and that beginning on December 10th 2012 the royalty payment would be adjusted to 5% from 20% from that point thereafter?  Why then after claiming that it had realized the "Initial Purchase Price" did not the Defendant make a demand to the Plaintiffs for the handover of the trade secret?  Why if Defendant is to claim that it has realized the "Initial Purchase Price" has it not proffered ANY payment for the "Additional Purchase Price"?

The answer to all these inquiries is simple and plain.  The evidence shows that the Defendant made no attempt to give written notice to the Plaintiffs of the lesser royalty payment pursuant to the "Additional Purchase Price".  The evidence shows that Defendant abruptly ceased making payments a few days before the December 10th due date.  The evidence indicates that the Defendant attempted to coerce the Plaintiffs into a new modification of their agreement.

The evidence shows that this was a deliberate breach performed in anticipation that it would lead to a better deal.  The Defendant performed in the manner it did to bully and to otherwise impose upon the Plaintiffs its desire to pay less than what it bargained.  The Defendant was aware that an interruption of the royalty payment would visit an immediate shock upon both *Transcience* and upon Yolanda personally.  The Defendant was hopeful that this shock would force the Plaintiffs to their knees and enable them to renegotiate the terms of the agreement.  Insofar as Defendant wished to visit a harm upon Plaintiffs they have succeeded.  As noted throughout, Plaintiffs have been harmed by measures of damage that will before long go beyond monetary compensation.

**4.   <u>To apply the trade secret pouch purchase payments to the Initial Purchase Price is in essence a contract without consideration;</u>**

The current situation is analogous to say a contract for the lease with an option to purchase an automobile from a car dealer.  For analogical purposes, payments of $62.50 a month for the lease of the car would be applied toward the initial purchase price of $5,000.  It is preposterous to subsume payments made toward the operation of the vehicle (referencing gasoline and, by relation, alluding to the trade secreted Sea-Monkeys® pouches) could or otherwise would ever be used to approach the contracted for initial purchase price of $5,000. This is true, of course, even if (as here) the car dealer operates, independent from its dealership, a gasoline station.

Furthermore, given this working analogy, the purchaser could, absurdly enough (and in the event that there were sufficient storage tanks available) simply purchase up front in advance $5,000 worth of gasoline that the purchaser could use for future anticipated operation of the vehicle.  In effect the purchaser would have purchased the car for free or maximally for the margin of profit derived solely from the sale of gasoline at current prices.  It is possible given

omnipresent inflation that the purchaser in this analogy may even glean a benefit of "less than free: should gasoline rise in price to threshold levels in the future.

       In the same way, Defendant is presenting that the payments made toward the purchases of the trade secreted Sea-Monkeys® packets are to be counted toward the "Initial Purchase Price" of 5 million dollars.  As noted previously, the 2009 modification of the 2007 agreement provided that royalty payments would from thereon after be applied toward the 5 million dollar "Initial Purchase Price".  If, and rather ridiculously, the payments made for the purchases of the trade secreted pouches were to be applied to the 5 million dollar "Initial Purchase Price" then Defendant could have, on the same day the contract came into effect, purchased from the Plaintiffs 5 million dollars worth of pouches.  This would amount to, in effect, purchasing the intellectual property for free or, as in relation to above, for maximally the margin of profit derived between the cost to manufacture the pouches and the amount received. It is conceivable, if the contract is misconstrued in this way, (given ubiquitous inflation) that with the purchase of this essential component of the Sea-Monkeys® product that Defendant could ultimately succeed in purchasing Plaintiffs intellectual property for "less than free".

       Such an abhorrent interpretation of the agreement between the parties is an agreement without consideration.  If therefore the agreement between the parties was as the Defendant is desperately attempting to present it to be the contract would fail on its face for lack of consideration.  Regardless, the Defendant would be prevented from exercising their pretended interpretation of the agreement between the parties by the doctrine of promissory estoppel. Promissory estoppel prevents one party from withdrawing a promise to perform made to a second party if the latter, as is the case here, has reasonably relied on that promise.

## SUMMARY LIKELIHOOD OF SUCCESS ON THE MERITS

The argument that Defendant had already paid the Initial Purchase Price fails on the first pass.  A clear, concise, contextual reading of the agreement between the parties puts this issue to rest with no further inquiry being necessary.  Defendant is risking the assessment of substantial punitive damages at trial by maliciously maintaining a position that Plaintiffs allege the Defendant knows and knew all along to be false.

