UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

| | | |
|---|---|---|
| TRANSCIENCE CORPORATION & | ) | Civil Action No. 13 CV 6642 |
| YOLANDA VON BRAUNHUT | ) | |
| (individual), | ) | |
| Plaintiffs, | ) | |
| -against- | ) | |
| | ) | |
| BIG TIME TOYS, LLC, | ) | |
| Defendant. | ) | |

------------------------------------------------------------x

---

### DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE RELIEF

---

Of Counsel and on the Brief:

    John A. Stone, Esq.

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................... ii

INTRODUCTORY STATEMENT ........................................ 1

OVERVIEW ....................................................... 2

LEGAL ARGUMENT ................................................ 6

POINT I

      PLAINTIFFS HAVE NOT DEMONSTRATED IRREPARABLE
      HARM ..................................................... 6

POINT II

      PLAINTIFFS' DELAY PRECLUDES THE GRANT OF
      INJUNCTIVE RELIEF ...................................... 10

POINT III

      BALANCING THE EQUITIES TIPS DECIDEDLY IN FAVOR
      OF DENIAL OF PLAINTIFFS' REQUEST FOR INJUNCTIVE RELIEF ... 11

POINT IV

      PLAINTIFFS HAVE NOT DEMONSTRATED A LIKELIHOOD
      OF SUCCESS ON THE MERITS ............................... 12

POINT V

      ASSUMING ARGUENDO THAT PLAINTIFFS ARE OTHERWISE
      ENTITLED TO AN INJUNCTION, AN INJUNCTION CANNOT
      BE AWARDED UNLESS AND UNTIL PLAINTIFFS PROMPTLY
      POST APPROPRIATE SECURITY ............................. 19

CONCLUSION ................................................... 20

## TABLE OF AUTHORITIES

Page

**Cases**

A.X.M.S. Corp. v. Friedman,
  948 F. Supp.2d 319 (S.D.N.Y. 2013)...........................7

Citibank, N.A. v. Citytrust,
  756 F.2d 273 (2d Cir.1985)................................10

Collagenex Pharmaceuticals, Inc. v. IVAX Corporation,
  375 F.Supp.2d 120 (E.D.N.Y. 2005)..........................7

Faiveley Transp. Malmo AB v. Wabtec Corp.,
  559 F.3d 110 (2d Cir. 2009)................................7

Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp.,
  25 F.3d 119 (2d Cir.1994).................................10

Jayaraj v. Scappini,
  66 F.3d 36 (2d Cir.1995)...................................7

Majorica, S.A. v. R.H. Macy & Co.,
  762 F.2d 7 (2d Cir.1985)..................................10

Nampa Classical Academy v. Goesling,
  2009 WL 2923069 (D.Idaho 2009).............................8

New York Progress And Protection PAC v. Walsh,
  733 F.3d 483 (2d Cir. 2013)................................1

Register.com, Inc. v. Verio, Inc.,
  356 F.3d 393 (2d Cir.2004).................................7

Rex Medical, L.P. v. Angiotech Pharmaceuticals (US), Inc.,
  754 F.Supp.2d 616 (S.D.N.Y. 2010)..........................7

Salinger v. Colting,
  607 F.3d. 68 (2d Cir. 2010)................................6

Sampson v. Murray,
  415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974).............7

Synergy Advanced Pharm., Inc. v. CapeBio, LLC,
  2010 WL 2194809 (S.D.N.Y. 2010)...............................7

Winter v. Natural Resources Defense Council,
  555 U.S. 7, 129 S.Ct. 365 , 172 L.Ed.2d 249 (2008)...........6

## Rules

Federal Rule of Civil Procedure 65(c) ........................19

## INTRODUCTORY STATEMENT

Defendant Big Time Toys, LLC files this brief in opposition to plaintiffs' Motion for a preliminary injunction.

> A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor and that an injunction is in the public interest.

New York Progress And Protection PAC v. Walsh, 733 F.3d 483, 486 (2d Cir. 2013).

First, plaintiffs have not demonstrated irreparable harm. Transcience Corporation admits it has suffered no such harm. Ms. von Braunhut's purported irreparable harm is based on her inability to pay her bills. As a matter of law, her supposed injuries do not constitute irreparable harm and they are far too removed from the Sea-Monkeys business to be grounds for a preliminary injunction. Additionally, plaintiffs' more than one year delay in filing their Motion makes clear there is no irreparable harm here.

