# Exhibit A

JUDGE RAMOS

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

———————————————————————————— x

TRANSCIENCE &
YOLANDA VON BRAUNHUT (individual)
                   Plaintiffs

       -against-

BIG TIME TOYS, LLC
                Defendant.

———————————————————————————— x

**13 CV 6642**

Index No.:

**VERIFIED COMPLAINT**

RECEIVED
SEP 19 2013
U.S.D.C. S.D. N.Y.
CASHIERS

## PETITION FOR INJUNCTIVE RELIEF
## &
## CLAIM FOR MONEY DAMAGES

      Plaintiffs TRANSCIENCE & YOLANDA VON BRAUNHUT (individual) by and through their attorney William Timmons, Esq., with offices located in Sayville New York, hereby file this Summons and Verified Complaint in this Petition for Injunctive Relief *and* Claim for Money Damages, and allege the following in support thereof:

### INTRODUCTION

By this Petition for Injunctive Relief *and* Claim for Money Damages Plaintiffs seek:

- the issuance of permanent injunction by the Court prohibiting any future use of the Licensed Trademarks or Licensed Copyrights by the Defendant as detailed within this Complaint;

- the issuance of a permanent Order of the Court requiring that the Defendant immediately cease selling, marketing , and/or producing any of the previously Licensed Products as detailed within this Compliant;

- the issuance of an Order of the Court requiring that the Defendant immediately return to Plaintiffs any and all unsold product, packets, tooling, packaging materials, and any other thing(s) that relate to the previously Licensed Products as detailed within this Compliant;

- the issuance of a permanent Order of the Court preventing the Defendant from selling, marketing , and/or producing knock-off products related to the previously Licensed Products as detailed within this Compliant;

- an awarding of compensatory damages, commensurate with interest, from Defendant to Plaintiffs from damages resultant of breach of contract and non-performance of an implied contract as detailed within this Complaint;

- an awarding of statutory damages, commensurate with interest, from Defendant to Plaintiffs for Defendant's willful and egregiously executed trademark and copyright infringements of Plaintiffs' intellectual property as detailed within this Complaint; and

- an award of attorney's fees, costs, and disbursements payable by Defendant in favor of Plaintiffs for the total expense of bringing forth this action.

## JURISDICTION AND VENUE

1. The Court has subject matter jurisdiction over the case pursuant to 28 U.S.C. § 1331: "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

2. This action is based upon Defendant's alleged infringement of Plaintiffs' United States (US) trademarked and US copyrighted intellectual property rights.

3. In accordance with 28 U.S.C. § 1367, the Court has supplemental jurisdiction over the entire matter pursuant to "all other claims that are so related . . . that they form part of the same case or controversy" (§ 1367(a)).

4. Alternatively, the Court has subject matter jurisdiction over the case pursuant to diversity jurisdiction under 28 U.S.C. § 1332: US Code - Section 1332: *Diversity of citizenship; amount in controversy; costs.*

5. The matter in controversy in the current instance exceeds the sum or value of $75,000, exclusive of interest and costs.

6. The action in the current instance is between citizens/corporations of different states.

7. The Court has personal jurisdiction over the parties of the case pursuant to the parties' substantial and recurring economic contacts with the State of New York.

8. In addition, the parties have consented to the application of the laws of the State of New

York pursuant to the content of the now terminated "Purchase Agreement and Amendment to License Agreement" dated May 1, 2009. (**see Exhibit B**)

9. Furthermore, the parties have consented to the jurisdiction of the federal courts in the County of New York of the State of New York with respect to any remedies available to the parties in aid of arbitration, if so elected, pursuant to the now terminated "Purchase Agreement and Amendment to License Agreement" dated May 1, 2009.(**see Exhibit B**)

10. Finally, the third party to the now terminated contract, namely Escrow Holder Sichenzia Ross Friedman Ference, LLP, as provided for in the said terminated contract maintains offices at 61 Broadway, 32nd Floor, New York, NY 10006.

11. Venue is proper because the third party to the terminated contract, namely Escrow Holder Sichenzia Ross Friedman Ference, LLP, as provided for in the said terminated contract maintains offices at 61 Broadway, 32nd Floor, New York, NY 10006.

## PARTIES

12. Plaintiff TRANSCIENCE (hereinafter and above, together with Plaintiff YOLANDA VON BRAUNHUT, "Plaintiffs") is a Maryland corporation with offices and a principle place of business located at 6200 Chapmans Landing Road, Indian Head, MD 20640-3040.

13. Plaintiff YOLANDA VON BRAUNHUT (hereinafter and above, together with Plaintiff TRANSCIENCE, "Plaintiffs") is an individual with an address located at 6200 Chapmans Landing Road, Indian Head, MD 20640-3040. YOLANDA VON BRAUNHUT is the Chief Executive Officer (CEO) and chief acting agent of TRANSCIENCE.

14. Defendant BIG TIME TOYS, LLC (hereinafter, together with its agents acting on its behalf, "Defendant") is a Tennessee Limited Liability Company (LLC) with an office located at 708 Berry Road, Nashville, TN 37204. **SAM HARWELL** is a resident of the State of Tennessee

and is the president and CEO of Defendant BIG TIME TOYS, LLC.

## FACTUAL ALLEGATIONS

15.  Plaintiffs are the sole and exclusive owners of methods, materials, and properties (including intellectual properties) for designing, hatching, growing, and sustaining live micro-crustaceans (*Artemia NYOS*); a hybrid brine shrimp known and sold under the United States registered trademark "Sea-Monkeys®".

16.  Plaintiffs are each owners of certain copyrights registered in the United States Copyright Office (USCO) and others unregistered.

17.  Plaintiff Yolanda von Braunhut is the copyright owner of an instruction book entitled, "It's Fun To Raise Pet Sea-Monkeys".

18.  Noted American inventor and marketer Harold von Braunhut held 196 patents for various products, many of which have become cultural icons, with the United States Patent and Trademark Office (USPTO).

19.  Harold von Braunhut invented and registered with the USPTO the brine shrimp product, initially called "Instant Life", in 1957. (**see Exhibit A; sub-exhibits A thru D)**

20.  Harold changed the name to "Sea-Monkeys®"and registered such with the USPTO in the year 1962.(**see Exhibit A; sub-exhibits A thru D)**

21.  Harold started a corporation named "Transcience" and transferred to it ownership of various products he had invented over the years.

22.  Transcience relies upon direct sales and licensing agreements relating to its Sea-Monkeys® product to account for most of its profits.

23.  The Transcience Corporation is a Maryland corporation with offices and a principle place of business located at 6200 Chapman's landing Road, Indian Head, Maryland 20640.

24. Harold married Yolanda Signorelli (now known as: Yolanda von Braunhut) in the year 1980.

25. Harold was the CEO of Transcience until his untimely death in 2003.

26. Upon his death Yolanda became the CEO of Transcience.

27. Yolanda has been the CEO of Transcience ever since.

28. In June of the year 2007, Plaintiffs entered into a License Agreement with the Defendant Big Time Toys, LLC. (**see Exhibit A**)

29. The 2007 License Agreement granted Defendant rights to produce, market, and sell the Sea-Monkeys® product owned by Plaintiffs.

30. The 2007 License Agreement provided that Defendant Licensee "pay to the Licensor a royalty of ten percent (10%) of 'Gross Sales' of Licensed Products sold by Licensee to third parties". (**see Exhibit A; page 8**)

31. The 2007 License Agreement provided that the royalty payments were due on the 10th of each month over the duration of the contract. (**see Exhibit A; page 8**)

32. The 2007 License Agreement provided that the agreement would commence on January 1st 2008 and expire on December 31, 2012 unless otherwise terminated, renewed, or extended by terms as provided therein.

33. The 2007 License Agreement provided that the Licensors will continue to manufacture, produce, and sell (at a controlled and reduced cost) to the Licensee the trade secret pouches upon which the Sea-Monkeys® product is based. (**see Exhibit A; paragraph pages 9-10; 16-18**).

34. The 2007 License Agreement provided that Licensee would pay to Licensor a supplemental laboratory fee of $750 per week for "Laboratory and Research Facility

Maintenance". (see Exhibit A; paragraph 10A; page 17)

35. The 2007 License Agreement provided that the Licensees would procure and otherwise produce other parts of the final Licensed Product, including but not limited to the water tank and packaging materials, from outside sources.

36. The 2007 License Agreement gave Defendant Licensee the right to purchase the entire Licensed Product "for an amount not to exceed 10 million dollars". (see Exhibit A; paragraph 17)

37. The 2007 License Agreement provided that the 10 million dollar purchase price would be realized in 2 segments; namely an initial lump sum 5 million dollar payment followed by an application of a 5% royalty payment per year from merchandising sales (and a per year percentage of entertainment related revenue) from that point thereafter until the remaining 5 million dollar sum was attained.

38. The 2007 License Agreement provided that after realization of the first 5 million dollars of the 10 million dollar purchase amount that the Licensor would turn over to Licensee the production/manufacture of the pouches, including but not limited to the trade secrets, upon which the Sea-Monkeys® product is based. (see Exhibit A; page 23)

39. The 2007 License Agreement provided that the "agreement shall be governed by the laws of the State of New York." (see Exhibit A; page 26; paragraph 21)

40. In May of the year 2009 Plaintiffs and Defendant modified their existing agreement as evidenced by "Purchase Agreement and Amendment to License Agreement".(see Exhibit B)

41. The 2009 Amendment Agreement modified the 2007 License Agreement only where expressly indicated leaving those provisions not expressly indicated intact. (see Exhibit B; Section 5; page 12)

42.  The 2009 Amendment Agreement provided that the supplemental laboratory fee payable to Licensor by Licensee for "Laboratory and Research Facility Maintenance" would be reduced to $375 per week. (see **Exhibit B; page 15 [f]**)

43.  The 2009 Amendment Agreement provided that Defendant Licensee "pay to the Licensor a royalty of twenty percent (20%) of 'Gross Sales' of Licensed Products sold by Licensee to third parties" (see **Exhibit B; pages & 4**).

44.  The 2009 Amendment Agreement expressly provided that the royalty payments would be applied directly to the "Initial Purchase Price" to realize the first 5 million dollars of the 10 million dollar purchase price. (see **Exhibit B; pages 3 & 4**).

45.  The 2009 Amendment Agreement "expressly agreed that all such (royalty) payments due on and after the Effective Date shall be applied to the payment of the Purchase Price." (see **Exhibit B; page 4**).

46.  Furthermore, the 2009 Amendment Agreement expressly provided that the "Initial Purchase Price" of 5 million dollars "shall be paid as follows:  (i) $500,000 shall be paid upon execution of this Agreement" and "(ii) $4,500,000 shall be paid in the form of royalties payable under the License Agreement." (see **Exhibit B; page 3; Section 2.2. <u>Purchase Price</u> (a) (i) & (ii)**)

47.  Plaintiffs note that 500,000 + 4,500,000 equals the sum of 5,000,000.

48.  Plaintiffs/Licensors and Defendant Licensee performed in accordance with their agreement without further occurrence until December of the year 2012.

49.  A few days before the day when the royalty payments were due on December 10th 2012 Defendant, through its agents, called Plaintiffs and informed Plaintiffs of Defendant's intention to NOT provide the royalty payment on the December 10th due date.

50. Defendant indicated to Plaintiffs at that time an intention to breach the agreement.

51. Defendant did NOT provide the royalty payment on December 10th 2012 as agreed to by the parties in the 2007 License Agreement and 2009 Amendment Agreement.

52. Defendant ceased to make laboratory fee payments on or about December 10th 2012.

53. The 2009 Amendment Agreement, namely *Section 2.4.(a)* <u>Remedies for BTT failure to Pay Royalties</u> (**see Exhibit B; page 6**), provided that, in the event of a failure to make a royalty payment that the Licensee shall have 15 days from the date of receipt of notice of failure to make a royalty payment to cure any such default.

54. Plaintiff sent notice to Defendant of the failure of Defendant to make a royalty payment in the form of a letter entitled "NOTICE OF DEFAULT" sent to the main offices of Defendant on December 20, 2012. (**see Exhibit C**)

55. Plaintiff effectively declared,[1] 15 days after the receipt of the "NOTICE OF DEFAULT" by Defendant without cure of the default, the 2009 Amendment Agreement and the 2007 License Agreement "null and void and of no further force of effect" in a letter sent to the Defendant dated January 18, 2013. (**see Exhibit D**)

56. Defendant, through its agents, in a letter dated January 22, 2013 sent to Plaintiffs' counsel facetiously, ludicrously, and in demonstration of bad faith put forth an unfounded notion that the pouch payments for the purchase of the Sea-Monkeys® pouches should be counted toward the realization of the first 5 million dollars or "Initial Purchase Price" of the 10 million dollar total purchase price of Sea-Monkeys® Properties. (**see Exhibit E**)

57. Such a notion is nowhere to be found or can be held to be anywhere implied in either the 2007 License Agreement or the 2009 Amendment to License Agreement.

