## EXHIBIT D

### LICENSED PATENTS

(The following patents, in addition to all patents referred to in Exhibit A)

1.     U.S. Patent No.

United States Patent: 6416217

## USPTO PATENT FULL-TEXT AND IMAGE DATABASE

| Home | Quick | Advanced | Pat Num | Help |

| Hit List | Previous | Bottom |

| View Cart | Add to Cart |

| Images |

( 3 of 3 )

| United States Patent | 6,416,217 |
| Von Braunhut | July 9, 2002 |

Aquarium watch

### Abstract

A timepiece has a removably attachable aquarium, adapted to support aquatic life. Living aquatic pets are introduced into the aquarium prior to attaching the aquarium to the timepiece. A wearer of such timepiece is then able to contemporaneously tell time and enjoy watching the living aquatic pets. A kit is also provided with a timepiece, an aquarium and aquatic life adapted to be supported in said aquarium.

Inventors: Von Braunhut; Harold (Bryans Rd., MD)
Appl. No.: 09/761,366
Filed:       January 16, 2001

| Current U.S. Class: | 368/278 ; 368/10; 368/223; 368/226; 368/285; 368/62; 368/67 |
| Current International Class: | G04B 47/04 (20060101); G04B 47/00 (20060101); G04B 037/00 (); G04B 037/12 () |
| Field of Search: | 368/10,62,65,67,76,77,80,116,223-227,240,278,285 |

### References Cited [Referenced By]

#### U.S. Patent Documents

| 410808 | September 1889 | Schelker |
| 947937 | February 1910 | Porter |
| 1006965 | October 1911 | Matalene |
| 2746237 | May 1956 | Anderson |
| 4945523 | July 1990 | Lam |
| 5272681 | December 1993 | Lee |
| 5305292 | April 1994 | Reynoso |

United States Patent: 6416217                                    Page 2 of 10

| | | |
|---|---|---|
| <u>5652736</u> | July 1997 | Lee |
| <u>5751667</u> | May 1998 | Nunes |
| <u>5850373</u> | December 1998 | Lee |
| <u>5923623</u> | July 1999 | Lee |

*Primary Examiner:* Martin; David
*Assistant Examiner:* Lindinger; Michael L.
*Attorney, Agent or Firm:* Katten Muchin Zavis Rosenman

---

### *Claims*

---

I claim:

1. A wristwatch comprising:

a) a watch face, and

b) an aquarium removably attached to said watch face,

c) wherein said aquarium further comprises a plug member adapted to permit the introduction of aquatic life into said aquarium and further adapted to seal said aquatic life within said aquarium.

2. A wristwatch in accordance with claim 1, wherein said plug member is positioned adjacent said watch face when said aquarium is attached to said watch face.

3. A wristwatch in accordance with claim 1, wherein said aquarium is rotatingly removably attached to said watch face.

4. A wristwatch in accordance with claim 1, wherein said watch face further comprises a time display.

5. A wristwatch in accordance with claim 4, wherein said time display is digital.

6. A wristwatch in accordance with claim 4, wherein said time display is viewable through said aquarium when said aquarium is attached to said watch face.

7. A wristwatch in accordance with claim 4, wherein said time display is viewable through said aquarium when said aquarium is attached to said watch face and filled with aquatic life.

8. A wristwatch in accordance with claim 1, further comprising aquatic life adapted for insertion into said aquarium.

9. A wristwatch in accordance with claim 8, wherein said aquatic life is hybrid brine shrimp.

10. A wristwatch in accordance with claim 8, further comprising a transport member adapted to introduce said aquatic life into, and remove said aquatic life from, said aquarium.

11. A wristwatch in accordance with claim 1, further comprising a decorative element adapted for insertion between said aquarium and said watch face.

United States Patent: 6416217

12. A wristwatch in accordance with claim 11, wherein said decorative element is a phosphorescent disc.

13. A wristwatch in accordance with claim 4, further comprising an interchangeable watch face.

14. An aquarium watch system comprising:

a) a wristwatch,

b) an aquarium removably attachable to said wristwatch,

c) a transport member for introducing aquatic life into said aquarium.

15. An aquarium watch system in accordance with claim 14, wherein said aquarium further comprises a plug member adapted to permit the introduction of aqueous fluid into said aquarium and further adapted to seal said aqueous fluid within said aquarium.

16. An aquarium watch system in accordance with claim 15, further comprising aquatic life adapted to survive in said aquarium.

17. An aquarium watch system in accordance with claim 16, wherein said aquatic life is adapted to survive for at least 12 hours in said aquarium.

18. An aquarium watch system in accordance with claim 16, wherein said aquatic life is hybrid brine shrimp.

19. An aquarium watch system in accordance with claim 16, further comprising means for coloring said aquatic life.

20. An aquarium watch kit comprising:

a) a watch for telling time,

b) an aquarium removably attachable to said watch, said aquarium adapted to support aquatic life,

c) aquatic life adapted to survive in said aquarium,

d) a water purifier for preparing a separate living environment for said aquatic life,

e) growth food for nourishing said aquatic life, and

f) a transport member adapted to transport said aquatic life between said separate environment and said aquarium.

21. A method in accordance with claim 20, wherein said growth food further comprises coloring means for imparting color to said aquatic life.

22. A method in accordance with claim 21, wherein said coloring means further comprises dried algae.

23. A method of contemporaneously telling time and enjoying aquatic pets, comprising the steps of:

a) providing a timepiece having a time display,

b) providing an aquarium constructed for removable attachment to said timepiece, said aquarium having a plug member adapted to permit the introduction aquatic pets into said aquarium and further adapted to seal said aquatic pets within said aquarium, and

c) introducing aquatic pets into said aquarium.

24. A method in accordance with claim 23, further comprising the step of attaching said aquarium to said timepiece.

25. A method in accordance with claim 23, wherein said time display is viewable through said aquarium when said aquarium is attached to said timepiece.

26. A method in accordance with claim 23, wherein said aquarium is further rotatably attachable to said timepiece.

27. A method in accordance with claim 23, further comprising the step of introducing a phosphorescent element to said timepiece or said aquarium for illuminating said timepiece or said aquarium.

28. A combination timepiece and aquarium comprising:

a) a timepiece having a time display, and

b) an aquarium removably attached to said timepiece,

c) wherein said aquarium further comprises a plug member adapted to permit the introduction of aquatic life into said aquarium and further adapted to seal said aquatic life within said aquarium.

29. A combination timepiece and aquarium in accordance with claim 28, wherein said aquarium is rotatingly removably attached to said timepiece.

30. A combination timepiece and aquarium in accordance with claim 28, wherein said timepiece is adapted to be worn on a human wrist.

31. A combination timepiece and aquarium in accordance with claim 28, wherein said timepiece is adapted to be carried in a user's pocket.

32. A combination timepiece and aquarium in accordance with claim 28, further comprising aquatic life adapted for insertion into said aquarium.

33. A combination timepiece and aquarium in accordance with claim 32, wherein said aquatic life is hybrid brine shrimp.

34. A combination timepiece and aquarium in accordance with claim 28, further comprising a transport member adapted to introduce said aquatic life into, and remove said aquatic life from, said aquarium.

35. A combination timepiece and aquarium in accordance with claim 28, further comprising a decorative element provided on said timepiece or said aquarium for modifying the appearance of said combination timepiece and aquarium.

United States Patent: 6416217

36. A combination timepiece and aquarium in accordance with claim 35, wherein said decorative element is a phosphorescent disc removably attachable to said aquarium.

37. A combination timepiece and aquarium in accordance with claim 35, wherein said decorative element is an interchangeable timepiece face.

---

### *Description*

---

## FIELD OF THE INVENTION

This invention relates to watches and aquariums in general, and more specifically to a combination watch and aquarium for housing and displaying living creatures.

## BACKGROUND OF THE INVENTION

Kids love pets. For some children, pets serve as friends, confidants, items of affection and items of consolation. For other children, pets take the place of brothers or sisters they never had or will have.

One of the easiest types of pets to take care of are fish. Fish will generally live for a long time as long as they are fed regularly and provided with a clean and healthy environment. One example of an aquatic pet that has been providing children with years of enjoyment is the inventor's own Sea Monkeys.RTM..

Aquatic pets, however, tend to have one major drawback to providing round the clock enjoyment. They must be kept in a large tank sufficient to support their life. Such tank is usually stationary, kept in one particular location. Thus, children, and also some adults for that matter, are usually left to dreaming about fish playtime when sitting at school or congregating at a friend's house. Often times, children are left to fixate on their watch, counting down the hours, minutes and finally seconds until they can get back to playtime with the fishes.

There is a need, therefore, for a means to allow fish lovers and the like to enjoy their aquatic friends "round the clock," so to speak. Such need is met by the watch of the present invention, which is adapted to contain and display live aquatic pets while worn on the wrist of the user, while at the same time providing the user with the time of day. Such need is more particularly met by the watch system of the invention, which is provided with a watch and aquatic pet life adapted to be displayed in such watch.

The watch system of the present invention differs significantly from the prior art, which is limited to supporting and displaying ornamental life, not actual life. For example, U.S. Pat. No. 5,652,736 to Lee discloses a sealed, fluid-filled container detachably attached to a wristwatch for housing ornamental objects. Similarly, in U.S. Pat. No. 5,305,292 to Reynoso, the watch dials are immersed in a fluid adapted to contain ornamental floating articles such as fake divers and fake fish. Neither the Lee nor Reynoso aquatic environments are suitable for the introduction and continued support of aquatic pet life. Ornamental aquatic life in a timepiece is also displayed in U.S. Pat. Nos. 5,272,681 and 5,850,373 both to Lee.

## OBJECTS OF THE INVENTION

It is an object of the present invention, therefore, to provide a watch that is constructed and adapted to support aquatic pet life.

It is a further object of the present invention to provide a watch having an aquarium that is adapted to support aquatic pet life.

It is a still further object of the present invention to provide a watch having an aquarium whereby a user can view the time displayed on the watch through the living environment of the aquarium.

It is a still further object of the present invention to provide a watch having a detachable aquarium that is adapted for the introduction and removal of aquatic life therefrom.

It is a still further object of the present invention to provide a watch system having a time piece, a detachable aquarium and aquatic pet life adapted to be housed within said aquarium.

It is a still further object of the present invention to provide a life-supporting aquarium adapted for engagement with a wristwatch.

Still other objects and advantages of the invention will become clear upon review of the following detailed description in conjunction with the appended drawings.

SUMMARY OF THE INVENTION

A timepiece is provided with a removably attachable aquarium adapted to support aquatic life. The aquarium is provided with a plug that seals the aquarium and permits the introduction of aquatic life into the aquarium. Once aquatic life is introduced into the aquarium, the aquarium is attached to the timepiece and a wearer of such timepiece is then able to contemporaneously tell time and enjoy watching the aquatic life. A kit is also provided with a timepiece, an aquarium and aquatic life adapted to be supported in said aquarium.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is an exploded view of the aquarium watch of the present invention.

FIG. 2 illustrates the application of a water purifier to an aqueous environment in preparation for the introduction of aquatic life.

FIG. 3 illustrates the introduction of aquatic life to the purified aqueous environment of FIG. 2.

FIG. 4 illustrates aquatic life in an aqueous environment.

FIG. 5A illustrates the introduction of growth food to the aquatic life in an aqueous environment.

FIG. 5B illustrates the introduction of an alternative growth food to the aquatic life in an aqueous environment.

FIG. 6 is an assembled view of the aquarium watch of the present invention.

FIG. 7 illustrates the removal of the aquarium from the watch of FIG. 6.

FIG. 8 illustrates the use of a transport member to withdraw aquatic life from a separate, aqueous environment.

FIG. 9 illustrates the use of a transport member to introduce aquatic life into an aquarium.

FIG. 10 illustrates the attachment of an aquarium containing aquatic life to a timepiece.

FIG. 11 illustrates an aquarium containing aquatic life attached to a timepiece.

FIG. 12 is a kit containing the aquarium watch of the present invention.

FIG. 13 is an exploded view of an aquarium watch of the present invention with optional phosphorescent elements attachable thereto.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

The present inventor is also the owner of U.S. Pat. No. 3,673,986 and the creator of the Sea Monkey.RTM. phenomenon. For purposes of illustration and explanation, the inventor's own Sea Monkeys.RTM. will be used as an example of aquatic life or aquatic pets capable of being contained and displayed within the aquarium watch of the present invention. Clearly other aquatic life forms may be usable with the present invention. However, the use of Sea Monkeys.RTM. is preferable to other aquatic life because of their size, their constant movement and their history of providing children around the world with hours of entertainment.

The following detailed description is of the best mode or modes of the invention presently contemplated. Such description is not intended to be understood in a limiting sense, but to be an example of the invention presented solely for illustration thereof, and by reference to which in connection with the following description and the accompanying drawings one skilled in the art may be advised of the advantages and construction of the invention. In the various views of the drawings, like reference characters designate like or similar parts.

