## PURCHASE AGREEMENT
## AND
## AMENDMENT TO LICENSE AGREEMENT

This PURCHASE AGREEMENT AND AMENDMENT TO LICENSE AGREEMENT ("Agreement") is made and entered into as of May 1, 2009 (the "Effective Date"), by and among BIG TIME TOYS, LLC, a Tennessee limited liability company, headquartered at 708 Berry Road, Nashville, TN 37204 ("BTT"), YOLANDA von BRAUNHUT, an individual with an address at 6200 Chapmans Landing Road, Indian Head, MD 20640-3040 ("YvB"), TRANSCIENCE CORPORATION, a Maryland corporation with offices and principal place of business at 6200 Chapmans Landing Road, Indian Head, MD 20640-3040 ("Transcience") and Sichenzia Ross Friedman Ference LLP, a New York limited liability partnership with offices at 61 Broadway, 32nd Floor, New York, NY 10006, Attn: Michael H. Ference, Esq. (the "Escrow Holder"), with reference to and incorporation of the following:

RECITALS:

A.  Pursuant to a License Agreement, made as of June 26, 2007 by and among BTT, YvB and Transcience (the "License Agreement"), BTT holds exclusive rights to make, have made, use, sell, distribute and advertise Licensed Products worldwide (defined terms used in this Agreement, but not defined herein, shall have the meanings ascribed to such terms in the License Agreement);

B. YvB and Transcience are the sole and exclusive owners of the Licensed Products and certain personal property used in connection therewith, Transcience is the owner of registered and unregistered United States and foreign trademarks, including "Instant Life®", "Instant Pets®", "Ocean-Zoo®" and "Sea-Monkeys®", a current list of which is set forth on Exhibit B to the License Agreement (including any other trademarks licensed thereunder, the "Licensed Trademarks");

C.  YvB and Transcience are each owners of certain copyrights registered in the United States Copyright Office, and unregistered, and YvB is the copyright owner of an instruction book titled "It's Fun To Raise Pet Sea-Monkeys", a current list of which is set forth on Exhibit C to the License Agreement (including any other copyrights licensed thereunder, the "Licensed Copyrights");

D.   Transcience is the owner of certain United States and foreign patents and patent applications, a current list of which is set forth on Exhibit D to the License Agreement (including any other patents licensed thereunder, the "Licensed Patents");

E.  Transcience and YvB, in June 2008, filed a Statement of Claim with the American Arbitration Association ("AAA") against BTT, captioned Transcience Corporation and Yolanda von Braunhut v. Big Time Toys LLC, AAA Case No. 13 133 Y 01392 08 (the "Arbitration"), alleging, among other things, that BTT breached the License Agreement;

F.   BTT, in July 2008, filed an Answer, Affirmative Defenses and Statement of Counterclaim in the Arbitration alleging, among other things, that Transcience and YvB breached the License Agreement;

G.   In August 2008, BTT filed a lawsuit in the Chancery Court for the Twentieth District for the State of Tennessee at Nashville, captioned <u>Big Time Toys, LLC v. George C. Atamian</u>, Docket No. 08-1769-III (the "<u>Lawsuit</u>") (the Lawsuit and Arbitration are collectively referred to herein as the "<u>Litigations</u>") alleging, among other things, that George C. Atamian ("<u>Atamian</u>") tortiously interfered with BTT's contractual rights;

H.   The parties to this Agreement, and Atamian, desire to avoid the expense and inconvenience of further litigation, without admission of fault or liability, and to resolve and settle all existing claims, counterclaims and disputes among them, whether known or unknown, which have been or could have been brought to date in the Litigations;

I.   The License Agreement grants to BTT the option to purchase from YvB and Transcience all right, title and interest in and to the Licensed Products;

J.   This Agreement, which is being executed May 25, 2010, is effective May 1, 2009, with certain provisions effective January 1, 2010; and

K.   BTT desires to exercise the Option (defined more fully below), and YvB and Transcience agree that the Option is hereby exercised, all on the terms and conditions and as described herein, and in connection therewith, and the execution of the Settlement Agreement and Mutual Release, to which this Agreement is appended, the Litigations shall be settled as provided therein:

NOW, THEREFORE, in consideration of the foregoing, the mutual promises herein contained and other good and valuable considerations, the adequacy, sufficiency and receipt of which are hereby acknowledged, and in full and final settlement of the Litigations, the parties agree as follows:

AGREEMENT:

1.   **Definitions**.  In this Agreement the following capitalized words and expressions shall, unless the context requires otherwise, have the following meanings:

"<u>Option</u>" shall mean the option granted pursuant to Section 17 of the License Agreement, as amended by the terms hereof.

"<u>Sea-Monkeys®</u>" shall mean the entire Amazing Live Sea-Monkeys® line as described more fully in the License Agreement and Appendix A hereto.

"<u>Sea-Monkeys® Properties</u>" shall mean and include the Licensed Products and, collectively and without limitation, (a) all of the intellectual property (1) associated with Sea-Monkeys®, including the intellectual property described in <u>Appendix A</u> of this Agreement, and

(2) listed on Exhibits A, B and C to the License Agreement (including in each case, without limitation, the Trade Secrets, patent, patents in process, trademarks, tradenames, copyrights and all foreign rights and rights to extend and/or renew any of such intellectual property), (b) the Licensed Copyrights, the Licensed Trademarks, and the Licensed Patents, and (c) all personal property, tangible and intangible, related thereto, including without limitation the goodwill of the business, the domain names "www.sea-monkeys.com" and www.Sea-MonkeyGear.com and the web sites related thereto, and the items necessary or desirable to manufacture, market, advertise and sell the Licensed Products.

"Trade Secrets" shall mean any and all of the information necessary or desirable to own and operate the Sea-Monkeys® business, and shall include each of the formulas created for use by or for Sea-Monkeys®, including formula compositions, detailed instructions for the preparation of the formulas, technology, material handling instructions and specific details disclosing sources of all materials used in the manufacture, sources for obscure materials not readily available, as well as pharmaceutical sources from which common chemicals have historically been obtained for the preparation of the formulas, all of which Trade Secrets are specifically identified and generally described in Appendix A.

## 2. Exercise of Option; Purchase of Sea-Monkeys® Properties.

2.1.   Option Exercise.   BTT hereby exercises the Option, and YvB and Transcience hereby acknowledge and accept BTT's exercise of the Option, upon the terms and conditions provided herein.  BTT hereby purchases from Transcience and YvB all right, title and interest, free of all liens, claims and encumbrances, in and to any and all of the Sea-Monkeys® Properties and Licensed Products, including Sea-Monkeys®, related assets and the goodwill of the business associated therewith, in exchange for the Purchase Price (as defined in Section 2.2) and otherwise in accordance with the terms and conditions of this Agreement.

