UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x

| | | |
|---|---|---|
| **TRANSCIENCE CORPORATION &** | ) | Civil Action No. 13 CV 6642 |
| **YOLANDA VON BRAUNHUT** | ) | |
| **(individual),** | ) | **ANSWER TO 2nd AMENDED COMPLAINT,** |
| **Plaintiffs,** | ) | **AFFIRMATIVE DEFENSES** |
| **-against-** | ) | **AND** |
| | ) | **COUNTERCLAIMS** |
| **BIG TIME TOYS, LLC,** | ) | |
| **Defendant.** | ) | |

------------------------------------------------------x

Defendant Big Time Toys, LLC ("BTT" or "defendant"), by way of Answer to the 2nd

Amended Complaint filed by plaintiffs Transcience Corporation ("Transcience") and Yolanda

von Braunhut ("von Braunhut" and, together with Transcience, "plaintiffs"), says:

**DEMAND FOR INJUNCTIVE RELIEF and CLAIM FOR MONEY DAMAGES**

The 2nd Amended Complaint speaks for itself with respect to the relief sought by

plaintiffs, and BTT avers that plaintiffs are not entitled to any such relief.

**JURISDICTION AND VENUE**

1.     BTT denies that this Court has subject matter jurisdiction over this case as

plaintiffs have not asserted a viable claim upon which such jurisdiction can be based.

2.     The 2nd Amended Complaint speaks for itself and defendant avers that plaintiffs

have no viable trademark infringement or copyright infringement claims as alleged in paragraph

2.

3.     Defendant denies that this Court has supplemental jurisdiction over the entire

matter, as alleged in paragraph 3 of the 2nd Amended Complaint.

4.     BTT admits, upon information and belief, that there is diversity of citizenship

between plaintiffs and defendant as alleged in paragraph 4 of the 2nd Amended Complaint. However, BTT avers that this Court lacks jurisdiction because the United States District Court for the Southern District of New York is not the proper venue for this matter because the parties are not citizens or residents of the State of New York, and did not consent to the jurisdiction of the state or federal courts of the State of New York other than "for the purpose of the enforcement of any arbitration award."

5.      BTT admits the allegations set forth in paragraph 5.

6.      BTT admits, upon information and belief, that the action is between citizens/corporations of different states as alleged in paragraph 6 of the 2nd Amended Complaint. However, BTT avers that this Court lacks jurisdiction because it is not the proper venue for this matter because the parties are not citizens or residents of the State of New York, and did not consent to the jurisdiction of the state or federal courts of the State of New York other than "for the purpose of the enforcement of any arbitration award."

7.      BTT denies the allegations set forth in paragraph 7.

8.      Plaintiffs and defendant entered into a License Agreement, dated June 26, 2007 (the "License Agreement"), and a Purchase Agreement and Amendment to License Agreement, dated May 1, 2009, between (the "Purchase Agreement"). The License Agreement and Purchase Agreement referenced in paragraph 8 each speaks for itself, and BTT avers that neither the License Agreement nor the Purchase Agreement is terminated.

9.      BTT denies the allegations set forth in paragraph 9.

10.      As to the allegations set forth in paragraph 10, the 2nd Amended Complaint speaks for itself, except that BTT avers that the Purchase Agreement is not terminated.

11.      As to the allegations set forth in paragraph 11, BTT denies venue is proper, denies

knowledge sufficient to form a belief as to the address of the Escrow Holder, and avers that the contract referred to in paragraph 11 is not terminated.

## PARTIES

12.     BTT denies knowledge sufficient to form a belief as to the truth of the allegations contained in paragraph 12.

13.     BTT denies knowledge sufficient to form a belief as to the truth of the allegations contained in paragraph 13.

14.     As to the allegations set forth in paragraph 14, BTT admits that BTT is a Tennessee limited liability company with an office located at 2823 Dogwood Place, Nashville, TN 37204 and an office formerly located at 708 Berry Road, Nashville, TN 37204, that Sam Harwell is a resident of the State of Tennessee and CEO and owner of BTT, and that James O'Rourke is a resident of the State of Tennessee and an employee of BTT.

## FACTUAL ALLEGATIONS

15.     BTT denies the allegations contained in paragraph 15.

16.     BTT denies the allegations contained in paragraph 16.

17.     BTT denies knowledge sufficient to form a belief as to the truth of the allegations contained in paragraph 17.

18.     BTT denies knowledge sufficient to form a belief as to the truth of the allegations contained in paragraph 18.

19.     BTT denies knowledge sufficient to form a belief as to the truth of the allegations contained in paragraph 19.

20.     BTT denies knowledge sufficient to form a belief as to the truth of the allegations contained in paragraph 20. BTT denies that "Exhibit A; sub-exhibits A thru D" offer any proof

of the assertions in paragraph 20.

21.   BTT denies knowledge sufficient to form a belief as to the truth of the allegations contained in paragraph 21.  BTT denies that "Exhibit A; sub-exhibits A thru D" offer any proof of the assertions in paragraph 21.

22.   BTT denies knowledge sufficient to form a belief as to the truth of the allegations contained in paragraph 22.

23.   BTT denies knowledge sufficient to form a belief as to the truth of the allegations contained in paragraph 23.

24.   BTT denies knowledge sufficient to form a belief as to the truth of the allegations contained in paragraph 24.

25.   BTT denies knowledge sufficient to form a belief as to the truth of the allegations contained in paragraph 25.

26.   BTT denies knowledge sufficient to form a belief as to the truth of the allegations contained in paragraph 26.

27.   BTT denies knowledge sufficient to form a belief as to the truth of the allegations contained in paragraph 27.

28.   BTT denies knowledge sufficient to form a belief as to the truth of the allegations contained in paragraph 28.

29.   BTT admits the allegations contained in paragraph 29.

30.   As to the allegations contained in paragraph 30, the License Agreement speaks for itself.

31.   As to the allegations contained in paragraph 31, the License Agreement speaks for itself.

32.    As to the allegations contained in paragraph 32, the License Agreement speaks for itself.

33.    As to the allegations contained in paragraph 33, the License Agreement speaks for itself.

34.    BTT denies the allegations set forth in paragraph 34.

35.    BTT denies knowledge sufficient to form a belief as to the truth of the allegations contained in paragraph 35.

36.    BTT denies knowledge sufficient to form a belief as to the truth of the allegations contained in paragraph 36.

37.    As to the allegations contained in paragraph 37, the License Agreement speaks for itself.

38.    As to the allegations contained in paragraph 38, the License Agreement speaks for itself.

39.    BTT denies knowledge sufficient to form a belief as to the truth of the allegations contained in paragraph 39.

40.    As to the allegations contained in paragraph 40, the License Agreement speaks for itself.

41.    As to the allegations contained in paragraph 41, the License Agreement speaks for itself.

42.    As to the allegations contained in paragraph 42, the License Agreement speaks for itself.

43.    As to the allegations contained in paragraph 43, the License Agreement speaks for itself.

44.     As to the allegations contained in paragraph 44, the License Agreement speaks for itself.

45.     As to the allegations contained in paragraph 45, the Purchase Agreement speaks for itself.

46.     As to the allegations contained in paragraph 46, the Purchase Agreement speaks for itself.

47.     As to the allegations contained in paragraph 47, the Purchase Agreement speaks for itself.

48.     As to the allegations contained in paragraph 48, the Purchase Agreement speaks for itself.

49.     As to the allegations contained in paragraph 49, the Purchase Agreement speaks for itself.

50.     As to the allegations contained in paragraph 50, the Purchase Agreement speaks for itself.

51.     BTT admits the allegations contained in paragraph 51.

52.     As to the allegations contained in paragraph 52, the Purchase Agreement speaks for itself.

53.     As to the allegations contained in paragraph 53, the License Agreement and Purchase Agreement each speaks for itself.