Plaintiffs assert, and the evidence suggests, that Defendants have been insincere all along with respect to Defendant's assertion that the pouch purchases are to be applied to the "Initial Purchase Price".  The evidence before the Court illustrates clearly that the royalty payments and the payments made for the pouches were separate and distinct payments.  The evidence shows that the sole purpose of the phrase upon which the Defendant rests its defense, namely "all payments hereunder" is drafted so as to clarify that the 2009 amendment from thereon after applies all such royalty payments to the "Initial Purchase Price" of 5 million dollars.

The evidence before the Court shows that the contract between the parties was terminated due to non-payment by Defendant.  The evidence shows that the contract was unequivocally terminated in accordance with the terms of the contract.  The evidence shows that Defendant was given notice of default, that Defendant did not operate to cure the default, and that the contractual agreement was effectively annulled.  Defendant's belated assertion that the trade secret pouch purchase payments are to be somehow applied toward the "Initial Purchase Price" is fraudulent on its face.  The Defendant has conjured up the current impasse by relying on a deliberate misinterpretation.  Defendant willfully continues to maintain a position that it knows is false.  Defendant's position cannot be justified by the plain meaning of the contract.  There is, in fact, NO genuine issue of fact that would be required for a trier of fact to decide.  Defendant has

prevented and continues to prevent the Plaintiffs from profiting from its US trademarked Sea-Monkeys® product.

Central to the case is the determination that the payments made for the purchase of the trade secret pouches CANNOT be misconstrued as royalty payments.  The trade secret pouches upon which Plaintiff's trademarked Sea-Monkeys® product is based are manufactured exclusively by the Plaintiffs.  The payments made to Plaintiffs for these trade secret pouches do not visit a pure profit upon Plaintiffs.  The payments made for these trade secret pouches must account for the costs of labor and manufacturing of the pouches.  The royalty payments require no additional or ongoing outlay of expense to procure profit.  The royalty payments are a foundational aspect of the Sea-Monkeys® product that can be traced directly back to Harold von Braunhut himself.

**D.  The presence of sufficiently serious questions going to the merits of the *defense* AND a balancing of the hardships tipping in favor of the Plaintiffs**

Plaintiffs argue in the alternative that should, for whatever reason, the Court determine that Plaintiffs have not met their burden to show a likelihood of success on the merits that, most certainly, there are serious questions going to the merits of the *defense* of the Defendant and that a balancing of the hardships clearly tips in favor of the Plaintiffs.

This alternative option in the *Sonesta* test, as set forth above, is intended to give the court of first impression the discretion to act, in consideration of all the variables, where a determination of success on the merits is decidedly premature but the interests of Justice, relating to a balancing of the relative hardships, favors the GRANT of injunctive relief.  This option is most readily realized from the perspective of a defendant moving a court for injunctive relief in full realization of an ongoing and impending irreparable harm that will likely be visited on the moving party.

In the current instance, even if the Court is not convinced that the Plaintiffs will likely prevail on the merits at this early stage of the lawsuit it is clearly evident that the Defendant has NOT set forth a *prima facie* defense to the action.  The written contract between the parties had been terminated pursuant to its own terms.  This is readily apparent.  There is NO *bona fide* dispute or disagreement here.  It *is* evident on its face that the Defendant's 2 primary defenses are in fact mutually exclusive arguments that act in effect to cancel each other out.  As noted throughout, it is inherently hypocritical to argue simultaneously that an external event interfered with your ability to pay and then also argue that you had already paid.  There are therefore very serious questions going to the merits of the Defendant's position.

As set forth in the testimony proffered by Yolanda in her attached affidavit a balancing of the hardships clearly favors the issuance of preliminary injunctive relief.  The Defendant is a limited liability company that sells a variety of products and is not, by any measure of means, solely dependent upon their continuing misappropriation of the Plaintiffs' Sea-Monkeys® product.  The Plaintiffs, by every measure of means, ARE dependent on its Sea-Maoneys® product.  The issuance of preliminary injunctive will have a nominal effect upon the Defendant relative to the continuing hardships that the Plaintiffs have experienced and will continue to experience if the relief sought is not granted.

### E.  <u>The inapplicability of any equitable defenses</u>

A party asserting the equitable defense of laches must establish both plaintiff's unreasonable lack of diligence under the circumstances in initiating an action, as well as prejudice from such a delay. *See Southside Fair Housing Committee v. City of New York,* 928 F.2d 1336, 1354 (2d Cir.1991) (citation omitted); *Lottie Joplin Thomas Trust v. Crown Publishers, Inc.,* 592 F.2d 651, 655 & n. 4 (2d Cir.1978).