Second, the balancing of the equities mandates that plaintiffs' Motion be denied. If injunctive relief is granted, Sea-Monkeys will be off the market. The business will stop. Valuable shelf space in mass retailers will be lost, likely never to be reclaimed. Plaintiffs' financial predicament will

not change.  The public interest will not be advanced by shutting down the Sea-Monkeys business.

Lastly, plaintiffs have not demonstrated a likelihood of success on the merits.  Defendant asserts multiple affirmative defenses in its Answer, including that *force majeure* excused performance and that it has paid the Initial Purchase Price of $5,000,000.  Defendant did not breach the agreements.

If the Court is inclined to grant plaintiffs' request for relief, they must be compelled to post appropriate security.

We respectfully submit, as explained more fully below, that plaintiffs' Motion for an injunction must be denied.

### OVERVIEW

On June 26, 2007, plaintiffs, as licensors, and defendant, as licensee, entered into a "License Agreement" granting defendant exclusive worldwide rights to "Sea-Monkeys" products and an option to purchase all such rights.  (Original Complaint, Ex. A).  "Sea-Monkeys" are brine shrimp, hatched from eggs[1] in a small aquarium tank, and sold as a toy/novelty item.  The Sea-Monkeys product (or "kit") contains two principal components; (i) a small plastic tank and related paraphernalia manufactured at defendant's direction in China; and (ii) a set of three "pouches" (each slightly larger than a sugar packet), one

---

[1]    The eggs can remain in a dormant state for many years.  They "hatch" when put in contact with water.

05-216.3  1651261.4

purporting to contain dormant "instant live eggs", another - "water purifier" and the third - "growth food", which plaintiffs manufactured in the U.S. and sold to defendant.   Under the License Agreement and Purchase Agreement, pouches manufactured by plaintiffs are shipped from the U.S. to defendant's manufacturer in China, inserted into kits and shipped to various countries for sale.   Defendant's principal U.S. customers for Sea-Monkeys are major mass retailers.   (O'Rourke Aff., paras. 3-8).

Effective May 1, 2009, the parties amended the License Agreement by entering into a "Purchase Agreement and Amendment to License Agreement" ("Purchase Agreement").   (Original Complaint, Ex. B).   Section 2.1 of the Purchase Agreement provides:

> [defendant] hereby exercises the [purchase option] . . . [defendant] hereby purchases from [plaintiffs] all right, title and interest, free of all liens, claims and encumbrances, in and to any and all of the Sea-Monkeys® Properties and Licensed Products, including Sea-Monkeys®, related assets and the goodwill of the business associated therewith, in exchange for the Purchase Price . . .

Defendant maintains that it is the beneficial and equitable owner (but not title holder) of all Sea-Monkeys properties. Defendant pays the $10,000,000 "Purchase Price" over time in the form of periodic payments (comprised of $5,000,000 of "Initial Purchase Price" and $5,000,000 of "Additional Purchase Price",

05-216.3  1651261.4

3

explained more fully below).   Fully executed, but undated, assignments of title to all of the Sea-Monkeys properties are held in escrow.  (Original Complaint, Ex. B, Sec. 3.2).

Once defendant's "Initial Purchase Price" payments total $5,000,000, among other things, titles to the Sea-Monkeys properties are required to be released by the escrow agent to defendant and defendant takes over the manufacture of the pouches.   The remaining $5,000,000 of "Additional Purchase Price" is paid over time in the form of a 5% royalty on sales.

By email dated November 14, 2012, defendant notified plaintiffs of a material disruption in its Sea-Monkeys business arising from the import/export of pouches manufactured by plaintiffs (explained more fully below).  (O'Rourke Aff., para. 12, Ex. B).  By email dated December 6, 2012, defendant advised plaintiffs that it would not be making a payment to plaintiffs in December 2012.   (O'Rourke Aff., para. 13, Ex. C).   In response, plaintiffs sent defendant a notice of default, dated December 20, 2012 (Amended Complaint, Ex. C), and a subsequent notice, dated January 18, 2013, declaring the contract terminated (Amended Complaint, Ex. D).