---

[1] The declaration of termination is consistent with *Section 2.4.(a)(i)* of the 2009 Amendment Agreement. (see Exhibit **B; page 6**)

58. Such an unfounded notion is a delaying tactic and is fraught with malice.

59. If such a notion is sustained, echoed, or in any way continues to be maintained by Defendant Plaintiffs reserve the right to amend this Complaint with the insertion of an action for tortious interference of contract replete with a demand for substantial punitive damages and sanctions.

60. The phrase "all such payments" in the last line of Section 2.2(a) of the 2009 Amendment Agreement clearly and without question or reasonable doubt refers to all such royalty payments, and no other payment, being now (relative to the initial 2007 License Agreement) applicable to the realization of the 5 million dollar "Initial Purchase Price". (see **Exhibit B; page 4**)

61. Plaintiffs allege that, during this time, Defendant, through its agents, attempted to persuade Plaintiffs to accept a lower purchase price for the sale of "Sea-Monkeys® Properties".

62. Plaintiffs did NOT agree to accept a lower purchase price for the sale of "Sea-Monkeys® Properties".

63. Plaintiffs effectively reconfirmed the declaration of termination of the 2009 Amendment Agreement and the 2007 License Agreement in a letter sent to the Defendant dated January 29,2013. (see **Exhibit F**)

64. Plaintiffs sent further correspondence to Defendant in attempts to resolve the issues in as civil a manner as possible and avoid the need for unnecessary and frivolous litigation. (see **Exhibit G**)

65. Plaintiffs allege that Defendant, through its agents, responded in a nonsensical, unrealized, trite, trivial, malicious, and dismissive way. (see **Exhibit H**)

66. Plaintiffs allege that Defendant further responded by threatening to initiate litigation

against Plaintiffs should Plaintiffs attempt to enter into agreement(s) with third parties to license the Sea-Monkeys® product to anyone else.

67.  Plaintiffs allege that Defendant did not initiate legal process of any sort against Plaintiffs between December 10th of the year 2012 and the time of filing of this Complaint.

68.  In the current instance Plaintiffs do NOT seek the Court to adjudicate the issue of whether or not there was a breach of contract by the Defendant.

69.  Uncontroverted *prima facie* evidence of breach of the 2009 Amendment Agreement and the 2007 License Agreement by Defendant is detailed within this Complaint.

70.  The contract between Plaintiffs and the Defendant was effectively terminated upon Plaintiffs declaration of such after Defendant's failure to cure the default after receiving proper notice of default. **(see Exhibit B; page 6; see also Exhibits D & F)**

71.  Pursuant to *Section 2.4.(a)Remedies for BTT failure to Pay Royalties* of the 2009 Amended Agreement the remedies for failure to pay the royalty after notice of default and failure to cure default provide, among other things, that Plaintiffs be entitled to:  1) declare the agreement terminated with "no further force or effect", 2) "commence an action for equitable relief, including but not limited to, injunctive relief prohibiting any continued use of the Licensed Trademarks and Licensed Copyrights", 3) require that Defendants "immediately cease selling, marketing, or producing the Licensed Products and Sea-Monkeys® Properties", and finally, 4) that "any rights granted" under the contract to Defendant be "deemed null and void". (see **Exhibit B; pages 6 & 7)**

72.  Defendant, all throughout the days between January 18, 2013 and the date of September 10th 2013, prominently featured the Sea-Monkeys® product on the homepage of the *Big Time Toys* website located at http://www.bigtimetoys.com/ without right, permission or

authorization to do so. (see **Exhibits K, L, M &N**)

73. Plaintiffs allege that Defendant continues to prominently feature the Sea-Monkeys® product on the homepage of the *Big Time Toys* website without right, permission or authorization to do so.

74. Plaintiffs have been directly harmed by Defendant's interference with Plaintiffs' ability to generate profits from the Sea-Monkeys® product.

75. Plaintiffs now seek the Court's assistance: 1) to recover damages resultant from Defendant's past, ongoing, and continuing unauthorized use of Sea-Monkeys® Properties and 2) to prevent further future harm to the Plaintiffs at the hands of the Defendant.

## COUNT ONE
### DAMAGES SUSTAINED FROM DEFENDANT'S BREACH OF CONTRACT

76. Plaintiffs repeat, reiterate, and re-allege each and every fact and/or allegation set forth above and incorporate such as if fully set forth herein.

77. Plaintiffs maintain that a valid contract existed between the parties as evidenced from the 2007 License Agreement and the 2009 Amendment to License Agreement (see **Exhibits A&B**).

78. Defendant failed to produce the royalty payment due on December 10th 2012.

79. Defendant breached the contract with Plaintiffs when it failed to correct the default within 15 days after receipt of notice of default.

80. Plaintiffs were in compliance with the terms of the agreement between the parties over the lifespan of the now terminated agreement.

81. Defendant has NOT produced a single royalty payment to the Plaintiffs since November of 2012.

82. Defendant has NOT made a single laboratory fee payment since Defendant's breach

of contract in December of 2012.

83.  Plaintiffs declared the agreement between the parties "null and void with no further force or effect" pursuant to *Section 2.4.(a)(i)* of the 2009 Amendment Agreement on January 2013. **(see Exhibit D; page 6; and Exhibits D & F)**

84.  Defendant continues to receive benefits from continuing and ongoing unauthorized sales of the Sea-Monkeys® product.

85.  As a result of the aforementioned breach of contract Plaintiffs have suffered damages resultant from Defendant's failure to produce the royalty payments and the supplemental laboratory fee payment as provided for in the 2009 Amendment to License Agreement.

86.  The 2009 Amendment to License Agreement provided that Defendant pay a royalty of 20% of Gross sales of monies generated from sale to third parties of the previously licensed Sea-Monkeys® product.

87.  The 2009 Amendment to License Agreement provided a forecast of approximately $3,750,000 Gross sales per year of the Sea-Monkeys product and based upon that figure provided a minimum royalty payment payable by Defendant to Plaintiffs of $750,000 per year (payable in quantities of $62,500 per month). **(see Exhibit B; page 4 & 5)**

88.  Compensatory damages in the State of New York "place the non-breaching party in as good a position as it would have been had the contract been performed." *Brushton-Moira Cent. School Dist. v. Fred H. Thomas Assocs., P.C.*, 91 N.Y.2d 256, 261, 692 N.E.2d 551, 669 N.Y.S.2d 520 (N.Y. 1998).

89.  Damages are based on the accrual date of Plaintiffs' cause of action (*Rodriguez v Moore-McCormack Lines*, 32 NY2d 425, *supra*; *Simon v Electrospace Corp.*, 28 NY2d 136, *supra*).

90.  Plaintiffs note that interest is awarded pursuant to statutory mandate; most notably CPLR 5001(a) providing that interest shall be recovered upon a sum awarded for a breach of contract and CPLR 5001(b) mandating that "interest shall be computed from the earliest date the cause of action existed". (see **Exhibit I**)

91.  As a result of the breach of contract, as described above, Plaintiffs have suffered money damages for royalty payments NOT PAID in the amount of $62,500.00 per month for each and every month (due on the tenth of each month) since Defendant's first failure to produce the royalty payment due on December 10th 2012.

92.  As a result of Defendant's breach of contract, as described above, Plaintiffs have suffered money damages for unpaid supplemental laboratory fee payments in the amount of $375.00 per week for each and every week since Defendant's first failure to pay this fee on or about December 10th 2012.

93.  As a result Defendant's breach of contract, as described above, Plaintiffs continue to suffer money damages for royalty payments NOT paid in the amount $62,500.00 for each and every future month that goes by from the date of this Complaint forward; all resultant from Defendant's failure to produce the royalty payment due on the 10th of each month as specified in the original breached agreement.

**COUNT TWO**
**DAMAGES SUSTAINED FROM DEFENDANT'S**
**NON-PERFORMANCE OF IMPLIED CONTRACT**

94.  Plaintiffs repeat, reiterate, and re-allege each and every fact and/or allegation set forth above and incorporate such as if fully set forth herein.

95.  Plaintiffs maintain that a valid express contract existed between the parties as evidenced from the 2007 License Agreement and the 2009 Amendment to License Agreement

(see Exhibits A & B).

96. Defendant failed to pay Plaintiffs the royalty payment due on December 10th 2012.

97. Defendant breached the express contract with Plaintiffs when it failed to correct the default within 15 days after receipt of notice of default. (see Exhibits C, D & F)

98. Plaintiffs were in compliance with the terms of the express agreement between the parties over the lifespan of the now terminated agreement.

99. Defendant has NOT produced a single royalty payment to the Plaintiffs since November of 2012.

100. Defendant has NOT made a single laboratory fee payment since Defendant's breach of the express agreement in December of 2012.

101. Plaintiffs declared the agreement between the parties "null and void and of no further force or effect" pursuant to *Section 2.4.(a)(i)* of the 2009 Amendment Agreement on January 2013. (see Exhibits D& F)

102. Defendant continues to receive benefits from continuing and ongoing unauthorized sales of the Sea-Monkeys® product.

103. Plaintiffs contend that an implied contract came into existence by default after Defendant's willful termination of the agreement previously entered into by the parties.

104. Plaintiffs argue that past, ongoing, and future unjust enrichments by Defendant at the expense of Plaintiffs necessitate the imposition of an implied contract between the parties.

105. Plaintiffs have no desire to reform or otherwise reenter into any contractual relationship with Defendant outside the temporal implied contract that Plaintiffs contend came into being by default upon Defendant's breach of the original express agreement.

106. Plaintiffs contend that the implied contract now in place by default serves only to

compensate the Plaintiffs for use of Plaintiffs' valuable intellectual property and for no other reason.

107. Plaintiffs note that the implied contract now in place by default does not in any way provide for the sale of Sea-Monkeys® Properties to Defendant.

108. Plaintiffs note that Defendant's willful failure to cure the breach of contract and subsequent visitation of hardship upon the Plaintiffs, as described with particularity throughout this Complaint, has terminated the possibility of sale of Sea-Monkeys® Properties to Defendant.

109. The 2009 Amendment to License Agreement provided that Defendant pay a royalty of 20% of Gross sales of monies generated from sale to third parties of the previously licensed Sea-Monkeys® product.

110. The 2009 Amendment to License Agreement provided a forecast of approximately $3,750,000 Gross sales per year of the Sea-Monkeys product and based upon that figure provided a minimum royalty payment payable by Defendant to Plaintiffs of $750,000 per year (payable in quantities of $62,500 per month). (see **Exhibit B; page 4 & 5**)

111. Damages are intended to place the non-breaching party in as good a position as it would have been had the contract been performed (*see, e.g., Goldstein Corp v City of New York*, 80 NY2d 366, 373).

112. Damages are based on the accrual date of Plaintiffs' cause of action (*Rodriguez v Moore-McCormack Lines*, 32 NY2d 425, *supra*; *Simon v Electrospace Corp.*, 28 NY2d 136, *supra*).

113. Plaintiffs note that interest is awarded pursuant to statutory mandate; most notably CPLR 5001(a) providing that interest shall be recovered upon a sum awarded for a breach of contract and CPLR 5001(b) mandating that "interest shall be computed from the earliest date the

cause of action existed". **(see Exhibit I)**

114. As a result of Defendant's non-performance of the implied contract, as described above, Plaintiffs have suffered money damages for royalty payments NOT paid in the amount $62,500.00 per month for each and every month (on the tenth of each month) since the Defendant's first failure to produce the royalty payment due on December 10th 2012.

115. As a result of Defendant's non-performance of the implied contract, as described above, Plaintiffs have suffered money damages for missed supplemental laboratory fee payments in an amount of either $375.00 or $750.00 per week, dependent upon the measure of damages, for each and every week since Defendant's first failure to pay this fee on or about December 10th 2012.

116. As a result Defendant's non-performance of the implied contract, as described above, Plaintiffs continue to suffer money damages for royalty payments NOT paid in the amount $62,500.00 for each and every future month that goes by from the date of this Complaint forward; all resultant from Defendant's failure to produce the royalty payment due on the 10th of each month as specified in the terminated agreement and resurrected in the implied contract.

## COUNT THREE
## DEFENDANT'S UNJUST ENRICHMENT
## FROM NON-PERFORMANCE OF IMPLIED CONTRACT

117. Plaintiffs repeat, reiterate, and re-allege each and every fact and/or allegation set forth above and incorporate such as if fully set forth herein.

118. Plaintiffs have NOT received royalty payments from Defendant since Defendant's last royalty payment was received on or about November 10th 2012.

119. Defendant has been unjustly enriched by its continuing and ongoing unauthorized sales of the previously licensed Sea-Monkeys® product.

120. Defendant was enriched at the expense of the Plaintiffs: 1) by minimally denying Plaintiffs the previous entitlement to 20% of the gross sales of the previously licensed Sea-Monkeys® product and 2) by maximally preventing and/or interfering with Plaintiffs' right to generate sales on Plaintiffs' own accord from sales or license agreements of the Sea-Monkeys® product to third parties.

121. Defendant's non-performance, non-accountability, delay, obstruction, and inability to account for the profits generated from past and continuing sales of the previously licensed Sea-Monkeys® product is inherently unjust.

122. Defendant has no good faith basis or defense to justify or otherwise excuse their past and ongoing enrichment at the expense of the Plaintiffs.