FIG. 1 is an exploded view of the aquarium watch 25 of the present invention, which comprises a timepiece 30 having a wrist strap 32 and a display 35, and an aquarium 40 attachable to said timepiece 30. For purposes of explanation, the timepiece 30 will be described as a wrist watch preferably having a digital display 35, although other portable timepieces such as stop watches, or analog time pieces such as pocket watches will be sufficiently operable. The aquarium 40 of the invention is generally hemispherical and is provided with an inner chamber 43 sealed between a dome-shaped upper surface 42 and a relatively flat lower surface 44. A plug member 45 is removably attachable to said lower surface 44 for permitting the introduction of aquatic life into said chamber 43 of said aquarium 40 and for sealing aquatic life within said chamber 43. Also, the aquarium 40 is preferably attached to the timepiece 30 so that the lower surface 44 is adjacent the time display 35 for contemporaneous viewing of the time and the inhabitants of the aquarium. However, it will be understood that the aquarium 40 could also attach to the side of the watch opposite. the display side (not shown), in which case the user could view the time on one side of the watch, and the inhabitants of the aquarium on the other side of the watch. Such an embodiment might be useful for individuals that wear watches with the display side adjacent their inner wrist.

As noted above, the inventor's own Sea Monkeys.RTM. will be used to demonstrate the use and enjoyment of the aquarium watch 25 of the present invention. In this regard, FIG. 12 illustrates a kit 20 containing an aquarium watch 25 as well as means to grow, nourish and manipulate aquatic life which will be displayed in such watch 25. Use of the components of the kit 20 of FIG. 12 will now be explained.

As shown in FIG. 2, a separate living environment, such as a drinking glass 50 or the like 50, is filled with an aqueous solution such as tap water 55. A water purifier and conditioner package 60 (contained

within the kit 20) is added to the water 55 to prepare the water 55 for introduction of aquatic life. The purifier 60 preferably contains materials, which when dissolved in the tap water 55 create the necessary environment in which the aquatic life, and in this case Sea Monkeys.RTM. or hybrid brine shrimp, will hatch and develop. The purifier 60 also contains a material to remove any harmful chemicals, such as chlorine contained in the ordinary tap water, chlorine being harmful to aquatic life, and in the case of Sea Monkeys.RTM. hybrid brine shrimp. The purifier package 60 may also contain some dried eggs of small aquatic life, such as, but not limited to, hybrid brine shrimp. In order to maintain the contents of the purifier package 60 in a dry moisture-free condition and thus inhibit premature hatching of the brine shrimp, a drying agent may be included therein. This dry mixture may be kept preferably in a moisture-proof package for an indefinite period of time with little or no loss of its properties.

After the tap water 55 has been purified, conditioned and aged as hereinbefore described, a second package 70 (contained within the kit 20 of FIG. 12) is added to the treated water 55 as shown in FIG. 3. The second package 70 contains additional salts for the maintenance of the required saline environment, food material such as yeast for the hatched and developing aquatic life, or in this case Sea Monkeys.RTM. or hybrid brine shrimp, as well as additional dried eggs of small marine life or hybrid brine shrimp. The brine shrimp will be viewable in the water 55 upon the introduction of the contents of the second package 70 to the environment 50, although such shrimp will appear very small and thus difficult to ascertain for at least a couple of days. The contents of the second package 70 are also preferably sealed in a moisture-proof container so that it may be kept dry for an indefinite period of time with little or no loss of its properties.

FIG. 4 illustrates aquatic life 75, and in this case Sea Monkeys.RTM. or hybrid brine shrimp, happily swimming and frolicking in its aqueous environment 50. In order to maintain and nourish the aquatic life 75 in its environment 50, the user may introduce a small amount of food from the food package 80 (contained within the kit 20) into the water 55 of the environment 50 as shown in FIG. 5A, preferably with the feeding spoon 90 contained within the kit 20 of FIG. 12. Alternatively, as shown in FIG. 5B, the user may introduce a food package 80A containing dried algae, which results in the appearance of colored aquatic life 75A upon the consumption of such food 80A. In this case, it is preferable, for example, if the aquatic life 75A appears red, which may highlight the presence of such aquatic life 75A against a dark background. The use of other additives that result in other colored appearances are also contemplated.

After the aquatic life 75 has been nourished and fed, they may be introduced into the aquarium 40 and viewed and enjoyed separately while in the aquarium 40. It is preferable if the aquarium 40 containing aquatic life 75 is attached to the timepiece 30 of the present invention, so that a user may also enjoy the aquatic life 75 while being able to tell time at the same time.

The introduction of aquatic life into the aquarium watch of the present invention will now be described in connection with FIGS. 6-11. It will be understood that the preceding discussion is specific to the cultivation of Sea Monkeys.RTM. or hybrid brine shrimp as used in connection with the kit of FIG. 12. However, it will also be understood that the aquarium watch of the present invention may be used with aquatic life other than Sea Monkeys.RTM. or hybrid brine shrimp. Thus, the introduction of aquatic life into the aquarium watch of the present invention as described in connection with FIGS. 6-11 will not necessarily be dependent on the use of the kit of FIG. 12 to cultivate and grow such aquatic life.

Prior to introducing aquatic life 75 into the aquarium 40, the aquarium must be separated and freed from the timepiece 30 as shown in FIGS. 6 and 7. If the aquarium timepiece of the present invention is sold in an assembled condition as shown in FIG. 6, then the aquarium 40 must be separated from the timepiece 30 as shown in FIG. 7. The aquarium 40 is preferably attached to the timepiece 30 by means of a bayonet-type lock, which is a fairly secure type of removable, rotatable interlock. Of course, other

connection methods may be used for attaching the aquarium 40 to the timepiece 30.

FIG. 8 illustrates the use of a transport member 100 to withdraw aquatic life 75 from its separate, aqueous environment 50, while FIG. 9 illustrates the use of said transport member 100 to introduce aquatic life 75 into the aquarium 40 of the invention. The transport member 100 has a bellows-type handle 105 which, when expanded as shown in FIG. 8, causes the aquatic life 75 and its aqueous environment 55 to be sucked through an opening 107 at the end of the transport member 100 opposite the handle 105 and into a transport chamber 108 between the handle 105 and opening 107. As shown in FIG. 8, the transport member 100 is then inserted into the aquarium 40 through the plug opening 46 and the handle 105 is compressed, forcing the contents of the transport chamber 108 into the aquarium 40. While the transport member 100 of the invention happens to be sold with the kit 20 of FIG. 12, other types of transport members may be used as desired to convey aquatic life 75 to the aquarium 40 of the invention.

Once the aquarium 40 is filled with aquatic life 75, the aquarium 40 is sealed with the plug member 45 and attached to the timepiece 30 as shown in FIGS. 10 and 11. The sealing of the aquarium 40 may result in the presence of an air bubble 110 near the top of the aquarium 40, which the aquatic life 75 can access if desired. After the aquarium 40 has been attached to the timepiece 30 as shown in FIG. 11, the user may view the time display 35 while contemporaneously watching the aquatic life 75 frolic around the aquarium 40. Thus, when asked the time of day, an owner of the present invention can either give the correct time indicated on the display 35, or exclaim with great wit, "half past a Sea Monkey.RTM.!"

Due to the limited space provided by the aquarium of the present invention, it may be necessary to return the aquatic life to their original environment for nourishment and oxygen after a certain period of time. The aquarium of the present invention is adapted to retain Sea Monkeys.RTM. or hybrid brine shrimp for a period of twelve hours before it becomes necessary to return them to their separate environment. Of course, this time period may vary depending on the size and quantity of aquatic pets held within the aquarium. For example, if it was desired to introduce a tadpole or the like into the aquarium, it may be necessary to return to the tadpole a larger living environment after only a couple of hours, depending of course on the sizes of the tadpole and the aquarium.

FIG. 13 illustrates two possible methods for increasing the ability to view the contents of the aquarium 40. For example, a phosphorescent piece 46 may be snapped into the bottom surface 44 of the aquarium 40 to impart a glow to the aquarium 40 and its contents. Such piece 46 may be adapted to glow for a considerable period of time depending on its material composition and the extent to which such piece 46 is exposed to light. Such glow piece 46 is preferably configured and dimensioned for removable attachment to the aquarium 40, and more particularly the outer bottom surface 44 of the aquarium 40. Furthermore, depending on its material composition, the piece 46 may inhibit viewing of the time display 35 if and when the aquarium 40 is attached to the timepiece 30. Thus, the user of the invention may also be provided with the option of an interchangeable watch face 48, which is also preferably composed of phosphorescent material. Again, such phosphorescent material may be adapted to glow for a considerable period of time depending on its material composition, and preferably has a cutout for exposure of the time display 35 therethrough. The phosphorescent elements illustrated by way of example in FIG. 13 are particularly visually enhancing when used in conjunction with colored aquatic life as discussed in connection with FIG. 5B.

While FIG. 13 illustrates the addition of phosphorescent elements to the aquarium watch of the present invention, other viewing enhancements are contemplated. For example, the phosphorescent piece 46 may instead comprise a set of pieces having different colors or designs for creating unique visual environments. Thus, for example, the aquarium environment can be blue one day and red the next, or it

could be a solid color one day and stripped or dotted the next. Alternative watch faces 48 may also be used, with ornamental possibilities being endless. Also, while FIG. 13 illustrates the use of phosphorescent material, which provides a residual glow upon an exposure to an ambient light source, other illuminating elements may be introduced or added to certain aspects of the invention to create even greater visual effects. Thus, for example, a LED element may be provided between the aquarium 40 and timepiece 30 that illuminates the contents of the aquarium 40 and/or timepiece 30 upon the activation of a switch or the push of a button. Similarly, other static and dynamically powered devices may be incorporated into the aquarium watch of the invention to increase the viewing environment and overall enjoyment to the user.

While the present invention has been described at some length and with some particularity with respect to the several described embodiments, it is not intended that it should be limited to any such particulars, or embodiments or any particular embodiment, but it is to be construed with references to the appended claims so as to provide the broadest possible interpretation of such claims in view of the prior art and, therefore, to effectively encompass the intended scope of the invention.

* * * * *



# EXHIBIT B

# PURCHASE AGREEMENT
## AND
## AMENDMENT TO LICENSE AGREEMENT

This PURCHASE AGREEMENT AND AMENDMENT TO LICENSE AGREEMENT ("Agreement") is made and entered into as of May 1, 2009 (the "Effective Date"), by and among BIG TIME TOYS, LLC, a Tennessee limited liability company, headquartered at 708 Berry Road, Nashville, TN 37204 ("BTT"), YOLANDA von BRAUNHUT, an individual with an address at 6200 Chapmans Landing Road, Indian Head, MD 20640-3040 ("YvB"), TRANSCIENCE CORPORATION, a Maryland corporation with offices and principal place of business at 6200 Chapmans Landing Road, Indian Head, MD 20640-3040 ("Transcience") and Sichenzia Ross Friedman Ference LLP, a New York limited liability partnership with offices at 61 Broadway, 32nd Floor, New York, NY 10006, Attn: Michael H. Ference, Esq. (the "Escrow Holder"), with reference to and incorporation of the following:

## RECITALS:

A. Pursuant to a License Agreement, made as of June 26, 2007 by and among BTT, YvB and Transcience (the "License Agreement"), BTT holds exclusive rights to make, have made, use, sell, distribute and advertise L icensed Products worldwide (defined terms used in this Agreement, but not defined herein, shall have the meanings ascribed to such terms in the License Agreement);

B. YvB and Transcience are the sole and exclusive owners of the Licensed Products and certain personal property used in connection therewith, Transcience is the owner of registered and unregistered United States and foreign trademarks, including "Instant Life®", "Instant Pets®", "Ocean-Zoo®" and "Sea-Monkeys®", a current list of which is set forth on Exhibit B to the License Agreement (including any other trademarks licensed thereunder, the "Licensed Trademarks");

C. YvB and Transcience are each owners of certain copyrights registered in the United States Copyright Office, and unregistered, and YvB is the copyright owner of an instruction book titled "It's Fun To Raise Pet Sea-Monkeys", a current list of which is set forth on Exhibit C to the License Agreement (including any other copyrights licensed thereunder, the "Licensed Copyrights");

D. Transcience is the owner of certain United States and foreign patents and patent applications, a current list of which is set forth on Exhibit D to the License Agreement (including any other patents licensed thereunder, the "Licensed Patents");

E. Transcience and YvB, in June 2008, filed a Statement of Claim with the American Arbitration Association ("AAA") against BTT, captioned Transcience Corporation and Yolanda von Braunhut v. Big Time Toys LLC, AAA Case No. 13 133 Y 01392 08 (the "Arbitration"), alleging, among other things, that BTT breached the License Agreement;

F.   BTT, in July 2008, filed an Answer, Affirmative Defenses and Statement of Counterclaim in the Arbitration alleging, among other things, that Transcience and YvB breached the License Agreement;

G.   In August 2008, BTT filed a lawsuit in the Chancery Court for the Twentieth District for the State of Tennessee at Nashville, captioned Big Time Toys, LLC v. George C. Atamian, Docket No. 08-1769-III (the "Lawsuit") (the Lawsuit and Arbitration are collectively referred to herein as the "Litigations") alleging, among other things, that George C. Atamian ("Atamian") tortiously interfered with BTT's contractual rights;

H.   The parties to this Agreement, and Atamian, desire to avoid the expense and inconvenience of further litigation, without admission of fault or liability, and to resolve and settle all existing claims, counterclaims and disputes among them, whether known or unknown, which have been or could have been brought to date in the Litigations;

I.   The License Agreement grants to BTT the option to purchase from YvB and Transcience all right, title and interest in and to the Licensed Products;

J.   This Agreement, which is being executed May 25, 2010, is effective May 1, 2009, with certain provisions effective January 1, 2010; and

K.   BTT desires to exercise the Option (defined more fully below), and YvB and Transcience agree that the Option is hereby exercised, all on the terms and conditions and as described herein, and in connection therewith, and the execution of the Settlement Agreement and Mutual Release, to which this Agreement is appended, the Litigations shall be settled as provided therein:

NOW, THEREFORE, in consideration of the foregoing, the mutual promises herein contained and other good and valuable considerations, the adequacy, sufficiency and receipt of which are hereby acknowledged, and in full and final settlement of the Litigations, the parties agree as follows:

AGREEMENT:

1.   Definitions.  In this Agreement the following capitalized words and expressions shall, unless the context requires otherwise, have the following meanings:

"Option" shall mean the option granted pursuant to Section 17 of the License Agreement, as amended by the terms hereof.