2.2.   Purchase Price.   The total purchase price for the Licensed Property shall be $10,000,000, payable as follows (the "Purchase Price"):

(a)   Initial Purchase Price.   Five Million Dollars ($5,000,000) of the Purchase Price (the "Initial Purchase Price") shall be paid as follows:

(i) $500,000 shall be paid upon execution of this Agreement (the "Initial Cash Payment"), by certified check, bank check or otherwise immediately available funds, payable to "Sichenzia Ross Friedman Ference LLP, as attorneys for Transcience Corp.", and

(ii) $4,500,000 shall be paid in the form of royalties payable under the License Agreement, except that effective January 1, 2010, (x) the royalty rate under Section 4.A. of the License Agreement shall be twenty percent (20%) and not ten percent (10%), and (y) the Minimum Royalty under Section 4.B. of the License Agreement shall be $750,000 and not $500,000, payable in twelve (12) equal monthly installments on or before the tenth (10th) day of each month.  In the event that royalties paid during a calendar year equal or exceed the annual Minimum Royalty amount ($750,000) prior to the end of such

calendar year, only actual royalties under Section 4.A. shall be payable for the remainder of that calendar year. For example, if as of September 30 of a calendar year royalties paid equal $750,000, then only actual royalties (and no monthly Minimum Royalty amount) shall be paid for the remainder of such calendar year. The monthly payments of the Minimum Royalty shall recommence the following calendar year. At the Closing, BTT shall pay the sum of $104,166.67 by certified or bank check made payable to "Sichenzia Ross Friedman Ference LLP, as attorneys for Transcience Corp.", which amount represents the difference between the Minimum Royalty payments due to Transcience under the License Agreement and the increased Minimum Royalty payments due hereunder for the months of January 2010 through May 2010.

All payments hereunder and under the License Agreement, including the Minimum Royalty, shall be a nonrefundable advance against any amounts due to Transcience and YvB. It is expressly agreed that all such payments due on and after the Effective Date shall be applied to the payment of the Purchase Price.

(b) _Additional Purchase Price_. The remaining Five Million Dollars ($5,000,000) of the Purchase Price (the "_Additional Purchase Price_") shall be payable as royalties, monthly, except that immediately following payment of the final installment of the Initial Purchase Price in paragraph (a) above, BTT's sole payment obligations to Transcience and YvB shall be;

(i) five percent (5%) of "Gross Sales" of Licensed Products sold by BTT to third parties, subject to the following terms and conditions;

(A) If BTT sells any Licensed Product to any party affiliated with BTT prior to such third party sale, or in any way directly or indirectly related to or under the common control with BTT, at a price less than the regular price charged to other parties, the royalty payable to Transcience and YvB shall be computed on the basis of the regular price charged to other parties; and

(B) "Gross Sales" shall mean billed-out gross shipments to third parties less deductions for trade discounts and merchandise returns. In the event that BTT grants any approved sublicensee the right to make, have made, use and sell Licensed Products, BTT shall pay Transcience and YvB twenty-five percent (25%) of the sublicense income received by BTT from such sublicensees. The Licensed Products shall be considered as "sold" when billed out, or, if not previously billed out, when shipped, mailed or otherwise delivered to the recipient of the goods by any means;

(ii) twenty-five percent (25%) of all entertainment related revenue received by BTT for the first three years following the payment of the final installment of the Initial Purchase Price, and ten percent (10%) of all entertainment related revenue received by BTT thereafter, and

(iii) Transcience and YvB shall be entitled to retain the ten percent (10%) royalty payable by Transcience and YvB to BTT for Transcience's and YvB's operation of the

website www.Sea-MonkeyGear.com (as described in paragraph 5(a) of this Agreement (which amends Section 2 of the License Agreement)), for which BTT shall receive a credit against the amounts due for the Additional Purchase Price. Promptly following the date Transcience closes its books for each month, but in no event later than thirty (30) days following the close of such month, Transcience and YvB shall deliver to BTT a statement signed by YvB, listing the quantity, description of goods, revenues and gross sales price, itemized deductions from gross sales price and the net sales price of products sold by Transcience and YvB from, through or relating to www.Sea-MonkeyGear.com during the preceding month (the "Royalty Statement") and the amount due BTT (as to such statements, BTT shall have the same rights to audit Transcience and YvB as they have to audit BTT as set forth herein and in the License Agreement);

until the balance of the Additional Purchase Price is paid in full. Promptly following the date BTT closes its books for each month that Additional Purchase Price is payable, but in no event later than thirty (30) days following the close of such month, BTT shall deliver to YvB a statement signed by a duly authorized officer of BTT, listing the quantity, description of goods and gross sales price, itemized deductions from gross sales price and the net sales price of the Licensed Products sold by BTT and its sublicensees during the preceding month (the "Royalty Statement"). Payments of any amounts due to YvB shall accompany the Royalty Statement. Following the payment in full of the Additional Purchase Price, BTT shall have no further obligations to Transcience or YvB.

(c) Payee. All payments due to Transcience and YvB hereunder shall be made to YvB, who shall receive the same as agent for, and on behalf, of YvB and Transcience.

(d) Prepayment. BTT shall have the right, to be exercised at any time, to prepay all or any portion of the Initial Purchase Price and/or Additional Purchase Price.

2.3.   Minimum Annual Sales. Commencing with the calendar year beginning January 1 following the year in which the payment of the final installment of the Initial Purchase Price in paragraph 2.2(a) above occurs, BTT agrees that it shall generate no less than $3,000,000 of Gross Sales of Licensed Products for each calendar year until the Additional Purchase Price is paid in full. In the event BTT fails to generate $3,000,000 in Gross Sales of Licensed Products for any such calendar year, within sixty (60) days following the close of such calendar year, Transcience and YvB shall have the right to provide written notice to BTT of their intent to terminate this Agreement, and in the event of such delivery of notice of intent to terminate, BTT shall then have thirty (30) days from the date of receipt of such notice to pay to Transcience and YvB a royalty amount calculated as follows:  (i) five percent (5%) of the difference between $3,000,000 and the Gross Sales of Licensed Products actually generated for such calendar year, less (ii) any payments for such year under Section 2.2(b)(ii) hereof, and less (iii) any credit for such year under Section 2.2(b)(iii) hereof, in which event this Agreement shall continue in full force and effect for the next succeeding calendar year.  Any such payments by BTT shall be a nonrefundable advance against any amounts due to Transcience and YvB hereunder, including the Additional Purchase Price.  In the event BTT fails to make such payment, Transcience and YvB shall be entitled, as their sole remedy, to declare this Agreement terminated and BTT shall immediately return to Transcience all of the Trade Secrets, Licensed Products and Sea-

Monkeys® Properties, including the return of any and all tooling owned by BTT, or its agents (to the extent owned by BTT), for the production of the Licensed Products, as more fully described in Section 2.4(b) below.

    2.4.   <u>Remedies for BTT Failure to Pay Royalties</u>.