54.     As to the allegations contained in paragraph 54, the License Agreement and Purchase Agreement each speaks for itself.

55.     As to the allegations contained in paragraph 55, the License Agreement and Purchase Agreement each speaks for itself.

56.     BTT denies knowledge sufficient to form a belief as to the truth of the allegations contained in paragraph 56.

57.     BTT advised plaintiffs, without limitation, as set forth in the email dated December 6, 2012 (Exhibit C hereto), of the need to manufacture pouches in China.

58.     As to the allegations contained in paragraph 58, the License Agreement speaks for itself.

59.     As to the allegations contained in paragraph 59, BTT admits that, through its agents, BTT called George Atamian prior to December 10th 2012.

60.     BTT admits that, through its agents, BTT called George Atamian prior to December 10th 2012.   BTT lacks sufficient information to admit or deny the remaining allegations in paragraph 60.

61.     BTT admits that, through its agents,  BTT called George Atamian prior to December 10th 2012.   BTT lacks sufficient information to admit or deny the remaining allegations in paragraph 61.

62.     Upon information and belief, BTT denies the allegations set forth in paragraph 62.

63.     Upon information and belief, BTT denies the allegations set forth in paragraph 63.

64.     BTT admits the allegations set forth in paragraph 64.

65.     BTT admits the allegations contained in paragraph 65.

66.     BTT admits the allegations set forth in paragraph 66.

67.     As to the allegations contained in paragraph 67, the Purchase Agreement speaks for itself.

68.     As to the allegations set forth in paragraph 68, the letter referred to therein speaks for itself.

69.     As to the allegations set forth in paragraph 69, the letter referred to therein speaks for itself.

70.     As to the allegations set forth in paragraph 70, BTT admits that it sent a letter to plaintiffs' counsel, which speaks for itself.

71.     As to the allegations contained in paragraph 71, the letter referred to therein speaks for itself.

72.     As to the allegations contained in paragraph 72, the letter referred to therein speaks for itself.

73.     BTT denies the allegations set forth in paragraph 73, and avers that the License Agreement and Purchase Agreement each speaks for itself.

74.     BTT denies the allegations set forth in paragraph 64.

75.     BTT admits the allegations set forth in paragraph 65.

76.     As to the allegations contained in paragraph 76, the Purchase Agreement speaks for itself.

77.     BTT denies the allegations set forth in paragraph 77.

78.     BTT denies the allegations contained in paragraph 78.

79.     As to the allegations set forth in paragraph 79, the letter referred to therein speaks for itself.

80.     As to the allegations set forth in paragraph 80, the correspondence referred to therein speaks for itself.

81.     As to the allegations set forth in paragraph 81, the correspondence referred to

therein speaks for itself.

82.     BTT denies the allegations set forth in paragraph 82.

83.     BTT admits the allegations set forth in paragraph 83.

84.     BTT admits the allegations set forth in paragraph 84.

85.     BTT admits the allegations set forth in paragraph 85.

86.     BTT admits the allegations set forth in paragraph 86.

87.     BTT admits the allegations set forth in paragraph 87.

88.     As to the allegations set forth in paragraph 88, the packaging speaks for itself. BTT denies that plaintiffs own the Sea-Monkeys trademark.   BTT admits the remaining allegations set forth in paragraph 88.

89.     As to the allegations set forth in paragraph 89, the packaging speaks for itself. BTT denies that plaintiffs own the Sea-Monkeys trademark.   BTT admits the remaining allegations set forth in paragraph 89.

90.     As to the allegations set forth in paragraph 90, the packaging speaks for itself.

91.     As to the allegations set forth in paragraph 91, the packaging speaks for itself.

92.     BTT denies the allegations set forth in paragraph 92.

93.     BTT denies the allegations set forth in paragraph 93.

94.     As to the allegations set forth in paragraph 94, the Purchase Agreement speaks for itself.

95.     As to the allegations set forth in paragraph 95, the agreements among the parties are contained in the License Agreement and Purchase Agreement, each of which speaks for itself.

96.     BTT admits the allegations set forth in paragraph 96.

97.     BTT admits the allegations set forth in paragraph 97.

98.     BTT admits the allegations set forth in paragraph 98.

99.     BTT denies the allegations set forth in paragraph 99.

100.    BTT admits the allegations set forth in paragraph 100.

101.    BTT denies knowledge sufficient to form a belief as to the truth of the allegations set forth in paragraph 101, except that the agreement referred to therein speaks for itself.  BTT denies that "Exhibit A; Page 6 paragraph 1(D)(vii)" of the License Agreement offers any proof of the assertions set forth in paragraph 101.

102.    As to the allegations set forth in paragraph 102, the Purchase Agreement speaks for itself

103.    As to the allegations set forth in paragraph 103, BTT denies that plaintiffs are entitled to damages and that plaintiffs are entitled to any injunctive relief.

## COUNT ONE

## DAMAGES SUSTAINED FROM DEFENDANT'S BREACH OF CONTRACT

104.    BTT repeats and realleges each and every answer and defense to the previous allegations of the 2nd Amended Complaint and incorporates the same as if set forth fully herein.

105.    BTT admits the allegations set forth in paragraph 105.

106.    BTT denies the allegations set forth in paragraph 106.

107.    BTT denies the allegations set forth in paragraph 107.

108.    BTT denies the allegations set forth in paragraph 108.

109.    As to the allegations set forth in paragraph 109, BTT admits that it did not make a royalty payment on December 10th 2012.

110.    BTT admits the allegations set forth in paragraph 110.

111.    As to the allegations set forth in paragraph 111, BTT admits that it has not made a laboratory fee payment since December 2012, but denies that it has breached the License Agreement of Purchase Agreement.

112.    BTT denies the allegations contained in paragraph 112.

113.    As to the allegations set forth in paragraph 113, the letter referred to therein speaks for itself.

114.    BTT denies the allegations set forth in paragraph 114.

115.    BTT denies the allegations set forth in paragraph 115.

116.    As to the allegations set forth in paragraph 116, the letter referred to therein speaks for itself.

117.    BTT admits the allegations set forth in paragraph 117.

118.    BTT denies the allegations set forth in paragraph 118.

119.    As to the allegations set forth in paragraph 119, BTT denies being unjustly benefitted or enriched from the sales of the Sea-Monkeys product as alleged, and avers that any receipt by BTT of any benefit or sale of the Sea-Monkeys products does not violate any legal or equitable duty to plaintiffs.