As detailed in her affidavit Yolanda sets forth testimony relating to how she has arrived to where she is today.  Her entire journey commencing from the Defendant's breach of contract in December of 2012 up to the present has been nothing short of nightmarish.  She has struggled each and every day to make it to the next.  She has been cut off from her primary source of sustainability upon which she, and her husband before he died, had come to rely upon since going back to the 1960's.  There is no such equivalent reliance by the Defendant.  The Sea-Monkeys® product is one of many toy products that the Defendant has sold over the years.  There is no prejudicial reliance here, no prior investments in the future of the product that are at risk, no good faith reliance whatsoever.  As is noted in the record, the Defendant did NOT initiate legal process to fully claim what it now claims it owns in defense.  Instead, the Defendant waited for the Plaintiffs to initiate legal action, knowing all along that Plaintiffs fiscal posture made it difficult to do so.

As is noted in her affidavit, Yolanda and her company have only just now been able to attain the posture necessary to request the relief they now seek.  Additionally, the inherent absurdity of the Defendant's defense position gave Yolanda cause to think that the Defendant would settle the matter.  The Defendant throughout the months of impasse would seemingly be open to settlement but would then contemptibly re-arrive at and return to its hostile and untenable misrepresentations.

**F.  Security interest**

A security given in compliance with FRCP Rule 65 (c) is NOT warranted in the current instance due to the uncontested fact that Defendant, regardless of how the Court should ultimately rule, is currently in possession of a sizable amount of money that it has withheld from the Plaintiffs over the course of the past year.  In the event of the grant of a preliminary

injunction, thereby permitting the Plaintiffs to reconnect to the profitably of their Sea-Monkeys®

product, the leftover litigation will address the amount and scope of the money damages

sustained by the Plaintiffs.  As such these damages that are yet to be itemized are in effect the

security interest that the Defendant has currently in its possession in the unlikely event that the

Defendant succeeds at trial.

Furthermore, and regardless with respect to how the action is finally adjudicated,

Plaintiffs have without question been reimbursed nowhere near the 10 million dollar amount that

the now terminated agreement between the parties had originally provided for.  This non-realized

amount can therefore be utilized as a security interest against any cross compensation that the

Court sees fit to employ.

## CONCLUSION

It is the position of the Plaintiffs, and a viewpoint that the Plaintiffs will set forth in great

detail at trial, that the Defendant performed a deliberate and calculated breach of the agreement

between the parties in an attempt to get a better deal.  There is, of course, nothing inherently

wrong or unethical with such a strategy.  When the strategy did not pan out however, the

Defendant should have walked away and left the Plaintiffs to fend for themselves.

Unfortunately, they did not.  There is currently no working agreement between the parties.

There is currently no working status quo.  A balancing of the equities shows that the harms

increase exponentially and irreparably on the side of the Plaintiffs with the simple unstoppable

progression of time.

Because there is no *bona fide* issue of fact in the current instance, if the Court is so

inclined, and pursuant to FRCP, Rule 65; "before or after beginning the hearing on a motion for

a preliminary injunction, the court may advance the trial on the merits and consolidate it with the

hearing".  It is noteworthy that the damages in the current instance are readily ascertainable from the record generated thus far; namely that the Defendant realizes a profit margin of between 30 to 40 percent (**see Exhibit A, paragraph 10**) of gross worldwide sales that were at 3.4M (**see Exhibit A, paragraph 16**) at the time Defendant first became associated with the Sea-Monkeys® product.  The Court therefore has a basis for the calculation of the full order of money damages.  Short of such consolidation, the Plaintiffs plead with the Court to GRANT the preliminary injunctive relief requested so that the Plaintiffs may return to a state of normalcy.

WHEREFORE, Plaintiffs respectfully request the following injunctive relief:

(1) The issuance of an Order of the Court, effective for the duration of this lawsuit, requiring that the Defendant BIG TIME TOYS, LLC, its agents, and assignee immediately cease selling, marketing, and/or producing any of Plaintiffs' trademarked and copyrighted products, including but not limited to Sea-Monkeys® Properties;

(2) The issuance of a preliminary injunction by the Court prohibiting any continuing use of Plaintiffs' trademarks or copyrights by the Defendant BIG TIME TOYS, LLC, its agents, and assignees for the duration of this lawsuit;

(3) and any such other and further relief as the Court may deem just and proper.

Respectfully Submitted,

By: _s/ William Timmons_
William Timmons, Esq.
25 Candee Avenue
Sayville, New York 11782
 (631) 750-5980

Attorneys for Plaintiffs
TRANSCIENCE CORPORATION &YOLANDA VON BRAUNHUT

Dated:  February 18, 2014