On January 22, 2013, defendant's counsel sent a letter to plaintiffs' counsel, stating:

> [Defendant ("BTT")] has reviewed the assertions in the [December 20, 2102 and January 18, 2013] Letters and disagrees that any default under the

05-216.3  1651261.4

4

[Purchase Agreement] or [License] Agreement has occurred. We call to your attention Section 2.2(a) of the [Purchase Agreement], which provides "All payments hereunder and under the License Agreement, including the Minimum Royalty, shall be a nonrefundable advance against any amounts due to Transcience and YvB. **It is expressly agreed that all such payments due on and after the Effective Date shall be applied to the payment of the Purchase Price.**" (Emphasis added). According to BTT's records, payments made by BTT to Ms. von Braunhut from May 1, 2009 through November 30, 2012 total in excess of the Initial Purchase Price of $5,000,000. We further call to your attention that recent actions taken by the United States Fish and Wildlife Service, as well as foreign governments, with respect to pouches supplied by Transcience Corporation, materially adversely affected BTT's ability to market and sell the products in certain markets. Such acts, we believe, constitute a force majeure of the type described in Section 20.G. of the [License] Agreement and give rise to other defenses. Accordingly, it is BTT's position that no default has occurred.

We further call to your attention that Transcience Corporation and Yolanda von Braunhut have chronically failed to comply with the [Purchase Agreement], particularly Section 5(c), with respect to the supply of pouches to BTT. Such failure constitutes a default under the [Purchase Agreement][2].

(Amended Complaint, Ex. E). Defendant has continued its Sea-Monkeys business.

Because plaintiffs repudiated the agreements, and will not release legal titles to the Sea-Monkeys properties to defendant, defendant has withheld payments to plaintiffs.

---

[2] Plaintiffs consistently failed to supply pouches to defendant on a timely basis, as required by the Purchase Agreement. These failures caused defendant to miss shipping deadlines to its customers. To avoid this problem, defendant over-ordered pouches from plaintiffs to minimize its dependence on them.

05-216.3  1651261.4                    5

On September 19, 2013, nine (9) months after the purported default, plaintiffs filed a Verified Complaint in this matter. About October 4, 2013, plaintiffs served the Complaint on defendant. On November 25, 2013, defendant filed its Answer. On December 13, 2013, plaintiffs filed an Amended Complaint. On January 6, 2013, defendant filed its Answer to the Amended Complaint. On January 29, 2014, more than one (1) year after the alleged default and termination of the agreements, and more than four (4) months after the Verified Complaint was filed, plaintiffs requested a pre-motion conference to discuss its proposed motion for injunctive relief.

### LEGAL ARGUMENT

### POINT I

### PLAINTIFFS HAVE NOT DEMONSTRATED IRREPARABLE HARM

Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.

Salinger v. Colting, 607 F.3d 68, 79 (2d Cir. 2010), citing, Winter v. Natural Resources Defense Council, 555 U.S. 7, 129 S.Ct. 365, 375-76, 172 L.Ed.2d 249 (2008).

A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction.

05-216.3  1651261.4

Faiveley Transp. Malmo AB v. Wabtec Corp., 559 F.3d 110, 118 (2d Cir. 2009).

"[F]inancial loss is not of itself sufficient to establish irreparable harm." Collagenex Pharmaceuticals, Inc. v. IVAX Corporation, 375 F.Supp.2d 120, 139 (E.D.N.Y. 2005). Indeed,

> the fact that an alleged harm can be remedied in money damages is the antithesis of irreparable harm, and such a fact requires that the Court not find an irreparable injury.

A.X.M.S. Corp. v. Friedman, 948 F. Supp.2d 319, 336 (S.D.N.Y. 2013); see also, Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 404 (2d Cir.2004) ("If an injury can be appropriately compensated by an award of money damages, then an adequate remedy at law exists, and no irreparable injury may be found to justify specific relief"); Jayaraj v. Scappini, 66 F.3d 36, 39 (2d Cir.1995) (quoting Sampson v. Murray, 415 U.S. 61, 90, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974), to hold that "[m]ere injuries, however substantial, in terms of money, time and energy ... are not enough"); Synergy Advanced Pharm., Inc. v. CapeBio, LLC, 2010 WL 2194809, *4 (S.D.N.Y. 2010)("irreparable harm by definition 'cannot be remedied by an award of monetary damages'").