123. Defendant has no good faith basis or defense for its continuing, corruptible posture.

124. Plaintiffs seek both remedies at law and remedies in equity for Plaintiffs unjust enrichment as stated throughout this Complaint in the form of: 1) money damages for monies that have otherwise been diverted from the Plaintiffs and 2) equitable relief in the form of injunctions that will prevent Defendant from visiting continuing future harm upon the Plaintiffs.

125. As a result of Defendant's unjust enrichment, as described above, Plaintiffs have suffered substantial financial damages by the self-serving actions of the Defendant and will continue to suffer ongoing recurring future damages if Defendant is not otherwise prevented from doing so.

<u>COUNT FOUR</u>
<u>CONVERSION</u>

126. Plaintiffs repeat, reiterate, and re-allege each and every fact and/or allegation set forth above and incorporate such as if fully set forth herein.

127. Plaintiffs have clear and unequivocal title to the intellectual property that formed

the basis for the contractual relationship established between the Plaintiffs and the Defendant in 2007 and revisited in 2009. **(see Exhibit A; sub-exhibits A thru D)**

128.  Defendant has exercised and continues to exercise control over the Plaintiffs intellectual property in a manner that is inconsistent with the Plaintiff's exclusive right of possession.

129.  Defendant has violated or otherwise interfered with Plaintiffs' dominion relative to Plaintiffs' intellectual property.

130.  Defendant continues to violate or otherwise interfere with Plaintiffs' dominion relative to Plaintiffs' intellectual property.

131.  Defendant, between the dates of January 18, 2013 and September 10th 2013 and presumably thereafter, identified/identifies the trademarked Sea-Monkeys® product as one of "*Our Home Run Toys*" on the *Big Time Toys* website located at http://www.bigtimetoys.com/. **(see Exhibit M)**

132.  Defendant, as demonstrated by its continuing undisputed lack of compensatory providence, has made an unauthorized assumption of the right to possession or ownership of the Sea-Monkeys® Properties.

133.  Defendant has failed to compensate Plaintiffs for Defendant's past and ongoing unauthorized use of the previously licensed Sea-Monkeys® product.

134.  Defendant has wrongfully taken possession of monies to which it is not entitled to in obviation of and with complete disrespect and disregard of Plaintiff's intellectual property rights.

135.  Defendant continues to wrongfully take possession of monies to which it is not entitled to in obviation and with complete disrespect and disregard of Plaintiff's intellectual

property rights.

136.  Defendant has made an unauthorized assumption of the right to possession or ownership of monies to which Plaintiffs have sole and exclusive claim.

137.  As a result of the conversion, as described above, Defendant has converted property and continues to convert property into property of its own to which Plaintiffs alone have sole and exclusive claim.

## COUNT FIVE
## TRADEMARK INFRINGEMENT

138.  Plaintiffs repeat, reiterate, and re-allege each and every fact and/or allegation set forth above and incorporate such as if fully set forth herein.

139.  Plaintiffs have clear and unequivocal title to the intellectual property that formed the basis for the contractual relationship established between the Plaintiffs and the Defendant in 2007 and revisited in 2009. **(see Exhibit A; sub-exhibits A thru D)**

140.  Plaintiffs declared the agreement between the parties "null and void and of no further force or effect" pursuant to *Section 2.4.(a)(i)* of the 2009 Amendment Agreement on January 18th of the year 2013. **(see Exhibits D & F)**

141.  Plaintiffs own *all* trademarks for the Sea-Monkeys® product. **(see Exhibit A; sub-exhibits A thru D)**

142.  All of Plaintiffs' trademarks for the Sea-Monkeys® product are registered with the United States Trademark and Patent Office (USPTO). **(see Exhibit A; sub-exhibits A thru D)**

143.  Plaintiffs have NOT received royalty payments from Defendant since Defendant's last royalty payment was received on or about November 10th 2012.

144.  Defendant, between the dates of January 18, 2013 and September 10th 2013 and presumably thereafter, prominently featured/features the trademarked Sea-Monkeys® product on

the *Big Time Toys* website located at http://www.bigtimetoys.com/ (see **Exhibits K, L, M, & N**)

145. Defendant, between the dates of January 18, 2013 and September 10th 2013 and presumably thereafter, identified/identifies the trademarked Sea-Monkeys® product as one of "*Our Home Run Toys*" on the *Big Time Toys* website located at http://www.bigtimetoys.com/. (see **Exhibit M**)

146. Defendant has presented and continues to present to the world an assumed right and/or authorization to sell the trademarked Sea-Monkeys® product on the *Big Time Toys* website located at http://www.bigtimetoys.com/. (see **Exhibits K & M**).

147. Defendant has received and continues to receive benefits from continuing and ongoing unauthorized sales of Plaintiffs trademarked Sea-Monkeys® product.

148. Defendant has made no attempt to compensate Plaintiffs for their past and ongoing unauthorized use of Plaintiffs trademarked Sea-Monkeys® product.

149. Defendant willfully continues to profit from its unauthorized use of Plaintiffs trademarked Sea-Monkeys® product.

150. Defendant's profits come at the expense of Plaintiffs and precipitate harm upon the Plaintiffs.

151. Defendant on its website represents to its partners/retailers that it has authorization to sell the trademarked Sea-Monkeys® product. (see **Exhibits K, M, & N**)

152. Defendant's representation of authorization to sell the trademarked Sea-Monkeys® product on Defendant's web site has interfered with Plaintiffs ability to enter into 3rd party contractual relationships to profit from its Sea-Monkeys® product.

153. The Lanham Act; enacted July 6, 1946, codified at 15 U.S.C. § 1051 et seq. (15 U.S.C. ch. 22; provides remedies that can be sought when a trademark is infringed in Subchapter

III, Sections 42 and 43.

154.  These provisions are codified in 15 USC §1117; "Recovery for violation of rights; profits, damages and costs; attorney fees; treble damages". **(see Exhibit J)**

155.  Plaintiffs elect to be compensated (determinable at trial) by the greater of actual damages, defining compensatory damages as all profits Defendant unrightfully obtained, or statutory damages as provided for by the Lanham Act and/or other laws of the USA.

156.  As a result of the trademark infringement, as described above, Defendant has profited and continues to profit from intellectual property to which Defendant has no claim.

<u>**COUNT SIX**</u>
<u>**COPYRIGHT INFRINGEMENT**</u>

157.  Plaintiffs repeat, reiterate, and re-allege each and every fact and/or allegation set forth above and incorporate such as if fully set forth herein.

158.  Plaintiffs have clear and unequivocal title to the intellectual property that formed the basis for the contractual relationship established between the Plaintiffs and the Defendant in 2007 and revisited in 2009. **(see Exhibit A; sub-exhibits A thru D)**

159.  Plaintiffs declared the agreement between the parties "null and void and of no further force or effect" pursuant to *Section 2.4.(a)(i)* of the 2009 Amendment Agreement on January 18th of the year 2013. **(see Exhibits D & F)**

160.  Plaintiffs own *all* copyrights for the Sea-Monkeys® product. **(see Exhibit A; sub-exhibits A thru D)**

161.  All of Plaintiffs' copyrights for the Sea-Monkeys® product are registered with the United States Copyright Office (USCO). **(see Exhibit A; sub-exhibits A thru D)**

162.  Plaintiffs have NOT received royalty payments from Defendant since Defendant's last royalty payment was received on or about November 10th 2012.

163. Defendant, between the dates of January 18, 2013 and September 10th 2013 and presumably thereafter, prominently featured/features the copyrighted Sea-Monkeys® product on the *Big Time Toys* website located at http://www.bigtimetoys.com/. **(see Exhibits K, L, M, & N)**

164. Defendant, between the dates of January 18, 2013 and September 10th 2013 and presumably thereafter, identified/identifies the copyrighted Sea-Monkeys® product as one of *"Our Home Run Toys"* on the *Big Time Toys* website located at http://www.bigtimetoys.com/. **(see Exhibit M)**

165. Defendant has presented and continues to present to the world an assumed right and/or authorization to sell the copyrighted Sea-Monkeys® product on the *Big Time Toys* website located at http://www.bigtimetoys.com/. **(see Exhibits K & M).**

166. Defendant has received and continues to receive benefits from continuing and ongoing unauthorized sales of Plaintiffs copyrighted Sea-Monkeys® product.

167. Defendant has made no attempt to compensate Plaintiffs for their past and ongoing unauthorized use of Plaintiffs copyrighted Sea-Monkeys® product.

168. Defendant willfully continues to profit from its unauthorized use of Plaintiffs copyrighted Sea-Monkeys® product.

169. Defendant's profits come at the expense of Plaintiffs and precipitate harm upon the Plaintiffs.

170. Defendant on its website represents to its partners/retailers that it has authorization to sell the copyrighted Sea-Monkeys® product. **(see Exhibits K, M, & N)**

171. Defendant's representation of authorization to sell the copyrighted Sea-Monkeys® product on Defendant's web site has interfered with Plaintiffs ability to enter into 3rd party contractual relationships to profit from its product.

172. Exclusive rights in copyrighted works are defined and remedies for infringement are contained in Chapters 1 and 5 of Title 17 of the *United States Code* (USC). (**see Exhibit O**)

173. Chapter 5 section 501 of Title 17 of the USC provides for an action of *Infringement of Copyright;* 17 USC § 501. (**see Exhibit P**)

174. Plaintiffs assert that the copyrighted Sea-Monkeys® product is a protected work, that the Defendant copied the protected work, and that such copying of the protected work was an infringement of Plaintiffs copyright.

175. Chapter 5 section 504 of Title 17 of the USC provides for remedies for copyright infringement; 17 USC § 504. (**see Exhibit Q**)

176. Plaintiffs will elect to be compensated (before final judgment of the matter) by either actual damages, defining compensatory damages as all profits Defendant unrightfully obtained, or statutory damages as provided for by US Copyright Law.

177. As a result of the copyright infringement, as described above, Defendant has profited and continues to profit from intellectual property to which Defendant has no claim.

## DEMAND FOR EQUITABLE RELIEF

WHEREFORE, the Plaintiff respectfully requests the following equitable relief:

(1) The issuance of an injunction by the Court prohibiting any continued use of the Licensed Trademarks or Licensed Copyrights as provided for in the now terminated 2007 "License Agreement" and the likewise terminated 2009 "Purchase Agreement and Amendment to License Agreement";

(2) The issuance of an Order of the Court requiring that the Defendants immediately cease selling, marketing , and/or producing any of the Licensed Products, including but not limited to Sea-Monkeys® Properties, as provided for in the now terminated 2007

"License Agreement" and the likewise terminated 2009 "Purchase Agreement and Amendment to License Agreement";

(3) The issuance of an Order of the Court requiring that the Defendant immediately return to Plaintiffs any and all unsold product, packets, tooling, packaging materials, and any other thing related to the previously Licensed Products as provided for in the now terminated 2007 "License Agreement" and the likewise terminated 2009 "Purchase Agreement and Amendment to License Agreement";

(4) The issuance of a permanent Order of the Court prohibiting the Defendant from selling, marketing , and/or producing knock-off products related to the previously Licensed Products as defined in the now terminated 2007 "License Agreement" and the likewise terminated 2009 "Purchase Agreement and Amendment to License Agreement";

(5) Assessing against the Defendant punitive damages, in favor of Plaintiffs, to punish Defendant for their egregious behavior and uncivil tortious actions which necessitated the bringing of this lawsuit;

(6) Awarding the Plaintiffs attorney's fees, costs, and disbursements of this action, and any such other and further relief as the Court may deem just and proper.

## DEMAND FOR RELIEF AT LAW

WHEREFORE, in addition to the above stated equitable relief, the Plaintiff respectfully requests the following relief at law:

(1) Awarding the Plaintiffs the greater of 1) compensatory damages for royalty payments NOT paid in the amount of SIXTY TWO THOUSAND FIVE HUNDRED DOLLARS ($62,500.00 USD) multiplied by the number of months that minimum royalty payments have NOT been paid (beginning on December 10th 2012)[2] **OR** 2) compensatory

---

[2] The amount past due, using the minimum royalty payment as the measure of damages, as of September 10th 2013 is exactly SIX HUNDRED AND TWENTY FIVE THOUSAND DOLLARS ($625,000.00 USD).  On October 10th 2013

damages equaling 20% of Gross sales of monies generated from sale to third parties of the previously licensed Sea-Monkeys® product for the period that royalty payments have NOT been paid (beginning on December 10th 2012); for amounts past due pursuant to the now terminated 2007 "License Agreement" and the likewise terminated 2009 "Purchase Agreement and Amendment to License Agreement";

(2) Awarding the Plaintiffs compensatory damages for supplemental laboratory fees NOT paid in the amount of SEVEN HUNDRED AND FIFTY DOLLARS ($750.00 USD) multiplied by the number of weeks that supplemental laboratory fees have NOT been paid (beginning on December 10th 2012)[3] for amounts past due pursuant to the now terminated 2007 "License Agreement";

(3) Awarding the Plaintiffs interest thereupon due, in accordance with amounts due relative to the now terminated 2007 "License Agreement" and the likewise terminated 2009 "Purchase Agreement and Amendment to License Agreement";

(4) Awarding the Plaintiffs statutory damages, commensurate with interest, for Defendant's willful and egregiously executed trademark and copyright infringements of Plaintiffs' intellectual property; and

(5) Awarding the Plaintiffs attorney's fees, costs, and disbursements of this action, and any such other and further relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury on all issues triable of right by jury.