"Sea-Monkeys®" shall mean the entire Amazing Live Sea-Monkeys® line as described more fully in the License Agreement and Appendix A hereto.

"Sea-Monkeys® Properties" shall mean and include the Licensed Products and, collectively and without limitation, (a) all of the intellectual property (1) associated with Sea-Monkeys®, including the intellectual property described in Appendix A of this Agreement, and

(2) listed on Exhibits A, B and C to the License Agreement (including in each case, without limitation, the Trade Secrets, patent, patents in process, trademarks, tradenames, copyrights and all foreign rights and rights to extend and/or renew any of such intellectual property), (b) the Licensed Copyrights, the Licensed Trademarks, and the Licensed Patents, and (c) all personal property, tangible and intangible, related thereto, including without limitation the goodwill of the business, the domain names "www.sea-monkeys.com" and www.Sea-MonkeyGear.com and the web sites related thereto, and the items necessary or desirable to manufacture, market, advertise and sell the Licensed Products.

"Trade Secrets" shall mean any and all of the information necessary or desirable to own and operate the Sea-Monkeys® business, and shall include each of the formulas created for use by or for Sea-Monkeys®, including formula compositions, detailed instructions for the preparation of the formulas, technology, material handling instructions and specific details disclosing sources of all materials used in the manufacture, sources for obscure materials not readily available, as well as pharmaceutical sources from which common chemicals have historically been obtained for the preparation of the formulas, all of which Trade Secrets are specifically identified and generally described in Appendix A.

2. **Exercise of Option; Purchase of Sea-Monkeys® Properties.**

2.1.   Option Exercise.  BTT hereby exercises the Option, and YvB and Transcience hereby acknowledge and accept BTT's exercise of the Option, upon the terms and conditions provided herein.  BTT hereby purchases from Transcience and YvB all right, title and interest, free of all liens, claims and encumbrances, in and to any and all of the Sea-Monkeys® Properties and Licensed Products, including Sea-Monkeys®, related assets and the goodwill of the business associated therewith, in exchange for the Purchase Price (as defined in Section 2.2) and otherwise in accordance with the terms and conditions of this Agreement.

2.2.   Purchase Price.  The total purchase price for the Licensed Property shall be $10,000,000, payable as follows (the "Purchase Price"):

(a)  Initial Purchase Price.  Five Million Dollars ($5,000,000) of the Purchase Price (the "Initial Purchase Price") shall be paid as follows:

(i) $500,000 shall be paid upon execution of this Agreement (the "Initial Cash Payment"), by certified check, bank check or otherwise immediately available funds, payable to "Sichenzia Ross Friedman Ference LLP, as attorneys for Transcience Corp.", and

(ii) $4,500,000 shall be paid in the form of royalties payable under the License Agreement, except that effective January 1, 2010, (x) the royalty rate under Section 4.A. of the License Agreement shall be twenty percent (20%) and not ten percent (10%), and (y) the Minimum Royalty under Section 4.B. of the License Agreement shall be $750,000 and not $500,000, payable in twelve (12) equal monthly installments on or before the tenth (10th) day of each month.  In the event that royalties paid during a calendar year equal or exceed the annual Minimum Royalty amount ($750,000) prior to the end of such

calendar year, only actual royalties under Section 4.A. shall be payable for the remainder of that calendar year. For example, if as of September 30 of a calendar year royalties paid equal $750,000, then only actual royalties (and no monthly Minimum Royalty amount) shall be paid for the remainder of such calendar year. The monthly payments of the Minimum Royalty shall recommence the following calendar year. At the Closing, BTT shall pay the sum of $104,166.67 by certified or bank check made payable to "Sichenzia Ross Friedman Ference LLP, as attorneys for Transcience Corp.", which amount represents the difference between the Minimum Royalty payments due to Transcience under the License Agreement and the increased Minimum Royalty payments due hereunder for the months of January 2010 through May 2010.

All payments hereunder and under the License Agreement, including the Minimum Royalty, shall be a nonrefundable advance against any amounts due to Transcience and YvB. It is expressly agreed that all such payments due on and after the Effective Date shall be applied to the payment of the Purchase Price.

     (b) Additional Purchase Price. The remaining Five Million Dollars ($5,000,000) of the Purchase Price (the "Additional Purchase Price") shall be payable as royalties, monthly, except that immediately following payment of the final installment of the Initial Purchase Price in paragraph (a) above, BTT's sole payment obligations to Transcience and YvB shall be;

     (i) five percent (5%) of "Gross Sales" of Licensed Products sold by BTT to third parties, subject to the following terms and conditions;

     (A) If BTT sells any Licensed Product to any party affiliated with BTT prior to such third party sale, or in any way directly or indirectly related to or under the common control with BTT, at a price less than the regular price charged to other parties, the royalty payable to Transcience and YvB shall be computed on the basis of the regular price charged to other parties; and

     (B) "Gross Sales" shall mean billed-out gross shipments to third parties less deductions for trade discounts and merchandise returns. In the event that BTT grants any approved sublicensee the right to make, have made, use and sell Licensed Products, BTT shall pay Transcience and YvB twenty-five percent (25%) of the sublicense income received by BTT from such sublicensees. The Licensed Products shall be considered as "sold" when billed out, or, if not previously billed out, when shipped, mailed or otherwise delivered to the recipient of the goods by any means;

     (ii) twenty-five percent (25%) of all entertainment related revenue received by BTT for the first three years following the payment of the final installment of the Initial Purchase Price, and ten percent (10%) of all entertainment related revenue received by BTT thereafter, and

     (iii) Transcience and YvB shall be entitled to retain the ten percent (10%) royalty payable by Transcience and YvB to BTT for Transcience's and YvB's operation of the

website www.Sea-MonkeyGear.com (as described in paragraph 5(a) of this Agreement (which amends Section 2 of the License Agreement)), for which BTT shall receive a credit against the amounts due for the Additional Purchase Price. Promptly following the date Transcience closes its books for each month, but in no event later than thirty (30) days following the close of such month, Transcience and YvB shall deliver to BTT a statement signed by YvB, listing the quantity, description of goods, revenues and gross sales price, itemized deductions from gross sales price and the net sales price of products sold by Transcience and YvB from, through or relating to www.Sea-MonkeyGear.com during the preceding month (the "Royalty Statement") and the amount due BTT (as to such statements, BTT shall have the same rights to audit Transcience and YvB as they have to audit BTT as set forth herein and in the License Agreement);

until the balance of the Additional Purchase Price is paid in full. Promptly following the date BTT closes its books for each month that Additional Purchase Price is payable, but in no event later than thirty (30) days following the close of such month, BTT shall deliver to YvB a statement signed by a duly authorized officer of BTT, listing the quantity, description of goods and gross sales price, itemized deductions from gross sales price and the net sales price of the Licensed Products sold by BTT and its sublicensees during the preceding month (the "Royalty Statement"). Payments of any amounts due to YvB shall accompany the Royalty Statement. Following the payment in full of the Additional Purchase Price, BTT shall have no further obligations to Transcience or YvB.

(c) Payee. All payments due to Transcience and YvB hereunder shall be made to YvB, who shall receive the same as agent for, and on behalf, of YvB and Transcience.

(d) Prepayment. BTT shall have the right, to be exercised at any time, to prepay all or any portion of the Initial Purchase Price and/or Additional Purchase Price.

2.3.   Minimum Annual Sales. Commencing with the calendar year beginning January 1 following the year in which the payment of the final installment of the Initial Purchase Price in paragraph 2.2(a) above occurs, BTT agrees that it shall generate no less than $3,000,000 of Gross Sales of Licensed Products for each calendar year until the Additional Purchase Price is paid in full. In the event BTT fails to generate $3,000,000 in Gross Sales of Licensed Products for any such calendar year, within sixty (60) days following the close of such calendar year, Transcience and YvB shall have the right to provide written notice to BTT of their intent to terminate this Agreement, and in the event of such delivery of notice of intent to terminate, BTT shall then have thirty (30) days from the date of receipt of such notice to pay to Transcience and YvB a royalty amount calculated as follows: (i) five percent (5%) of the difference between $3,000,000 and the Gross Sales of Licensed Products actually generated for such calendar year, less (ii) any payments for such year under Section 2.2(b)(ii) hereof, and less (iii) any credit for such year under Section 2.2(b)(iii) hereof, in which event this Agreement shall continue in full force and effect for the next succeeding calendar year. Any such payments by BTT shall be a nonrefundable advance against any amounts due to Transcience and YvB hereunder, including the Additional Purchase Price. In the event BTT fails to make such payment, Transcience and YvB shall be entitled, as their sole remedy, to declare this Agreement terminated and BTT shall immediately return to Transcience all of the Trade Secrets, Licensed Products and Sea-

Monkeys® Properties, including the return of any and all tooling owned by BTT, or its agents (to the extent owned by BTT), for the production of the Licensed Products, as more fully described in Section 2.4(b) below.

2.4.    Remedies for BTT Failure to Pay Royalties.

(a)    Prior to Payment of Final Installment of Initial Purchase Price.  In the event of any failure by BTT to make any payment required to be made hereunder, or under the License Agreement, prior to the payment of the final installment of the Initial Purchase Price, YvB and Transcience shall so notify BTT in writing and BTT shall then have fifteen (15) days from the date of receipt of such notice to cure any such default.  In the event of BTT's failure to cure such default within such period, YvB and Transcience shall be entitled to:

(i)    Declare this Agreement and the License Agreement terminated, in which case this Agreement and the License Agreement shall be deemed null and void and of no further force or effect;

(ii)    Accelerate all sums due, and to become due, pursuant to this Agreement with respect to the Initial Purchase Price only, which shall become immediately due and payable to Transcience and YvB;

(iii)    Direct the Escrow Holder to return all property (tangible, intangible, personal, intellectual and other), bills of sale, assignments and UCC financing statements and other documents and instruments, and the Trade Secrets held in Escrow (as described in Section 3.2 below), and BTT to return any and all tooling owned by BTT for the production of the Licensed Products.  The Licensed Products, Sea-Monkeys® Properties and tooling may then, at the option of Transcience and YvB, be sold at public sale, or retained by Transcience or YvB in satisfaction of any outsanding amounts due Transcience and YvB under this Agreement and the License Agreement.  In the event that Transcience and YvB elect to sell the property, which election shall be made in writing with notice to BTT within thirty (30) days after the date this Agreement is declared terminated, the property shall then be sold in one lot or in separate parcels, as Transcience and YvB ma y determine, without undue delay and in a commercially reasonable manner.  To the extent permitted by law, Transcience and YvB shall be permitted, without notice or publication, to adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for the sale.  The proceeds of any sale of, or other realization upon, all or any part of the Licensed Products and/or Sea-Monkeys® Properties shall be applied in the following order of priorities: (A) first, to pay the expenses of such sale or other realization, including reasonable attorneys' fees, and all expenses, liabilities and advances reasonably incurred or made by Transcience and YvB in connection therewith; (B) second, to the payment of the amounts due under this Agreement in such order of priority as Transcience and YvB, in their sole discretion, shall determine and (C) finally, to pay to BTT, or its successors or assigns, or as a court of competent jurisdiction may direct, any surplus then

remaining from such proceeds;

(iv)   Commence an action for equitable relief, including, but not limited to, injunctive relief prohibiting any continued use of the Licensed Trademarks and Licensed Copyrights; and/or

(v)   Require that BTT immediately cease selling, marketing, or production of the Licensed Products and Sea-Monkeys® Properties, and any rights granted to BTT under this Agreement shall be deemed null and void.

Notwithstanding anything to the contrary contained above, and in addition to all rights and remedies available to Transcience and/or YvB, in the event BTT fails to make any payment required to be made hereunder prior to the payment of the final installment of the Initial Purchase Price, interest thereon shall accrue from the date due until paid in full at a rate of interest equal to the lesser of (x) 5% in excess of the highest Prime Rate then announced from time to time by any commercial bank then a member of the New York Clearing House Association, or (y) the highest rate of interest permitted by law in such event. The foregoing remedies are not exclusive and Transcience and/or YvB shall be entitled to seek and assert such remedies either singly or concurrently, at their option. In the event of such default, Transcience and/or YvB shall be entitled to one or more of the foregoing forms of relief as described herein in this Section 2.4(a), as well as any other appropriate legal or equitable relief necessary to protect and/or enforce Transcience's and YvB's interest in the Licensed Trademarks and Licensed Copyrights.