    (a)  <u>Prior to Payment of Final Installment of Initial Purchase Price</u>.  In the event of any failure by BTT to make any payment required to be made hereunder, or under the License Agreement, prior to the payment of the final installment of the Initial Purchase Price, YvB and Transcience shall so notify BTT in writing and BTT shall then have fifteen (15) days from the date of receipt of such notice to cure any such default.  In the event of BTT's failure to cure such default within such period, YvB and Transcience shall be entitled to:

    (i)    Declare this Agreement and the License Agreement terminated, in which case this Agreement and the License Agreement shall be deemed null and void and of no further force or effect;

    (ii)    Accelerate all sums due, and to become due, pursuant to this Agreement with respect to the Initial Purchase Price only, which shall become immediately due and payable to Transcience and YvB;

    (iii)    Direct the Escrow Holder to return all property (tangible, intangible, personal, intellectual and other), bills of sale, assignments and UCC financing statements and other documents and instruments, and the Trade Secrets held in Escrow (as described in Section 3.2 below), and BTT to return any and all tooling owned by BTT for the production of the Licensed Products.  The Licensed Products, Sea-Monkeys® Properties and tooling may then, at the option of Transcience and YvB, be sold at public sale, or retained by Transcience or YvB in satisfaction of any outsanding amounts due Transcience and YvB under this Agreement and the License Agreement.  In the event that Transcience and YvB elect to sell the property, which election shall be made in writing with notice to BTT within thirty (30) days after the date this Agreement is declared terminated, the property shall then be sold in one lot or in separate parcels, as Transcience and YvB ma y determine, without undue delay and in a commercially reasonable manner.  To the extent permitted by law, Transcience and YvB shall be permitted, without notice or publication, to adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for the sale.  The proceeds of any sale of, or other realization upon, all or any part of the Licensed Products and/or Sea-Monkeys® Properties shall be applied in the following order of priorities: (A) first, to pay the expenses of such sale or other realization, including reasonable attorneys' fees, and all expenses, liabilities and advances reasonably incurred or made by Transcience and YvB in connection therewith; (B) second, to the payment of the amounts due under this Agreement in such order of priority as Transcience and YvB, in their sole discretion, shall determine and (C) finally, to pay to BTT, or its successors or assigns, or as a court of competent jurisdiction may direct, any surplus then

remaining from such proceeds;

(iv)    Commence an action for equitable relief, including, but not limited to, injunctive relief prohibiting any continued use of the Licensed Trademarks and Licensed Copyrights; and/or

(v)    Require that BTT immediately cease selling, marketing, or production of the Licensed Products and Sea-Monkeys® Properties, and any rights granted to BTT under this Agreement shall be deemed null and void.

Notwithstanding anything to the contrary contained above, and in addition to all rights and remedies available to Transcience and/or YvB, in the event BTT fails to make any payment required to be made hereunder prior to the payment of the final installment of the Initial Purchase Price, interest thereon shall accrue from the date due until paid in full at a rate of interest equal to the lesser of (x) 5% in excess of the highest Prime Rate then announced from time to time by any commercial bank then a member of the New York Clearing House Association, or (y) the highest rate of interest permitted by law in such event.  The foregoing remedies are not exclusive and Transcience and/or YvB shall be entitled to seek and assert such remedies either singly or concurrently, at their option.  In the event of such default, Transcience and/or YvB shall be entitled to one or more of the foregoing forms of relief as described herein in this Section 2.4(a), as well as any other appropriate legal or equitable relief necessary to protect and/or enforce Transcience's and YvB's interest in the Licensed Trademarks and Licensed Copyrights.

(b)    After Payment of Final Installment of Initial Purchase Price and Prior to Payment of Final Installment of Additional Purchase Price.  In the event of any failure by BTT to make any payment required to be made hereunder after payment of the final installment of Initial Purchase Price and prior to payment of the final installment of Additional Purchase Price, YvB and Transcience shall so notify BTT in writing and BTT shall then have thirty (30) days from the date of receipt of such notice to cure any such default.  In the event of BTT's failure to cure such default within such period, YvB's and Transcience' sole recourse and remedy against BTT shall be limited to (i) declaring this Agreement terminated, (ii) to a return of the Trade Secrets, Licensed Products and Sea-Monkeys® Properties, including the return of any and all tooling utilized by BTT, or its agents (to the extent owned by BTT), for the production of the Licensed Products, and (iii) to enforce and foreclose Transcience' and YvB's security interest therein; it being expressly understood by each party hereto that any judgment in any action or proceeding in connection therewith shall be enforceable against BTT only to the extent of BTT's interest in the Trade Secrets, Licensed Products and Sea-Monkeys® Properties, and neither Transcience nor YvB shall sue for, seek or demand any money damages or deficiency judgment against BTT in any such action or proceeding under or by reason of or in connection with this Agreement or the License Agreement.  BTT agrees to cooperate and execute any necessary documents to effect the transfer of ownership of the Trade Secrets, Licensed Products and Sea-Monkey Properties from BTT to Transcience and/or YvB.  BTT shall have a limited license for a period of one hundred and twenty (120) days from the date of such termination to complete any work in process and to sell any inventory.  Thereafter, BTT shall immediately cease selling, marketing, producing or expoiting the Licensed Products and Sea-Monkeys® Properties, and any rights granted to BTT

under this Agreement shall be deemed null and void.  YvB or TSC shall be entitled to commence an action for equitable relief, including, but not limited to, injunctive relief prohibiting any continued use by BTT of the Licensed Trademarks and Licensed Copyrights.  BTT further agrees that, subject to applicable laws imposing record retention requirements, following the expiration of such one hundred and twenty (120) day period, that it shall destroy any documents or other materials in its possession containing Trade Secrets.

**3.  Purchase Terms.**

3.1.  Delivery of Certifications to BTT.  As an express condition to BTT's payment of the Initial Cash Payment payable under Section 2.2(a)(i) hereof, YvB and Transcience shall deliver to BTT the D'Agostino Certificate (defined below) and the Escrow Agreement (defined below).

3.2.  Delivery of Licensed Products to Escrow Holder.

(a) Concurrently with BTT's payment of the Initial Cash Payment, Transcience and YvB shall transfer to the Escrow Holder, to be held for the benefit of BTT, all right, title and interest, free of all liens, claims and encumbrances, in and to any and all of the Licensed Products and Sea-Monkeys® Properties, including all intellectual property and personal property used in the manufacture, use, advertising, marketing or sale of Licensed Products (collectively, the "Escrowed Documents and Properties").  Subject to the terms of this Agreement, title to the Trade Secrets, Licensed Products and Sea-Monkeys® Properties shall remain with Transcience and/or YvB until the payment in full of the Initial Purchase Price.

(b) YvB and Transcience shall execute in favor of BTT and deliver to the Escrow Holder (i) such bills of sale and assignments of contracts, patents, copyrights and trademarks as BTT shall reasonably request, and (ii) such security agreements and UCC financing statements and other documents evidencing BTT's encumbrances upon, and to create, preserve, perfect or validate a security interest in, the Licensed Products and Sea-Monkeys® Properties as BTT shall reasonably request.  YvB and Transcience shall place the Trade Secrets (in the form of written disclosures of sufficient content and detail to enable one of ordinary skill in the art(s) to which they pertain to practice them) into escrow with the Escrow Holder.

(c) The Escrow Holder shall hold all of such materials and information in escrow for the benefit of BTT and shall not make any use of any of them for its own benefit or the benefit of any other person, or disclose all or any part of the Trade Secrets to any person, firm or other entity without BTT's express written consent.  The Escrow Holder shall enter into the Escrow Agreement (the "Escrow Agreement") in the substantially the form attached hereto.

3.3.  Security of Intellectual Property.

(a) From and after the date hereof, neither YvB nor Transcience shall (i) transfer, or permit to be transferred, to any person, firm or other entity any interest of any kind in all or any part of the Licensed Products or Sea-Monkeys® Properties, (ii) encumber or permit to be encumbered the Licensed Products or Sea-Monkeys® Properties, or (iii) disclose all or any part of the Trade Secrets to any other person, firm or entity, except to Dr. Anthony D'Agostino, or

another laboratory designated by Transcience (who shall enter into a confidentiality agreement with BTT in form and substance satisfactory to BTT), and consented to by BTT (which consent shall not be unreasonably withheld), and except to the extent reasonably necessary for the testing of the Licensed Products (in which case the identity of any such other persons shall be immediately disclosed to BTT ).