120.    BTT denies the allegations set forth in paragraph 120.

121.    BTT denies the allegations set forth in paragraph 121, except that the Purchase Agreement speaks for itself.

122.    BTT denies the allegations set forth in paragraph 122.

123.    As to the allegations set forth in paragraph 123, the Purchase Agreement speaks for itself.

124.    As to the allegations set forth in paragraph 124, the Purchase Agreement speaks

for itself.

125.   BTT denies the allegations set forth in paragraph 125.

126.   BTT is not required to admit or deny statements of law as pled in paragraph 126 and reserves the right to assert, brief, and rely upon the law governing this matter.

127.   BTT is not required to admit or deny statements of law as pled in paragraph 127 and reserves the right to assert, brief, and rely upon the law governing this matter.

128.   Plaintiffs' assertions in paragraph 128 speak for themselves.

129.   BTT is not required to admit or deny statements of law or procedure as pled in paragraph 129 and reserves the right to assert, brief, and rely upon the law or procedure governing this matter.

130.   BTT denies the allegations set forth in paragraph 130.

131.   BTT denies the allegations set forth in paragraph 131.

132.   BTT denies the allegations set forth in paragraph 132.

## COUNT TWO

## DEFENDANT'S UNJUST ENRICHMENT FROM QUASI CONTRACT

133.   BTT repeats and realleges each and every answer and defense to the previous allegations of the 2nd Amended Complaint and incorporates the same as if set forth fully herein.

134.   BTT denies knowledge sufficient to form a belief as to the truth of the allegations contained in paragraph 134.

135.   BTT denies the allegations set forth in paragraph 135.

136.   BTT denies the allegations set forth in paragraph 136.

137.   BTT denies the allegations set forth in paragraph 137.

138.   BTT denies the allegations set forth in paragraph 138.

139.   BTT denies the allegations set forth in paragraph 139.

140.   As to the allegations set forth in paragraph 140, the 2nd Amended Complaint speaks for itself.

141.   BTT denies the allegations set forth in paragraph 141.

## COUNT THREE

## TRADEMARK INFRINGEMENT

142.   BTT repeats and realleges each and every answer and defense to the previous allegations of the 2nd Amended Complaint and incorporates the same as if set forth fully herein.

143.   BTT denies the allegations set forth in paragraph 143. BTT further denies that "Exhibit A; sub-exhibits A thru D" offer any proof of the assertions in paragraph 143.

144.   As to the allegations set forth in paragraph 144, the letter referred to therein speaks for itself.

145.   BTT denies the allegations set forth in paragraph 145. BTT further denies that "Exhibit A; sub-exhibits A thru D" offer any proof of the assertions in paragraph 145.

146.   BTT denies knowledge sufficient to form a belief as to the truth of the allegations contained in paragraph 146. BTT denies that "Exhibit A; sub-exhibits A thru D" offer any proof of the assertions in paragraph 146.

147.   BTT denies knowledge sufficient to form a belief as to the truth of the allegations set forth in paragraph 147.

148.   BTT admits the allegations set forth in paragraph 148.

149.   BTT admits the allegations set forth in paragraph 149.

150.   BTT admits the allegations set forth in paragraph 150.

151.   BTT admits the allegations set forth in paragraph 151, except that BTT makes no

admission as to the quantification or materiality of any benefits received.

152.   BTT denies the allegations set forth in paragraph 152.

153.   BTT denies the allegations set forth in paragraph 153.

154.   BTT denies the allegations set forth in paragraph 154.

155.   BTT admits the allegations set forth in paragraph 155.

156.   BTT denies the allegations set forth in paragraph 156.

157.   BTT denies the allegations set forth in paragraph 157.

158.   BTT denies the allegations set forth in paragraph 158.

159.   BTT denies knowledge sufficient to form a belief as to the truth of the allegations contained in paragraph 159.

160.   BTT denies the allegations set forth in paragraph 160.

161.   BTT is not required to admit or deny statements of law as pled in paragraph 161 and reserves the right to assert, brief, and rely upon the law governing this matter.

162.   BTT is not required to admit or deny statements of law as pled in paragraph 162 and reserves the right to assert, brief, and rely upon the law governing this matter.

163.   BTT denies that plaintiffs have the right to the "election" of recovery alleged in paragraph 163.

164.   BTT denies the allegations set forth in paragraph 164.

## COUNT FOUR

## COPYRIGHT INFRINGEMENT

165.   BTT repeats and realleges each and every answer and defense to the previous allegations of the 2nd Amended Complaint and incorporates the same as if set forth fully herein

166.   BTT denies the allegations set forth in paragraph 166. BTT further denies that

"Exhibit A; sub-exhibits A thru D" offer any proof of the assertions in paragraph 166.

167.    As to the allegations set forth in paragraph 167, the letter referred to therein speaks for itself.

168.    BTT denies the allegations set forth in paragraph 168. BTT further denies that "Exhibit A; sub-exhibits A thru D" offer any proof of the assertions in paragraph 168.

169.    Except as set forth below, BTT denies the allegations set forth in paragraph 169. BTT further denies that "Exhibit A; sub-exhibits A thru D" offer any proof of the assertions in paragraph 169.  Upon information and belief, BTT avers that the only registered copyright that is subject to this 2nd Amended Complaint is the "von Braunhut Copyright – "Its Fun to Raise Pet Sea-Monkeys Instruction Handbook" ("Handbook") (as set forth on "Exhibit A, Sub-exhibit C" to plaintiffs' 2nd Amended Complaint).   BTT further avers that it has never copied, published, marketed, sold or otherwise used the Handbook.

170.    BTT denies the allegations contained in paragraph 170.

171.    BTT denies the allegations set forth in paragraph 171.

172.    BTT denies the allegations set forth in paragraph 172.

173.    BTT denies the allegations set forth in paragraph 173.

174.    BTT denies the allegations set forth in paragraph 174.

175.    BTT denies the allegations set forth in paragraph 175.

176.    BTT denies the allegations set forth in paragraph 176.

177.    BTT denies the allegations set forth in paragraph 177.

178.    BTT denies the allegations set forth in paragraph 178.

179.    BTT denies the allegations set forth in paragraph 179.

180.    BTT denies the allegations set forth in paragraph 180.

181.   BTT denies the allegations set forth in paragraph 181.

182.   BTT denies knowledge sufficient to form a belief as to the truth of the allegations set forth in paragraph 182.

183.   BTT is not required to admit or deny statements of law as pled in paragraph 183 and reserves the right to assert, brief, and rely upon the law governing this matter.

184.   BTT is not required to admit or deny statements of law as pled in paragraph 184 and reserves the right to assert, brief, and rely upon the law governing this matter.

185.   As to the allegations set forth in paragraph 185, plaintiffs' assertions speak for themselves.

186.   BTT is not required to admit or deny statements of law as pled in paragraph 186 and reserves the right to assert, brief, and rely upon the law governing this matter.