Additionally, the alleged irreparable harm "must be shown to be 'actual and imminent, not remote or speculative,'" Rex Medical, L.P. v. Angiotech Pharmaceuticals (US), Inc., 754

F.Supp.2d   616,   621   (S.D.N.Y.   2010),   "conjectural   [or]

attenuated." *Nampa   Classical   Academy   v.   Goesling*, 2009   WL

2923069, *2 (D.Idaho 2009).

   *Transcience Corporation.*   Plaintiffs admit that irreparable

harm  to  Transcience  is  "lacking,  at  this  point"  and  that

Transcience's   "short   term   and   long   term   remedies"   are

"admittedly money damages . . ."  (Plaintiffs' Brief, p. 9).

   Plaintiffs have not established that Transcience will be

irreparably harmed if an injunction is not granted.

   *Ms.   von   Braunhut.*     If   Transcience   will   not   suffer

irreparable  harm  from  defendant's  continued  operation  of  the

business, it follows that Ms. von Braunhut will not as well.

   Ms. von Braunhut's claim of irreparable harm is essentially

that  she  cannot  pay  her  bills  because  she  has  been  unable  to

draw  a  salary  as  CEO  of  Transcience,  and  she  is  not  receiving

money  in  her  capacity  as  a  licensor.   More  specifically,  Ms. von

Braunhut  asserts  three  forms  of  irreparable  harm  –  namely  that

she might lose (i) her farm (from failure to pay property taxes,

mortgage  and  utility  bills),  (ii)  her  teeth  (from  inability  to

pay  for  dental  care),  and  (iii)  her  pet  bird  –  Josephine  (from

inability  to  pay  for  veterinary  care).    (No  disrespect  is

intended  here;  von  Braunhut  Aff.,  paras.  35-36,  55-57,  64-78).

Each  is  entirely  independent  of  defendant's  continued  conduct  of

the Sea-Monkeys business.  These "attenuated" harms can be cured

by money damages.   Granting the injunction will not eliminate them.   The harms are not legally irreparable.[3]

Plaintiffs have not shown and cannot establish that Ms. von Braunhut will be irreparably harmed if an injunction is not imposed.

*Granting   Injunctive   Relief   Will   Harm   the   Business.*
Conversely, granting injunctive relief will shut down the Sea-Monkeys business.   To be clear, enjoining defendant will not give plaintiffs the right to engage in the Sea-Monkeys business.[4] No one will be marketing and selling the product.   Valuable shelf space in mass retailers will be lost, likely never to be reclaimed,   resulting  in  a  material  adverse  effect  on  the business.   Finally, enjoining defendant from conducting the Sea-Monkeys business will not save Ms. von Braunhut's farm, teeth or bird.   It will not alleviate her personal financial plight.

Plaintiffs have not established irreparable harm.   Their Motion should be denied.

---

[3] It is noteworthy that defendant paid Ms. von Braunhut more than $5,000,000 over the 3-1/2 year period from May 1, 2009 to December 1, 2012.

[4] Plaintiffs' Brief states on page 5 that they petition the "Court for an  Order  that  will  allow  the  Plaintiffs  to  profit  from  its intellectual property . . . ."   We want to be sure that plaintiffs understand that if the injunction is granted, no one will be in the business until the case is resolved – a bizarre result for plaintiffs to be seeking.

05-216.3  1651261.4

POINT II

**PLAINTIFFS' DELAY PRECLUDES THE GRANT OF INJUNCTIVE RELIEF**

On December 20, 2012, plaintiffs sent defendant a notice of default under the License Agreement and Purchase Agreement (Amended Complaint, Ex. C). On January 18, 2013, plaintiffs sent defendant a letter declaring those agreements terminated (Amended Complaint, Ex. D). On September 19, 2013, nine (9) months after the alleged default, plaintiffs filed a Verified Complaint in this matter. On January 29, 2014, more than one (1) year after the alleged default and termination of the agreements (and more than four (4) months after the Verified Complaint was filed), plaintiffs requested a pre-motion conference to discuss its proposed motion for injunctive relief.

Delay is typically relevant to both irreparable harm and to laches (although the latter doctrine relates only to permanent relief). A district court should generally consider delay in assessing irreparable harm. See Majorica, S.A. v. R.H. Macy & Co., 762 F.2d 7, 8 (2d Cir.1985) (per curiam); see also Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp., 25 F.3d 119, 124-25 (2d Cir.1994); Citibank, N.A. v. Citytrust, 756 F.2d 273, 277 (2d Cir.1985). Most of the caselaw on this issue involves trademark and copyright disputes, where a presumption of irreparable harm

arises once a plaintiff establishes a likelihood of success on a claim[5].