---

and on the tenth of every month thereafter this amount will increase incrementally by SIXTY TWO THOUSAND FIVE HUNDRED DOLLARS ($62,500.00 USD).

[3] The amount past due as of September 6th 2013 is exactly TWENTY NINE THOUSAND AND TWO HUNDRED AND FIFTY DOLLARS ($29,250.00 USD). Every week thereafter, from 9-6-13 forward, this amount will increase incrementally by SEVEN HUNDRED AND FIFTY DOLLARS ($750.00 USD).

Respectfully Submitted,

By: _William Timmons_

William Timmons, Esq.
25 Candee Avenue
Sayville, New York 11782
(631) 750-5980

Attorneys for Plaintiffs
TRANSCIENCE & YOLANDA VON BRAUNHUT

Dated:  September 10, 2013

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————x

TRANSCIENCE &
YOLANDA VON BRAUNHUT (individual)
                             Plaintiffs

        -against-

BIG TIME TOYS, LLC
                          Defendant.

———————————————————————x

Index No.:

**VERIFIED COMPLAINT**

## DECLARATION OF WILLIAM TIMMONS, ESQ.

STATE OF NEW YORK    )
                        )   s.s:
COUNTY OF SUFFOLK   )

    I, **WILLIAM TIMMONS**, an attorney admitted to practice in the State of New York and in the US federal courts for the Eastern District for the State of New York (EDNY) and for the Southern District for the State of New York (SDNY), under penalty of perjury, hereby declare:

1. I have been retained by Plaintiffs TRANSCIENCE & YOLANDA VON BRAUNHUT. I submit this **Summons and Verified Complaint**. I know the facts testified to in this **Summons and Verified Complaint** to be true based on my personal knowledge and a review of the documentation.

2. To the best of my knowledge, information, and belief formed after an inquiry reasonable under the circumstances the presentation of these papers or the contentions therein are not frivolous as defined in Subsection (c) of Section 130-1.1 of the Rules of the Chief Administrative Judge (22 NYCRR).

3. I declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the foregoing is true and correct.

Executed on September 19, 2013

By: _William T_____

William Timmons, Esq.
25 Candee Avenue
Sayville, New York 11782
(631) 750-5980

Attorneys for Plaintiffs
TRANSCIENCE &YOLANDA VON BRAUNHUT

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

————————————————————————x
                                                        :
TRANSCIENCE &                                           :
YOLANDA VON BRAUNHUT (individual)                       :
                              Plaintiffs                :      Index No.:
                                                        :
                                                        :
          -against-                                     :
                                                        :      **VERIFIED COMPLAINT**
                                                        :
                                                        :
BIG TIME TOYS, LLC                                      :
                              Defendant.                :
————————————————————————x

## VERIFICATION PAGE

**YOLANDA VON BRAUNHUT**, being duly sworn, deposes and says:

I am the acting agent of Plaintiff TRANSCIENCE and am the individual named as a Plaintiff in the above-entitled action.  I have read the foregoing **Verified Complaint** and know the contents thereof.  The contents of such are true to my knowledge, except as to matters therein stated to be alleged on information and belief and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this _10th_ day of _SEPTEMBER_, 2013,

at _BRYANS ROAD, MD. 20616_

_Yolanda von Braunhut_                                    _9/10/13_
Yolanda von Braunhut                                       Date

Sworn to before me this _10th_

_____ day of _SEPTEMBER_, 2013

_Gloria M. Davies_ NOTARY
GLORIA M. DAVIES
COMMISSION EXPIRES 5-8-2016

# EXHIBIT A

## LICENSE AGREEMENT

AGREEMENT made as of the 26th day of June 2007 (this "Agreement") by and among Transcience Corporation, a Maryland corporation with offices and a principal place of business at 6200 Chapman's Landing Road, Indian Head, Maryland 20640 and Yolanda von Braunhut whose principal place of residence is the same ("Transcience" and "von Braunhut", respectively, and individually as a "Licensor" or collectively as the "Licensors", as appropriate) and Big Time Toys, LLC, a Tennessee limited liability company with offices and principal place of business at 8005 Church Street East, Brentwood, Tennessee 37027 ("Licensee").

### R E C I T A L S :

WHEREAS, Licensors are the sole and exclusive owners of methods, materials and properties, including intellectual properties, for hatching, growing and sustaining live microcrustaceans (Artemia nyos), a hybrid brine shrimp known and sold under the United States registered trademark "Sea-Monkeys®", and hatched egg and design, and have manufactured and sold a line of products and accessories, including tanks and pouches, in conjunction therewith since 1960, all as more fully described on Exhibit A (the "Licensed Products"); and

WHEREAS, Transcience is the owner of registered and unregistered United States and foreign trademarks, including "Instant Life", "Instant Pets" and "Sea-Monkeys", a current list of which is set forth on Exhibit B (including any other trademarks licensed hereunder, the "Licensed Trademarks"); and

WHEREAS, von Braunhut and Transcience are each owners of certain copyrights registered in the United States Copyright Office, and unregistered, and von Braunhut is the copyright owner of an instruction book titled "It's Fun To Raise Pet Sea-Monkeys", a current list of which is set forth on Exhibit C (including any other copyrights licensed hereunder, the "Licensed Copyrights"); and

WHEREAS, Transcience is the owner of certain United States and foreign patents and patent applications, a current list of which is set forth on Exhibit D (including any other patents licensed hereunder, the "Licensed Patents"); and

WHEREAS, Licensee is desirous of obtaining an exclusive worldwide license to make, have made, use, sell, distribute and advertise the Licensed Products, and to utilize the Licensed Trademarks, Licensed Copyrights and Licensed Patents, worldwide under the terms hereof; and

WHEREAS, Licensors agree to grant such license upon the terms and conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the mutual covenants and premises herein set forth, it is agreed as follows:

1. TERM; CANCELLATION; GRANT OF LICENSE; REPRESENTATIONS AND
WARRANTIES OF LICENSORS

A.      Term; Renewals.

(i) Term.  The term of the license granted hereunder (the "License") shall commence on January 1, 2008 (the "Effective Date") and, unless terminated in accordance with the terms hereof, shall continue through and including December 31, 2012.

(ii) Renewal.  Licensee shall have the option to renew this Agreement for two (2) additional periods of five (5) years each by giving Licensors notice of intent to renew at least twelve (12) months prior to the scheduled expiration of the License.

B.      Cancellation.  In addition to any other cancellation rights provided herein, Licensee shall have the right to cancel this Agreement, without any further obligation of Licensee; (i) at any time on or before January 15, 2008 in the event that, between the date hereof and January 1,

05-216.1-671918.7                               2

2008, there is a Material Adverse Change (defined below); or (ii) at any time, provided that Licensee gives at least six (6) months prior written notice to Licensors and such cancellation is effective on or after January 1, 2011. For purposes hereof, "Material Adverse Change" shall mean a material adverse change in the Sea-Monkeys business, assets or operations, as proposed to be licensed to Licensee hereunder, and shall include any threatened or filed litigation material to the transactions contemplated hereby and any material disruption in the manufacturing or shipping processes with respect to the Licensed Products.

C.      Grant.  Except as expressly set forth in this paragraph C, this License grants to Licensee the exclusive right and license to make, have made, use, sell, distribute and advertise the Licensed Products worldwide.  This License includes, but is not limited to, a license under any and all patents, trademarks and copyrights and any applications therefor, which have been filed or may be filed in the future with respect to the Licensed Products.

(i)      Empire Agreement.  An agreement, entitled "The Amazing Live Sea-Monkeys – Binding Deal Memorandum", dated May 9, 2005 (the "Empire Agreement"), was entered into by and among Transcience and Empire Pictures Incorporated (the "Empire Licensee").  A complete copy of the Empire Agreement is attached hereto as Exhibit E.  Licensor shall not amend, modify or supplement the Empire Agreement in a manner that could adversely affect Licensee without the prior written consent of Licensee (but Licensor shall be permitted to extend the Empire Agreement without Licensee's consent on the condition that in any such extension Empire shall agree, in an enforceable writing, that (i) its rights are limited to visual entertainment in the form of motion picture, television and home video, (ii) under no circumstances does the Empire Agreement grant to Empire the right, directly or indirectly, to manufacture, sell or distribute Sea Monkey's pouches or tanks and that such rights shall not be considered "ancillary and subsidiary" to the entertainment rights, and (iii) Transcience's "Reserved Rights" (as such term is used in the Empire Agreement) shall mean all rights with respect to the Products, including all existing copyrights and trademarks, other than those entertainment rights explicitly granted to Empire, and Transcience's "Reserved Rights" shall specifically include the right to advertise on television and other video means).  Each Licensor represents, jointly

and severally, that the Empire License (x) is limited to certain "entertainment rights", and does not, directly or indirectly, permit the manufacture, sale or distribution of Sea-Monkeys pouches or tanks, and (y) does not conflict with the rights granted to Licensee hereunder.  Licensor acknowledges that its use of any characters created under the Empire Agreement on tanks will require a separate movie royalty license agreement.  In the event that a movie or other theatrical event is released under the Empire Agreement during the first twelve (12) months of the term of this Agreement, Licensor shall be entitled to retain all compensation payable under the Empire Agreement; provided, however, that (x) if Licensee's gross sales of Licensed Products exceed six million dollars ($6,000,000.00) in any  twelve (12) month period, and a movie or other theatrical event is released  after the conclusion of such twelve (12) month period, and (y) in all events after December 31, 2009, fifty percent (50%) of all compensation payable under the Empire Agreement shall be paid to Licensee.

(ii)    IGT Agreement.  This License is subject to a "License Agreement ("Sea-Monkeys")", dated May 15, 2002 (the "IGT Agreement"), by and between Educational Insights, Inc., as licensor ("IGT Licensor"), and IGT, as licensee (the "IGT Licensee"), with respect to the use of the mark "Sea-Monkeys" and certain related properties on gaming machines.  A complete copy of the IGT Agreement is attached as Exhibit F.  The IGT Agreement shall not be amended, modified or supplemented in a manner that could adversely affect Licensee without the prior written consent of Licensee (but Licensor shall be permitted to extend the IGT Agreement without Licensee's consent).  Each Licensor represents, jointly and severally, that the IGT Agreement does not, directly or indirectly, permit the manufacture, sale or distribution of Sea-Monkeys pouches or tanks, or conflict with the rights granted to Licensee hereunder.  All royalties from the IGT Agreement shall be split 75% for Licensors and 25% for Licensee up to the amount earned during the twelve months preceding the Effective Date.  Thereafter, all royalties under the IGT Agreement shall be split 75% for Licensee and 25% for Licensors.

D.  Each Licensor represents and warrants, jointly and severally, that:

(i)  It has the right and power to grant the licenses granted herein and that, except for the Empire Agreement, the IGT Agreement, and the "License to Manufacture Certain Articles Known as Sea-Monkeys® and Bubble Making Device Under United States and Foreign Patent and Trademarks and To Use Copyrighted Printed Materials and Copyrighted Artwork Relating Thereto", dated September 22, 2000, and related agreements among Transcience, von Braunhut and Educational Insights, Inc. ("EI"), a complete copy of which, including all other agreements among such parties or any of them (collectively, the "EI Agreement"), is attached hereto as Exhibit G, there are no other agreements with regard to the subject matter hereof;

(ii)  It has no knowledge that the Licensed Products, the Licensed Trademarks, the Licensed Copyrights and/or the Licensed Patents infringe any rights of any third party;

(iii)  It has the right and power to enter into this Agreement, and that together they are the owners of all of the intellectual properties licensed in this Agreement, and that this Agreement shall be a valid and binding obligation of each Licensor, enforceable against each of them in accordance with its terms;

(iv)  The execution and delivery of this Agreement, the grant of the license hereunder and compliance with the provisions hereof, do not conflict with or constitute, on the part of any Licensor, a breach of or default under any agreement (including the Empire Agreement, the IGT Agreement and the EI Agreement) or other instrument to which any Licensor is a party or any existing law, administrative regulation, court order or consent decree to which any Licensor is subject;

(v)   The EI Agreement, and all rights of EI and any other parties thereto, shall terminate on or before December 31, 2007, and after such date neither EI nor any other party shall have any rights to make, have made, use or sell Licensed Products or any intellectual property in connection therewith (except IGT pursuant to the IGT Agreement);

(vi)   Licensors shall indemnify and hold Licensee harmless from any breach of the representations and warranties herein, including all claims, litigation, expenses, loss or penalty including reasonable attorneys fees and costs relating to a claim by any third party relative to the intellectual property rights licensed herein; and

(vii)   EI's sales of Licensed Products over the twelve (12) months ended December 31, 2006 exceeded $3,400,000.