(b)   After Payment of Final Installment of Initial Purchase Price and Prior to Payment of Final Installment of Additional Purchase Price. In the event of any failure by BTT to make any payment required to be made hereunder after payment of the final installment of Initial Purchase Price and prior to payment of the final installment of Additional Purchase Price, YvB and Transcience shall so notify BTT in writing and BTT shall then have thirty (30) days from the date of receipt of such notice to cure any such default. In the event of BTT's failure to cure such default within such period, YvB's and Transcience' sole recourse and remedy against BTT shall be limited to (i) declaring this Agreement terminated, (ii) to a return of the Trade Secrets, Licensed Products and Sea-Monkeys® Properties, including the return of any and all tooling utilized by BTT, or its agents (to the extent owned by BTT), for the production of the Licensed Products, and (iii) to enforce and foreclose Transcience' and YvB's security interest therein; it being expressly understood by each party hereto that any judgment in any action or proceeding in connection therewith shall be enforceable against BTT only to the extent of BTT's interest in the Trade Secrets, Licensed Products and Sea-Monkeys® Properties, and neither Transcience nor YvB shall sue for, seek or demand any money damages or deficiency judgment against BTT in any such action or proceeding under or by reason of or in connection with this Agreement or the License Agreement. BTT agrees to cooperate and execute any necessary documents to effect the transfer of ownership of the Trade Secrets, Licensed Products and Sea-Monkey Properties from BTT to Transcience and/or YvB. BTT shall have a limited license for a period of one hundred and twenty (120) days from the date of such termination to complete any work in process and to sell any inventory. Thereafter, BTT shall immediately cease selling, marketing, producing or expoiting the Licensed Products and Sea-Monkeys® Properties, and any rights granted to BTT

under this Agreement shall be deemed null and void.  YvB or TSC shall be entitled to commence an action for equitable relief, including, but not limited to, injunctive relief prohibiting any continued use by BTT of the Licensed Trademarks and Licensed Copyrights.  BTT further agrees that, subject to applicable laws imposing record retention requirements, following the expiration of such one hundred and twenty (120) day period, that it shall destroy any documents or other materials in its possession containing Trade Secrets.

3.  **Purchase Terms.**

3.1.  <u>Delivery of Certifications to BTT</u>.  As an express condition to BTT's payment of the Initial Cash Payment payable under Section 2.2(a)(i) hereof, YvB and Transcience shall deliver to BTT the D'Agostino Certificate (defined below) and the Escrow Agreement (defined below).

3.2.  <u>Delivery of Licensed Products to Escrow Holder</u>.

(a)  Concurrently with BTT's payment of the Initial Cash Payment, Transcience and YvB shall transfer to the Escrow Holder, to be held for the benefit of BTT, all right, title and interest, free of all liens, claims and encumbrances, in and to any and all of the Licensed Products and Sea-Monkeys® Properties, including all intellectual property and personal property used in the manufacture, use, advertising, marketing or sale of Licensed Products (collectively, the "<u>Escrowed Documents and Properties</u>").  Subject to the terms of this Agreement, title to the Trade Secrets, Licensed Products and Sea-Monkeys® Properties shall remain with Transcience and/or YvB until the payment in full of the Initial Purchase Price.

(b)  YvB and Transcience shall execute in favor of BTT and deliver to the Escrow Holder (i) such bills of sale and assignments of contracts, patents, copyrights and trademarks as BTT shall reasonably request, and (ii) such security agreements and UCC financing statements and other documents evidencing BTT's encumbrances upon, and to create, preserve, perfect or validate a security interest in, the Licensed Products and Sea-Monkeys® Properties as BTT shall reasonably request.  YvB and Transcience shall place the Trade Secrets (in the form of written disclosures of sufficient content and detail to enable one of ordinary skill in the art(s) to which they pertain to practice them) into escrow with the Escrow Holder.

(c)  The Escrow Holder shall hold all of such materials and information in escrow for the benefit of BTT and shall not make any use of any of them for its own benefit or the benefit of any other person, or disclose all or any part of the Trade Secrets to any person, firm or other entity without BTT's express written consent.  The Escrow Holder shall enter into the Escrow Agreement (the "<u>Escrow Agreement</u>") in the substantially the form attached hereto.

3.3.  <u>Security of Intellectual Property</u>.

(a)  From and after the date hereof, neither YvB nor Transcience shall (i) transfer, or permit to be transferred, to any person, firm or other entity any interest of any kind in all or any part of the Licensed Products or Sea-Monkeys® Properties, (ii) encumber or permit to be encumbered the Licensed Products or Sea-Monkeys® Properties, or (iii) disclose all or any part of the Trade Secrets to any other person, firm or entity, except to Dr. Anthony D'Agostino, or

another laboratory designated by Transcience (who shall enter into a confidentiality agreement with BTT in form and substance satisfactory to BTT), and consented to by BTT (which consent shall not be unreasonably withheld), and except to the extent reasonably necessary for the testing of the Licensed Products (in which case the identity of any such other persons shall be immediately disclosed to BTT ).

(b)  YvB shall cause the Trade Secrets disclosures to be delivered to Dr. Anthony D'Agostino of the Montauk Marine Science Institute of L.I., NY, or such other person as may be mutually agreed upon by the parties hereto.  Dr. Anthony D'Agostino has provided a letter to BTT, which is annexed hereto, and which BTT acknowledges is acceptable to BTT (the "D'Agostino Certificate") in which he advises that (i) he read the documents submitted into escrow, including (i) the "General Instruction 'For Makings Sea Monkey Kit Formula'", (ii) the "Secret Laboratory Bulk Formulae", and (iii) the "Resource Guide and Vendors Information", all as more fully described therein.  He further advises that the instructions and secret formulae will permit duplication of the described process in any appropriate facility by BTT.  Transcience and YvB understand and agree that BTT is relying on the accuracy of the D'Agostino Certificate (i) in making the Initial Cash Payment to YvB and Transcience, and (ii) entering into this Agreement.

(c)  From and after the date hereof, except as otherwise specifically permitted herein (or in the event that Transcience or YvB declare this Agreement terminated and null and void following a default by BTT that has not been cured within any permitted cure periods), neither YvB nor Transcience shall (i) make, use or sell any item or product coming within the scope of, or competitive with, any of the Licensed Products (except to the extent permitted pursuant to Section 5.C of the License Agreement, as amended by this Agreement, in connection with Transcience's use and operation of www.Sea-MonkeyGear.com or other similar approved website)) or (ii) disclose all or any part of the Trade Secrets to any other person, firm or entity.

3.4.  Transfer of Licensed Property to BTT.

(a)  Upon BTT's payment of the final installment of the Initial Purchase Price payable under Section 2.2(a) hereof, the License Agreement shall terminate and the Escrow Holder shall immediately release from escrow and deliver to BTT or its designee title to the Trade Secrets, Licensed Products and Sea-Monkeys® Properties and all of the information, documents and materials (including, without limitation, the Trade Secrets disclosures) deposited with the Escrow Holder.  At such time, all right, title and interest in and to all Licensed Products and Sea-Monkeys® Properties, free and clear of any and all liens, claims and encumbrances of any kind, shall be transferred to and vest in BTT, subject only to Transcience and YvB's security interest in such Licensed Products and Sea-Monkeys® Properties with respect to the payment of the Additional Purchase Price.  These obligations of YvB, Transcience and the Escrow Holder to release Licensed Products are conditioned only on BTT's tender of the final installment of the Initial Purchase Price and are otherwise absolute and unconditional.  Beginning immediately after BTT's payment of the final installment of the Initial Purchase Price, upon BTT's request YvB, or her designee (who shall be subject to the prior written approval of BTT in its reasonable discretion), shall provide sufficient training in the preparation of the Sea-Monkeys® formulas so that BTT or its designees may assume these responsibilities if it chooses to do so, at mutually

agreeable times and at a mutually agreeable location.  BTT agrees to compensate YvB, or her designee, at the rate of $300 per hour for her provision of such training, and agrees to reimburse YvB, or her designee, for her reasonable expenses incurred in connection with such training, provided such expenses are pre-approved by BTT in writing.

(b)  Upon BTT's payment of the final installment of the Initial Purchase Price, and the occurrence of the events described in Section 3.4(a), upon Transcience' or YvB's request, BTT shall execute and deliver to YvB a financing statement (Form UCC-1) and such other papers that may be reasonably necessary and desireable that YvB shall reasonably request in order to create, preserve, perfect or validate a security interest in only the Licensed Trademarks, Licensed Copyrights, Licensed Patents and Trade Secrets.  Upon payment in full of the Additional Purchase Price, such financing statements and other papers shall immediately terminate and YvB and Transcience shall promptly take all actions reasonably requested by BTT to effect such termination.

3.5.  www.Sea-Monkey.com.

(a)      The domain www.Sea-Monkey.com shall be transferred to BTT as of the date of execution of this Agreement.  Until payment of the final installment of the Additional Purchase Price pursuant to Section 2.2(b) hereof, BTT shall be required to maintain on the www.Sea-Monkey.com website, and on any other website maintained by or on behalf of BTT on which BTT sells Sea-Monkeys® Products, a topic heading named "Sea-Monkey Parts & Supplies", or other appropriate named heading that indicates the sale of such products, for the sale of those parts and supplies listed on Exhibit H to the License Agreement ("Aftermarket Products").  Transcience and/or YvB shall have the exclusive right to sell the Aftermarket Products by direct mail until payment of the final installment of the Additional Purchase Price. Under said topic heading, BTT shall be required to maintain a web link which shall direct and connect the user to www.Sea-MonkeyGear.com, on which website Transcience shall be permitted to sell Aftermarket Products by direct mail.  The rights under this Section 3.5(a) shall be in addition to any rights Transcience and YvB have under the License Agreement, as amended, including the rights under Section 2.A. thereof.

(b)      Following the payment of the final installment of the Initial Purchase Price pursuant to Section 2.2(a) hereof, Transcience shall be obligated to purchase pouches solely from BTT.  BTT shall charge Transcience the same price for pouches as Transcience charged to BTT immediately prior thereto (the quantity of the contents in each pouch shall not change).   Thereafter, in the event the cost of ingredients, materials, services or labor, is increased, such increase will be passed on to Transcience, provided, however, that documented price increases to BTT are shown to Transcience and reasonable efforts have been made by BTT to find alternate sources for ingredients, materials, services or labor, that can be readily purchased from reliable alternate sources. When providing price increase documentation (which shall include at least two written competitive quotes if reasonably available for the same item from different vendors), BTT may redact such parts of the invoice or quotation as may be necessary to ensure the confidentiality of the supplier and items related to the formulation of the pouch.

3.6     Transfer of Pouch Manufacturing Operations.   On or before January 1, 2011, Transcience and YvB shall cause the pouch manufacturing operations, including the machinery and equipment used therein, presently conducted at Transcience' facilities at 6200 Chapmans Landing Road, Indian Head, Maryland to be transferred to the facilities of Graphics Communications, at 793 Nina Way, Warminster, Pennsylvania.  In the event that acceptable arrangements cannot be made with Graphics Communications, the parties shall negotiate in good faith alternative arrangments reasonably acceptable to each.  Transcience shall give BTT sixty (60) days advance written notice of the date of the move.  The sixty (60) day period for Transcience to fill pouch orders submitted by BTT shall be tolled during the period of the move. BTT shall reimburse Transcience up to $5,000 of costs of relocating the machinery and equipment to Graphics Communications.  Transcience shall provide a copy of the moving invoices to BTT.

4.  Representations and Warranties.

In addition to the representations and warranties in the License Agreement, which BTT, Transcience and YvB reaffirm as of the date hereof, Transcience and YvB, jointly and severally, hereby represent and warrant as follows:

4.1.  YvB Representations and Warranties. YvB represents and warrants to BTT, which representations and warranties are material parts of the consideration to be received by BTT hereunder, as follows:

(a) YvB is the sole owner of all of the issued and outstanding capital stock of Transcience;

(b) HvB, YvB's deceased husband, conceived, invented and developed the biological product registered under the trade name "Sea-Monkeys®" and YvB and/or Transcience are the sole owners of, and hold all right, title and interest in and to, the Sea-Monkeys® Properties, the Licensed Products, the Licensed Trademarks, the Licensed Copyrights, the Licensed Patents and all other property necessary or desirable to make, have made, use, sell, distribute and advertise the Licensed Products and Sea-Monkeys® Properties and to conduct the Sea-Monkeys® business;

(c) YvB and Dr. Anthony D'Agostino, and only said persons, know the Trade Secrets;

(d) YvB and Transcience have the power and authority, without necessity of the knowledge or consent of any other person, to convey the Sea-Monkeys® Properties, the Licensed Products, the Licensed Trademarks, the Licensed Copyrights, the Licensed Patents and all other property necessary or desirable to make, have made, use, sell, distribute and advertise the Licensed Products and Sea-Monkeys® Properties and to conduct the Sea-Monkeys® business to BTT and otherwise fully perform, or cause to be fully performed, the obligations respectively imposed on each of them hereunder and, following such conveyance, BTT shall have all right, title and interest in and to all properties necessary and desirable to conduct the Sea-Monkeys® business; and

(e) There are no liens or other encumbrances on any property which is the subject of this Agreement and such property shall be and remain free of all such liens or other encumbrances, except for any liens or encumbrances created hereby.