(b)  YvB shall cause the Trade Secrets disclosures to be delivered to Dr. Anthony D'Agostino of the Montauk Marine Science Institute of L.I., NY, or such other person as may be mutually agreed upon by the parties hereto.  Dr. Anthony D'Agostino has provided a letter to BTT, which is annexed hereto, and which BTT acknowledges is acceptable to BTT (the "D'Agostino Certificate") in which he advises that (i) he read the documents submitted into escrow, including (i) the "General Instruction 'For Makings Sea Monkey Kit Formula'", (ii) the "Secret Laboratory Bulk Formulae", and (iii) the "Resource Guide and Vendors Information", all as more fully described therein.  He further advises that the instructions and secret formulae will permit duplication of the described process in any appropriate facility by BTT.  Transcience and YvB understand and agree that BTT is relying on the accuracy of the D'Agostino Certificate (i) in making the Initial Cash Payment to YvB and Transcience, and (ii) entering into this Agreement.

(c)  From and after the date hereof, except as otherwise specifically permitted herein (or in the event that Transcience or YvB declare this Agreement terminated and null and void following a default by BTT that has not been cured within any permitted cure periods), neither YvB nor Transcience shall (i) make, use or sell any item or product coming within the scope of, or competitive with, any of the Licensed Products (except to the extent permitted pursuant to Section 5.C of the License Agreement, as amended by this Agreement, in connection with Transcience's use and operation of www.Sea-MonkeyGear.com or other similar approved website)) or (ii) disclose all or any part of the Trade Secrets to any other person, firm or entity.

3.4.  Transfer of Licensed Property to BTT.

(a)  Upon BTT's payment of the final installment of the Initial Purchase Price payable under Section 2.2(a) hereof, the License Agreement shall terminate and the Escrow Holder shall immediately release from escrow and deliver to BTT or its designee title to the Trade Secrets, Licensed Products and Sea-Monkeys® Properties and all of the information, documents and materials (including, without limitation, the Trade Secrets disclosures) deposited with the Escrow Holder.  At such time, all right, title and interest in and to all Licensed Products and Sea-Monkeys® Properties, free and clear of any and all liens, claims and encumbrances of any kind, shall be transferred to and vest in BTT, subject only to Transcience and YvB's security interest in such Licensed Products and Sea-Monkeys® Properties with respect to the payment of the Additional Purchase Price.  These obligations of YvB, Transcience and the Escrow Holder to release Licensed Products are conditioned only on BTT's tender of the final installment of the Initial Purchase Price and are otherwise absolute and unconditional.  Beginning immediately after BTT's payment of the final installment of the Initial Purchase Price, upon BTT's request YvB, or her designee (who shall be subject to the prior written approval of BTT in its reasonable discretion), shall provide sufficient training in the preparation of the Sea-Monkeys® formulas so that BTT or its designees may assume these responsibilities if it chooses to do so, at mutually

agreeable times and at a mutually agreeable location.  BTT agrees to compensate YvB, or her designee, at the rate of $300 per hour for her provision of such training, and agrees to reimburse YvB, or her designee, for her reasonable expenses incurred in connection with such training, provided such expenses are pre-approved by BTT in writing.

(b)  Upon BTT's payment of the final installment of the Initial Purchase Price, and the occurrence of the events described in Section 3.4(a), upon Transcience' or YvB's request, BTT shall execute and deliver to YvB a financing statement (Form UCC-1) and such other papers that may be reasonably necessary and desireable that YvB shall reasonably request in order to create, preserve, perfect or validate a security interest in only the Licensed Trademarks, Licensed Copyrights, Licensed Patents and Trade Secrets.  Upon payment in full of the Additional Purchase Price, such financing statements and other papers shall immediately terminate and YvB and Transcience shall promptly take all actions reasonably requested by BTT to effect such termination.

3.5.  www.Sea-Monkey.com.

(a)  The domain www.Sea-Monkey.com shall be transferred to BTT as of the date of execution of this Agreement.  Until payment of the final installment of the Additional Purchase Price pursuant to Section 2.2(b) hereof, BTT shall be required to maintain on the www.Sea-Monkey.com website, and on any other website maintained by or on behalf of BTT on which BTT sells Sea-Monkeys® Products, a topic heading named "Sea-Monkey Parts & Supplies", or other appropriate named heading that indicates the sale of such products, for the sale of those parts and supplies listed on Exhibit H to the License Agreement ("Aftermarket Products").  Transcience and/or YvB shall have the exclusive right to sell the Aftermarket Products by direct mail until payment of the final installment of the Additional Purchase Price.  Under said topic heading, BTT shall be required to maintain a web link which shall direct and connect the user to www.Sea-MonkeyGear.com, on which website Transcience shall be permitted to sell Aftermarket Products by direct mail.  The rights under this Section 3.5(a) shall be in addition to any rights Transcience and YvB have under the License Agreement, as amended, including the rights under Section 2.A. thereof.

(b)  Following the payment of the final installment of the Initial Purchase Price pursuant to Section 2.2(a) hereof, Transcience shall be obligated to purchase pouches solely from BTT.  BTT shall charge Transcience the same price for pouches as Transcience charged to BTT immediately prior thereto (the quantity of the contents in each pouch shall not change).  Thereafter, in the event the cost of ingredients, materials, services or labor, is increased, such increase will be passed on to Transcience, provided, however, that documented price increases to BTT are shown to Transcience and reasonable efforts have been made by BTT to find alternate sources for ingredients, materials, services or labor, that can be readily purchased from reliable alternate sources.  When providing price increase documentation (which shall include at least two written competitive quotes if reasonably available for the same item from different vendors), BTT may redact such parts of the invoice or quotation as may be necessary to ensure the confidentiality of the supplier and items related to the formulation of the pouch.

3.6     Transfer of Pouch Manufacturing Operations.   On or before January 1, 2011, Transcience and YvB shall cause the pouch manufacturing operations, including the machinery and equipment used therein, presently conducted at Transcience' facilities at 6200 Chapmans Landing Road, Indian Head, Maryland to be transferred to the facilities of Graphics Communications, at 793 Nina Way, Warminster, Pennsylvania.   In the event that acceptable arrangements cannot be made with Graphics Communications, the parties shall negotiate in good faith alternative arrangments reasonably acceptable to each.   Transcience shall give BTT sixty (60) days advance written notice of the date of the move.   The sixty (60) day period for Transcience to fill pouch orders submitted by BTT shall be tolled during the period of the move. BTT shall reimburse Transcience up to $5,000 of costs of relocating the machinery and equipment to Graphics Communications.   Transcience shall provide a copy of the moving invoices to BTT.