187.   BTT denies that plaintiffs are entitled to the "election" of recovery alleged in paragraph 187.

188.   BTT denies the allegations set forth in paragraph 188.

## AFFIRMATIVE DEFENSES

1.   The Purchase Agreement provides:

Except as set forth in subsection (b) of this Section 13, **in the event of a disagreement between the parties with respect to this Agreement, if a party shall elect to adjudicate such dispute, such party shall submit the issue in dispute for arbitration under the rules of the American Arbitration Association**, the election to be by written notice to the other party. Upon service of the notice, the issue shall be submitted to an arbitrator(s) in accordance with the rules. The arbitration shall be at a location within New York County, the State of New York, USA, at a place selected by the arbitrators. The decision of the arbitrator on any matter submitted shall be final, conclusive and binding upon the parties. *Each of the parties by executing this Agreement unconditionally submits to the jurisdiction of the courts of New York State and Federal Courts sitting in the County of New York, for the purpose of confirmation of any arbitration award and any remedies sought in aid of arbitration.* The

> prevailing party in any such arbitration shall be entitled to an award of fees and costs in connection with that action as well as in connection with enforcement of any decision in connection therewith, including reasonable attorney's fees and costs. (emphasis added).

Therefore, BTT does not waive and defendant reasserts and preserves its rights to arbitration. Therefore, this Court lacks jurisdiction because the parties to the License Agreement and Purchase Agreement agreed to arbitrate this matter, and not consent to the jurisdiction of the state or federal courts of the State of New York other than "for the purpose of the enforcement of any arbitration award."

2.     Any breaches by BTT of the License Agreement or Purchase Agreement are not "material" breaches and, therefore, are not actionable.

3.     BTT has cured any breaches by it of the License Agreement and Purchase Agreement.

4.     Any failure by BTT to comply with its obligations under the License Agreement and Purchase Agreement is due to plaintiffs' improper actions, breaches of the License Agreement and Purchase Agreement, and bad faith.

5.     The Complaint fails to state a claim upon which relief may be granted.

6.     Plaintiffs are barred from receiving any equitable relief, including but not limited to an injunction, by plaintiffs' unclean hands.

7.     Plaintiffs' recovery or relief is barred by plaintiffs' tortious interference with BTT's prospective business and/or contractual relations.

8.     Plaintiffs' recovery or relief is barred by the doctrine of waiver.

9.     Plaintiffs' recovery or relief is barred by the doctrine of laches.

10.    Plaintiffs' recovery or relief is barred by the doctrine of estoppel.

11.    Plaintiffs' attempted exercise of contractual remedies is in bad faith, and contrary

to the implied covenant of good faith and fair dealing.

12.     While denying any allegations made by plaintiffs, plaintiffs are barred from exercising their contractual remedies because BTT's alleged failure to perform the contractual duties complained of are the result, in whole or in part, of plaintiffs' wrongful conduct and breaches of the License Agreement and Purchase Agreement.

13.     BTT has not breached the License Agreement or Purchase Agreement.

14.     Plaintiffs have failed to mitigate their damages.

15.     Plaintiffs' recovery or relief is barred by the doctrine of accord and satisfaction and/or release.

16.     Plaintiffs' claims are barred, in whole or in part, for lack of subject matter or other jurisdiction.

17.     Plaintiffs have failed to join indispensable parties.

18.     Plaintiffs' recovery or relief is barred by plaintiffs' fraud when procuring the License Agreement and Purchase Agreement.

19.     Plaintiffs' recovery or relief is barred by plaintiffs' equitable fraud when procuring the License Agreement and Purchase Agreement.

20.     Plaintiffs' recovery or relief is barred by plaintiffs' negligent misrepresentation when procuring the License Agreement and Purchase Agreement.

21.     Plaintiffs' recovery or relief is barred by the forthright negotiator principle.

22.     Plaintiffs' recovery or relief is barred by the doctrine of mutual mistake.

23.     Plaintiffs' recovery or relief is barred by plaintiffs' failure to exercise certain conditions precedent to the exercise of their contractual remedies, including, but not limited to, the failure to give BTT notice and an opportunity to cure the alleged defaults.

24.     Plaintiffs' recovery or relief is barred by the Economic Loss Doctrine.

25.     Plaintiffs' recovery or relief is barred by the Doctrine of Avoidable Consequences.

26.     Plaintiffs' recovery or relief is barred by the Doctrine of Frustration of Purpose.

27.     Plaintiffs' recovery or relief is barred by the Doctrine of Commercial Impracticability.

28.     Plaintiffs' recovery or relief is barred by plaintiffs' breach of fiduciary duty.

29.     Plaintiffs' recovery or relief is barred because plaintiffs' damages, if any, were caused by superseding or intervening causes over which BTT has no control.

30.     Plaintiff's recovery or relief is barred, or limited, by plaintiffs' negligence.

31.     Plaintiffs' recovery or relief is barred by set-off.

32.     Plaintiff's equitable claims are barred by statute and contract because "equity follows the law."

33.     The License Agreement and Purchase Agreement are a "hybrid" licensing agreement encompassing inseparable patent and nonpatent rights, and is therefore unenforceable beyond the expiration date of underlying patents because the agreements do not provide a discounted rate for nonpatent rights or some other clear indication that the royalty at issue is in no way subject to patent leverage.   Kimble v. Marvel Enters. Inc., 727 F.3d 856, 107 U.S.P.Q.2d 1496 (9th Cir. 2013).

34.     Plaintiffs' recovery is barred by Section 33 of the Lanham Act, 15 U.S.C. Sec. 1501 et seq.

35.     Plaintiffs' recovery and relief are barred by the Fair Use Doctrine.

36.     Plaintiffs' recovery and relief are barred by the First Sale Doctrine.

37.    Plaintiffs' recovery and relief under Count Two are barred, in whole or in part, by Section 301 of the Copyright Act, 17 U.S.C. Sec. 301.

38.    Plaintiffs' equitable claims are barred because "equity will not be an instrument of injustice."

39.    Plaintiffs' recovery or relief is barred by the functionality doctrine.

## COUNTERCLAIMS

1.    BTT is a toy company that has been in business since 1995.

2.    "Sea-Monkeys" are brine shrimp, hatched from eggs in a small aquarium tank, and sold as a toy/novelty item.  The Sea-Monkeys product (or "kit") contains two principal components; (i) a small plastic tank and related paraphernalia manufactured at defendant's direction in China ("Tank"); and (ii) a set of three "pouches" (each slightly larger than a sugar packet, "Pouches"), formerly supplied to BTT by plaintiffs.  Pouches supplied by plaintiffs purportedly contained the following; (i) water treatment chemicals (i.e., "Pouch 1 - Water Purifier"), (ii) artemia salina, or brine shrimp, eggs (i.e., "Pouch 2 - Instant Life Eggs"), and (iii) food for the brine shrimp (i.e., "Pouch 3 - Growth Food").  Pouches are inserted into the kits in China and shipped to various countries for sale.  BTT's principal U.S. customers for Sea-Monkeys are major mass retailers.

3.    On June 26, 2007, Transcience Corporation, von Braunhut and BTT entered into the License Agreement (the "License Agreement").

4.    Section 1.C. of the License Agreement grants to BTT ". . . the exclusive right and license to make, have made, use, sell, distribute and advertise the Licensed Products worldwide."