Here, the more than one (1) year delay in seeking equitable relief is compelling evidence that there is no irreparable harm.

### POINT III

### BALANCING THE EQUITIES TIPS DECIDEDLY IN FAVOR OF DENIAL OF PLAINTIFFS' REQUEST FOR INJUNCTIVE RELIEF

Unlike a traditional infringement case, here defendant (to its knowledge) is the only company marketing and selling Sea-Monkeys, as it had been since about January 1, 2008.  The dispute centers on whether the contract that authorized defendant to market and sell remains in effect, not the authenticity of the product.

If defendant is enjoined from selling Sea-Monkeys, they will be off the market.  Enjoining defendant from selling would not entitle plaintiffs' to start selling.  Nor would an injunction alleviate Ms. von Braunhut's personal financial plight.

The absence of a showing of irreparable harm, the fact that an injunction will shut down the business, and the fact that it will do nothing to alleviate Ms. von Braunhut's financial

---

[5] Because this case centers on whether defendant has continued contract rights (not the authenticity of the product), and because it is the only person marketing and selling the product, presumptions of irreparable harm that arise in traditional infringement cases do not apply here.

05-216.3  1651261.4

11

plight, all dictate that the balance of the equities falls decidedly in defendant's favor.

<u>POINT IV</u>

**PLAINTIFFS HAVE NOT DEMONSTRATED A LIKELIHOOD OF
<u>SUCCESS ON THE MERITS</u>**

Defendant has asserted in its separate Motion (heard contemporaneously herewith) that plaintiffs' Amended Complaint fails to state claims for which relief may be granted and, therefore, must be dismissed. Defendant submits that equitable relief cannot be granted if the underlying Amended Complaint is dismissed.

In its Answer, defendant asserted affirmative defenses, among other things, denying that it has breached the agreements because its performance was temporarily excused by "*force majeure*" and asserting that it has paid the "Initial Purchase Price" under the Purchase Agreement. Contrary to plaintiffs' misunderstanding, these positions are not "mutually exclusive".[6]

*Force Majeure*. The Sea-Monkeys business suffered a material disruption in Fall 2012. By certified letter, dated October 25, 2012, the United States Fish and Wildlife Service ("USFWS") notified defendant that certain of its shipments were in violation of United States statutes and regulations.

---

[6]  The Purchase Agreement and License Agreement, including the *force majeure* clause, continue beyond the payment of the "Initial Purchase Price", through the payment of the "Additional Purchase Price". The parties' rights and obligations after the Initial Purchase Price is paid, however, are different.

05-216.3  1651261.4

(O'Rourke Aff., para. 9, Ex. A).  USFWS claimed that because the dormant eggs contained in the kits were a "living organism," they could not be imported into the U.S. without following special import/export rules.  USFWS impounded shipments of Sea-Monkeys in Illinois that were destined to Walmart.  Another shipment, destined to Toys-R-Us, was impounded in Los Angeles. These shipments were returned to China.  (O'Rourke Aff., paras. 9-17, Ex. B).

By email dated November 14, 2012, defendant notified plaintiffs of this disruption.  (O'Rourke Aff., para. 12, Ex. B).  Plaintiffs' representative, Dr. D'Agostino (of Montauk Marine Laboratory, recipient of lab fees defendant pays), reportedly replied, ". . . in 45 years of working with Sea-Monkey® related issues, [he] has never had any contact from USFWS."  (O'Rourke Aff., para. 12, Ex. B).  By email dated December 6, 2012, defendant advised plaintiffs that it would not be making a December 2012 payment.  (O'Rourke Aff., para. 13, Ex. C).  At that time, and for ensuing few months, defendant did not know whether it would be able to continue the Sea-Monkeys business at all.  To defendant's knowledge, the USFWS issues now appear to have been resolved.

Foreign regulatory agencies also banned the importation of the kits into certain European Union countries for the same reason asserted by USFWS.  As a result, in about May 2012,

05-216.3  1651261.4

13

defendant was required to return to China two containers of Sea-Monkeys products that were sitting in Italy.  Defendant remains precluded from shipping Sea-Monkeys into European Union countries, resulting in an estimated loss of about $500,000 of annual sales.