## 2.  CHANNELS OF DISTRIBUTION AND RIGHTS RESERVED TO THE LICENSORS

A.      The rights granted hereunder shall be for all classes of trade and channels of distribution, including, but not limited to, retail (mass, specialty, gifts, pet, drug, supermarkets, etc.), educational, wall digital; Internet (with the exception of aftermarket pouches and components in the current Transcience mail order form, a copy of which is attached as Exhibit H hereto), international and other, except for any sales by Transcience by direct mail.  Transcience specifically reserves to itself the right to sell the Licensed Products throughout the world direct to consumers via mail-order.  The rights reserved to Transcience in the preceding sentence are personal to Transcience and shall not be, directly or indirectly, sublicensed, assigned or otherwise transferred to any other person without the prior written consent of Licensee, except that Transcience may continue to supply or sell directly to international distributors to fill Licensor's mail order sales.  Product developed for the school market may not present

05-216:1-679018.7

6

SeaMonkeys® as experiments or biological specimens to be dissected, starved, mistreated or examined in any way that would be harmful to them.

### 3. SUBLICENSES

A.       The license granted by Licensors to Licensee hereunder shall include the exclusive right of the Licensee, subject to Licensors' Creative Control as specified in paragraph 9/1 below, to grant sublicenses to third parties to make, have made, use, sell, distribute and advertise the Licensed Products worldwide, and to enter into joint venture agreements.  Licensors agree to produce Sea-Monkeys formulas for sale only to (i) the Licensee, (ii) an approved sublicense of Licensee, and (iii) for direct mail pursuant to certain rights reserved by Transcience under paragraph 2A hereof.

B.       Each such sublicense, or any amendment or modification thereto, by Licensee shall be subject to the express prior written approval of Licensor, which shall not be unreasonably withheld, conditioned or delayed.  Minimum royalties shall be established by Licensee based upon the sublicensee's sublicensed territory and anticipated sales volume.  The royalty rate, time and manner of payment shall be consistent with the terms hereof and any such sublicense shall provide for termination by Licensee (as sublicensor) for any material breach of the terms thereof by sublicensee.

C.       Licensee agrees that it will indemnify Licensors and hold them harmless from any liabilities, expenses, loss or penalty, including reasonable attorneys' fees and costs of investigations, incurred by Licensor in defending against any claims that arise out of any sublicenses and/or agreements made by Licensee with third parties, except to the extent such claims arise out of actions taken at the direction of, or with the approval of, Licensors.

### 4. ROYALTY PAYMENTS

A.   Licensee agrees to pay to Licensors a royalty of ten percent (10%) of "Gross Sales" of Licensed Products sold by Licensee to third parties. If Licensee sells any Licensed Product to any party affiliated with Licensee prior to such third party sale, or in any way directly or indirectly related to or under the common control with Licensee, at a price less than the regular price charged to other parties, the royalty payable to Licensor shall be computed on the basis of the regular price charged to other parties. "Gross Sales" shall mean billed-out gross shipments to third parties less deductions for trade discounts and merchandise returns. In the event that Licensee grants any approved sublicensee the right to make, have made, use and sell Licensed Products, Licensee shall pay Licensor twenty-five percent (25%) of the gross income received by Licensee from such sublicensees.

B.      Commencing with the Effective Date, a minimum royalty shall be paid by Licensee in the amount of $400,000 for the first twelve (12) month period following the Effective Date, and a minimum royalty of $500,000 per year for each twelve (12) month period thereafter that this License is in effect (the "Minimum Royalty"). The Minimum Royalty shall be paid in equal monthly installments, on or before the tenth day of each month. The Minimum Royalty shall be a nonrefundable advance against any amounts due to Licensors hereunder. In the event that EI, any affiliate thereof, or any other party (other than Transcience under paragraph 2.A. hereof) makes any sales of Licensed Products after the Effective Date, in addition to any other remedies available to Licensee hereunder, Licensee shall be entitled to take an amount equal to ten percent (10%) of such "Gross Sales" (as defined above) as a credit by Licensee against any amounts due to Licensors hereunder, including the Minimum Royalty. Licensors will cooperate with Licensee to obtain and provide to Licensee any documentation required to evidence any such sales.

C.      The Licensed Products shall be considered as "sold" when billed out, or, if not

previously billed out, when shipped, mailed or otherwise delivered to the recipient of the goods by any means.

D.    Promptly following the date Licensee closes its books for each month during the term hereof, but in no event later than thirty (30) days following the close of such month, Licensee shall deliver to Licensors and/or their designee, a statement signed by a duly authorized officer of Licensee, listing the quantity, description of goods and gross sales price, itemized deductions from gross sales price and the net sales price of the Licensed Products sold by Licensee and its sublicensees during the preceding month (the "Royalty Statement").  Payments of any royalties due to Licensors shall accompany the Royalty Statement.

E.    All payments due to Licensors hereunder shall be made to Yolanda von Braunhut, who shall receive the same as agent for, and on behalf, of all Licensors.

F.    Licensee agrees to pay for continued maintenance, modification and repair of Licensors' tooling and molds listed on Exhibit H.  Licensors represent and warrant that on the date hereof, such tooling is in good working condition.

## 5. POUCH PRODUCTION:

A.    Licensors shall be the sole supplier of all Sea-Monkeys pouches (which shall include, but not be limited to, numbers 1, 2, 3, 4 and Sea-Diamonds).  Licensors failure to supply Sea-Monkeys pouches, in accordance with the terms hereof, shall be deemed a material breach of this Agreement by Licensors.

B.    Licensee shall provide projected needs in units at least three (3) months before delivery.

C.    Licensee shall provide purchase orders to Transcience which, unless agreed to by Transcience, shall provide for a delivery date at least sixty (60) days after the date of the

purchase order.  Licensors shall use its best efforts to ship the purchased products within one hundred and twenty (120) days of receipt of each purchase order.

D.      Payment terms shall be fifty percent (50%) with purchase order and the balance due fifteen (15) days after the Licensors invoice for verified delivery of pouches.  Partial shipments of orders are acceptable and payable upon such invoicing.

E.      The price shall be F.O.B. Warminster Pennsylvania, $0.21 per pouch (the quantity of the contents in each pouch shall not change) for each unit.  In the event the cost of ingredients is increased, such increase will be passed on to Licensee, provided, however, that documented price increases to Licensors are shown to Licensee and reasonable efforts have been made by Licensors to find alternate sources for ingredients that can be readily purchased from reliable alternate sources.  When providing price increase documentation (which shall include at least two written competitive quotes if reasonably available for the same item from different vendors), Licensors may redact such parts of the invoice or quotation as may be necessary to ensure the confidentiality of the supplier and items related to the formulation of the pouch.

F.      Licensors shall provide pouches to EI only with respect to products that EI will ship on or before December 31, 2007, pursuant to purchase orders held by EI requiring shipment on or before such date.  Licensors shall use their best efforts to cause EI to provide documentation reasonably satisfactory to Licensors and Licensee that will allow Licensors to monitor such EI purchase orders.  Licensors shall direct EI that any pouches held by EI on January 1, 2008 shall be transferred to, or at the direction of, Licensors.

## 6. ADVANCE PAYMENT

A.      Upon execution and delivery of this License by the last person to sign, Licensee shall advance the sum of one hundred thousand dollars ($100,000.00) (the "Advance").  The Advance

shall be delivered to, and held in an interest bearing escrow account by, a mutually acceptable third party, and shall be released to Licensors promptly upon the fulfillment of all Advance Release Conditions (defined below). Following its release to Licensors, the Advance shall be credited against Licensee's payment obligations to Licensors hereunder, including the Minimum Royalty, at the rate of $5,555.56 per month (the "Advance"). Investment earnings on such amount held in escrow shall be paid to the person receiving the escrowed amount. The "Advance Release Conditions" are as follows: (1) Licensors shall provide to Licensee, in writing, (x) a letter (in the form of Exhibit I) advising EI of its obligation to comply with Section 16.D of the EI Agreement (which right shall be exercised by Licensors in at the direction of Licensee and any purchase price shall be paid by Licensee) and advising of the cost to purchase such items, and (y) a letter from Licensors' counsel, in the form attached hereto as Exhibit I, addressed to EI, advising that the effective date of termination of the EI Agreement is December 31, 2007 and that EI shall have no selloff or other rights with respect to the products licensed thereunder after such date; and (2) all factories have entered into binding written agreements with Licensee to: (x) continue to make the same products for Licensee at the same or lower price and delivery terms as offered to EI, with no price increase before January 1, 2009; (y) confirm to Licensee the balance, if any, remaining owed to purchase and own the tooling along with the amounts charged for tooling per-unit built on to the current prices; and (z) allow Licensee to move the tooling on no more than one week notice if it is unable to match a valid written quote from a different factory, provided that Licensee has paid off the balance of the cost of the tooling, for up to one year after the Effective Date and, thereafter allow Licensee to move the tooling for any reason, as long as the tooling is paid for. Licensee acknowledges that some of the tooling is owned by factories in China and cannot be transferred unless first paid for.

Licensee shall make reasonable efforts to continue to utilize the existing Chinese factories, unless and until the volume increases to the extent that additional factories are needed (subject to the above the items (x), (y) and (z) in this section). Licensee shall have the right to work directly with the Chinese factories to negotiate the lowest possible costs for the goods, consistent with the quality of the products.

## 7. LICENSED PRODUCTS GUARANTEE

A.      Licensors, and each of them jointly and severally, guarantee the viability, quality, performance and fitness for the particular purpose of each pouch supplied to Licensee for sale in Licensee's kits according to the claims made for each respective product (which claims shall not be changed without the prior written consent of Licensee) (the "Licensor Guarantee").

B.      Licensors, and each of them jointly and severally, accept full and unconditional responsibility for the viability, quality and performance of any and all pouches made by them, under their direction, or under their supervision, and will promptly and in a commercially prudent manner handle all consumer complaints with respect thereto at their expense. Licensors shall maintain, during the term hereof, and operate a consumer service bureau (the "Consumer Service Bureau"). In the event of a claimed failure of a kit to hatch live Sea-Monkeys that grow and survive for at least one (1) year, Licensors shall replace the "Water Purifier" and "Instant-Life®" pouches according to terms and conditions printed in the Sea-Monkeys® Growth Guarantee and the Sea-Monkeys® Life Insurance Policies, attached thereto (which shall not be changed without the prior written consent of Licensee). Licensee agrees to print on all kits, packaging and any Licensee internet site that offers Licensed Products for sale, Guarantee information with the Transcience name and address for consumers to contact if they desire to make a claim for replacement as herein specified.

C.     Licensors disclaim responsibility or liability for damage claims resulting from the manufacture, sale and distribution of the Licensed Products, including for missing parts or supplies, mispacked kits, broken, damaged, defective or pilfered parts, materials and lost or missing components, or defective packaging.

D.     Licensee agrees to not recycle pouches from any returned shipments without the approval of Licensors nor include it in any new merchandise offered for sale.   Samples of pouches from returned shipments must be sent to the Licensors' laboratory for viability tests before such approval can be given.

## 8.  ADVERTISING CONSIDERATION FOR GRANT OF LICENSE

A.     Licensee shall produce and film a Sea-Monkeys® television commercial and perform a television test with respect thereto in at least one major market before Christmas 2009, which shall involve Wal-Mart, Toys "R" Us, K-Mart or Target.  Licensee agrees to continue to reasonably promote the Licensed Products to consumers and to the trade during the term of the License.  The contents of all advertising shall be subject to the reasonable prior approval of Transcience, which shall be provided in writing within seven (7) days of the date requested, and shall not be unreasonably conditioned, withheld or delayed.  After such contents are approved, it shall be deemed approved for all uses and all purposes during the term hereof.

B.     As additional and essential consideration for the license hereunder, Licensee agrees that it will insert advertising materials supplied by Licensors into the Licensed Products packaging, provided, however, that such materials directly relate to the Licensed Products, are reasonably acceptable in form and substance to Licensee, adhere to the quality standards of Licensee and do not impose any material additional costs on Licensee.  Licensee shall print replacement parts and supply coupons on packaging and shall publish such coupons on any Licensee internet site that

offers Licensed Products for sale, to assist Licensors in their direct-to-consumer sales of the Licensed Products and related items by mail order and other means of direct to consumer marketing, and to assist Licensee by providing consumers the instrument with which to address complaints in order to obtain satisfaction under the Licensor Guarantee.  Licensee further agrees to manufacture for and sell to Licensors, Licensors' requirements of the Licensed Products for mail-order and other mutually agreed purposes at Licensee's direct cost of materials and labor, plus ten percent (10%) of such amount.  The terms of such purchase shall be as set forth in Paragraph 5.B through E. hereof.  No royalties shall be payable on any sales by Licensee to Licensor or any person affiliated therewith or related thereto.