4.2.   Transcience Representations and Warranties. Transcience represents and warrants to BTT, which representations and warranties are material parts of the consideration to be received by BTT hereunder, as follows:

(a) YvB and/or Transcience are the sole owners of, and hold all right, title and interest in and to, the Sea-Monkeys® Properties, the Licensed Products, the Licensed Trademarks, the Licensed Copyrights, the Licensed Patents and all other property necessary or desirable to make, have made, use, sell, distribute and advertise the Licensed Products and Sea-Monkeys® Properties and to conduct the Sea-Monkeys® business;

(b) YvB and Transcience have the power and authority, without necessity of the knowledge or consent of any other person, to convey the Sea-Monkeys® Properties, the Licensed Products, the Licensed Trademarks, the Licensed Copyrights, the Licensed Patents and all other property necessary or desirable to make, have made, use, sell, distribute and advertise the Licensed Products and Sea-Monkeys® Properties and to conduct the Sea-Monkeys® business to BTT and otherwise fully perform, or cause to be fully performed, the obligations respectively imposed on each of them hereunder and, following such conveyance, BTT shall have all right, title and interest in and to all properties necessary and desirable to conduct the Sea-Monkeys® business; and

(c) There are no liens or other encumbrances on any property which is the subject of this Agreement and such property shall be and remain free of all such liens or other encumbrances, except for any liens or encumbrances created hereby.

5.   Amendments to License Agreement.  The License Agreement shall remain in effect, as amended hereby, until the payment of the final installment of the Initial Purchase Price.  Upon payment of the final installment of the Initial Purchase Price the License Agreement shall terminate.  As of the Effective Date, the License Agreement shall be amended as follows:

(a)   Section 2 - Distribution:   Section 2 shall be amended by adding the following two sections:

B.   Licensee shall have the right, in its sole discretion, to select distributors for the Licensed Products.  Notwithstanding the foregoing, upon expiration or earlier termination of the Distribution Agreement, between BTT and Moose Licensing Pty Ltd. ("Moose"), dated March 5, 2008 (the "Moose Agreement"), Licensee agrees to appoint PowerOn as its exclusive distributor of Licensed Products for the territory of Australia on the condition that PowerOn shall enter into a distribution agreement with Licensee on terms and conditions satisfactory to Licensee in its sole discretion, which shall be at least as favorable to Licensee as the Moose Agreement, shall provide for minimum order quantities by PowerOn, and shall contain a commitment of PowerOn to purchase a

defined minimum amount of television ad time.  If PowerOn becomes the distributor in Australia, PowerOn shall be allowed to operate an Australian version of the SMG website.  If PowerOn operates such a website, then PowerOn shall pay Licensee a ten percent (10%) royalty as agreed to in a distribution agreement between PowerOn and Licensee.

C.   www.Sea-monkeygear.com.  Licensee agrees to permit Licensor to operate a website at the url of www.Sea-MonkeyGear.com or such other url containing the words "Sea", "Monkey" and "Gear" as Licensee shall approve, which approval shall not be unreasonably withheld ("SMG").  Licensor shall pay Licensee royalties in the amount of ten percent (10%) of all Gross Sales.  "Gross Sales" shall mean all sales minus returns, shipping and handling and PayPal (or the equivalent) costs.  Upon expiration or termination of the License Agreement and the transfer of all right, title and interest in and to the Sea-Monkeys® Properties to Licensee, the domain, all SMG websites and all manufacturing information will be transferred by Licensor to Licensee, subject only to Licensor's right and license (without the right to sublicense) to continue to use such property under the terms hereof until the final installment of the Additional Purchase Price is paid.  Licensee reserves all rights of creative control over the type, appearance, design, presentation and usage to be used by Licensor with respect to SMG and all items to be sold on SMG, which rights Licensee agrees to exercise reasonably and without delay.  All approval requests shall be made in writing by Licensor to Licensee.  All approvals by Licensee shall be made in writing to Licensor.  If Licensee does not respond in writing to Licensor with an approval, a disapproval or desired changes within ten (10) business days after approval request, then approval is deemed granted for that request.  Licensor shall not sell on SMG any Licensed Products manufactured or sold by Licensee or any competing products.  All products sold on SMG by Licensor shall be brand-supportive components or Sea-Monkeys® memorabilia only.  Licensor shall account and pay Licensee the royalty due under this Paragraph on a monthly basis, under terms and conditions as set forth in Section 4 hereof.  Promptly following the date Transcience closes its books for each month, but in no event later than thirty (30) days following the close of such month, Transcience and YvB shall deliver to BTT a statement signed by YvB, listing the quantity, description of goods, revenues and gross sales price, itemized deductions from gross sales price and the net sales price of products sold by Transcience and YvB from, through or relating to www.Sea-MonkeyGear.com during the preceding month (the "Royalty Statement") and the amount due BTT (as to such statements, BTT shall have the same rights to audit Transcience and YvB as they have to audit BTT under the License Agreement).  Payments of any royalties due Licensee shall accompany the Royalty Statement.

(b) Section 4.D. - Royalty Reports:  Licensee shall submit to Licensor a Royalty Statement in the form attached hereto as Exhibit A, with a copy sent via email to George Atamian at grog5@verizon.net, or such other person as YvB shall designate to BTT in writing.

(c) Section 5 - Pouches:

(i)   5.B. shall be amended and restated to provide as follows:

B.      Licensee shall provide Licensor with a one hundred and twenty (120) day forecast of projected pouch needs, which forecast shall be updated by Licensee monthly.

        (ii)   5.C. shall be amended and restated as follows:

C.      Licensee shall provide purchase orders for pouches to Transcience which, unless agreed to by Transcience, shall provide for a delivery date (the "Delivery Due Date") no earlier than the date sixty (60) days after the later of (i) the date the purchase order is provided to Transcience, or (ii) the date of receipt by Transcience of the thirty-five percent (35%) down payment in connection therewith.  Within five (5) business days of receipt of the purchase order, Licensor shall give Licensee written notification of the expected delivery date of the products specified therein.  Licensor shall use its "best efforts" to present the orders, which shall conform to the Licensor Guarantee, for shipment and acceptance by Licensee on the Delivery Due Date.  If an order is not presented for shipment on or before the Delivery Due Date, Licensee may thereafter withhold any payments due Licensor hereunder and under the License Agreement that are in excess of the Minimum Royalty until that shipment is accepted by Licensee, following which all withheld amounts shall be payable immediately.

        (iii)  5.D. shall be amended and restated as follows:

D.      Payment terms shall be thirty-five percent (35%) with purchase order and the balance due fifteen (15) days after the Licensor's invoice for verified delivery of all pouches specified in the purchase order to Licensee.  Partial shipments of orders (provided such partial shipment contains complete Sets of Pouches (as defined below) may be accepted by Licensee and are payable upon such invoicing.  Unless expressly specified in a purchase order, in no event shall Licensee be required to accept, or pay for, any order presented for shipment that does not include complete Sets of Pouches.

        (iv)   5.E. - the following shall be added to the end of Section 5.E.:

E.      Notwithstanding anything to the contrary contained herein or in the License Agreement, Licensor shall not increase the price per pouch above $0.21 through the period ending December 31, 2010.  For calendar years beginning January 1, 2011 and each January 1 thereafter, if Licensee's sales in the preceding calendar year exceed $3,500,000, any proposed increase in the per pouch price for the following calendar year shall be limited to no more than $0.01 per pouch, subject to documentation and proof, as provided in this Section 5.E.  For example, if in calendar year 2010 Licensee's sales exceed $3,500,000, during calendar year 2011 Licensor shall be permitted to increase the price of a pouch by no more than $0.01, provided that Licensors document to Licensee such increases in its costs of ingredients and reasonable efforts have been made by Licensors to find alternate sources for ingredients that can be readily purchased from reliable alternate sources, as more fully described above.  Under no circumstances shall the price of pouches increase more than 10% in any calendar year.

(v) 5.G. - a new section 5.G. shall be added, which shall provide as follows:

G.     Licensee agrees that a minimum order quantity of 200,000 Sets of Pouches (a "Set of Pouches" shall consist of three pouches; Pouch 1 - water purifier, Pouch 2 - Sea Monkeys Instant Live Eggs and Pouch 3 - Growth Food) shall apply to all orders. Licensee may order up to 500,000 Sets of Pouches at a time.

(d) **Section 6 - Advance Payment:**  Section 6 shall be amended by adding the following section:

B.     Licensee shall have the right to use, at no cost, any and all tooling owned by or under the control of Licensors.  Licensee shall have the right, at its sole discretion, without any approval by Licensor, to create and use its own tooling to manufacture the Licensed Products.  Licensee shall have the right, at its sole discretion, without any approval by Licensor, to appoint and use any manufacturer it desires to manufacture the Licensed Products.  Prior to shipment of any new, injected molded Licensed Product for sale, Licensee agrees to send such new, injected molded product shots from the factory manufacturing product to George C. Atamian or such other person, as Licensor shall direct, for testing for the purpose of ensuring that the design of, and the plastic used in, the Licensed Product is free from contaminants or components injurious to the Sea-Monkey® hatching process and lifespan.

(e) **Section 9 - Creative Control:**  The parties agree that the Creative Control provisions in Section 9 of the License Agreement shall apply only to public displays by Licensee of the type, appearance, design, presentation and usage of Licensed Products to retail consumers. Creative Control does not apply to any nonpublic displays, including without limitation limited displays during the development process, to focus groups, to the wholesale trade, at shows, or otherwise.  After Licensee has been granted an approval, such approval shall be for all uses and all purposes during the term of the License Agreement.  Licensee may, at its option, seek approvals from Licensors during the development process of new products.  George Atamian, or such other person designated by Licensor in writing, is recognized by the parties as a representative of TSC and von Braunhut for the purpose of consents or approvals regarding Creative Control.

(f) **Section 10.A. - Testing:**  The supplemental laboratory fee of seven hundred and fifty dollars per week ($750) shall be reduced to three hundred seventy-five dollars ($375.00) per week, and the quarterly payment option shall be reduced from nine thousand seven hundred and fifty dollars ($9,750.00) per quarter to four thousand eight hundred seventy five dollars ($4,875.00) per quarter.  Upon the payment of the Initial Purchase Price, Licensee shall be under no further obligation to make any such payments.

(g) **Section 17.B. - Option to Purchase:**   Section 17.B shall be amended and restated as follows:

B. If the purchase option is exercised, upon payment of the final installment of the Initial Purchase Price payable under Section 2.2(a) of the Purchase Agreement, Licensee shall

own all aftermarket sales. Licensors shall cause the lab to transfer to, or otherwise disclose to, Licensee, at no out-of-pocket expense to Licensee, all right, title and interest (free and clear of any and all liens, claims and encumbrances) in and to all information, know-how, and trade secrets needed to continue proper performance of its services and also shall cause the lab to sign a reasonable confidentiality agreement (at no additional cost to Licensee) at that time. At any time prior to the exercise date of the option, Licensors shall, upon request by Licensee, cause the lab to deposit all such information, know how and trade secrets with an independent escrow agent, to be released to Licensee upon exercise of the option and payment of the final installment of the Initial Purchase Price payable under Section 2.2(a) hereof.

(h) **Section 19 - Arbitration:** The following sentence shall be added to Section 19: The prevailing party in any arbitration shall be entitled to an award of fees and costs, including reasonable attorney fees and costs.

6. **Further Cooperation.** At any party's request, each other party shall execute and deliver such other instruments and do and perform such other acts and things as may be necessary or desirable for effecting completely the consummation of the transactions contemplated hereby, including, without limitation, execution, acknowledgment, and recordation of other such papers as is necessary or desirable for fully perfecting and conveying to BTT the benefit of the transactions contemplated hereby. YvB and Transcience shall continue to prosecute, maintain, and defend the Licensed Trademarks, Licensed Copyrights, Licensed Patents, and Trade Secrets at its sole expense until the payment of the final installment of the Initial Purchase Price.

7. **Notices.** All notices, demands, contracts or waivers hereunder shall be given in writing by mail, messenger, overnight air courier, together with a copy by facsimile, addressed as indicated below or as otherwise indicated in writing by a party hereto. Three (3) business days from the date of mailing notices shall be deemed to be the date of service. The date of messenger or facsimile shall be deemed to be the date of service. One (1) business day from the date of overnight air courier handling shall be deemed to be the date of service for courier handled notices.

If to YvB or Transcience:                          If to BTT:

Mail and                                           Mail and
Messenger:    Yolanda von Braunhut                 Messenger:    Big Time Toys, LLC
              6200 Chapmans Landing Road                         708 Berry Road
              Indian Head, MD 20640-3040                         Nashville, TN 37204
              Attn.: Chief Executive Officer                     Attn.: Garry Barber
                                                                President


Copy to:      Sichenzia Ross Friedman Ference LLP
              61 Broadway, 32nd Floor
              New York, NY 10006
              Attn: Michael H. Ference, Esq.

8. **No Modification; Waiver**. The terms of this Agreement shall not be modified except by an agreement in writing signed by all of the parties hereto. The failure of a party to strictly enforce any provision of this agreement shall not result in a waiver of said party's right to strictly enforce such provision in the future, and no waiver by either party of a breach or default hereunder shall be deemed a waiver by such party of a subsequent breach or default of a like or similar nature.