## 4. **Representations and Warranties.**

In addition to the representations and warranties in the License Agreement, which BTT, Transcience and YvB reaffirm as of the date hereof, Transcience and YvB, jointly and severally, hereby represent and warrant as follows:

4.1.   YvB Representations and Warranties. YvB represents and warrants to BTT, which representations and warranties are material parts of the consideration to be received by BTT hereunder, as follows:

(a) YvB is the sole owner of all of the issued and outstanding capital stock of Transcience;

(b) HvB, YvB's deceased husband, conceived, invented and developed the biological product registered under the trade name "Sea-Monkeys®" and YvB and/or Transcience are the sole owners of, and hold all right, title and interest in and to, the Sea-Monkeys® Properties, the Licensed Products, the Licensed Trademarks, the Licensed Copyrights, the Licensed Patents and all other property necessary or desirable to make, have made, use, sell, distribute and advertise the Licensed Products and Sea-Monkeys® Properties and to conduct the Sea-Monkeys® business;

(c) YvB and Dr. Anthony D'Agostino, and only said persons, know the Trade Secrets;

(d) YvB and Transcience have the power and authority, without necessity of the knowledge or consent of any other person, to convey the Sea-Monkeys® Properties, the Licensed Products, the Licensed Trademarks, the Licensed Copyrights, the Licensed Patents and all other property necessary or desirable to make, have made, use, sell, distribute and advertise the Licensed Products and Sea-Monkeys® Properties and to conduct the Sea-Monkeys® business to BTT and otherwise fully perform, or cause to be fully performed, the obligations respectively imposed on each of them hereunder and, following such conveyance, BTT shall have all right, title and interest in and to all properties necessary and desirable to conduct the Sea-Monkeys® business; and

(e) There are no liens or other encumbrances on any property which is the subject of this Agreement and such property shall be and remain free of all such liens or other encumbrances, except for any liens or encumbrances created hereby.

4.2.   Transcience Representations and Warranties. Transcience represents and warrants to BTT, which representations and warranties are material parts of the consideration to be received by BTT hereunder, as follows:

(a) YvB and/or Transcience are the sole owners of, and hold all right, title and interest in and to, the Sea-Monkeys® Properties, the Licensed Products, the Licensed Trademarks, the Licensed Copyrights, the Licensed Patents and all other property necessary or desirable to make, have made, use, sell, distribute and advertise the Licensed Products and Sea-Monkeys® Properties and to conduct the Sea-Monkeys® business;

(b) YvB and Transcience have the power and authority, without necessity of the knowledge or consent of any other person, to convey the Sea-Monkeys® Properties, the Licensed Products, the Licensed Trademarks, the Licensed Copyrights, the Licensed Patents and all other property necessary or desirable to make, have made, use, sell, distribute and advertise the Licensed Products and Sea-Monkeys® Properties and to conduct the Sea-Monkeys® business to BTT and otherwise fully perform, or cause to be fully performed, the obligations respectively imposed on each of them hereunder and, following such conveyance, BTT shall have all right, title and interest in and to all properties necessary and desirable to conduct the Sea-Monkeys® business; and

(c) There are no liens or other encumbrances on any property which is the subject of this Agreement and such property shall be and remain free of all such liens or other encumbrances, except for any liens or encumbrances created hereby.

**5.  Amendments to License Agreement.**  The License Agreement shall remain in effect, as amended hereby, until the payment of the final installment of the Initial Purchase Price.  Upon payment of the final installment of the Initial Purchase Price the License Agreement shall terminate.  As of the Effective Date, the License Agreement shall be amended as follows:

(a)  **Section 2 - Distribution**:   Section 2 shall be amended by adding the following two sections:

B.   Licensee shall have the right, in its sole discretion, to select distributors for the Licensed Products.  Notwithstanding the foregoing, upon expiration or earlier termination of the Distribution Agreement, between BTT and Moose Licensing Pty Ltd. ("Moose"), dated March 5, 2008 (the "Moose Agreement"), Licensee agrees to appoint PowerOn as its exclusive distributor of Licensed Products for the territory of Australia on the condition that PowerOn shall enter into a distribution agreement with Licensee on terms and conditions satisfactory to Licensee in its sole discretion, which shall be at least as favorable to Licensee as the Moose Agreement, shall provide for minimum order quantities by PowerOn, and shall contain a commitment of PowerOn to purchase a

defined minimum amount of television ad time.  If PowerOn becomes the distributor in Australia, PowerOn shall be allowed to operate an Australian version of the SMG website.  If PowerOn operates such a website, then PowerOn shall pay Licensee a ten percent (10%) royalty as agreed to in a distribution agreement between PowerOn and Licensee.

C.      www.Sea-monkeygear.com.  Lic ensee agrees to permit Licensor to operate a website at the url of www.Sea-MonkeyGear.com or such other url containing the words "Sea", "Monkey" and "Gear" as Licensee shall approve, which approval shall not be unreasonably withheld ("SMG").  Licensor shall pay Licensee royalties in the amount of ten percent (10%) of all Gross Sales.  "Gross Sales" shall mean all sales minus returns, shipping and handling and PayPal (or the equivalent) costs.  Upon expiration or termination of the License Agreement and the transfer of all right, title and interest in and to the Sea-Monkeys® Properties to Licensee, the domain, all SMG websites and all manufacturing information will be transferred by Licensor to Licensee, subject only to Licensor's right and license (without the right to sublicense) to continue to use such property under the terms hereof until the final installment of the Additional Purchase Price is paid.  Licensee reserves all rights of creative control over the type, appearance, design, presentation and usage to be used by Licensor with respect to SMG and all items to be sold on SMG, which rights Licensee agrees to exercise reasonably and without delay.  All approval requests shall be made in writing by Licensor to Licensee.  All approvals by Licensee shall be made in writing to Licensor.  If Licensee does not respond in writing to Licensor with an approval, a disapproval or desired changes within ten (10) business days after approval request, then approval is deemed granted for that request. Licensor shall not sell on SMG any Licensed Products manufactured or sold by Licensee or any competing products.  All products sold on SMG by Licensor shall be brand-supportive components or Sea-Monkeys® memorabilia only.  Licensor shall account and pay Licensee the royalty due under this Paragraph on a monthly basis, under terms and conditions as set forth in Section 4 hereof.  Promptly following the date Transcience closes its books for each month, but in no event later than thirty (30) days following the close of such month, Transcience and YvB shall deliver to BTT a statement signed by YvB, listing the quantity, description of goods, revenues and gross sales price, itemized deductions from gross sales price and the net sales price of products sold by Transcience and YvB from, through or relating to www.Sea-MonkeyGear.com during the preceding month (the "Royalty Statement") and the amount due BTT (as to such statements, BTT shall have the same rights to audit Transcience and YvB as they have to audit BTT under the License Agreement). Payments of any royalties due Licensee shall accompany the Royalty Statement.

        (b) **Section 4.D. - Royalty Reports**:  Licensee shall submit to Licensor a Royalty Statement in the form attached hereto as Exhibit A, with a copy sent via email to George Atamian at grog5@verizon.net, or such other person as YvB shall designate to BTT in writing.

        (c) **Section 5 - Pouches**:

        (i)      5.B. shall be amended and restated to provide as follows:

B.      Licensee shall provide Licensor with a one hundred and twenty (120) day forecast of projected pouch needs, which forecast shall be updated by Licensee monthly.

(ii)    5.C. shall be amended and restated as follows:

C.      Licensee shall provide purchase orders for pouches to Transcience which, unless agreed to by Transcience, shall provide for a delivery date (the "Delivery Due Date") no earlier than the date sixty (60) days after the later of (i) the date the purchase order is provided to Transcience, or (ii) the date of receipt by Transcience of the thirty-five percent (35%) down payment in connection therewith.  Within five (5) business days of receipt of the purchase order, Licensor shall give Licensee written notification of the expected delivery date of the products specified therein.  Licensor shall use its "best efforts" to present the orders, which shall conform to the Licensor Guarantee, for shipment and acceptance by Licensee on the Delivery Due Date.  If an order is not presented for shipment on or before the Delivery Due Date, Licensee may thereafter withhold any payments due Licensor hereunder and under the License Agreement that are in excess of the Minimum Royalty until that shipment is accepted by Licensee, following which all withheld amounts shall be payable immediately.