5.    Pursuant to the License Agreement, BTT markets and sells Sea-Monkeys

6.      On May 1, 2009, Transcience Corporation, von Braunhut and BTT entered into the Purchase Agreement and Amendment to License (the "Purchase Agreement").

7.      Section 17 of the License Agreement provides:

A.      At any time during the term of the Agreement, Licensee shall have the right to purchase all right, title and interest, free of all liens, claims and encumbrances, in and to any and all of the Licensed Products, including Sea-Monkeys and related assets (which shall specifically include all intellectual property rights, including trade secrets) for  an amount not to exceed $10,000,000, payable as follows:  (i) $5,000,000 upon exercise of the option, upon which all right, title and interest in and to all such assets, free and clear of any and all liens, claims and encumbrances shall be transferred to Licensee, including the secret formula, and (ii) up to $5,000,000 shall be payable thereafter from (x) royalties comprised of 5% of merchandising sales, and (y) entertainment related revenue comprised of 25% of all entertainment related revenue received by Licensee for the first three years following exercise of the option, and 10% of all entertainment related revenue received by Licensee thereafter, until the balance of the purchase price is fully paid.  If Licensee exercises the purchase option, and thereafter elects to resell the assets before the balance of the purchase price has been paid, the balance of the purchase price shall become fully due upon Licensee's consummation of the resale.  (emphasis supplied).

B.      [As amended and restated by Section 5(g) of the Purchase Agreement]  If the purchase option is exercised, upon payment of the final installment of the Initial Purchase Price payable under Section 2.2(a) of the Purchase Agreement, Licensee shall own all aftermarket sales.  Licensors shall cause the lab to transfer to, or otherwise disclose to, Licensee, at no out-of-pocket expense to Licensee, all right, title and interest (free and clear of any and all liens, claims and encumbrances) in and to all information, know-how, and trade secrets needed to continue proper performance of its services and also shall cause the lab to sign a reasonable confidentiality agreement (at no additional cost to Licensee) at that time. . . .

8.      The Purchase Agreement, which among other things amended the License Agreement, provides as follows:

2.1.    Option Exercise.  BTT hereby exercises the Option [set forth in Section 17 of the License Agreement], and [von Braunhut, "YvB"] and Transcience hereby acknowledge and accept BTT's exercise of the Option, upon the terms and conditions provided herein.  **BTT hereby purchases from Transcience and YvB all right, title and interest, free of all liens, claims and**

**encumbrances, in and to any and all of the Sea-Monkeys® Properties and Licensed Products**, including Sea-Monkeys®, related assets and the goodwill of the business associated therewith, in exchange for the Purchase Price (as defined in Section 2.2) and otherwise in accordance with the terms and conditions of this Agreement. (emphasis supplied).

9.      The Purchase Agreement further provides as follows:

2.2.  Purchase Price.  The total purchase price for the Licensed Property shall be $10,000,000, payable as follows (the "Purchase Price"):

(a)  Initial Purchase Price.   Five Million Dollars ($5,000,000) of the Purchase Price (the "Initial Purchase Price") shall be paid as follows:

(i) $500,000 shall be paid upon execution of this Agreement (the "Initial Cash Payment"), by certified check, bank check or otherwise immediately available funds, payable to "Sichenzia Ross Friedman Ference LLP, as attorneys for Transience Corp.", and

(ii) $4,500,000 shall be paid in the form of royalties payable under the License Agreement, except that effective January 1, 2010, (x) the royalty rate under Section 4.A. of the License Agreement shall be twenty percent (20%) and not ten percent (10%), and (y) the Minimum Royalty under Section 4.B. of the License Agreement shall be $750,000 and not $500,000, payable in twelve (12) equal monthly installments on or before the tenth (10th) day of each month.  In the event that royalties paid during a calendar year equal or exceed the annual Minimum Royalty amount ($750,000) prior to the end of such calendar year, only actual royalties under Section 4.A. shall be payable for the remainder of that calendar year.  For example, if as of September 30 of a calendar year royalties paid equal $750,000, then only actual royalties (and no monthly Minimum Royalty amount) shall be paid for the remainder of such calendar year.  The monthly payments of the Minimum Royalty shall recommence the following calendar year.  At the Closing, BTT shall pay the sum of $104,166.67 by certified or bank check made payable to "Sichenzia Ross Friedman Ference LLP, as attorneys for Transience Corp.", which amount represents the difference between the Minimum Royalty payments due to Transience under the License Agreement and the increased Minimum Royalty payments due hereunder for the months of January 2010 through May 2010.

**All payments hereunder and under the License Agreement, including the Minimum Royalty**, shall be a nonrefundable advance against any amounts due to Transience and YvB.  **It is expressly agreed that all such payments due on and after the Effective Date shall be applied to the payment of the Purchase Price.**  (emphasis supplied).

10.     The Purchase Agreement further provides as follows:

3.4.  <u>Transfer of Licensed Property to BTT</u>.

(a)   Upon BTT's payment of the final installment of the Initial Purchase Price payable under Section 2.2(a) hereof, the License Agreement shall terminate and the Escrow Holder shall immediately release from escrow and deliver to BTT or its designee title to the Trade Secrets, Licensed Products and Sea-Monkeys® Properties and all of the information, documents and materials (including, without limitation, the Trade Secrets disclosures) deposited with the Escrow Holder.  At such time, all right, title and interest in and to all Licensed Products and Sea-Monkeys® Properties, free and clear of any and all liens, claims and encumbrances of any kind, shall be transferred to and vest in BTT, subject only to Transcience and YvB's security interest in such Licensed Products and Sea-Monkeys® Properties with respect to the payment of the Additional Purchase Price.  These obligations of YvB, Transcience and the Escrow Holder to release Licensed Products are conditioned only on BTT's tender of the final installment of the Initial Purchase Price and are otherwise absolute and unconditional.

11.     BTT has made payments under the Purchase Agreement and under the License Agreement, including the Minimum Royalty, on and after the Effective Date of the Purchase Agreement, in excess of $5,000,000.

12.     Plaintiffs have not caused the lab to transfer to, or otherwise disclose to, BTT, at no out-of-pocket expense to BTT, all right, title and interest (free and clear of any and all liens, claims and encumbrances) in and to all information, know-how, and trade secrets needed to continue proper performance of its services and also have not caused the lab to sign a reasonable confidentiality agreement (at no additional cost to BTT) at that time, as required by Section 17.B of the License Agreement (as amended by Section 5(g) of the Purchase Agreement).

13.     The Escrow Holder has not released from escrow and delivered to BTT or its designee title to the Trade Secrets, Licensed Products and Sea-Monkeys® Properties and all of the information, documents and materials (including, without limitation, the Trade Secrets disclosures) deposited with the Escrow Holder, as required by Section 3.4 of the Purchase Agreement.