These regulatory actions caused significant disruption and expense to defendant.  Defendant asserts that these governmental actions met the *force majeure* provision in Section 20.G. of the License Agreement, which provides:

> G.   It is understood and agreed that, in the event of an act of the government . . ., or labor or manufacturing problems which prevent the performance by Licensee of the provisions of this agreement, such nonperformance by Licensee will not be considered a breach of this agreement, and such nonperformance will be excused while, but not longer than, the conditions described herein prevail.

Those actions were directed at defendant and, more specifically, the ability to import and export the pouches (and kits containing pouches) supplied by plaintiffs.[7]  The actions went to the heart of defendant's ability to continue the Sea-Monkeys business.  Defendant maintains that its performance under the agreements was temporarily excused.

Plaintiffs argue that *force majeure* would only excuse nonpayment if it is such that it "compromises the ability of the paying party to pay."  Plaintiffs offer no citations to support

---

[7] Cases cited by plaintiffs discussing force majeure in the context of general market conditions are clearly distinguishable.

05-216.3  1651261.4

14

that statement.   Plaintiffs further state in their brief that they will require "expansive and extensive Discovery [sic] of Defendant's fiscal posture at the time of the breach" to determine if defendant had the ability to make payments under the agreements.   (Plaintiffs Brief, p. 12-13).   Plaintiffs tacitly admit that discovery is needed to determine if *force majeure* excuses payment here.   They cannot simply speculate that future discovery might support their claim and, therefore, there is a likelihood of success.   Nonetheless, during the course of the business disruption, defendant did not have sufficient cash flow to pay its accounts payable in a timely fashion.   (O'Rourke Aff., para. 18).

The inability to ship product into the U.S. and European Union, based on unforeseen regulatory actions specifically directed at Sea-Monkeys eggs, are events squarely described in Section 20.G. of the License Agreement.   It is defendant who will likely succeed in showing that *force majeure* excused its performance.   Plaintiffs have not shown a "likelihood of success" on this issue.

*Payment of "Initial Purchase Price" in Full*.   Additionally, following the November 2012 disruption in the business, defendant reviewed the agreements to determine its rights and responsibilities, including its payment obligations.   If, as defendant asserts, the "Initial Purchase Price" was paid in

05-216.3  1651261.4

15

full, there would have been no payment due plaintiffs in December 2012 and there would be no breach of the Purchase Agreement. At that point, among other things, title to the Sea-Monkeys properties would be released from escrow and delivered to defendant, and defendant would no longer be obligated to purchase pouches from plaintiffs or pay supplemental laboratory fees.

Section 2.2 of the Purchase Agreement, which addresses payment of the Purchase Price, provides:

> Purchase Price. The total purchase price for the Licensed Property shall be $10,000,000, payable as follows (the "Purchase Price"):
>
> (a) Initial Purchase Price. Five Million Dollars ($5,000,000) of the Purchase Price (the "Initial Purchase Price") shall be paid as follows:
>
> (i) $500,000 shall be paid upon execution of this Agreement . . . , and
>
> (ii) $4,500,000 shall be paid in the form of royalties payable under the License Agreement, except that . . . the Minimum Royalty under Section 4.B. of the License Agreement shall be $750,000 . . . payable in twelve (12) equal monthly installments on or before the tenth (10th) day of each month . . . .
>
> **All payments hereunder and under the License Agreement, including the Minimum Royalty,** shall be a nonrefundable advance against any amounts due to Transcience and YvB. It is expressly agreed that **all such payments due on and after the Effective Date shall be applied to the payment of the Purchase Price.**" (Emphasis added).
>
> (b) Additional Purchase Price. The remaining Five Million Dollars ($5,000,000) of the Purchase Price (the "Additional Purchase Price") shall be

> payable as royalties, monthly, [at five percent (5%)
> of "Gross Sales" of Licensed Products, with a minimum
> annual royalty of $150,000].