9.  ADDITIONAL AGREEMENTS AND COVENANTS FOR GRANT OF LICENSE

### 9/1     CREATIVE CONTROL

Licensors reserve all rights of creative control over the type, appearance, design, presentation and usage ("Creative Control") to be used by Licensee and all sublicensees and persons with whom Licensee has a joint venture agreement with respect to any and all Licensed Products.  It is further agreed that Creative Control shall not be relinquished by Licensors to any advertising agency, marketing agency, television production company, agent or any others engaged by Licensee for goods or services performed for, or delivered to Licensee in conjunction with any Sea-Monkeys® product or products manufactured or sold under this License by Licensee.  If Licensee does not receive approval from Licensors of submissions made by Licensee within ten (10) business days after receipt of same by Licensors, then any such submission shall be deemed approved.  Licensors agree not to unreasonably withhold, delay or condition approval of submissions.  Licensee acknowledges and agrees that Creative Control is a material part of this License agreement and a violation of this provision shall be considered to be

a material breach of this License agreement.

## 9/2  TRADEMARK AND COPYRIGHT RIGHTS AND USAGES

A.      All use by Licensee of the Licensed Trademarks and of any other trademarks associated with the Licensed Products (other than trademarks owned by Licensee) shall inure to the benefit of Licensors.  All rights in said trademarks other than those specifically granted herein are reserved.  Licensee shall, at any time, whether during or after the term of this Agreement, at no out-of-pocket expense to Licensee, execute any documents reasonably required by Licensors to confirm their ownership of all such rights.

B.      Any and all copyrights which may arise or be acquired at any time in any of the Licensed Products, package design, label or the like, whether created by the Licensors and/or the Licensee (other than copyrights owned by Licensee), shall be the property of the Licensors, but Licensee shall have the right to use such material during the term hereof.

C.      Licensee agrees to cooperate with Licensors or their designee in the prosecution of any trademark or copyright applications that the Licensors may determine should be filed, and for that purpose Licensee shall supply to Licensors from time-to-time, such samples, containers, packages, labels and similar materials as may reasonably be required in connection with any such application used only for that purpose.

D.      Licensee shall, and shall cause each sublicensee and joint venturer to agree to, mark each Licensed Product manufactured and/or distributed by it with the legend: "Copyright ©, the copyright year and Yolanda von Braunhut or Transcience Corp.", as and to the extent appropriate, or if patents are pending, such notice shall also appear.  Licensee shall also mark all catalogs, promotional material, advertising and other materials and presentations applicable to the Licensed Products with any and all such legends as may in each case be appropriate.

E.      Licensee shall, whenever using the Licensed Trademarks, to the extent required by law, use the appropriate trademark symbols: "®" to indicate a registered trademark and a "™" to indicate an unregistered trademark.  All use by Licensee of the Licensed Trademarks shall inure to the benefit of the Licensors. All rights in said trademarks other than those specifically granted herein are reserved.    Licensee shall, at any time, whether during or after the term of this Agreement, at no out-of-pocket expense to it, execute any documents reasonably required by Licensors to confirm their ownership of all such rights.

F.      The Licensee shall use the Licensed Products, Licensed Trademarks and Licensed Copyrights only in the form authorized by Licensors and only in connection with Licensed Products as specified, and shall not place or use the same in connection with merchandise of any kind, nature or description other than the Licensed Products.

G.      Licensee agrees that it will not, during the term of this Agreement or thereafter, attack the ownership and validity of the Licensed Trademarks and/or the Licensed Copyrights or any registration thereof issued by any country or dominion throughout the world.

H.      Licensee agrees to display the Licensed Products, Licensed Copyrights and Licensed Trademarks only in such form and manner as are specifically approved in writing by Licensors, causing or allowing same to appear on the Licensed Products produced hereunder, and/or on their containers, tags, boxes, packages, product cards, labels and the like, and on all catalogs, advertising or promotional material used in connection therewith, such additional legends, marking and notices as Licensors may reasonably request.  Before releasing such materials, or causing or allowing such materials to be released whether by Licensee or sublicensee, Licensee shall submit specimen of same to Licensor for its approval to permit Licensee to edit, modify or otherwise amend such markings, legends and notices, and the form and manner in which the

Licensed Products are displayed.  If approval from Licensors is not received in writing within ten

(10) business days after receipt of specimens and/or samples by Licensors, approval of the form,

nature and/or the appearance of the Licensed Products are thereby deemed approved.  Licensors

agree that such approval shall not be unreasonably withheld, conditioned or delayed.

I.        Licensee agrees that it will not use or associate the Licensed Products and Licensed

Trademarks with any other trademark without the written consent of the Licensors.

## 10.  LABORATORY AND RESEARCH FACILITY MAINTENANCE

A.        Licensee recognizes that the continuance of laboratory testing of the Licensed

Product is essential to determine viability, quality and performance of the unique characteristics

of the Licensed Products line in and packages offered for sale by Licensee, and that the

continuance of research and development programs that has enhanced and improved the

evolution of the Sea-Monkeys as a unique biological phenomena, and will continue to upgrade

the Licensed Product, agrees to pay, weekly, a supplemental laboratory fee of seven hundred and

fifty dollars ($750.00) per week.  Licensee may, at its option, make such payments quarter-

annually, in advance, on the first day of each calendar quarter, in the amount of nine thousand

seven hundred and fifty dollars ($9,750.00) per quarter.  Payments shall be made to Licensors'

designee, Dr. Anthony D'Agostino, Ph.D., Senior Research Scientist.  If Licensee exercises its

option to purchase all of the Sea-Monkeys assets, it shall have the right to discontinue such

payments.

B.        Pouches from each item in a production run shall be tested and certified by the

laboratory as filling all criteria of performance as represented to, and accepted by Licensee, prior

to delivery to Licensee's designated assemblers.  If all criteria are not met for any reason

whatsoever, the pouches will be destroyed and replaced at Licensors' sole cost and expense.

C.       Licensee agrees to send samples of all pouches taken from any returned merchandise to the laboratory for testing prior to resale or reissue to determine the existing viability, performance and condition of the formulas.  The laboratory director will provide a report to the Licensee to insure that all redistributed kits or goods will match the criteria established for the product by Licensors and delivered in good faith and good condition to the Licensee.  If said pouches fail to pass the criteria tests through no fault of the Licensors, Licensee agrees to destroy any unsalvageable goods at its own expense.

## 11. TRADEMARKS, AND COPYRIGHT MAINTENANCE

A.       Inasmuch as international trademark and copyright laws require periodic fees or payments in amounts determined separately by each country where trademarks have been granted, Licensors shall bear sole responsibility to make payments required by law to establish and renew said rights from time to time in the countries where the trademarks for the Licensed Products are registered, and to protect any and all rights to same.  If trademarks are due to expire or have expired in certain countries, or if no sales activity is warranted or undertaken in said countries, then Licensors may, at will, but with no less than four (4) months notice to Licensee, abandon the trademarks at expiration.

B.       Should Licensee wish the Licensed Products to be registered in countries not covered by the Licensors, Licensors agree to register and file trademarks and copyrights where required, but Licensee agrees to pay filing and maintenance fees in those countries during the term hereof.  Ownership shall, at all times, inure to the Licensors, and will not be transferred to Licensee.  Licensee shall have full benefit and protection for same in those countries, for the term hereof.

C.       Licensee shall have the right, at its own discretion, to institute or prosecute any action or proceeding against any party for or by reason of any unlawful infringing of the rights granted

to it by this Agreement; provided, however, that any suit or suits will be instituted, maintained or prosecuted solely at the cost and expense of Licensee, and any and all sums collected or recovered in any such suit or suits, whether by decree, judgment, settlement or otherwise, belong exclusively to Licensee and such sums, after deducting the actual costs and expenses incurred by Licensee in such proceeding, shall be treated as Gross Sales or sublicense revenues, whichever may be the case, hereunder; provided, further, however, that Licensor will have the right to promptly elect to share equally the expense of any such action or proceeding brought by Licensee, and in that event, Licensor will share equally in any and all sums recovered in such suit or suits.  Upon request of Licensee, Licensor will execute all papers, testify on all matters and otherwise cooperate in every way necessary and desirable for the prosecution of any such suits, actions or proceedings including appearing as a party plaintiff if requested by Licensee. Licensee will reimburse Licensor for the reasonable out-of-pocket expenses incurred as a result of such cooperation unless Licensor has elected to share the costs as aforesaid.  Licensee will promptly notify Licensor of the institution of any action or proceeding against third parties for or by reason of any such unlawful infringements.  If Licensee elects not to prosecute any infringement suit, Licensor may do so at Licensor's own expense after notice to Licensee of that intention.  Licensee will cooperate in every way necessary and desirable for the prosecution of any such suits, actions or proceedings.  Any sums recovered will belong exclusively to Licensor, after first reimbursing Licensee for its reasonable expenses incurred as a result of such cooperation.

## 12.  RECORDS

Licensee agrees to maintain appropriate books of account in which accurate entries shall be made concerning all transactions within the scope of this agreement.    Licensors shall have

the right, to be exercised during business hours and no more than two times per calendar year, through any authorized representatives of its choice, on not less than ten (10 ) business days prior written notice to Licensee, to examine and take extracts from such books of account and other records, documents and materials in the possession of, or under the control of Licensee, with respect to royalties payable under this agreement. Licensee shall keep all such books of account and records available for at least two (2) years or as required by the United States Internal Revenue Service after the close of each reporting year. Any information obtained shall be treated by Licensors, and its authorized representatives, as confidential information.

### 13. **CONTROL OF USE**

A.      Each Licensed Product shall be subject to the reasonable approval of Licensors, which shall not be unreasonably withheld, delayed or conditioned, and upon approval thereof, Licensee agrees to manufacture the same as approved. During the term thereof, Licensee shall, from time-to-time, upon request, submit samples of the current productions of the Licensed Products as evidence of the maintenance of quality standards as set forth herein. If written approval from Licensors relative to submissions made by Licensee is not received by Licensee within ten (10) business days after delivery to Licensors, such submission shall be deemed approved.

### 14. **BEST EFFORTS**

A.      During the term of this License agreement, Licensee shall use its reasonable best efforts to exploit the rights and license granted hereby.

B.      Licensee shall use reasonable efforts to promote and conclude suitable arrangements, sublicenses and other agreements for the manufacture and/or sale of the Licensed Products in major United States markets.

C.      Licensee shall exercise due diligence in the enforcement of the terms of any and all

sublicenses and agreements relating to any of the Licensed Products negotiated by it.

## 15. RENEWAL, EXPIRATION AND TERMINATION

A.      If the Licensee fails to render statements or to make payment of royalties and the consideration set forth in paragraphs 3 and 4 or observe the requirements regarding Creative Control as set forth in paragraph 9/1 in any material respect, the Licensors, may on thirty (30) day written notice to the Licensee, terminate this Agreement.  If such default is not cured within such thirty (30) days, this Agreement shall terminate upon the date set forth in such notice, without prejudice to the moneys due to Licensors hereunder up until the date of such termination. If the Licensee shall correct such default during the notice period, the notice shall be of no further force or effect.

B.      If the Licensee shall abandon the exploitation and stop attempting to sell the Licensed Product for a period of three (3) consecutive months, the Licensors may, on thirty (30) days written notice to the Licensee, terminate this Agreement.  If such default is not cured within such thirty (30) days, this Agreement shall terminate upon the date set forth in such notice, without prejudice to the moneys due to Licensors hereunder up until the date of such termination.

C.      If any party makes any assignment of assets or business for the benefit of creditors, or if a trustee or receiver is appointed to administer or conduct its business, or if any voluntary or involuntary petition in bankruptcy is filed against, or by such party, then the rights granted herein shall forthwith cease and terminate without prior notice or legal action by the other party; and provided, further, that in the event that the any party fails to comply with any material provision of this Agreement in any material respect, or any representation or warranty made herein is incorrect or untrue in any material respect when made, or becomes untrue or incorrect in any material respect during the term hereof, the other party may terminate this Agreement upon not

less than thirty (30) days written notice to the breaching party, but, if such breaching party shall correct such default during the notice period, the notice shall be of no further force or effect.

D.      Upon the termination of this Agreement for any reason set forth in subdivisions A through C herein, Licensee shall, at its sole cost and expense, furnish Licensors with all artwork, plates, dies and printing material furnished to Licensee by Licensors. Licensee shall also offer to sell Licensor all new artwork, molds, tools and/or dies and other materials and/or equipment built or purchased by Licensee for the Licensed Products at Licensee's then book value.

E.      In the event of cancellation, Licensee shall have 120 days after termination to fill then existing purchase orders and sell inventory to current customers at prices that will not damage the brand.

## 16. INSURANCE

A.      Licensee shall procure and maintain at its expense, in full force and effect at all times during the term hereof, at least five million dollars ($5,000,000.00) of products liability insurance coverage for the Licensed Products with responsible insurance carrier or carriers reasonably acceptable to Licensors. Licensors shall be listed as an additional insured on Licensee's policy, and such policy shall provide for at least ten (10) days prior written notice to Licensors of any cancellation or substantial modification thereof.

B.      Licensee shall, from time to time, upon reasonable written request by the other, promptly furnish or cause to be furnished to Licensors, evidence in form and substance satisfactory to Licensors, of the maintenance of the insurance required by paragraph A above, including but not limited to copies of policies, certificates of insurance (with applicable riders and endorsement) and proof of premium payments.