9. **Relationship of the Parties**. This Agreement does not appoint either party as the agent of the other party, or create a partnership or joint venture between the parties.

10. **Assignment**. This Agreement may not be assigned by any party without the written consent of the other parties. YvB and Transcience hereby consent to BTT's transfer of all or any of its interest herein to (a) any business entity which succeeds to all or substantially all of BTT's assets and business and/or (b) any publicly held business entity which (1) has a provable net worth in excess of $15,000,000 and (2) is in the toy, educational or novelty or similar business, all on condition only that any such transferee(s) also concurrently assume(s) all of BTT's obligations with respect to the interest transferred. This Agreement is binding on the parties and on their heirs, legal representatives and permitted successors, assigns and transferees.

11. **Governing Law**. This Agreement shall be construed and interpreted pursuant to the laws of the State of New York, without regard to its choice of law provisions, and the parties consent and submit to the jurisdiction of the New York State and Federal Courts sitting in the County of New York for the confirmation of any award rendered in an arbitration arising from this Agreement, and for any remedies available to the parties in aid of arbitration.

12. **Equitable Relief**. Transcience and YvB acknowledge and agree that damages alone would be insufficient to compensate BTT for a breach by Transcience or YvB of this Agreement and that irreparable harm would result from a breach of this Agreement. Each of Transcience and YvB hereby consent to the entering of an order for injunctive relief to prevent a breach or further breach, and the entering of an order for specific performance to compel performance of any obligations under this Agreement, including the obligations to furnish pouches to Licensee. Each party agrees that no party shall be permitted to contest the validity of an injunction issued by a New York court in Maryland, Tennessee or any other state, on the ground that the alleged harm does not constitute irreparable harm.

13. **Arbitration**.

(a) *Arbitration*. Except as set forth in subsection (b) of this Section 13, in the event of a disagreement between the parties with respect to this Agreement, if a party shall elect to adjudicate such dispute, such party shall submit the issue in dispute for arbitration under the rules of the American Arbitration Association, the election to be by written notice to the other party. Upon service of the notice, the issue shall be submitted to an arbitrator(s) in accordance with the rules. The arbitration shall be at a location within New York County, the State of New York, USA, at a place selected by the arbitrators. The decision of the arbitrator on any matter submitted shall be final, conclusive and binding upon the parties. Each of the parties by executing this Agreement unconditionally submits to the jurisdiction of the courts of New York

State and Federal Courts sitting in the County of New York, for the purpose of confirmation of any arbitration award and any remedies sought in aid of arbitration. The prevailing party in any such arbitration shall be entitled to an award of fees and costs in connection with that action as well as in connection with enforcement of any decision in connection therewith, including reasonable attorney's fees and costs.

(b) <u>Special Master</u>. In the event of a disagreement between the parties solely with respect to the subject matter hereof or of the License Agreement (other than a disagreement wherein a party is seeking (i) termination of this Agreement or the License Agreement, (ii) damages reasonably calculated to be in excess of $1,000,000, or (iii) directions to the Escrow Holder, following a Notice of Objection, as to the disbursement of the Escrowed Documents and Properties; in which event the matter shall be submitted to arbitration pursuant to Section 13(a) above), either party, if they wish to adjudicate such disagreement, shall submit the issue in dispute to a Special Master. Upon service of written notice to the other party, the issue shall be submitted to a single Special Master, who shall be selected and agreed to by the parties within seven (7) days of the notice. The parties expressly agree that Bert Levy shall be the Special Master if the parties do not mutually agree on a different person within such seven (7) day period. If Bert Levy is unable or unwilling to serve, and the parties cannot agree on a Special Master within such seven (7) day period, a mediator shall be selected by the parties within the next seven (7) days from the American Arbitration Association list of approved mediators. If the parties cannot agree within such second seven (7) day period, the American Arbitration Association will be requested to assign a mediator. Such mediator shall be the Special Master. Any party can remove an approved Special Master with at least ten (10) days prior written notice to the other parties, but not during a pending dispute. A new Special Master acceptable to all parties must be appointed with seven (7) days from the date of removal of the prior Special Master. The initiating party shall provide to the Special Master a summary of the dispute, its position and any supporting documents. The responding party shall have fifteen (15) days to submit its position statement and supporting documents, following which the initiating party shall have five (5) days to submit a reply. The Special Master shall then decide the matter within thirty (30) days of receipt of the last of the statements. The Special Master's decision is limited exclusively to selecting one of the remedies suggested by the parties. The decision by the Special Master shall be final, conclusive and binding on the parties. Each of the parties by executing this Agreement unconditionally submits to the jurisdiction of the courts of the State of New York and of the United States District Court for the Southern District of New York and other federal courts, for the purpose of enforcement of any award by the Special Master. The prevailing party in any such proceeding shall be entitled to an award of fees and costs in connection with that action as well as in connection with enforcement of any decision in connection therewith, including reasonable attorney's fees and costs.

(c) <u>Conflict</u>. In the event of any conflict between Section 13 hereof and Article 19 of the License Agreement, Section 13 hereof shall prevail.

14. <u>Headings</u>. The headings contained in this Agreement are for convenience and reference purposes only. They do not form a part hereof and shall not affect the meaning or interpretation of this Agreement.

15. **Entire Agreement.** This Agreement, the attached appendices and the other transaction documents executed contemporaneously herewith, shall constitute the entire understanding of the parties with respect to the subject matter, superseding all prior and contemporaneous promises, agreements and understandings, whether written or oral, pertaining thereto.

16. **Representations.** All parties acknowledge and represent that: (a) they have read this Agreement; (b) they clearly understand this Agreement and each of its terms; (c) they fully and unconditionally consent to the terms of this Agreement; (d) they have had the benefit and advice of counsel of their own selection; (e) they have executed this Agreement, freely, with knowledge, and without influence or duress; (f) they have not relied upon any other representations, either written or oral, express or implied, made to them by any person; (g) the consideration received by them has been actual and adequate; and (h) that they have the authority to enter into this Agreement.

17. **Severability.** Should any provision of this Agreement be declared illegal, unenforceable or void by any court of competent jurisdiction, in whole or in part, and cannot be modified to be enforceable, such provision or portion thereof shall be deemed severable from the remainder of this Agreement and shall in no way affect, impair or invalidate any other provision contained therein.

18. **Counterparts.** This Agreement may be executed in one or more counterparts, but all of such counterparts shall constitute but one and the same Agreement.

19. **Escrow Holder.**

(a) Escrow Holder shall hold the Escrowed Documents and Properties in escrow and shall dispose of the Escrowed Documents and Properties only in accordance with the provisions of this Section 19.

(b) Escrow Holder shall deliver the Escrowed Documents and Properties to BTT or Transcience and YvB, as the case may be, as follows:

(i) to BTT or at BTT's direction, no later than five (5) days after receipt by the Escrow Holder of a written certification by BTT, with a copy provided to Transcience and YvB, stating that the final installment of the Initial Purchase Price has been paid; or

(ii) at any time prior to the payment of the final installment of the Initial Purchase Price, to Transcience and YvB, after receipt of Transcience' and YvB's demand in which Transcience and YvB certifies either that (i) BTT has defaulted under this Agreement and such default has not been cured within any applicable cure periods, or (ii) this Agreement has been otherwise terminated or canceled, and Transcience and YvB is thereby entitled to receive the Escrowed Documents and Properties; but Escrow Holder shall not honor Transcience' and YvB's demand until more than ten (10) business days after Escrow Holder has given a

copy of Transcience' and YvB's demand to BTT in accordance with Section 19(c), nor thereafter if Escrow Holder receives a Notice of Objection from BTT within such ten (10) business day period.

Upon delivery of the Escrowed Documents and Properties in accordance with the provision of this Agreement, the escrow shall terminate and Escrow Holder shall be relieved of all liability hereunder with respect to the Escrowed Documents and Properties.

(c)   Upon receipt of a written demand from Transcience and YvB under Section 19(b)(ii), Escrow Holder shall promptly send a copy of such demand to BTT.  Within ten (10) business days after the date of receiving same, BTT may object to delivery of the Escrowed Documents and Properties to Transcience and YvB by giving a notice of objection (a "Notice of Objection") to Escrow Holder.  After receiving a Notice of Objection, Escrow Holder shall send a copy of such Notice of Objection to Transcience and YvB; and thereafter, in its sole and absolute discretion, Escrow Holder may elect (i) to continue to hold the Escrowed Documents and Properties until Escrow Holder receives a written agreement of Transcience and YvB and BTT or the written order of a court of competent jurisdiction, or arbitrator, as the case may be, directing the disbursement of the Escrowed Documents and Properties, in which event Escrow Holder shall disburse the Escrowed Documents and Properties in accordance with such agreement or order; and/or (ii) to deposit the Escrowed Documents and Properties with any court of competent jurisdiction or arbitrator, as the case may be, and bring an action of interpleader or other appropriate proceeding; and/or (iii) in the event of any litigation between BTT and Transcience and YvB, to deposit the Escrowed Documents and Properties with the clerk of the court, or arbitrator, as the case may be, in which such litigation is pending.

(d)   Escrow Holder shall have no duties or responsibilities except those set forth herein, which the parties hereto agree are ministerial in nature. BTT and Transcience and YvB acknowledge that Escrow Holder is serving without compensation, solely as an accommodation to the parties hereto, and except for Escrow Holder's own bad faith, misconduct or negligence, Escrow Holder shall have no liability of any kind whatsoever arising out of or in connection with its activity as Escrow Holder.  BTT and Transcience and YvB hereby jointly and severally (but with right of contribution) indemnify and agree to defend and hold Escrow Holder harmless from and against any and all loss, cost, claim, damage, liability, and expense, including reasonable attorneys' fees and disbursements (whether paid by Escrow Holder to retained attorneys or representing the fair value of legal services rendered by Escrow Holder to itself), which Escrow Holder may incur by reason of its acting as Escrow Holder, to the extent the same are not the result of Escrow Holder's bad faith, misconduct or negligence.

[Remainder of page left blank.  Signature page follows.]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, or caused it to be executed on their behalf by the undersigned thereunto duly authorized, as of the Effective Date.

WITNESSETH:                                      TRANSCIENCE CORPORATION

By _____                     By _____
Christopher P. Milazzo                               Yolanda von Braunhut, CEO

WITNESSETH:                                      YOLANDA VON BRAUNHUT,

_____                        _____
Christopher P. Milazzo                               Yolanda von Braunhut, individually

WITNESSETH:                                      BIG TIME TOYS, LLC

By _____                     By _____, CEO
Jeffrey T. Kramer                                    Sam K. Harwell, CEO

## SIGNATURE BY ESCROW HOLDER:

Sichenzia Ross Friedman Ference LLP is executing this Agreement, as Escrow Holder, solely for the purpose of agreeing to the provisions of Section 19 thereof and acknowledging receipt of the Escrowed Documents and Properties, which Escrow Holder agrees to hold in accordance with such provisions and the annexed Escrow Agreement.

SICHENZIA ROSS FRIEDMAN FERENCE LLP:

ATTEST:

_Christopher P. Milazzo_

_Michael H. Ference, Esq._

APPENDIX A

Part I: This describes tooling (molds, etc.), required for the manufacture of Sea-Monkey products including packages (hardware); the prepackaged formulas (software); and the location thereof (only where known by the Licensor). In the instance of hardware and goods not part of the specific biological processes, (where manufacturing and certain tooling was contracted abroad by BTT, then George Atamian and/or BTT will furnish the company name, person to contact and the address of each foreign company that is in subcontract production of items for Sea-Monkey kits and products, and in possession of custom tooling, molds, dies printing plates and packaging materials (such as boxes; blister cards; displays, etc.).

Tooling

A. Molds, Tools and Dies: American Molding Corporation, 35 Tisdale Avenue, Leominster, MA 01453. Contact: Brian Richard or Wayne Richard. Phone: 1 (978) 534-0009. Molds: Standard 5-lens Micro-View Aquarium with separate (removable) base and cover and variations thereof; Spoon mold (for feeding Sea Monkeys); Sea-Monkey Racetrack mold (2 cavity + one extra zigzag cavity); Two (2 accessory molds for Racetrack products; One piece, 6 lens Executive tank mold and mold base (inoperative due to misuse by former subcontractor Almar Molding of Philadelphia, PA); Binocular cover mold (a Sea-Monkey aquarium cover mold with dual observation lenses and separate feeding cap on feeding aperture).

B. Printing and Pouch Filling: Graphic Communications, 793 Nina Way, Warminster, PA 18974. Contact: Bob Lawler. Phone: 1 (215) 322-7124. This is a consolidated source that YvB and TSC utilize, who purchases the special laminated pouch paper directly from the mill for Sea-Monkey pouches and converts same by cutting the paper into rolls and printing them in color on their specialized presses. At the same location, they have a pouching facility with pouch filling machinery that enables the same source to fill and seal the finished pouches that are boxed in bulk for shipment to Transcience or its designee. This is a one source supplier who obtains the raw materials and is able to convert same into finished, printed and filled pouches that are then shipped directly to BTT's assembly line and/or warehouse. An additional valuable service provided by Graphic Communications is the manufacture of printing plates from supplied artwork, and the ability to modify artwork and make color and copy corrections. Contact: Loretta Dymant (at same Phone and address).