(iii)  5.D. shall be amended and restated as follows:

D.      Payment terms shall be thirty-five percent (35%) with purchase order and the balance due fifteen (15) days after the Licensor's invoice for verified delivery of all pouches specified in the purchase order to Licensee.  Partial shipments of orders (provided such partial shipment contains complete Sets of Pouches (as defined below) may be accepted by Licensee and are payable upon such invoicing.  Unless expressly specified in a purchase order, in no event shall Licensee be required to accept, or pay for, any order presented for shipment that does not include complete Sets of Pouches.

(iv)  5.E. - the following shall be added to the end of Section 5.E.:

E.      Notwithstanding anything to the contrary contained herein or in the License Agreement, Licensor shall not increase the price per pouch above $0.21 through the period ending December  31, 2010.  For calendar years beginning January 1, 2011 and each January 1 thereafter, if Licensee's sales in the preceding calendar year exceed $3,500,000, any proposed increase in the per pouch price for the following calendar year shall be limited to no more than $0.01 per pouch, subject to documentation and proof, as provided in this Section 5.E.  For example, if in calendar year 2010 Licensee's sales exceed $3,500,000, during calendar year 2011 Licensor shall be permitted to increase the price of a pouch by no more than $0.01, provided that Licensors document to Licensee such increases in its costs of ingredients and reasonable efforts have been made by Licensors to find alternate sources for ingredients that can be readily purchased from reliable alternate sources, as more fully described above.  Under no circumstances shall the price of pouches increase more than 10% in any calendar year.

(v)  5.G. - a new section 5.G. shall be added, which shall provide as follows:

G.      Licensee agrees that a minimum order quantity of 200,000 Sets of Pouches (a "Set of Pouches" shall consist of three pouches; Pouch 1 - water purifier, Pouch 2 - Sea Monkeys Instant Live Eggs and Pouch 3 - Growth Food) shall apply to all orders. Licensee may order up to 500,000 Sets of Pouches at a time.

(d)  **Section 6 - Advance Payment**:  Section 6 shall be amended by adding the following section:

B.      Licensee shall have the right to use, at no cost, any and all tooling owned by or under the control of Licensors.  Licensee shall have the right, at its sole discretion, without any approval by Licensor, to create and use its own tooling to manufacture the Licensed Products.  Licensee shall have the right, at its sole discretion, without any approval by Licensor, to appoint and use any manufacturer it desires to manufacture the Licensed Products.  Prior to shipment of any new, injected molded Licensed Product for sale, Licensee agrees to send such new, injected molded product shots from the factory manufacturing product to George C. Atamian or such other person, as Licensor shall direct, for testing for the purpose of ensuring that the design of, and the plastic used in, the Licensed Product is free from contaminants or components injurious to the Sea-Monkey® hatching process and lifespan.

(e)  **Section 9 - Creative Control**:  The parties agree that the Creative Control provisions in Section 9 of the License Agreement shall apply only to public displays by Licensee of the type, appearance, design, presentation and usage of Licensed Products to retail consumers. Creative Control does not apply to any nonpublic displays, including without limitation limited displays during the development process, to focus groups, to the wholesale trade, at shows, or otherwise.  After Licensee has been granted an approval, such approval shall be for all uses and all purposes during the term of the License Agreement.  Licensee may, at its option, seek approvals from Licensors during the development process of new products.  George Atamian, or such other person designated by Licensor in writing, is recognized by the parties as a representative of TSC and von Braunhut for the purpose of consents or approvals regarding Creative Control.

(f)  **Section 10.A. - Testing**:  The supplemental laboratory fee of seven hundred and fifty dollars per week ($750) shall be reduced to three hundred seventy-five dollars ($375.00) per week, and the quarterly payment option shall be reduced from nine thousand seven hundred and fifty dollars ($9,750.00) per quarter to four thousand eight hundred seventy five dollars ($4,875.00) per quarter.  Upon the payment of the Initial Purchase Price, Licensee shall be under no further obligation to make any such payments.

(g)  **Section 17.B. - Option to Purchase**:   Section 17.B shall be amended and restated as follows:

B. If the purchase option is exercised, upon payment of the final installment of the Initial Purchase Price payable under Section 2.2(a) of the Purchase Agreement, Licensee shall

own all aftermarket sales.  Licensors shall cause the lab to transfer to, or otherwise disclose to, Licensee, at no out-of-pocket expense to Licensee, all right, title and interest (free and clear of any and all liens, claims and encumbrances) in and to all information, know-how, and trade secrets needed to continue proper performance of its services and also shall cause the lab to sign a reasonable confidentiality agreement (at no additional cost to Licensee) at that time.  At any time prior to the exercise date of the option, Licensors shall, upon request by Licensee, cause the lab to deposit all such information, know how and trade secrets with an independent escrow agent, to be released to Licensee upon exercise of the option and payment of the final installment of the Initial Purchase Price payable under Section 2.2(a) hereof.

(h)  **Section 19 - Arbitration**:  The following sentence shall be added to Section 19:  The prevailing party in any arbitration shall be entitled to an award of fees and costs, including reasonable attorney fees and costs.

6.  **Further Cooperation.**   At any party's request, each other party shall execute and deliver such other instruments and do and perform such other acts and things as may be necessary or desirable for effecting completely the consummation of the transactions contemplated hereby, including, without limitation, execution, acknowledgment, and recordation of other such papers as is necessary or desirable for fully perfecting and conveying to BTT the benefit of the transactions contemplated hereby.  YvB and Transcience shall continue to prosecute, maintain, and defend the Licensed Trademarks, Licensed Copyrights, Licensed Patents, and Trade Secrets at its sole expense until the payment of the final installment of the Initial Purchase Price.

7.  **Notices.**   All notices, demands, contracts or waivers hereunder shall be given in writing by mail, messenger, overnight air courier, together with a copy by facsimile, addressed as indicated below or as otherwise indicated in writing by a party hereto. Three (3) business days from the date of mailing notices shall be deemed to be the date of service. The date of messenger or facsimile shall be deemed to be the date of service. One (1) business day from the date of overnight air courier handling shall be deemed to be the date of service for courier handled notices.

If to YvB or Transcience:                              If to BTT:

Mail and                                               Mail and
Messenger:   Yolanda von Braunhut             Messenger:   Big Time Toys, LLC
             6200 Chapmans Landing Road                    708 Berry Road
             Indian Head, MD 20640-3040                    Nashville, TN 37204
             Attn.: Chief Executive Officer                Attn.: Garry Barber
                                                           President

Copy to:     Sichenzia Ross Friedman Ference LLP
             61 Broadway, 32nd Floor
             New York, NY 10006
             Attn: Michael H. Ference, Esq.

**8. No Modification; Waiver.** The terms of this Agreement shall not be modified except by an agreement in writing signed by all of the parties hereto. The failure of a party to strictly enforce any provision of this agreement shall not result in a waiver of said party's right to strictly enforce such provision in the future, and no waiver by either party of a breach or default hereunder shall be deemed a waiver by such party of a subsequent breach or default of a like or similar nature.