05-216.3  1740384.1

14.    The Purchase Agreement, at Section 3.5, provides as follows:

(b)    Following the payment of the final installment of the Initial Purchase Price pursuant to Section 2.2(a) hereof, Transcience shall be obligated to purchase pouches solely from BTT. BTT shall charge Transcience the same price for pouches as Transcience charged to BTT immediately prior thereto (the quantity of the contents in each pouch shall not change). Thereafter, in the event the cost of ingredients, materials, services or labor, is increased, such increase will be passed on to Transcience, provided, however, that documented price increases to BTT are shown to Transcience and reasonable efforts have been made by BTT to find alternate sources for ingredients, materials, services or labor, that can be readily purchased from reliable alternate sources. When providing price increase documentation (which shall include at least two written competitive quotes if reasonably available for the same item from different vendors), BTT may redact such parts of the invoice or quotation as may be necessary to ensure the confidentiality of the supplier and items related to the formulation of the pouch.

15.    Plaintiffs have not purchased pouches from BTT, as required by Section 3.5 of the Purchase Agreement.

16.    Section 5.A. of the License Agreement explicitly provides that Transcience Corporation's and von Braunhut's "**failure to supply Sea-Monkeys pouches, in accordance with the terms [t]hereof, shall be deemed a material breach of [the] Agreement by [Transcience and von Braunhut]**". (emphasis added).

17.    The Purchase Agreement provides that Section 5.C. shall be amended and restated to provide as follows:

Licensee shall provide purchase orders for pouches to Transcience . . . Within five (5) business days of receipt of the purchase order, Licensor shall give Licensee written notification of the expected delivery date of the products specified therein. Licensor shall use its "best efforts" to present the orders, which shall conform to the Licensor Guarantee, for shipment and acceptance by Licensee on the Delivery Due Date. If an order is not presented for shipment on or before the Delivery Due Date, Licensee may thereafter withhold any payments due Licensor hereunder and under the License Agreement that are in excess of the Minimum Royalty until that shipment is accepted by Licensee, following which all withheld amounts shall be payable immediately.

18.    BTT has submitted purchase orders for product to plaintiff Transcience

Corporation.

19.     Plaintiff Transcience Corporation has never given BTT written notification of the expected delivery date of the products specified therein, as required by the Purchase Agreement, and has never delivered products to BTT on or before the Delivery Due Date.

20.     Plaintiff Transcience Corporation's persistent failure to conform to the Purchase Agreement in connection with the delivery of products caused BTT to order more product than it otherwise would have and to incur additional costs to maintain inventory.

21.     The Purchase Agreement provides that Section 5.D. shall be amended and restated to provide as follows: ". . . Partial shipments of orders (provided such partial shipment contains complete Sets of Pouches (as defined below) may be accepted by Licensee and are payable upon such invoicing.  Unless expressly specified in a purchase order, in no event shall Licensee be required to accept, or pay for, any order presented for shipment that does not include complete Sets of Pouches."

22.     On multiple occasions, plaintiff Transcience Corporation has shipped "partial shipments" of orders to BTT.

23.     Plaintiffs' actions have caused BTT to, among other things, postpone marketing plans, postpone television advertising, and scale back certain of its efforts, resulting in lost sales and opportunities for BTT.

24.     Prior to October 25, 2012, the United States Department of the Interior, Fish & Wildlife Service ("USFWS") determined, for the first time, that the Sea-Monkeys (dormant brine shrimp eggs) contained in the Pouches were "wildlife".

25.     By certified letter to BTT, dated October 25, 2012, USFWS advised that that "the shipment of wildlife" (i.e., brine shrimp eggs) contained in an identified ocean cargo

container (shipped at the direction of BTT from China to Elwood, Illinois, destined for Wal-Mart), violated certain export declaration requirements, fee requirements, inspection requirements, clearance requirements and notice requirements. (Exhibit A). BTT was required to return the containers to China. Other containers BTT had in the United States were also held by United States Customs.

26.     By emails dated November 14 and 27, 2012 (Exhibit B), BTT notified George Atamian, an officer of plaintiff Transcience Corporation, of a material disruption in its Sea-Monkeys business.

27.     By email dated December 6, 2012 (Exhibit C), BTT advised plaintiffs, through its officer, George Atamian, that it did not anticipate making the December 2012 Purchase Price payment

28.     Plaintiffs sent defendant a notice of default, dated December 20, 2012 (2nd Amended Complaint, Exhibit C), and a subsequent notice, dated January 18, 2013, declaring the contract terminated (2nd Amended Complaint, Exhibit D).

29.     In about 2011, Italy impounded certain ocean cargo containers and banned the importation of the kits into certain European countries. BTT was required to return containers in Italy.

30.     BTT communicated with plaintiffs regarding the USFWS assertions, including by emails dated November 27, 2012 (Exhibit B) and December 6, 2012 (Exhibit C).

31.     The USFWS and Italy actions caused significant disruption and expense to BTT.

32.     The License Agreement, at Section 20.G., provides as follows:

        G.     It is understood and agreed that, in the event of an act of the government, war conditions, fire, flood or other natural disaster, or labor or manufacturing problems which prevent the performance by Licensee of the provisions of this agreement, such nonperformance by Licensee will not be

considered a breach of this agreement, and such nonperformance will be excused while, but not longer than, the conditions described herein prevail.

33.     BTT's counsel sent a letter, dated January 22, 2013, stating:

[Defendant ("BTT")] has reviewed the assertions in the [December 20, 2012 and January 18, 2013] Letters and disagrees that any default under the [Purchase Agreement] or [License] Agreement has occurred.  We call to your attention Section 2.2(a) of the [Purchase Agreement], which provides "All payments hereunder and under the License Agreement, including the Minimum Royalty, shall be a nonrefundable advance against any amounts due to Transcience and YvB.  It is expressly agreed that all such payments due on and after the Effective Date shall be applied to the payment of the Purchase Price." (Emphasis added).  According to BTT's records, payments made by BTT to Ms. von Braunhut from May 1, 2009 through November 30, 2012 total in excess of the Initial Purchase Price of $5,000,000.  We further call to your attention that recent actions taken by the United States Fish and Wildlife Service, as well as foreign governments, with respect to pouches supplied by Transcience Corporation, materially adversely affected BTT's ability to market and sell the products in certain markets.  Such acts, we believe, constitute a force majeure of the type described in Section 20.G. of the [License] Agreement and give rise to other defenses.  Accordingly, it is BTT's position that no default has occurred.

We further call to your attention that Transcience Corporation and Yolanda von Braunhut have chronically failed to comply with the [Purchase Agreement], particularly Section 5(c), with respect to the supply of pouches to BTT.  Such failure constitutes a default under the [Purchase Agreement]. (Amended Complaint, Ex. E).

34.     After plaintiffs wrongfully terminated BTT's agreements, plaintiffs knowing failed and refused to provide information to BTT that was necessary for BTT to market the Sea-Monkey's product on BTT's website, which caused BTT to suffer damages in the form of lost advertising and sales.

35.     By their letters (2nd Amended Complaint, Exhibits C and D), and actions, Plaintiffs repudiated the License Agreement and Purchase Agreement.

## FIRST COUNT

## BREACH OF CONTRACT

36.     BTT repeats and realleges each and every allegation set forth above as if set forth

fully herein.