As part of defendant's review, it added up all payments made by it under the Purchase Agreement and License Agreement.  Between May 1, 2009 (the "Effective Date" of the Purchase Agreement) and December 1, 2012, defendant paid plaintiffs Minimum Royalties in the amount of $3,014,190.43 (Purchase Agreement, Section 2.2(a)), for pouches it purchased in the amount of $2,015,746.96 (Purchase Agreement, Section 5(c)(iv)) and supplemental laboratory fees totaling $87,750 (Purchase Agreement, Section 5(f)).  (O'Rourke Aff., para. 20).  All such payments are under the Purchase Agreement and, when added together, exceed $5,000,000.  Despite the express words in the Purchase Agreement (in bold above), plaintiffs dispute that pouch payments and the supplemental laboratory fees are included in the computation of the Initial Purchase Price.

Under the Purchase Agreement (Section 5(c)(iv)), defendant pays $0.21 to plaintiffs for each pouch (a set of three (3) pouches (costing $0.63) is inserted into each kit).  Defendant estimates that the cost to produce each pouch should be no more than approximately $0.08.  Plaintiffs should earn a significant profit element from the sale of each pouch to defendant.  Payments for pouches are part of the cost of acquiring the business in much the same way purchasing inventory can be part

05-216.3  1651261.4

17

of a business asset acquisition.  Accordingly, pouch purchases should, and do, count as part of the Initial Purchase Price. Additional support for this understanding can be found in the facts that, once the "Initial Purchase Price" is paid, defendant takes over pouch manufacturing operations (it no longer purchases them from plaintiffs) and the supplemental lab fees terminate.  Plaintiffs are simply mistaken in thinking that the full $10,000,000 Purchase Price should be "profit", without delivering assets that have costs associated with them.

Again, relying upon the express words in the Purchase Agreement, all payments thereunder and under the License Agreement, meaning the Minimum Royalty, payment for pouches and lab fees, are applied to the payment of the Purchase Price.  It is also important to note that under the Purchase Agreement, defendant exercised the purchase option and the "Minimum Royalty" is applied dollar for dollar to the "Purchase Price" for the Sea-Monkeys properties.  Here, the "Minimum Royalty" is installment purchase price, and not really a "royalty" within the customary meaning of such term.

About 8 pages of plaintiffs' Memorandum of Points and Authorities (pages 13 - 22) are devoted to addressing the subject language in the Purchase Agreement.  If defendant's position is "untenable" or a "deliberately nearsighted and feigned interpretation of the phrase", plaintiffs should be able

05-216.3  1651261.4

to summarily dispose of it.   The fact that they cannot speaks volumes.

Plaintiffs have not demonstrated a likelihood of success on this issue and their Motion should be denied.

## POINT V

### ASSUMING ARGUENDO THAT PLAINTIFFS ARE OTHERWISE ENTITLED TO AN INJUNCTION, AN INJUNCTION CANNOT BE AWARDED UNLESS AND UNTIL PLAINTIFFS PROMPTLY POST APPROPRIATE SECURITY

Federal Rule of Civil Procedure 65(c) provides:

(c)  Security.  The  court  may  issue  a  preliminary injunction  or  a  temporary  restraining  order  only  if the  movant  gives  security  in  an  amount  that  the  court considers  proper  to  pay  the  costs  and  damages sustained  by  any  party  found  to  have  been  wrongfully enjoined  or  restrained.  The  United  States,  its officers,  and  its  agencies  are  not  required  to  give security.

Here, if the Court is inclined to grant plaintiffs' request, security is essential.   The Sea-Monkeys business will come to a halt.   It will be very difficult to resurrect, likely never to return to mass retail.   Transcience and Ms. von Braunhut have admitted that they have limited financial resources.   Whatever equity they purport to have in the Sea-Monkeys properties would be inadequate to compensate defendant if it is wrongfully enjoined.

The  Purchase  Price  under  the  Purchase  Agreement  is $10,000,000  ($5,000,000  already  paid  in  the  form  of  Initial Purchase Price, and the second $5,000,000 of Additional Purchase

05-216.3  1651261.4

19

Price to be paid over time).  Defendant asserts that, using the Purchase Agreement as a proxy, security in the amount of at least $5,000,000 would be proper to pay the costs and damages sustained by it if it is found to have been wrongfully enjoined.

### CONCLUSION

In view of the forgoing, plaintiffs' Motion for Injunctive Relief should be denied.  If the Court is inclined to grant such relief, security in the form of a $7,500,000 bond is essential.

**DeCOTIIS, FITZPATRICK & COLE, LLP**
*Attorneys for Defendant*
*Big Time Toys, LLC*

By: _____
    JOHN A. STONE, ESQ.

Dated:   March 4, 2014