## 17. OPTION TO PURCHASE

22

A.    At any time during the term of the Agreement, Licensee shall have the right to purchase all right, title and interest, free of all liens, claims and encumbrances, in and to any and all of the Licensed Products, including Sea-Monkeys and related assets (which shall specifically include all intellectual property rights, including trade secrets) for an amount not to exceed $10,000,000, payable as follows: (i) $5,000,000 upon exercise of the option, upon which all right, title and interest in and to all such assets, free and clear of any and all liens, claims and encumbrances shall be transferred to Licensee, including the secret formula, and (ii) up to $5,000,000 shall be payable thereafter from (x) royalties comprised of 5% of merchandising sales, and (y) entertainment related revenue comprised of 25% of all entertainment related revenue received by Licensee for the first three years following exercise of the option, and 10% of all entertainment related revenue received by Licensee thereafter, until the balance of the purchase price is fully paid. If Licensee exercises the purchase option, and thereafter elects to resell the assets before the balance of the purchase price has been paid, the balance of the purchase price shall become fully due upon Licensee's consummation of the resale.

B.    If the purchase option is exercised, Licensee shall own all aftermarket sales. Licensors shall cause the lab to transfer to, or otherwise disclose to, Licensee, at no out-of-pocket expense to Licensee, all right, title and interest (free and clear of any and all liens, claims and encumbrances) in and to all information, know-how, and trade secrets needed to continue proper performance of its services and also shall cause the lab to sign a reasonable confidentiality agreement (at no additional cost to Licensee) at that time. At any time prior to the exercise date of the option, Licensors shall, upon request by Licensee, cause the lab to deposit all such information, know how and trade secrets with an independent escrow agent, to be released to Licensee upon exercise of the option.

C.       Payment of the balance owed will be secured by a UCC-1 on all Sea-Monkeys assets.

D.       If prior to the exercise of this option by Licensee, another company with the approval of Licensors seeks to purchase all of the Sea-Monkeys assets, Licensee shall be given a copy of the third party's (buyer's) executed letter of intent to purchase Sea-Monkeys and thereafter the Licensee shall have a thirty (30) day right of first refusal to purchase the assets at the price and terms set forth in subparagraph 17 A above or at such lower price and/or better terms as set forth in such executed letter of intent. If Licensee elects not to do so, Licensors shall be free to consummate the sale to the other company upon the terms and conditions in the executed letter of intent, which sale shall be subject to all of the terms and conditions of Licensors' agreements with Licensee, including this License agreement.

## 18. NOTICES

A.       Notices under this Licensee agreement shall be in writing and shall be sufficient if sent by Certified Mail or Priority Overnight Mail and addressed to the address set forth above or to such other address as one party shall designate to the other in writing.

B.       Reports, payments and notices hereunder shall be delivered at the respective address set forth above, except that a moving party shall, in writing, notify the other party that a specified new address shall thereafter be used.

C.       All consents, approvals, notices and/or acts required in this agreement to be given or made on behalf of the Licensors shall be given and made to von Braunhut who shall secure the consent of herself and Transeience.

## 19. ARBITRATION

In the event of a disagreement between the parties with respect to this Agreement, either party, if they wish to adjudicate such disagreement, shall submit the issue in dispute for

05-21.5.1: 679187                    24

arbitration under the rules of the American Arbitration Association, the election to be by written notice to the other party. Upon service of the notice, the issue shall be submitted to a single arbitrator in accordance with the rules. The arbitration shall be at a location within New York County, the State of New York, at a place selected by the arbitrator. The decision by the arbitrator on any matter submitted shall be final, conclusive and binding on the parties. Each of the parties by executing this Agreement unconditionally submits to the jurisdiction of the courts of the State of New York and of the United States District Court for the Southern District of New York and other federal courts, for the purpose of enforcement of any arbitration award.

## 20. MISCELLANEOUS

A.      Nothing contained herein shall be construed to place either party in the relationship of legal representative, partner, joint venturer or agent of the other, and neither party shall have the power to obligate or bind the other in any manner.

B.      The failure of a party to insist upon strict adherence to any term of this Agreement on any occasion shall not be considered a waiver, or deprive that party of the right thereafter to insist, upon strict adherence to that term or any other term of this Agreement.  Any waiver must be in writing.

C.      This Agreement contains the complete statement of all of the arrangements among the parties with respect to its subject matter, and cannot be changed or terminated orally. This Agreement is intended to replace and supersede all other prior agreements and understandings between the parties.

D.      Each party shall have the right to setoff amounts due to it against any amounts due by it to the other party.

E.      If any provision or portion of this Agreement shall at any time be determined by any

Court of competent jurisdiction to be invalid, illegal or unenforceable, and such determination shall become final, such provision or portion shall be deemed to be severed and deleted heretofore, and the remaining provisions and portions shall survive and be enforced to give effect to the intentions of the parties insofar as that is possible.

F.    Neither this Agreement nor any interest herein may be assigned in whole or in part by the Licensee without the prior written consent of the Licensors, except that without securing such prior written consent, Licensee may assign this Agreement to (a) a bona fide successor of all or substantially all of its business and /or (b) any publicly held business entity which (1) has a provable net worth in excess of $15,000,000.00 and (2) is in the toy, educational or novelty or similar business, all on condition only that any such transferee(s) also concurrently assume all of Licensee's obligations with respect to the interest transferred. No assignment shall be valid and binding until and unless Licensors shall be provided with a signed copy of the Assignment and the assignee shall have assumed in writing all of the duties and obligations of the Licensee. Licensors may assign this Agreement by giving written notice of such assignment with trademark symbols and Copyright notices.

G.    It is understood and agreed that, in the event of an act of the government, war conditions, fire, flood or other natural disaster, or labor or manufacturing problems which prevent the performance by Licensee of the provisions of this agreement, such nonperformance by Licensee will not be considered a breach of this agreement, and such nonperformance will be excused while, but not longer than, the conditions described herein prevail.

## 21.  GOVERNING LAW

A.    This agreement shall be governed by the laws of the State of New York.

B.    This Agreement constitutes the entire understanding and agreement of the parties and

26

05-2161-071918-7

may not be modified except by writing signed by them.

IN WITNESS WHEREOF, the parties have executed this Agreement on the date

above written.

BIG TIME TOYS, LLC                              TRANSCIENCE CORPORATION

By _____                     By: _____
Sam K. Harwell, Chief Manager                       Yolanda von Braunhut, CEO

WITNESSETH:                                     YOLONDA VON BRAUNHUT,

_____                        _____
                                                Yolanda von Braunhut, individually

                                                WITNESSETH:

                                                _____

05-216.1 671918.7                    27

Harold von Braunhut          1 (301) 375-9050      p.1          ☒002/002

may not be modified except by writing signed by them.

IN WITNESS WHEREOF, the parties have executed this Agreement on the date

above written.

BIG TIME TOYS, LLC                          TRANSCIENCE CORPORATION   6/18/2007

                                            By *Yolonda von Braunhut*
By_____                    Yolanda von Braunhut, CEO
Sam K. Harwell, Chief Manager

                                            YOLONDA VON BRAUNHUT,
WITNESSETH:                                 *Yolanda*
                                            *Yolonda von Braunhut*
_____                      Yolanda von Braunhut, individually

                                            WITNESSETH:

                                            _____

05:4161-5719186.                                    27

# EXHIBIT A

## LICENSED PRODUCTS

"Licensed Products" shall mean all Products, including tanks and pouches, devices, methods, processes and services embodying, comprising, using, consisting of, derived from or based on all or any part of the Sea-Monkeys brand or Licensor's Intellectual Property Rights, in whole or in part, and all manifestations, derivatives and extensions thereof, and all materials sold for use with, on or in connection therewith, all future improvements, embodiments, additions and components of or relating thereto, used for any purpose whatsoever anywhere in the world, whether or not any patents, trademarks or copyrights actually issue related thereto.

"Licensor's Intellectual Property Rights" means any and all intellectual property rights owned or controlled by Licensor which are embodied in or related to Sea-Monkeys, including, without limitation, modifications thereof; applications for or patents; patents issued; copyrights; trademarks either previously used in commerce by Licensor in connection with the item, or with respect to which Licensor has officially, and in a manner sanctioned by applicable laws, indicated its intent to use (it being understood that the mere creation or coining of a trademark by Licensor without such use does not create rights therein); proprietary or confidential data or information or trade secrets relating to Sea-Monkeys its design or manufacture, including but not limited to know how, but specifically excluding trade secret formulas for products sold in pouches; any invention derived from or substantially similar in purpose or function to Sea-Monkeys, regardless of the materials or operational systems used in the invention; all ideas, know how, trade secrets (other than trade secret formulas for products sold in pouches), methods, designs, developmental or experimental work, improvements, discoveries, product or research plans, products, inventions, business and marketing plans, techniques, manufacturing and other processes, data, source, object and executables codes, programs, diagrams, formats, technology, needs and specifications, technical information, reports, and documentation relating thereto; and all of Licensors' existing and future right, title and interest in and to Sea-Monkeys and intellectual property rights, and all versions thereof, now or hereafter created, whether or not patentable or registrable under patent, copyright or similar statutes including but not limited to (A) the undivided rights in patents, copyrights, trademarks, service marks, and all applications, registrations, extensions, substitutions, renewals, divisions, reissues, continuations, continuations in part and other filings related thereto, and all other proprietary rights of any kind therein, whether now known or hereafter created and throughout the world, (B) any and all claims, demands, and causes of action for infringement or otherwise of the same, past, present and future, and (C) all of the proceeds from the foregoing, accrued and unpaid and hereafter accruing.

# EXHIBIT B

## LICENSED TRADEMARKS

(The following trademarks, in addition to all trademarks referred to in Exhibit A)

## Transcience Corporation – Due Date List

| COUNTRY | TRADEMARK | REG. NO. | EXPIRES |
|---|---|---|---|
| Argentina | SEA-MONKEYS (Stylized) | 1.744.137 (Old Reg. No. 1.340.083) | 7/12/2009 |
| Australia | SEA-MONKEYS | 260449 | 7/20/2010 |
| Canada | SEA-MONKEYS | 630,098 | 1/13/2020 |
| Canada | SEA-MONKEYS | 552,029 | 10/5/2016 |
| European Union | SEA-MONKEYS | 000563155 | 6/30/2017 (Renewal appl. filed; waiting for Cert. Of Renewal, old expiration date: 6/30/2007) |
| France | SEA-MONKEYS | 1.626.432 | 11/8/2010 |
| Germany | SEA-MONKEYS | 899238 | 12/31/2010 |
| Italy | SEA-MONKEYS | 870677 | 5/20/2009 |
| Mexico | SEA-MONKEYS | 726034 | 8/10/2011 |
| Mexico | SEA-MONKEYS | 753394 | 8/10/2011 |
| New Zealand | SEA-MONKEYS | 277925 | 6/9/2018 |
| South Africa | SEA-MONKEYS | 1972/03452 | 7/4/2012 |
| South Korea | SEA-MONKEYS | 0569293 | 12/19/2013 |
| Spain | SEA-MONKEYS | 756685M | 6/14/2014 |
| Switzerland | SEA-MONKEYS | Not filed yet | |
| United Kingdom | SEA-MONKEYS | 967346 | 11/6/2015 |
| United States | SEA-MONKEYS | 2485247 | 9/4/2011 |
| United States | INSTANT LIFE | 769330 | 5/12/2014 |
| United States | SEA-MONKEYS | 769332 | 5/12/2014 |
| United States | HATCHED EGG DESIGN | 769331 | 5/12/2014 |

| COUNTRY | TRADEMARK | REG. NO. | EXPIRES |
|---------|-----------|----------|---------|
| United States | OCEAN ZOO | 2509518 | 11/20/2011 |
| United States | X-RAY SPEX | 1003937 | 2/4/2015 |
| United States | INSTANT PETS | 999873 | 12/17/2014 |
| United States | TC & Design | 999872 | 12/17/2014 |

**EXHIBIT C**

**LICENSED COPYRIGHTS**

(The following copyrights, in addition to all copyrights referred to in Exhibit A)

1.   <u>von Braunhut</u> Copyright – "Its Fun to Raise Pet Sea-Monkeys Instruction Handbook".