C. Formula Production: Transcience Corporation, 6200 Chapmans Landing Road, Bryans Road, MD 20640-3040. Contact: Yolanda von Braunhut. Phone: 1 (301) 375-7982). This is where all of the Sea-Monkey formulas are assembled, compounded, blended and shipped for the final step in production, which is the pouch-filling operation described in B. Here, Transcience operates its formulation lab and a blending facility in a separate building on the same private property owned by Yolanda von Braunhut. The blending facility houses bulk material storage, custom blending equipment, drumming and shipping of the finished powder in bulk to the pouch-filling destination (see B.).

Part II: Here is a superficial description of intellectual properties in connection with Sea-Monkeys. Note: Full details are restricted to the contents of the sealed envelope delivered to the Escrow

holder. These are: A. Two part formulas for all Sea-Monkey products (Lab formula additives in gram measurements); Bulk formulas (for combination, with appropriate lab formula). B. Methods used for compounding and blending both (Lab formula and bulk blend formula) and machinery and equipment used. C. Exotica: Rare and/or arcane organics and chemicals used in each process; a description of purpose and the source for each chemical or organic substance used.

# EXHIBIT C

# SICHENZIA ROSS FRIEDMAN FERENCE LLP
### ATTORNEYS AT LAW

## NOTICE OF DEFAULT

December 20, 2012

*Via Facsimile and Federal Express*

Big Time Toys, LLC
708 Berry Road
Nashville, TN 37204
Attention: Garry Barber, President

Re:     Purchase Agreement and Amendment to License Agreement
         Between Big Time Toys, LLC and Transcience Corporation and
         Yolanda von Braunhut, dated as of May 1, 2009 (the "Agreement")

Dear Mr. Barber:

This firm represents Transcience Corporation ("Transcience") and Yolanda von Braunhut ("YvB") in connection with the Agreement.

As you are aware, pursuant to the terms of the Agreement, Big Time Toys, LLC ("BTT") exercised its option to purchase from Transcience and YvB all right, title and interest in products licensed pursuant to a License Agreement, made as of June 26, 2007 (the "License Agreement"), by and among BTT, YvB and Transcience for the total sum of $10,000,000, which was divided into the following two components: (1) an Initial Purchase Price of $5,000,0000; and (2) an Additional Purchase Price of $5,000,000. Pursuant to Section 2.2(a) of the Agreement, BTT agreed to pay the $4,500,000 of the Initial Purchase Price remaining after the payment of $500,000 initial cash payment in the form of royalties payable under the License Agreement. Specifically, BTT agreed to pay Transcience the greater of the royalties set forth under Secton4 A. of the License Agreement (as amended by the Agreement), or a minimum royalty of $750,000, in twelve equal monthly installments on the 10th day of each month.

BTT has failed to pay the installment of the Initial Purchase Price due on December 10, 2012 in the amount of $62,500 pursuant to Section 2.2(a) of the Agreement. Please be advised that as a result of BTT's failure to make this payment, BTT is in default of its obligations under the Agreement and the License Agreement. Please be further advised that, in the event that BTT fails to cure said default on or before January 7, 2013, YvB and Transcience intends to enforce its rights and remedies under the Agreement and/or the License Agreement, including, but not limited to, those set forth in Section 2.4(a) of the Agreement.

This letter is without prejudice to, and shall not construed as a waiver of, any and all of Transcience and Yolanda von Braunhut's rights and remedies, at law or in equity, all of which are expressly reserved.



61 BROADWAY | NEW YORK, NEW YORK 10006
T 212 930 9700 | F 212 930 9725 | WWW.SRFF.COM

Big Time Toys, LLC
December 20, 2012
Page 2 of 2

Be guided accordingly.

Very truly yours,

Christopher P. Milazzo

cc:    Jeffrey Kramer, Esq. (via email only)

EXHIBIT D

# SICHENZIA ROSS FRIEDMAN FERENCE LLP
### ATTORNEYS AT LAW

January 18, 2013

*Via Facsimile and Federal Express*

Big Time Toys, LLC
708 Berry Road
Nashville, TN 37204
Attention: Garry Barber, President

Re:    Purchase Agreement and Amendment to License Agreement
       Between Big Time Toys, LLC and Transcience Corporation and
       Yolanda von Braunhut, dated as of May 1, 2009 (the "Agreement")

Dear Mr. Barber:

As you know, this firm represents Transcience Corporation ("Transcience") and Yolanda von Braunhut ("YvB") in connection with the Agreement.  I write with respect to the Notice of Default, dated December 20, 2012, served by my firm upon Big Time Toys, LLC ("BTT"), as a result of BTT's default in its obligation make the payment due December 10, 2012 (and thereafter) pursuant to the Agreement, and BTT's failure to cure said default on or before January 7, 2013.

Please be advised that, pursuant to Section 2.4(a) of the Agreement, Transcience and YvB hereby declare the Agreement and the License Agreement' made as of June 26, 2007 (the "License Agreement") are null and void and of no further force of effect.  Please be further advised that, pursuant to Section 2.4(a)(iii), Transcience and YvB hereby direct the Escrow Holder (as defined in the Agreement) to return to Transcience and YvB all property (tangible, intangible, personal, intellectual and other), bills of sale, assignments and UCC financing statements and other documents and instruments, and the Trade Secrets held in escrow under the Agreement,  and further demand that BTT return to Transcience and YvB  any and all tooling owned by BTT for the production of the Licensed Products and/or Sea-Monkeys® Properties.[1]

Additionally, pursuant to Section 2.4(a)(v), Transcience and YvB demand that BTT immediately cease selling, marketing or producing the Licensed Products and Sea-Monkeys® Properties, and hereby declares any and all rights granted to BTT under the Agreement  null and void.

---

[1] The term "Licensed Products" is defined at page 1 of the License Agreement.  The term "Sea-Monkeys® Properties" is defined in Section 1 of the Agreement.



61 BROADWAY ! NEW YORK, NEW YORK 10006
T 212 930 9700 ! F 212 930 9725 ! WWW.SRFF.COM

Big Time Toys, LLC
January 18, 2013
Page 2 of 2

Please contact the undersigned immediately so that we may coordinate the orderly return of my clients' property and the smooth transition of the production, manufacture, sales and marketing of Sea-Monkeys® Properties from you to my clients.  We look forward to hearing from you.

Finally, this letter is without prejudice to, and shall not construed as a waiver of, any and all of Transcience and Yolanda von Braunhut's rights and remedies under the Agreement, the License Agreement, or otherwise, at law or in equity, all of which are expressly reserved.

Very truly yours,

Christopher P. Milazzo

cc:      Jeffrey Kramer, Esq. (via email only)

# EXHIBIT E



**DECOTIIS**
DeCotiis, FitzPatrick & Cole, LLP

OFFICE

GLENPOINTE CENTRE WEST
500 FRANK W. BURR BLVD. SUITE 31
TEANECK, NEW JERSEY 07666
T: 201.928.1100   F: 201.928.0588
WWW.DECOTIISLAW.COM

DIRECT

JEFFREY G. KRAMER, ESQ.
JKRAMER@DECOTIISLAW.COM
201.907.5234

January 22, 2013

Yolanda von Braunhut
Transcience Corporation
6200 Chapmans Landing Road
Indian Head, MD 20640-3040
Attn.: Chief Executive Officer

Sichenzia Ross Friedman Ference LLP
61 Broadway, 32nd Floor
New York, NY 10006
Attn: Michael H. Ference, Esq.

Re:   Purchase Agreement and Amendment to License Agreement, dated as of May 1,
      2009, by and among Big Time Toys, LLC, Yolanda von Braunhut, Transcience
      Corporation and Sichenzia Ross Friedman Ference LLP (the "Amendment"),
      which amended a License Agreement, dated June 26, 2007 (the "Agreement")

      Notice of Cross Default

      Notice of Objection Pursuant to Section 19(c) of the Amendment

Dear Ms. von Braunhut and Mr. Ference:

      We are responding on behalf of Big Time Toys LLC ("BTT") to letters from Sichenzia
Ross Friedman Ference LLP, dated December 20, 2012 and January 18, 2013, in connection with
the above matter (the "Letters").

      BTT has reviewed the assertions in the Letters and disagrees that any default under the
Amendment or Agreement has occurred.   We call to your attention Section 2.2(a) of the
Amendment, which provides "All payments hereunder and under the License Agreement,
including the Minimum Royalty, shall be a nonrefundable advance against any amounts due to
Transcience and YvB.  **It is expressly agreed that all such payments due on and after the
Effective Date shall be applied to the payment of the Purchase Price.**" (Emphasis added).
According to BTT's records, payments made by BTT to Ms. von Braunhut from May 1, 2009
through November 30, 2012 total in excess of the Initial Purchase Price of $5,000,000.  We



05-2163  1524445.1                    TEANECK  ·  NEW YORK

**DECOTIIS**

January 22, 2013
Page 2

further call to your attention that recent actions taken by the United States Fish and Wildlife Service, as well as foreign governments, with respect to pouches supplied by Transcience Corporation, materially adversely affected BTT's ability to market and sell the products in certain markets. Such acts, we believe, constitute a force majeure of the type described in Section 20.G. of the Agreement and give rise to other defenses. Accordingly, it is BTT's position that no default has occurred.

We further call to your attention that Transcience Corporation and Yolanda von Braunhut have chronically failed to comply with the Amendment, particularly Section 5(c), with respect to the supply of pouches to BTT. Such failure constitutes a default under the Amendment.

Finally, although no notice has been provided by Transcience Corporation or Yolanda von Braunhut, this letter shall serve as BTT's Notice of Objection pursuant to Section 19(c) of the Amendment.

We trust you understand that BTT disputes that the Amendment and Agreement have been terminated and that you will be guided accordingly.

This letter is without prejudice to, and is not a waiver of, any and all of BTT's rights and remedies under the Amendment and/or the Agreement, or otherwise, at law or in equity, all of which are expressly reserved.

If you have any questions concerning the enclosed, please feel free to contact me.

Sincerely,

Jeffrey G. Kramer

# EXHIBIT F

# SICHENZIA ROSS FRIEDMAN FERENCE LLP
### ATTORNEYS AT LAW

January 29, 2013

*Via E-mail and First Class Mail*

Jeffrey G. Kramer, Esq.
DeCotiis, Fitzpatrick, Cole & Wisler, LLP
Glenpointe Center West
500 Frank W. Burr Boulevard, Suite 31
Teaneck, New Jersey 07666

Re:     Purchase Agreement and Amendment to License Agreement
        Between Big Time Toys, LLC and Transcience Corporation and
        Yolanda von Braunhut, dated as of May 1, 2009 (the "Agreement")

        Notice of Termination

        Response to Notice of Cross-Default

Dear Mr. Kramer:

I write in response to your letter, dated January 22, 2013 and in furtherance of the January 22, 2013 telephone conference between the parties and counsel.

Please be advised that Transcience Corporation ("TSC") and Yolanda von Braunhut dispute the contentions raised in your letter. First, it is my clients' position that Big Time Toys, LLC ("BTT") has not fully paid the Initial Purchase Price under the Agreement. BTT was required to make monthly minimum royalty payments of $62,500 to Ms. Braunhut in December 2012 (and thereafter) until BTT paid the sum of $5,000,000. As you know, BTT failed to make the payment due for December 2012, and failed to cure within fifteen (15) days after notice of such default. As a result, my clients exercised their rights under the Agreement and, among other things, terminated the Agreement. Accordingly, my clients deem the Agreement null, void and of no further force or effect.

Second, it is my understanding that the issues raised by the United States Fish and Wildlife Service and certain European governments have been resolved. Accordingly, such issues do not excuse BTT's failure to make the payments required under the Agreement.

Third, neither TSC nor Ms. von Braunhut have defaulted in their obligations under the Agreement. Your convenient cross-noticing of a purported default is clearly a manufactured attempt to excuse BTT's failure to make the payments required under the Agreement. Neither TSC nor von Braunhut are in default of any provision of the Agreement or License Agreement. Further, since the parties entered into the Agreement, BTT has never noticed any purported default with to pouch production. Indeed, BTT has inexplicably and without justification failed to pay for a pouch production that it ordered.



61 BROADWAY ¦ NEW YORK, NEW YORK 10006
T 212 930 9700 ¦ F 212 930 9725 ¦ WWW.SRFF.COM

Jeffrey G. Kramer, Esq.
January 29, 2013
Page 2 of 2

Finally, please be advised that my clients reject your offer to modify the Agreement as discussed during the January 22, 2013 conference call. As discussed above, my clients deem the Agreement terminated.

Notwithstanding, in settlement of the disputes between the parties, my clients are willing to reinstate the Agreement and the License Agreement for all territories, except Australia, on the terms and conditions contained therein (without any modification, except as to territory). Further, based upon your client's new claim with respect to the payment of the Initial Purchase Price, my clients would also require that BTT concede that the payments for BTT's purchase of pouches are not credited against the Initial Purchase Price and that the $5,000,000 Initial Purchase Price has not been paid, as well as cure its default in the payment of the minimum royalty for December 2012 and January 2013.

Alternatively, my clients would be willing to entertain an offer of a new license agreement that provides for a reduced royalty for a reduced geographic territory, or for a reduction in the properties and/or rights licensed.