**9. Relationship of the Parties.** This Agreement does not appoint either party as the agent of the other party, or create a partnership or joint venture between the parties.

**10. Assignment.** This Agreement may not be assigned by any party without the written consent of the other parties. YvB and Transcience hereby consent to BTT's transfer of all or any of its interest herein to (a) any business entity which succeeds to all or substantially all of BTT's assets and business and/or (b) any publicly held business entity which (1) has a provable net worth in excess of $15,000,000 and (2) is in the toy, educational or novelty or similar business, all on condition only that any such transferee(s) also concurrently assume(s) all of BTT's obligations with respect to the interest transferred. This Agreement is binding on the parties and on their heirs, legal representatives and permitted successors, assigns and transferees.

**11. Governing Law.** This Agreement shall be construed and interpreted pursuant to the laws of the State of New York, without regard to its choice of law provisions, and the parties consent and submit to the jurisdiction of the New York State and Federal Courts sitting in the County of New York for the confirmation of any award rendered in an arbitration arising from this Agreement, and for any remedies available to the parties in aid of arbitration.

**12. Equitable Relief.** Transcience and YvB acknowledge and agree that damages alone would be insufficient to compensate BTT for a breach by Transcience or YvB of this Agreement and that irreparable harm would result from a breach of this Agreement. Each of Transcience and YvB hereby consent to the entering of an order for injunctive relief to prevent a breach or further breach, and the entering of an order for specific performance to compel performance of any obligations under this Agreement, including the obligations to furnish pouches to Licensee. Each party agrees that no party shall be permitted to contest the validity of an injunction issued by a New York court in Maryland, Tennessee or any other state, on the ground that the alleged harm does not constitute irreparable harm.

**13. Arbitration.**

(a) Arbitration. Except as set forth in subsection (b) of this Section 13, in the event of a disagreement between the parties with respect to this Agreement, if a party shall elect to adjudicate such dispute, such party shall submit the issue in dispute for arbitration under the rules of the American Arbitration Association, the election to be by written notice to the other party. Upon service of the notice, the issue shall be submitted to an arbitrator(s) in accordance with the rules. The arbitration shall be at a location within New York County, the State of New York, USA, at a place selected by the arbitrators. The decision of the arbitrator on any matter submitted shall be final, conclusive and binding upon the parties. Each of the parties by executing this Agreement unconditionally submits to the jurisdiction of the courts of New York

State and Federal Courts sitting in the County of New York, for the purpose of confirmation of any arbitration award and any remedies sought in aid of arbitration. The prevailing party in any such arbitration shall be entitled to an award of fees and costs in connection with that action as well as in connection with enforcement of any decision in connection therewith, including reasonable attorney's fees and costs.

(b) <u>Special Master</u>. In the event of a disagreement between the parties solely with respect to the subject matter hereof or of the License Agreement (other than a disagreement wherein a party is seeking (i) termination of this Agreement or the License Agreement, (ii) damages reasonably calculated to be in excess of $1,000,000, or (iii) directions to the Escrow Holder, following a Notice of Objection, as to the disbursement of the Escrowed Documents and Properties; in which event the matter shall be submitted to arbitration pursuant to Section 13(a) above), either party, if they wish to adjudicate such disagreement, shall submit the issue in dispute to a Special Master. Upon service of written notice to the other party, the issue shall be submitted to a single Special Master, who shall be selected and agreed to by the parties within seven (7) days of the notice. The parties expressly agree that Bert Levy shall be the Special Master if the parties do not mutually agree on a different person within such seven (7) day period. If Bert Levy is unable or unwilling to serve, and the parties cannot agree on a Special Master within such seven (7) day period, a mediator shall be selected by the parties within the next seven (7) days from the American Arbitration Association list of approved mediators. If the parties cannot agree within such second seven (7) day period, the American Arbitration Association will be requested to assign a mediator. Such mediator shall be the Special Master. Any party can remove an approved Special Master with at least ten (10) days prior written notice to the other parties, but not during a pending dispute. A new Special Master acceptable to all parties must be appointed with seven (7) days from the date of removal of the prior Special Master. The initiating party shall provide to the Special Master a summary of the dispute, its position and any supporting documents. The responding party shall have fifteen (15) days to submit its position statement and supporting documents, following which the initiating party shall have five (5) days to submit a reply. The Special Master shall then decide the matter within thirty (30) days of receipt of the last of the statements. The Special Master's decision is limited exclusively to selecting one of the remedies suggested by the parties. The decision by the Special Master shall be final, conclusive and binding on the parties. Each of the parties by executing this Agreement unconditionally submits to the jurisdiction of the courts of the State of New York and of the United States District Court for the Southern District of New York and other federal courts, for the purpose of enforcement of any award by the Special Master. The prevailing party in any such proceeding shall be entitled to an award of fees and costs in connection with that action as well as in connection with enforcement of any decision in connection therewith, including reasonable attorney's fees and costs.

(c) <u>Conflict</u>. In the event of any conflict between Section 13 hereof and Article 19 of the License Agreement, Section 13 hereof shall prevail.

14. **Headings.** The headings contained in this Agreement are for convenience and reference purposes only. They do not form a part hereof and shall not affect the meaning or interpretation of this Agreement.

15.   **Entire Agreement.** This Agreement, the attached appendices and the other transaction documents executed contemporaneously herewith, shall constitute the entire understanding of the parties with respect to the subject matter, superseding all prior and contemporaneous promises, agreements and understandings, whether written or oral, pertaining thereto.

16.   **Representations.**  All parties acknowledge and represent that:  (a) they have read this Agreement; (b) they clearly understand this Agreement and each of its terms; (c) they fully and unconditionally consent to the terms of this Agreement; (d) they have had the benefit and advice of counsel of their own selection; (e) they have executed this Agreement, freely, with knowledge, and without influence or duress; (f) they have not relied upon any other representations, either written or oral, express or implied, made to them by any person; (g) the consideration received by them has been actual and adequate; and (h) that they have the authority to enter into this Agreement.

17.   **Severability.**    Should any provision of this Agreement be declared illegal, unenforceable or void by any court of competent jurisdiction, in whole or in part, and cannot be modified to be enforceable, such provision or portion thereof shall be deemed severable from the remainder of this Agreement and shall in no way affect, impair or invalidate any other provision contained therein.

18.   **Counterparts.**  This Agreement may be executed in one or more counterparts, but all of such counterparts shall constitute but one and the same Agreement.

19. **Escrow Holder.**

(a)  Escrow Holder shall hold the Escrowed Documents and Properties in escrow and shall dispose of the Escrowed Documents and Properties only in accordance with the provisions of this Section 19.

(b)  Escrow Holder shall deliver the Escrowed Documents and Properties to BTT or Transcience and YvB, as the case may be, as follows:

(i)  to BTT or at BTT's direction, no later than five (5) days after receipt by the Escrow Holder of a written certification by BTT, with a copy provided to Transcience and YvB, stating that the final installment of the Initial Purchase Price has been paid; or

(ii)  at any time prior to the payment of the final installment of the Initial Purchase Price, to Transcience and YvB, after receipt of Transcience' and YvB's demand in which Transcience and YvB certifies either that (i) BTT has defaulted under this Agreement and such default has not been cured within any applicable cure periods, or (ii) this Agreement has been otherwise terminated or canceled, and Transcience and YvB is thereby entitled to receive the Escrowed Documents and Properties; but Escrow Holder shall not honor Transcience' and YvB's demand until more than ten (10) business days after Escrow Holder has given a

copy of Transcience' and YvB's demand to BTT in accordance with Section 19(c), nor thereafter if Escrow Holder receives a Notice of Objection from BTT within such ten (10) business day period.