37.     BTT has performed its obligations under the License Agreement and Purchase Agreement in all material respects.

38.     Transcience Corporation and von Braunhut have breached the License Agreement and Purchase Agreement by, without limitation, (i) declaring the License Agreement and Purchase Agreement terminated and repudiating those agreements and refusing to perform their obligations thereunder, (ii) failing to ship Pouches in accordance with the terms of the Purchase Agreement, (iii) failing to perform its obligations under the License Agreement and Purchase Agreement following the termination of the force majeure, (iv) failing to turn over title to the Sea-Monkeys Properties to BTT, (v) failing to purchase Pouches from BTT and (VI) obstructing and frustrating BTT's attempts to market and sell Sea-Monkeys products.

39.     As a result of the foregoing, BTT has suffered compensatory and consequential damages, and will continue to suffer damages, in an amount to be determined.

WHEREFORE, BTT demands judgment against plaintiffs Transcience Corporation and von Braunhut, jointly, severally and individually, as follows:

(a)     Dismissing the 2nd Amended Complaint of Transcience and von Braunhut with prejudice;

(b)     Awarding BTT compensatory and consequential damages on the Counterclaims, together with interest thereon, in an amount to be determined at hearing, but in no event less than $10,000,000.00;

(c)     Compelling Transcience Corporation and von Braunhut to convey to BTT all right, title and interest in and to the Sea Monkeys Property;

(d)     For all costs and disbursements, including their reasonable attorneys' fees; and

(e)      For such other and further relief as the Court deems just, equitable and proper.

WHEREFORE, Defendant demands judgment dismissing Plaintiffs' 2nd Amended

Complaint with prejudice, plus attorneys fees, costs of suit, and such further relief as this Court

shall deem just and equitable.

Dated:       Spring Valley, New York
             December 16, 2014

                         DeCotiis, FitzPatrick & Cole, LLP


                         By: _____
                             John A. Stone, Esq.
                             DeCotiis, FitzPatrick & Cole, LLP
                             664 Chestnut Ridge Road
                             Spring Valley, NY  10977
                             (845) 352-0206
                             Attorneys for Respondent
                             Big Time Toys, LLC

**EXHIBIT A**

**October 25, 2012 USFWS Letter**



United States Department of the Interior
**FISH AND WILDLIFE SERVICE**
Office of Law Enforcement
10600 Higgins Road, Suite 200
Rosemont, IL 60018
847-298-3250



In Reply Refer To:
FWS/Region 3/LE

October 25, 2012

Certified Mail No. 7004 2890 0003 8765 3275
Return Receipt Requested

Big Time Toys, LLC
708 Berry Road
Nashville, TN 37204

Re:  INV 2012305927

*Customs Inspector Roth Ext 13*

Dear Sir/Madam:

This letter serves as formal warning that the shipment of wildlife exported on 07/29/2012 via ocean cargo Container # MSKU0637458 Bill of Lading # HKG5505362 on OOCL Nagoya 32 and numerous previous exports were in violation of the following:

> ***Declaration requirements for exportation [16 USC 1538(e); 50 CFR 14.63]***
> *Import/Export without Necessary Declarations or Reports (Failure to Declare or Submit Reports): Failure to file wildlife export declaration as required. Importers or their agents must file with the Service a completed Declaration for Importation or Exportation of Fish or Wildlife (Form 3-177).*

> ***Fee requirement [16 USC1538 (a)(1)(A); 50 CFR 14.94].*** *Designated port base inspection fees and Premium inspection fees. An import/export license holder must pay a base inspection fee for each wildlife shipment imported or exported at a designated port or a port acting as a designated port. An import/export license holder must pay a premium inspection fee for each wildlife shipment imported or exported containing live or protected species as defined in 14.94(h)(4).*

> ***Inspection requirements [16 USC 1538(d)(3); 50 CFR 14.51].*** *Service officers may detain for inspection and inspect any package, crate, or other container, including its contents, and all accompanying documents, upon importation or exportation.*

*Clearance requirements [16 USC 1538(d)(3); 50 CFR 14.52(c)]. A Service officer must clear all wildlife to be exported from the United States prior to the physical loading of the merchandise on a vehicle or aircraft, or the containerization or palletizing of such merchandise for export. To obtain clearance, the importer/exporter or the importer's or exporter's agent will make available to a Service officer all accompanying documents or wildlife.*

*Forty-eight (48) hour notice requirement [16 USC 1538(d)(3); 50 CFR 14.54(f)]. Exporters or their agents must notify the Service and make the shipment available for inspection at least 48 hours prior to the estimated time of exportation of any wildlife.*

For a copy of the regulations, go to our website at www.fws.gov/le. Please be advised that future violations **may** result in the seizure and forfeiture of the wildlife, monetary penalties, or both. All wildlife must be declared upon import **and** export from the US. If you have any questions you may contact Wildlife Inspector Laura DiPrizio at (847) 298-3250 ext. 16.

Sincerely,

Ryan Colburn
Supervisory Wildlife Inspector

Cc: File

**EXHIBIT B**

**November 14 and 27, 2014 Emails**

**From:** Jamie Orourke <jporourke@comcast.net>
**Date:** November 27, 2012 4:14:33 PM CST
**To:** George C Atamian <grog5@verizon.net>
**Cc:** Shane Brooks <shane.brooks@bigtimetoys.com>, Sam Harwell
<Sam.Harwell@bigtimetoys.com>
**Subject: Re: Urgent Sea Monkeys Fish and Wildlife Issue**

george,

Our problem w USFWS have only multiplied.

1. They forced Walmart to re export two shipments they were holding in Illinois and threatened them with
criminal charges. Walmart is billing us for all related expenses and they have no replenishment.

2. Illinois contacted USFWS in LA and notified them to not clear our shipments which were due in last week
and this week. We have spent literally hours on the phone with Illinois USFWS begging them not to require
WalMart to return these shipments. They threatened us with criminal charges too. This is a very ticklish
situation so please talk to me before you attempt to talk to USFWS.

3. We have at least two TRU shipments and one of ours being held in LA.

4. Our calls to the Supervisor there have not been returned. At this we have about 15 shipments on the water
and no basis for even hoping they will be cleared.

5. This is catastrophic for Seam Monkeys.

6. We had Graphic ship out what they had available and USFWS required we send it through a particular port
and be held there so they can inspect it before it goes out.

7. Like Italy, the USFWS have absolutely determined that the Sea Monkeys are live organisms and furthermore
come under their control.

1

8. The only long term solution to this situation to insure that Sea Monkeys are a viable product is to make them completely in China including the eggs and food. Please work with Yolanda in the next few days to determine what her honest net profit is on the pouches we buy from her. I propose that if the number is reasonable that Sam Pay her that for every pouch we ship from China in addition to the royalties.

It is my hope that we can work through this decently and in order. We have too much invested for us to watch this go down the drain to individuals preferences or secret formulas. If necessary I am prepared to propose to BTT to source the pouches in China using standard Artemia eggs and food which are plentiful and sort the rest out with you all later. We cannot sit on our hands and watch Sea Monkeys die along with our multi million dollar investment.