# TRANSCIENCE CORPORATION - STATUS REPORT

Report Date:  5/31/2007                    Page: 1

| Country | ID | Mark | Classes | Reg. Owner | App. # | App. Dt | Reg. # | Reg. Dt | Allow. Dt | ITU |
|---|---|---|---|---|---|---|---|---|---|---|
| Argentina | 9372 | SEA-MONKEYS (STYLIZED) | 29 | TRANSCIENCE CORPORATION | 2,211,676 | | 1,744,137 | 7/12/1999 | | No |
| Australia | 8784 | SEA-MONKEYS | 31 | TRANSCIENCE CORPORATION | 260449 | 7/20/1972 | 260449 | 7/20/1972 | | No |
| Canada | 8786 | SEA-MONKEYS | 28, 31 | HAROLD VON BRAUNHUT | 1,117,342 | 10/2/2001 | TMA630,008 | 1/13/2005 | | No |
|  | 8785 | SEA-MONKEYS | 31, 35 | HAROLD VON BRAUNHUT | 1,046,688 | 2/21/2000 | TMA552,029 | 10/5/2001 | | No |
| European Union | 8797 | SEA-MONKEYS | 1, 31 | TRANSCIENCE CORPORATION | 000563155 | 6/30/1997 | 000563155 | 11/23/1999 | | No |
| France | 8787 | SEA MONKEYS | 31 | TRANSCIENCE CORPORATION | 248,375 | 11/8/1990 | 1,626,432 | 11/8/1990 | | No |
| Germany | 8788 | SEA-MONKEYS | 1, 5, 31 | TRANSCIENCE CORPORATION | T1411431WZ | 12/21/1970 | 899238 | 11/8/1972 | | No |
| Italy | 8789 | SEA-MONKEYS | 31 | TRANSCIENCE CORPORATION | 257299RM | 5/20/1999 | 870677 | 7/2/2002 | | No |

# TRANSCIENCE CORPORATION – STATUS REPORT

Report Date: 5/31/2007      Page: 2

| Country | ID | Mark | Classes | Reg. Owner | App. # | App. Dt | Reg. # | Reg. Dt | Allow. Dt | ITU |
|---|---|---|---|---|---|---|---|---|---|---|
| | 9388 | SEA-MONKEYS | 31 | TRANSCIENCE CORPORATION | 99C002572 | 5/20/1999 | | | | No |
| Mexico | 8792 | SEA-MONKEYS | 28 | HAROLD VON BRAUNHUT | 0500763 | 8/10/2001 | 726034 | 11/30/2001 | | No |
| | 8793 | SEA-MONKEYS | 31 | HAROLD VON BRAUNHUT | 0500762 | 8/10/2001 | 753394 | 6/28/2002 | | No |
| New Zealand | 8790 | SEA-MONKEYS | 31 | HAROLD VON BRAUNHUT | 277925 | 5/9/1997 | 277925 | 10/15/1998 | | No |
| South Africa | 8791 | SEA-MONKEYS | 31 | TRANSCIENCE CORPORATION | 72/3452 | 7/4/1972 | 1972/03452 | 7/4/1972 | | No |
| South Korea | 8794 | SEA-MONKEYS | 31 | HAROLD VON BRAUNHUT | 2002-0027346 | 6/12/2002 | 569293 | 12/19/2003 | | No |
| Spain | 8795 | SEA-MONKEYS | 31 | TRANSCIENCE CORPORATION | 756685M | 6/14/1974 | 756685M | 3/30/1977 | | No |
| Switzerland | 8842 | SEA-MONKEYS | 28 | TRANSCIENCE CORPORATION | | | | | | No |
| United Kingdom | 8796 | SEA-MONKEYS | | | | | | | | |

# TRANSCIENCE CORPORATION - STATUS REPORT

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 8796 | SEA-MONKEYS | 31 | TRANSCIENCE CORPORATION | 967346 | 11/6/1970 | 967346 | 11/6/1991 | | No |

**Country:** United States

| ID | Mark | Classes | Reg. Owner | App. # | App. Dt | Reg. # | Reg. Dt | Allow. Dt | ITU |
|---|---|---|---|---|---|---|---|---|---|
| 9117 | SEA-MONKEYS | 28 | HAROLD VON BRAUNHUT | 76136804 | 9/28/2000 | 2485247 | 9/4/2001 | | No |
| 9370 | INSTANT LIFE | 31 | TRANSCIENCE CORPORATION | 72161789 | 1/31/1963 | 769330 | 5/12/1964 | | No |
| 9332 | "SEA-MONKEYS" | 31 | HAROLD VON BRAUNHUT | 72161791 | 1/31/1963 | 769333 | 5/12/1964 | | No |
| 9331 | HATCHED EGG DESIGN | 31 | HAROLD VON BRAUNHUT | 72161790 | 1/31/1963 | 769331 | 5/12/1964 | | No |
| 9329 | OCEAN-ZOO | 16 | HAROLD VON BRAUNHUT | 76137530 | 9/29/2000 | 2509518 | 11/20/2001 | | No |
| 9328 | X-RAY SPEX | 28 | TRANSCIENCE CORPORATION | 72455190 | 4/20/1973 | 1003937 | 2/4/1975 | | No |
| 9327 | INSTANT PETS | 31 | TRANSCIENCE CORPORATION | 72456406 | 5/3/1973 | 999873 | 12/17/1974 | | No |
| 8964 | TC & DESIGN | 31 | TRANSCIENCE CORPORATION | 72462952 | 3/29/1973 | 999872 | 12/17/1974 | | No |

# TRANSCIENCE CORPORATION - DOCKET

Report Date: 5/11/2007  Page: 1

| Action | Mark | Country | Classes | Application # | Registration # | Status | Client | ID |
|---|---|---|---|---|---|---|---|---|
| Use Required | SEA-MONKEYS (STYLIZED) | Argentina | 29 | 2,211,576 | 1,746,137 | Registered | TRANSCIENCE CORPORATION | 9372 |
| Renewal | SEA-MONKEYS (STYLIZED) | Argentina | 29 | 2,211,576 | 1,746,137 | Registered | TRANSCIENCE CORPORATION | 9372 |
| Use Required | SEA-MONKEYS | Australia | 31 | 260449 | 260449 | Registered | TRANSCIENCE CORPORATION | 8784 |
| Renewal | SEA-MONKEYS | Australia | 31 | 260449 | 260449 | Registered | TRANSCIENCE CORPORATION | 8784 |
| Use Required | SEA-MONKEYS | Canada | 24, 31 | 1,117,342 | TMA630,098 | Registered | YOLANDA VON BRAUNHUT | 8786 |
| Renewal | SEA-MONKEYS | Canada | 24, 31 | 1,117,342 | TMA630,098 | Registered | YOLANDA VON BRAUNHUT | 8785 |
| Renewal | SEA-MONKEYS | Canada | 31, 35 | 1,046,688 | TMA552,029 | Registered | YOLANDA VON BRAUNHUT | 8785 |
| Renewal | SEA-MONKEYS | Canada | 31, 35 | 1,046,688 | TMA552,029 | Registered | YOLANDA VON BRAUNHUT | 8785 |
| Renewal | SEA-MONKEYS | European Union | 1, 31 | 000563155 | 000563155 | Registered | TRANSCIENCE CORPORATION | 8797 |
| Use Required | SEA-MONKEYS | European Union | 1, 31 | 000563155 | 000563155 | Registered | TRANSCIENCE CORPORATION | 8797 |
| Renewal | SEA-MONKEYS | France | 31 | 248,315 | 1,626,432 | Registered | TRANSCIENCE CORPORATION | 8787 |
| Use Required | SEA-MONKEYS | France | 31 | 248,315 | 1,626,432 | Registered | TRANSCIENCE CORPORATION | 8787 |
| Use Required | SEA-MONKEYS | Germany | 1, 5, 31 | T141142IVVZ | 899238 | Registered | TRANSCIENCE CORPORATION | 8788 |
| Renewal | SEA-MONKEYS | Germany | 1, 5, 31 | T141142IVVZ | 899238 | Registered | TRANSCIENCE CORPORATION | 8788 |
| Renewal | SEA-MONKEYS | Italy | 31 | 252399RM | 810077 | Registered | TRANSCIENCE CORPORATION | 8789 |
| Renewal | SEA-MONKEYS | Italy | 31 | 99C002572 | 810077 | Registered | TRANSCIENCE CORPORATION | 9388 |
| Use Required | SEA-MONKEYS | Italy | 31 | 252399RM | 870077 | Registered | TRANSCIENCE CORPORATION | 8789 |
| Use Required | SEA-MONKEYS | Mexico | 31 | 0500762 | 753394 | Registered | YOLANDA VON BRAUNHUT | 8793 |
| Renewal | SEA-MONKEYS | Mexico | 31 | 0500762 | 753394 | Registered | YOLANDA VON BRAUNHUT | 8793 |
| Renewal | SEA-MONKEYS | Mexico | 28 | 0500763 | 726034 | Registered | YOLANDA VON BRAUNHUT | 8792 |
| Use Required | SEA-MONKEYS | Mexico | 28 | 0500765 | 726034 | Registered | YOLANDA VON BRAUNHUT | 8792 |
| Renewal | SEA-MONKEYS | New Zealand | 31 | 277925 | 277925 | Registered | YOLANDA VON BRAUNHUT | 8790 |
| Use Required | SEA-MONKEYS | New Zealand | 31 | 277925 | 277925 | Registered | YOLANDA VON BRAUNHUT | 8790 |

# TRANSCIENCE CORPORATION - DOCKET

Report Date: 5/31/2007   Page: 2

| Reg. Dt | Due Dt | Action | Mark | Country | Class | Application # | Registration # | Status | Client | ID |
|---|---|---|---|---|---|---|---|---|---|---|
| 7/4/2013 | 7/4/2012 | Renewal | SEA-MONKEYS | South Africa | 31 | 722482 | 1972/03452 | Registered | TRANSCIENCE CORPORATION | 8791 |
| 12/19/2012 | 12/19/2012 | Renewal | SEA-MONKEYS | South Korea | 31 | 2002-0027346 | 0569293 | Registered | YOLANDA VON BRAUNHUT | 8794 |
| 6/14/2009 | 6/14/2010 | Use Required | SEA-MONKEYS | Spain | 31 | 756685M | 756685M | Registered | TRANSCIENCE CORPORATION | 8795 |
| 6/14/2009 | 6/14/2010 | Renewal | SEA-MONKEYS | Spain | 31 | 756685M | 756685M | Registered | TRANSCIENCE CORPORATION | 8795 |
| 11/6/2009 | 11/6/2010 | Use Required | SEA-MONKEYS | United Kingdom | 31 | 967346 | 967346 | Registered | TRANSCIENCE CORPORATION | 8796 |
| 5/6/2015 | 11/6/2015 | Renewal | SEA-MONKEYS | United Kingdom | 31 | 967346 | 967346 | Registered | TRANSCIENCE CORPORATION | 8796 |
| 11/12/2013 | 5/12/2014 | Renewal Prior Nov 16, 1989 | HATCHED EGG DESIGN | United States | 31 | 72161790 | 760331 | Registered | YOLANDA VON BRAUNHUT | 9331 |
| 5/12/2014 | 11/12/2014 | Renewal Prior Nov 16, 1989 Ext #1 | HATCHED EGG DESIGN | United States | 31 | 72161790 | 760331 | Registered | YOLANDA VON BRAUNHUT | 9331 |
| 11/12/2013 | 5/12/2014 | Renewal Prior Nov 16, 1989 | "SEA-MONKEYS" | United States | 31 | 72161791 | 760332 | Registered | YOLANDA VON BRAUNHUT | 9332 |
| 5/12/2014 | 11/12/2014 | Renewal Prior Nov 16, 1989 Ext #1 | "SEA-MONKEYS" | United States | 31 | 72161791 | 760332 | Registered | YOLANDA VON BRAUNHUT | 9332 |
| 11/20/2010 | 11/20/2011 | Renewal | OCEAN-ZOO | United States | 16 | 76137530 | 2509518 | Registered | YOLANDA VON BRAUNHUT | 9929 |
| 6/17/2014 | 12/17/2014 | Renewal Prior Nov 16, 1989 | INSTANT PETS | United States | 31 | 72456606 | 999873 | Registered | TRANSCIENCE CORPORATION | 9327 |
| 12/17/2014 | 6/17/2015 | Renewal Prior Nov 16, 1989 Ext #1 | INSTANT PETS | United States | 31 | 72456606 | 999873 | Registered | TRANSCIENCE CORPORATION | 9327 |
| 8/4/2014 | 2/4/2015 | Renewal Prior Nov 16, 1989 | X-RAY SPEX | United States | 28 | 72455190 | 1003937 | Registered | TRANSCIENCE CORPORATION | 9328 |
| 2/4/2015 | 8/4/2015 | Renewal Prior Nov 16, 1989 Ext #1 | X-RAY SPEX | United States | 28 | 72455190 | 1003937 | Registered | TRANSCIENCE CORPORATION | 9328 |
| 5/12/2014 | 11/12/2014 | Renewal Prior Nov 16, 1989 Ext #1 | INSTANT LIFE | United States | 31 | 72161789 | 769330 | Registered | TRANSCIENCE CORPORATION | 9370 |
| 11/12/2013 | 5/12/2014 | Renewal Prior Nov 16, 1989 | INSTANT LIFE | United States | 31 | 72161789 | 769330 | Registered | TRANSCIENCE CORPORATION | 9370 |
| 9/4/2010 | 9/4/2011 | Renewal | SEA MONKEYS | United States | 28 | 76136804 | 2485247 | Registered | YOLANDA VON BRAUNHUT | 9117 |
| 6/17/2014 | 12/17/2014 | Renewal Prior Nov 16, 1989 | TC & DESIGN | United States | 31 | 72452852 | 999872 | Registered | TRANSCIENCE CORPORATION | 8964 |
| 12/17/2014 | 6/17/2015 | Renewal Prior Nov 16, 1989 Ext #1 | TC & DESIGN | United States | 31 | 72452852 | 999872 | Registered | TRANSCIENCE CORPORATION | 8964 |