This letter is without prejudice to, and shall not construed as a waiver of, any and all of TSC and Ms. von Braunhut's rights and remedies under the Agreement, the License Agreement, or otherwise, at law or in equity, all of which are expressly reserved.

Please call if you have any questions, or if you wish to discuss this matter further.

Sincerely,

Christopher P. Milazzo

cc:: Yolanda von Braunhut

# EXHIBIT G

February 6, 2013

*PRIVILEGED AND CONFIDENTIAL*
*FOR SETTLEMENT PURPOSES ONLY*

*Via Facsimile and Federal Express*

Big Time Toys, LLC
708 Berry Road
Nashville, TN 37204
Attention: Jamie O'Rourke

Re:     Purchase Agreement and Amendment to License Agreement
        Between Big Time Toys, LLC and Transcience Corporation and
        Yolanda von Braunhut, dated as of May 1, 2009 (the "Agreement")

Dear Jamie:

As you know, this firm represents Transcience Corporation ("Transcience") and Yolanda von Braunhut ("YvB") in connection with the Agreement. I write to follow up on our conversation yesterday regarding a possible resolution of the present dispute between the parties concerning the termination of the Agreement.

While my clients firmly believe that the Agreement (together with the License Agreement) was validly and effectively terminated pursuant to this firm's January 18, 2013 letter, they are prepared to amicably resolve the dispute regarding same to avoid litigation costs on the following material terms and conditions:

- Big Time Toys, LLC ("BTT") acknowledges that the Agreement and the License Agreement are terminated and relinquishes any and all rights thereunder:

- Transcience shall pay BTT the sum of $75,000 in full and final settlement of all disputes between the parties;

- Transcience shall waive its right to recover the December 2012 and January 2013 minimum royalty payments of $62,500 which BTT failed to pay;

- Transcience shall purchase BTT's present inventory of pouches at cost;

- BTT shall return and/or turn over all tooling used by BTT in connection with the manufacture of the Licensed Products and/or Sea-Monkeys ® Properties;

- The parties shall exchange general releases;

- BTT shall indemnify Transcience and YvB for any claims brought by BTT's distributors, suppliers or manufacturers of the Licensed Products and Sea-Monkeys® Properties; and

- The parties shall execute a formal, written agreement setting forth the agreed terms.

This letter is for settlement purposes only, and nothing contained herein shall create any binding obligation upon Transcience and YvB.  Transcience and YvB shall not be bound by any terms in connection with the potential resolution of this agreement unless and until the parties execute a formal, written settlement agreement.  Further, this letter s without prejudice to, and shall not construed as a waiver of, any and all of Transcience and Yolanda von Braunhut's rights and remedies under the Agreement, the License Agreement, or otherwise, at law or in equity, all of which are expressly reserved.

Very truly yours,

Christopher P. Milazzo

cc:   Jeffrey Kramer, Esq. (via email only)

# EXHIBIT H

**From:** Jamie Orourke [mailto:jporourke@comcast.net]
**Sent:** Wednesday, February 13, 2013 2:11 PM
**To:** Christopher Milazzo
**Cc:** Sam Harwell; Jeff Kramer; grog5 Atamian
**Subject:** BTT /TSC settlement

Chris - I am writing in response to your letter of February 11, 2013. As you know, we object to your assertion that we are in default of any agreements with TSC and/YvB. We will not, however, attempt to litigate the issues in these emails, but instead want to focus on a resolution of the issues. Below are our counterproposals:

**Option A:** Termination of Agreements:

1. TSC/YVB shall pay BTT $100,000 at closing and a 5% royalty on net sales and 25% of licensing income from the line in perpetuity or the cash equivalent.

2. TSC/YvB shall purchase all BTT Sea Monkey's related inventory at cost for cash where is as is.

3. BTT shall turn over to TSC/YvB all tooling and fixtures where is as is.

4. BTT will provide reasonable assistance, at no out-of-pocket cost to BTT and only for up to 90 days, to assist transition of business to TSC or BTT's successor.

5. BTT shall be entitled to complete any WIP and a 120 day sell off period.

6. Mutual releases and other customary documentation.

**Option B:** Modification of Existing Agreements:

1. BTT would pay TSC/YvB a $100,000 advance upon execution of the modification agreement.

2. BTT would pay a 10% royalty on net sales quarterly going forward with an annual minimum royalty of $150,000 up to a cumulative total of $3 million after which BTT would pay TSC/YvB a 5% royalty in perpetuity.

3. BTT is willing to consider a larger advance against future royalties for a commensurate reduction in future royalty payments.

4. All other terms and conditions of the "second phase" of current agreement would be in force including but not limited to creative control and pouch production.


I am prepared and available any time to work with you all in any way you see fit to bringing this to a mutually beneficial end.

Please feel free to call me with any questions or comments you may have.

Sincerely,


Jamie O'Rourke

J. P. O'Rourke

Sent from my iPhone

J P ORourke

Cell 615-202-1900

EXHIBIT I

## 17 USC § 106 – EXCLUSIVE RIGHTS IN COPYRIGHTED WORKS

**§ 106 . Exclusive rights in copyrighted works**

Subject to sections 107 through 122, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

(1) to reproduce the copyrighted work in copies or phonorecords;

(2) to prepare derivative works based upon the copyrighted work;

(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;

(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and

(6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

**EXHIBIT J**

**15 USC §1117**

**Recovery for violation of rights; profits, damages and costs; attorney fees; treble damages**

(a)     When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, a violation under section 43(a) or (d) [15 USC 1125(a) or (d)], or a willful violation under section 43(c) [15 USC 1125(c)], shall have been established in any civil action arising under this Act, the plaintiff shall be entitled, subject to the provisions of sections 29 and 32 [15 USC § §1111, 1114], and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party.

(b)     In assessing damages under subsection (a), the court shall, unless the court finds extenuating circumstances, enter judgment for three times such profits or damages, whichever is greater, together with a reasonable attorney's fee, in the case of any violation of section 32(1)(a) of this Act (15 U.S.C. 1114(1)(a)) or section 220506 of title 36, United States Code, that consists of intentionally using a mark or designation, knowing such mark or designation is a counterfeit mark (as defined in section 34(d) of this Act (15 U.S.C. 1116(d)), in connection with the sale, offering for sale, or distribution of goods or services. In such cases, the court may in its discretion award prejudgment interest on such amount at an annual interest rate established under section 6621(a)(2) of the Internal Revenue Code of 1986 [26 USC §6621(a)(2)], commencing on the date of the service of the claimant's pleadings setting forth the claim for such entry and ending on the date such entry is made, or for such shorter time as the court deems appropriate.

(c)      In a case involving the use of a counterfeit mark (as defined in section 34(d) (15 U.S.C. 1116(d)) in connection with the sale, offering for sale, or distribution of goods or services, the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits under subsection (a), an award of statutory damages for any such use in connection with the sale, offering for sale, or distribution of goods or services in the amount of--

(1) not less than $ 500 or more than $ 100,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just; or

(2) if the court finds that the use of the counterfeit mark was willful, not more than $ 1,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just.

(d)      In a case involving a violation of section 43(d)(1) [15 USC 1125(d)(1)], the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits, an award of statutory damages in the amount of not less than $ 1,000 and not more than $ 100,000 per domain name, as the court considers just.

(e)      In the case of a violation referred to in this section, it shall be a rebuttable presumption that the violation is willful for purposes of determining relief if the violator, or a person acting in concert with the violator, knowingly provided or knowingly caused to be provided materially false contact information to a domain name registrar, domain name registry, or other domain name registration authority in registering, maintaining, or renewing a domain name used in connection with the violation. Nothing in this subsection limits what may be considered a willful violation under this section.

# EXHIBIT K

Big Time Toys.





Big Time Toys.



EXHIBIT L

Big Time Toys.



**Toys    Partners              Company    Contact**

## Contact Us

**Big Time Toys, LLC**
708 Berry Road
Nashville, TN 37204

800-419-3810
Bob.Wardell@bigtimetoys.com

**CLICK HERE for Employment Opportunities**

**Moon Shoes Replacement Rubber Bands**
U.S. customers can send a check for $7 to Big Time Toys at the above address
($15 for Canadian customers) for a pack of 50 replacement rubber bands.

**CPSIA Codes**

Big Time Toys.

**Toys    Partners    Company    Contact**

## Our Company

Big Time Toys manufactures, markets, and sells its own branded products worldwide. Our products can now be found in specialty stores, mass merchants, supermarkets, drug stores, hardware stores, clubs and online retailers throughout the United States, Canada and Overseas.

Our mission is to serve toy shoppers (KIDS!) by bringing to market new, unique, and well-designed products. We strive to introduce exciting and clever products...faster than our competitors. We love products that beg the question, "Why didn't I think of that"? If one of our products can put a smile on a kid's (or adult's!) face, then we've accomplished our objective. Our products are innovative, clever, affordable, and fun!

Please browse our product pages, if you find something interesting,  contact us  to become a customer, or if you are a consumer, to find a retail store near you.

Big Time is headquartered in Nashville, TN and has its manufacturing management office in Hong Kong. Big Time is proud member of the TMA (Toy Manufacturing Association).

**CLICK HERE for Employment Opportunities**

# EXHIBIT M

Big Time Toys.





### The Amazing Live Sea-Monkeys®

The World's Only Instant Pets!®

Like us on Facebook!

Return to Toy Gallery

EXHIBIT N

Big Time Toys:





**EXHIBIT O**

## 17 USC § 106 – EXCLUSIVE RIGHTS IN COPYRIGHTED WORKS

**§ 106 . Exclusive rights in copyrighted works**

Subject to sections 107 through 122, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

(1) to reproduce the copyrighted work in copies or phonorecords;

(2) to prepare derivative works based upon the copyrighted work;

(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;

(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and

(6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

# EXHIBIT P

## 17 USC § 501 - INFRINGEMENT OF COPYRIGHT

**(a)** Anyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 through 122 or of the author as provided in section 106A (a), or who imports copies or phonorecords into the United States in violation of section 602, is an infringer of the copyright or right of the author, as the case may be. For purposes of this chapter (other than section 506), any reference to copyright shall be deemed to include the rights conferred by section 106A (a). As used in this subsection, the term "anyone" includes any State, any instrumentality of a State, and any officer or employee of a State or instrumentality of a State acting in his or her official capacity. Any State, and any such instrumentality, officer, or employee, shall be subject to the provisions of this title in the same manner and to the same extent as any nongovernmental entity.

**(b)** The legal or beneficial owner of an exclusive right under a copyright is entitled, subject to the requirements of section 411, to institute an action for any infringement of that particular right committed while he or she is the owner of it. The court may require such owner to serve written notice of the action with a copy of the complaint upon any person shown, by the records of the Copyright Office or otherwise, to have or claim an interest in the copyright, and shall require that such notice be served upon any person whose interest is likely to be affected by a decision in the case. The court may require the joinder, and shall permit the intervention, of any person having or claiming an interest in the copyright.

# EXHIBIT Q

## 17 USC § 504 - REMEDIES FOR INFRINGEMENT: DAMAGES AND PROFITS

**(a) In General.—** Except as otherwise provided by this title, an infringer of copyright is liable for either—

(1) the copyright owner's actual damages and any additional profits of the infringer, as provided by subsection (b); or

(2) statutory damages, as provided by subsection (c).

**(b) Actual Damages and Profits.—** The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

**(c) Statutory Damages.—**

(1) Except as provided by clause (2) of this subsection, the copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally, in a sum of not less than $750 or more than $30,000 as the court considers just. For the purposes of this subsection, all the parts of a compilation or derivative work constitute one work.

(2) In a case where the copyright owner sustains the burden of proving, and the court finds, that infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $150,000.  In a case where the infringer sustains the burden of proving, and the court finds, that such infringer was not aware and had no reason to believe that his or her acts constituted an infringement of copyright, the court in its discretion may reduce the award of statutory damages to a sum of not less than $200. The court shall remit statutory damages in any case where an infringer believed and had reasonable grounds for believing that his or her use of the copyrighted work was a fair use under section 107, if the infringer was:

(i) an employee or agent of a nonprofit educational institution, library, or archives acting within the scope of his or her employment who, or such institution, library, or archives itself, which infringed by reproducing the work in copies or phonorecords; or

(ii) a public broadcasting entity which or a person who, as a regular part of the nonprofit activities of a public broadcasting entity (as defined in section 118 (f)) infringed by performing a published nondramatic literary work or by reproducing a transmission program embodying a performance of such a work.

## 17 USC § 505 - REMEDIES FOR INFRINGEMENT: COSTS AND ATTORNEY'S FEES

In any civil action under this title, the court in its discretion may allow the recovery of full costs by or against any party other than the United States or an officer thereof.  Except as otherwise provided by this title, the court may also award a reasonable attorney's fee to the prevailing party as part of the costs.

## 17 USC § 502 - REMEDIES FOR INFRINGEMENT: INJUNCTIONS

(a) Any court having jurisdiction of a civil action arising under this title may, subject to the provisions of section 1498 of title 28, grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright.

(b) Any such injunction may be served anywhere in the United States on the person enjoined; it shall be operative throughout the United States and shall be enforceable, by proceedings in contempt or otherwise, by any United States court having jurisdiction of that person. The clerk of the court granting the injunction shall, when requested by any other court in which enforcement of the injunction is sought, transmit promptly to the other court a certified copy of all the papers in the case on file in such clerk's office.