Upon delivery of the Escrowed Documents and Properties in accordance with the provision of this Agreement, the escrow shall terminate and Escrow Holder shall be relieved of all liability hereunder with respect to the Escrowed Documents and Properties.

(c)   Upon receipt of a written demand from Transcience and YvB under Section 19(b)(ii), Escrow Holder shall promptly send a copy of such demand to BTT.  Within ten (10) business days after the date of receiving same, BTT may object to delivery of the Escrowed Documents and Properties to Transcience and YvB by giving a notice of objection (a "Notice of Objection") to Escrow Holder.  After receiving a Notice of Objection, Escrow Holder shall send a copy of such Notice of Objection to Transcience and YvB; and thereafter, in its sole and absolute discretion, Escrow Holder may elect (i) to continue to hold the Escrowed Documents and Properties until Escrow Holder receives a written agreement of Transcience and YvB and BTT or the written order of a court of competent jurisdiction, or arbitrator, as the case may be, directing the disbursement of the Escrowed Documents and Properties, in which event Escrow Holder shall disburse the Escrowed Documents and Properties in accordance with such agreement or order; and/or (ii) to deposit the Escrowed Documents and Properties with any court of competent jurisdiction or arbitrator, as the case may be, and bring an action of interpleader or other appropriate proceeding; and/or (iii) in the event of any litigation between BTT and Transcience and YvB, to deposit the Escrowed Documents and Properties with the clerk of the court, or arbitrator, as the case may be, in which such litigation is pending.

(d)   Escrow Holder shall have no duties or responsibilities except those set forth herein, which the parties hereto agree are ministerial in nature. BTT and Transcience and YvB acknowledge that Escrow Holder is serving without compensation, solely as an accommodation to the parties hereto, and except for Escrow Holder's own bad faith, misconduct or negligence, Escrow Holder shall have no liability of any kind whatsoever arising out of or in connection with its activity as Escrow Holder.  BTT and Transcience and YvB hereby jointly and severally (but with right of contribution) indemnify and agree to defend and hold Escrow Holder harmless from and against any and all loss, cost, claim, damage, liability, and expense, including reasonable attorneys' fees and disbursements (whether paid by Escrow Holder to retained attorneys or representing the fair value of legal services rendered by Escrow Holder to itself), which Escrow Holder may incur by reason of its acting as Escrow Holder, to the extent the same are not the result of Escrow Holder's bad faith, misconduct or negligence.

[Remainder of page left blank.  Signature page follows.]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, or caused it to be executed on their behalf by the undersigned thereunto duly authorized, as of the Effective Date.

WITNESSETH:                                      TRANSCIENCE CORPORATION

By _[signature]_                                 By: _[signature]_
Christopher P. Milazzo                               Yolanda  von Braunhut, CEO

WITNESSETH:                                      YOLANDA VON BRAUNHUT,

_[signature]_                                    _[signature]_
Christopher P. Milazzo                               Yolanda von Braunhut, individually

WITNESSETH:                                      BIG TIME TOYS, LLC

By _[signature]_ Jeffrey H. Krawer               By: _[signature]_, CEO
                                                     Sam K. Harwell, CEO

**SIGNATURE BY ESCROW HOLDER:**

Sichenzia Ross Friedman Ference LLP is executing this Agreement, as Escrow Holder, solely for the purpose of agreeing to the provisions of Section 19 thereof and acknowledging receipt of the Escrowed Documents and Properties, which Escrow Holder agrees to hold in accordance with such provisions and the annexed Escrow Agreement.

SICHENZIA ROSS FRIEDMAN FERENCE LLP:

ATTEST:

Christopher P. Milevo                         Michael H. Ference, Esq.

<u>APPENDIX A</u>

Part I: This describes tooling (molds, etc.), required for the manufacture of Sea-Monkey products including packages (hardware); the prepackaged formulas (software); and the location thereof (only where known by the Licensor). In the instance of hardware and goods not part of the specific biological processes, (where manufacturing and certain tooling was contracted abroad by BTT, then George Atamian and/or BTT will furnish the company name, person to contact and the address of each foreign company that is in subcontract production of items for Sea-Monkey kits and products, and in possession of custom tooling, molds, dies printing plates and packaging materials (such as boxes; blister cards; displays, etc.).

<u>Tooling</u>

A. <u>Molds, Tools and Dies:</u> American Molding Corporation, 35 Tisdale Avenue, Leominster, MA 01453. Contact: Brian Richard or Wayne Richard. Phone: 1 (978) 534-0009. Molds: Standard 5-lens Micro-View Aquarium with separate (removable) base and cover and variations thereof; Spoon mold (for feeding Sea Monkeys); Sea-Monkey Racetrack mold (2 cavity + one extra zigzag cavity); Two (2 accessory molds for Racetrack products; One piece, 6 lens Executive tank mold and mold base (inoperative due to misuse by former subcontractor Almar Molding of Philadelphia, PA); Binocular cover mold (a Sea-Monkey aquarium cover mold with dual observation lenses and separate feeding cap on feeding aperture).

B. <u>Printing and Pouch Filling:</u> Graphic Communications, 793 Nina Way, Warminster, PA 18974. Contact: Bob Lawler. Phone: 1 (215) 322-7124. This is a consolidated source that YvB and TSC utilize, who purchases the special laminated pouch paper directly from the mill for Sea-Monkey pouches and converts same by cutting the paper into rolls and printing them in color on their specialized presses. At the same location, they have a pouching facility with pouch filling machinery that enables the same source to fill and seal the finished pouches that are boxed in bulk for shipment to Transcience or its designee. This is a one source supplier who obtains the raw materials and is able to convert same into finished, printed and filled pouches that are then shipped directly to BTT's assembly line and/or warehouse. An additional valuable service provided by Graphic Communications is the manufacture of printing plates from supplied artwork, and the ability to modify artwork and make color and copy corrections. Contact: Loretta Dymant (at same Phone and address).

C. <u>Formula Production:</u> Transcience Corporation, 6200 Chapmans Landing Road, Bryans Road, MD 20640-3040. Contact: Yolanda von Braunhut. Phone: 1 (301) 375-7982). This is where all of the Sea-Monkey formulas are assembled, compounded, blended and shipped for the final step in production, which is the pouch-filling operation described in B. Here, Transcience operates its formulation lab and a blending facility in a separate building on the same private property owned by Yolanda von Braunhut. The blending facility houses bulk material storage, custom blending equipment, drumming and shipping of the finished powder in bulk to the pouch-filling destination (see B.).

Part II: Here is a superficial description of intellectual properties in connection with Sea-Monkeys. Note: Full details are restricted to the contents of the sealed envelope delivered to the Escrow

holder. These are: A. Two part formulas for all Sea-Monkey products (Lab formula additives in gram measurements); Bulk formulas (for combination, with appropriate lab formula). B. Methods used for compounding and blending both (Lab formula and bulk blend formula) and machinery and equipment used. C. Exotica: Rare and/or arcane organics and chemicals used in each process; a description of purpose and the source for each chemical or organic substance used.