Please get back to me ASAP

thanks,

Jamie


J. P. O'Rourke
jporourke@comcast.net
Cell 615-202-1900

On Nov 15, 2012, at 9:36 AM, George C Atamian wrote:


Dear Folks: I spoke with Dr. D'Agostino about the issue you are facing with USFWS.
He told me that in 45 years of working with Sea-Monkey® related issues, he has never had any contact from USFWS.
I called Ms DiPrizio at her IL office and left a message for her to call me back.
I will continue to try to contact her.
I share your concern about this issue and empathize with the potential disruption of getting product to your customers for Black Friday and Christmas sales.
Back to you at the earliest.
Adios, G

George C. Atamian
Transcience Corporation
President
PH: 909.985.0889
FX: 909.920.3143
grog5@verizon.net


**From:** Shane Brooks [mailto:shane.brooks@bigtimetoys.com]
**Sent:** Wednesday, November 14, 2012 12:46 PM
**To:** grog5@verizon.net
**Cc:** 'Jamie Orourke'
**Subject:** Urgent Sea Monkeys Fish and Wildlife Issue
**Importance:** High


HI George,

2

Attached and below is the information Jamie requested I sent you relating to the USFWS issue we are facing.

Thanks
Shane

---

**From:** Shane Brooks [mailto:shane.brooks@bigtimetoys.com]
**Sent:** Tuesday, November 13, 2012 5:35 PM
**To:** 'Ann Riley Caldwell'
**Cc:** 'Jamie Orourke'
**Subject:** RE: Transcience - Fish and Wildlife Export License

HI Ann-Riley,

Thanks for your quick response.  Jamie has been in touch with you already and wanted to pass along all the information that I have for this issue we're facing.

The US Fish and Wildlife has held-up a couple Walmart shipments claiming that a Wildlife Export Declaration has never been filed by BTT or Transcience; thus the eggs/pouches can not be imported into the US.  This Declaration is coming up as a requirement because the eggs are considered a living organism.  The end result is that unless we provide proof that an Export Declaration was filed or convince them that the eggs are not a living organism, the product currently quarantined by USFWS, will be returned to China as well as shipments that are due to arrive within the next couple weeks.

Attached is the certified letter we received outlining the issue with US Fish and Wildlife in Rosemont, IL.  I have been working with Inspector Jennifer Roth and her direct number is 847-298-3250 ext 13.

Thanks
Shane

---

**From:** Ann Riley Caldwell [mailto:annriley13@gmail.com]
**Sent:** Tuesday, November 13, 2012 4:39 PM
**To:** Shane Brooks
**Subject:** Re: Transcience - Fish and Wildlife Export License

No idea.  I know BTT gets a license from that department every year.  I have never had anything to do with it though.  Sorry but out of my area of knowledge.  Let me know if I need to get TSC involved in any way or ask them any questions -

Ann-Rliey

On Tue, Nov 13, 2012 at 2:24 PM, Shane Brooks <shane.brooks@bigtimetoys.com> wrote:
Hi Ann-Riley,

We have a big issue where the US Fish and Wildlife has rejected the shipments of the Sea Monkeys product for Walmart because they are claiming that the eggs should have been declared to Fish and Wildlife at export of US.

Has Transcience ever declared to the US Fish and Wildlife Services that they were exporting these SM pouches (eggs)?

Shane Brooks
Director of Manufacturing & Engineering
Big Time Toys
Nashville, Tennessee
Tel: (615) 383-2888 ext. 212

3

--
Ann-Riley Caldwell
ARC Strategic Consulting LLC
718 Thompson Lane
Suite 108 #233
Nashville TN 37204
Phone:  615.405.4317
Fax:  615.523.2869

---

No virus found in this message.
Checked by AVG - www.avg.com
Version: 2012.0.2221 / Virus Database: 2441/5394 - Release Date: 11/14/12

**EXHIBIT C**

**December 6, 2014 Emails**

**From:** Jamie Orourke <jporourke@comcast.net>
**Date:** December 6, 2012 9:35:41 PM CST
**To:** grog5 Atamian <grog5@verizon.net>
**Cc:** Sam Harwell <sam.harwell.9@facebook.com>, Anne Riley <annriley13@aol.com>
**Subject: Sea Monkeys Problems**

Ann please forward this from your email to George and Fax to Yolanda. George, please confirm receipt.


Yolanda and George,

Thanks you for your time today on the phone. this is the letter I said I would send to document what was said on the phone.


We sent you the below email on 11/27 regarding the problem we are now having importing and exporting Sea Monkeys. This situation, along with other factors beyond our control, have materially and adversely affected the Sea Monkeys business.  Because of these developments, BTT does not anticipate making the December minimum royalty payment to TSC.

We have consulted with our attorney, Jeff Kramer regarding our rights and obligations given these developments.  We are also continuing to analyze the determination that the US Fish and Wildlife Service and the European Union have made regarding the Sea Monkeys being live organisms and the regulations and prohibitions that go along with that.  As of this writing, all of our shipments to the US are being held in customs, Walmart shipments are being returned to China at BTT's expense, three containers to Italy have been returned to China and BTT has no clearance for Sea Monkeys to be shipped there in the future.

We are ready to try to work with you to come up with a reasonable resolution.  We are prepared to discuss returning the business to TSC or negotiating modifications to the current agreement. Time is of the essence and delays will be costly to everyone involved. Please contact Jamie O'Rourke directly as he will be handling this on behalf of BTT.

regards,

Jamie ORourke          Sam Harwell

1

Sent from my iPhone
J P ORourke
Cell 615-202-1900

November 27,2012

Jamie ORourke wrote:

george,

Our problem w USFWS have only multiplied.

1. They forced Walmart to re export two shipments they were holding in Illinois and threatened them with criminal charges. Walmart is billing us for all related expenses and they have no replenishment.

2. Illinois contacted USFWS in LA and notified them to not clear our shipments which were due in last week and this week. We have spent literally hours on the phone with Illinois USFWS begging them not to require WalMart to return these shipments. They threatened us with criminal charges too. This is a very ticklish situation so please talk to me before you attempt to talk to USFWS.

3. We have at least two TRU shipments and one of ours being held in LA.

4. Our calls to the Supervisor there have not been returned. At this time we have about 15 shipments on the water and no basis for even hoping they will be cleared.

5. This is catastrophic for Seam Monkeys.

6. We had Graphic ship out what they had available and USFWS required we send it through a particular port and be held there so they can inspect it before it goes out.

7. Like Italy, the USFWS have absolutely determined that the Sea Monkeys are live organisms and furthermore come under their control. At this time we have no basis for any hope of shipping Sea Monkeys to the EU since they have been determined to living organism and it is illegal to sell living organisms as toys in the EU.

8. The only long term solution to this situation to insure that Sea Monkeys are a viable product is to make them completely in China including the eggs and food. Please work with Yolanda in the next few days to determine what her honest net profit is on the pouches we buy from her. I propose that if the number is reasonable that Sam Pay her that for every pouch we ship from China in addition to the royalties.

It is my hope that we can work through this decently and in order. We have too much invested for us to watch this go down the drain to individuals preferences or secret formulas. If necessary I am prepared to propose to BTT to source the pouches in China using standard Artemia eggs and food which are plentiful and sort the rest out with you all later. We cannot sit on our hands and watch Sea Monkeys die along with our multi million dollar investment.

2

Please get back to me ASAP

thanks,

Jamie


J. P. O'Rourke
jporourke@comcast.net