**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

————————————————————x
:
TRANSCIENCE *et al*                                      :
               Plaintiffs          :          Index No.:        13-cv-6642 (ER)
:
     -versus-                                     :
:          **Plaintiff's Responses in Opposition to**
BIG TIME TOYS, LLC                                :          **Defendant's Motions** *in limine*
              Defendant           :
————————————————— x
—————————————————x
:
BIG TIME TOYS, LLC                                :
               Plaintiffs          :
:
     -versus-                                     :
:
TRANSCIENCE *et al*                                      :
               Defendant           :
————————————————— x


## <u>PLAINTIFF'S RESPONSES in OPPOSTION to DEFENDANT'S MOTION'S *IN LIMINE*</u>


William Timmons, Esq.
otzotzo@aol.com
25 Candee Avenue
Sayville, New York 11782
(631) 750-5980
*Attorney for Plaintiff*
*Yolanda von Braunhut*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES…………………..………..……………………………….………3

Defendant's Point 1:………………………………………………………………....6
    **a.** *Plaintiff's ability to maintain claims of trademark infringement*………………………6
    **b.** *The Partnership of Harold & Yolanda*………………………………………6
    **c.** *Applicable Case Law*……………………………………………………………7
    **d.** *Signature on behalf of partner*…………………………………………………9
    **e.** *Immediate steps taken to address latent defect*………………………………11
    **f.** *Incontestability of the Marks*………………………………………………12
    **g.** *Lack of Fraud*……………………………………………………………13
    **h.** *Conclusion*………………………………………………………………..15

Defendant's Point 2:……………………………………………………………15

Defendant's Point 3:……………………………………………………………...16

Defendant's Point 4:……………………………………………………………...16

Defendant's Point 5:……………………………………………………………16

Defendant's Point 6:……………………………………………………………..16

Defendant's Point 7:……………………………………………………………19
    *a.* *Applicable Legal Standards for willfulness*……………………………………....19
    *b.* *Attorney's fees and Costs*………………………………………………20

Defendant's Point 8:……………………………………………………………..20

Miscellaneous Point - Defendant's Motion to Quash:…………………………………...22

CONCLUSION……………………………………………………………….……...23

## TABLE OF AUTHORITIES

**Cases**                                                                                               **Page(s)**

*Dahon North America, Inc. v. Hon;*
Case No. 2:11-cv-05835-ODW (JCGx)……………………….……………………………………7

*Gaia Technologies v. Reconversion Tech.*
Nos. 95-1345, 95-1346 and 95-1347……………………………………………………………7,8,9

*Arachnid, Inc. v. Merit Industries, Inc.,*
939 F.2d 1574, 19 USPQ2d 1513 (Fed.Cir.1991)…………………………………….……………8

15 U.S.C. § 1060 (1994)……………………………………………………………..………..………..9

2010 Maryland Code;
CORPORATIONS AND ASSOCIATIONS TITLE 9A……………………………….……….……10

*Rushmore Recoveries X, LLC v Skolnick*
2007 NY Slip Op 51041(U) [15 Misc 3d 1139(A)]……………………………………….……11

*Trust v. Santiago,*
30 AD3d 572, 817 NYS2d 368 (2nd Dept. 2006);…………………………………………………11

*TPZ Corp. v. Dabbs,*
25 AD3d 787, 808 NYS2d 746 (2nd Dept. 2006);……………………………..………………11

*Citibank (South Dakota), N.A. v. Martin,*
11 Misc 3d 219, 807 NYS2d 284 (Civ.Ct. NY Co. 2005)………...………………… …………11

Section §7 (15 U.S.C. §1057)
*Certificates of registration* (h) *Correction of applicant's mistake*………………….……  …….11

Section 1065 of the 1947 Lanham Act………………………………………………………..12

Section 1115(b) of the 1947 Lanham Act…………………………………………………….13

*In re Bose Corporation,*
91 U.S.P.Q.2d 1938 (Fed. Cir. 2009)……………………………………………...………14

*Patsy's Italian Restaurant, Inc. v. Banas,*
658 F.3d 254, 271 (2d Cir. 2011)……………………………………………………………14

*Ileto v. Glock, Inc.,*
565 F.3d 1126, 1155 (9th Cir. 2009)…………………………………………..………………15

**Cases**                                                                 **Page(s)**

*Davis v. Monroe County Bd. of Educ.*,
526 U.S. 629, 642, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999)……………..…….……..15

*Getty Petroleum Corp. v. Island Transportation Corp.*,
878 F.2d 650, 657 (2d Cir. 1989)………………….……………………………….…..17

*Borkowski v. Borkowski*,
39 N.Y.2d 982, 983 (1976)……………………..…………………………………17

*Roy Export Co. v. CBS, Inc.*,
672 F.2d 1095, 1106 (2d Cir.), cert. denied, 459 U.S. 826, 103 S.Ct. 60 (1982)………..…17

*Beastie Boys, et al., V. Monster Energy Company,*
112 F.Supp.3d 31 (2015)………………………………………………….…...…..19,20

*Patsy's Brand, Inc. v. I.O.B. Realty, Inc.,*
317 F.3d 209, 221 (2d Cir.2003)………………………………………….…….....19

*Bambu Sales, Inc. v. Ozak Trading Inc.,*
58 F.3d 849, 854 (2d Cir.1995);……………………………………...………19

*Twin Peaks Prods. v. Publ'ns Int'l, Ltd.,*
996 F.2d 1366, 1383 (2d Cir.1993)………………………………………...……..20
.
*Keystone Global LLC v. Auto Essentials, Inc.,*
No. 12 Civ. 9077(DLC), 2015 WL 224359, at *7 (S.D.N.Y. Jan. 16, 2015);……………..20

*Leviton Mfg. Co. v. Fastmac Performance Upgrades, Inc.,*
 No. 13 Civ. 1629(LGS)(SN), 2014 WL 2653116, at *8 (S.D.N.Y. Feb. 28, 2014)……...20

15 U.S.C. § 1117(a)……………………………………………………...……..20

 *Microban Prods. Co. v. API Indus., Inc.,*
No. 14 Civ. 41(KPF), 2014 WL 1856471, at *23 (S.D.N.Y. May 8, 2014)…..…………..20

*Kepner-Tregoe, Inc. v. Vroom,*
186 F.3d 283, 289 (2d Cir.1999);…………………………..…………………..……20
.
*Hounddog Prods., L.L.C. v. Empire Film Grp., Inc.,*
826 F.Supp.2d 619, 634 (S.D.N.Y.2011);……………………………….…….20

*Nature's Enters., Inc. v. Pearson,*
No. 08 Civ. 8549(JGK), 2010 WL 447377, at *9 (S.D.N.Y. Feb. 9, 2010);………....…..20

**Cases**                                                                                                          **Page(s)**

*Manno v. Tenn. Prod. Ctr., Inc.,*
657 F.Supp.2d 425, 435 (S.D.N.Y.2009)………………………………………..……20

*Design Resources, Inc. v. John Wolf Decorative Fabrics*
No. 83 Civ. 7606(CBM), 1985 WL 2445, at *2 (S.D.N.Y. Sept. 5, 1985)…………..……….20

## PLAINTIFF'S RESPONSES in OPPOSTION to DEFENDANT'S MOTION'S *IN LIMINE*

Plaintiff Yolanda von Braunhut hereby responds point for point to Defendant's motions *in limine* as follows:

## Defendant's Point 1:
### *Plaintiff's ability to maintain claims of trademark infringement must be dismissed*

The Defendant, despite its long affiliation with Yolanda, has made much ado about how it was shocked and appalled to discover that Yolanda did not allegedly own at any point the trademarks relating to the Sea-Monkeys® name brand upon which her claim for trademark infringement under the Lanham Act and NYS common law are based.  Much effort, time, effort, and attention to this issue has been spent in the Defendant's attempt to circumvent the central issue of the dispute between the parties.

This central issue of dispute, has always been AND for which the trier of fact is needed, is whether or not the agreement between the parties provides that the pouch payments made by BTT were, or otherwise are, to be applied to the attainment of the 5 million dollar Initial Purchase Price (IPP) as detailed within the agreement between the parties.

### *The Partnership of Harold & Yolanda*

It is an undisputed fact that Yolanda was the loving and adoring wife of the late Harold von Braunhut and he, in likewise reciprocation, the loving and adoring husband of her.  Theirs is a love for the ages.  Despite the alleged short comings of Harold made by BTT in its proposed *vor dire*, noting that both Sam Harwell and J. P. O'Rourke had personally entertained Harold in Nashville in the mid-1990's, no such similar character flaws have ever been alleged of Yolanda.  Yolanda is, if there is such a thing, altruistic to a fault.  The extent and nature of these proceedings may, in fact, be proof that there is such a thing.

The partnership of John Lennon and Paul McCartney of the legendary musical rock band known to the world as **THE BEATLES**, insofar as is commonly known, was never committed to writing.  It is also commonly known, and adopted by every US state (and most notably the State

of Maryland), that a partnership is a form of business that does not require written documentation to come into existence.  Every song written by either John or Paul in the context of **THE BEATLES** was copyrighted jointly by them under the banner of "*Lennon & McCartney*" despite their partnership never having been memorialized in a written document.

In the current context, BTT has taken excessive exception to Yolanda's presentment of the partnership of "*Harold & Yolanda*" as it came to be on or about the date of October 14th in the year 2000.  This partnership, was and is (as will be detailed later) between husband and wife, 2 soul mates, and was formed in the ominous shadow of death after the death of Yolanda's much beloved father.  Pursuant to such formation, as detailed in her affidavit attesting to such and as recorded with the United States Patent and Trademark Office (**USPTO**), the partnership became the owner of "all the intellectual property and corporate interests" previously owned individually by either of them.  After Harold's passing in the year 2003 that property along with its concomitant goodwill passed solely to her pursuant to the terms of the partnership.

Had Yolanda recorded the same document that she recently recorded, and to which BTT has taken much exception to, immediately following Harold's death then there would be no basis to even begin to question the chain of title that is now of the record.

Similarly, it must also be noted that had BTT fully performed its contractual obligations by paying the money it was obliged to pay, that Yolanda would have likely filed the same exact *nunc pro tunc* filings at a later date after the latent defects in the chain of title would have invariably come to light.  BTT, in such a hypothetical, would be grateful for these filings in that circumstance.

The only difference between the past and future filings that otherwise perfect the chain of title with the present tense filing is that BTT is furiously fighting to avoid the central issue of the dispute and thereby escape any and all liability.

## *Applicable Case Law*

BTT brings up a litany of various case cites that it hopes to support its disingenuous contention that Yolanda never owned any of the property that formed the foundation of its contract with her.  All of these, however, are off point and readily distinguishable from the case now before the Court.  These are cases, unlike the one now before the Court, where there are allegations of fraud or failed business ventures whereby individuals perform in such a way so as

to intercept what is righty someone else's.  Among these *is Dahon North America, Inc. v. Hon*;
Case No. 2:11-cv-05835-ODW (JCGx) which in its holding quotes *Gaia Technologies v.
Reconversion Tech.* Nos. 95-1345, 95-1346 and 95-1347.

In *Gaia*, "The problem for Gaia in this case, however, is not the conduct of the
defendants, but Gaia's inability to prove that it was the owner of the Intellectual Property at the
time the suit was filed."  The court in *Gaia* further goes on with a discussion of *Arachnid, Inc. v.
Merit Industries, Inc.* as follows:

> The facts of this case are similar to *Arachnid, Inc. v. Merit Industries, Inc.,* 939 F.2d 1574, 19
> USPQ2d 1513 (Fed.Cir.1991). In *Arachnid,* IDEA and Arachnid entered into a 1980 agreement
> whereby IDEA was to provide consulting services to Arachnid. The agreement provided that any
> inventions conceived by IDEA would be the property of Arachnid and that all rights would be
> assigned by IDEA to Arachnid. After the agreement was terminated, several IDEA employees
> filed a patent application and assigned the application to IDEA. The application matured into a
> patent that accordingly issued to IDEA. On May 6, 1985, IDEA granted a non-exclusive license
> to Merit to practice the invention of the patent, and Merit sold devices covered by the patent
> during 1985 and 1986. Arachnid then sued Merit for infringement of the patent during that time
> period. *Id.* at 1576-77, 19 USPQ2d at 1514-15.

> On appeal to this court, Merit argued that Arachnid was not the owner of the patent at issue and
> thus lacked standing to bring the patent infringement action. Arachnid contended that it held legal
> title to the patent based on the 1980 consulting agreement between IDEA and Arachnid. *Id.* at
> 1577-78, 19 USPQ2d at 1516. This court flatly rejected Arachnid's argument, stating:

>> the fact remains that the Arachnid/IDEA consulting agreement was an *agreement to
>> assign,* not an assignment. Its provision that all rights to inventions developed during the
>> consulting period "will be assigned" by IDEA to Arachnid does not rise to the level of a
>> present assignment of an existing invention, effective to transfer all legal and equitable
>> rights therein to Arachnid and extinguish any rights of IDEA.
>> *Id.* at 1580, 19 USPQ2d at 1518.

In the case before the Court the assignment of the trademarks, whether it be from Harold
as an individual or Harold as an officer of the Transcience Corporation to the partnership of
"Harold & Yolanda" was immediate and unequivocal.  The assignments are "from that point
forward".  Furthermore, the assignment to the partnership of "Harold & Yolanda" forms the
basis for Yolanda to declare that she is "owner of all the intellectual property, common law
rights, and concomitant goodwill" in connection with that assignment. (see Exhibit #1; paragraph
5)  Yolanda's *nunc pro tunc* filings therefore give her title to the all of the trademarks brought
into question by BTT in the year 2003 upon Harold's passing.  This affords Yolanda title to all of

these Marks at the time the agreement between the parties was formed AND confer standing at the time the lawsuit was filed.

The court in *Gaia* further gives further light to the issues within that case as follows:

The only pieces of evidence presented by Gaia of a written assignment prior to the filing of its lawsuit are the minutes of the meetings of Banstar's shareholders and board of directors. Like the situation in *Arachnid,* these minutes, at most, are a memorialization of an agreement to sell all assets of Banstar to Gaia at some time in the future. Such an agreement to assign is not an assignment and thus did not vest legal title in Gaia of the Intellectual Property on August 4, 1991. Indeed, the record contains two writings (Banstar's August 1993 representation to the bankruptcy court and the November 1993 Banstar-Gaia cross-licensing agreement) which evidence that Banstar, and not Gaia, owned the Intellectual Property after the August 4, 1991 meeting, when the transfer of the Intellectual Property from Banstar to Gaia allegedly occurred.

This is clearly, however, not the case here as Yolanda, in the current instance, has in fact produced evidence of a "written assignment prior to the filing" of her lawsuit. (see Exhibits 2-4) The court in *Gaia* further goes on to suggest that *nunc pro tunc* filings may be a "saving grace".

The only possible saving grace for Gaia is the *nunc pro tunc* assignment of patent and trademark rights that was executed on October 24, 1994, but was made effective as of August 4, 1991, prior to Gaia's filing of the instant suit. *Id.* at 310, 917 F.Supp. 305

Yolanda, as is evidenced in the record, made *nunc pro tunc* filings with the intention to "save grace" or otherwise set the record straight.

### *Signature on behalf of partner*

BTT Another issue raised by BTT is the effective signing of the *nunc pro tunc* assignments by Yolanda on behalf of her partner.  For registered trademarks, 15 U.S.C. § 1060 (1994) provides:

Assignments shall be by instruments in writing duly executed.... An assignment shall be void as against any subsequent purchaser for a valuable consideration without notice, unless it is recorded in the Patent and Trademark Office within three months after the date thereof or prior to such subsequent purchase.

Both statutes thus provide that: (1) a patent or trademark assignment must be in writing; and (2) the recording of an assignment is necessary only to protect the assignee from subsequent bona fide purchasers without notice.

This requirement is therefore similar to the race/notice statutes in effect around the world with regard to compliance with the Statute of Frauds as such relates to real estate and subsequent purchasers for value.  It is a form of protection that is afforded to prevent fraud not so much from internal assignments as here but for external assignments to purchasers for value.

The Revised Uniform Partnership Act (**RUPA**) as adopted by Maryland in 2010 provides further guidance with regard to this issue.

The 2010 Maryland Code; CORPORATIONS AND ASSOCIATIONS TITLE 9A - MARYLAND REVISED UNIFORM PARTNERSHIP ACT conforms numerically to RUPA and reads as follows:

> **Subtitle 8 - Winding Up Partnership Business**
> **Section 802 - Partnership continues after dissolution.**
>
> **§ 9A-802. Partnership continues after dissolution.**
>
> (b)  Waiver of termination.- At any time after the dissolution of a partnership and before the winding up of its business is completed, all of the partners, including any dissociating partner other than a wrongfully dissociating partner, may waive the right to have the partnership's business wound up and the partnership terminated. In that event:
>
> (1) The partnership resumes carrying on its business as if dissolution had never occurred, and any liability incurred by the partnership or a partner after the dissolution and before the waiver is determined as if dissolution had never occurred; and
>
> (2) The rights of a third party accruing under § 9A-804(1) of this subtitle or arising out of conduct in reliance on the dissolution before the third party knew or received a notification of the waiver may not be adversely affected.

As can be seen here under current Maryland law the sum effect of **§ 9A-802 (b) (1)**  is that Yolanda can in fact sign for Harold pursuant to, as is noted all throughout the record, that Yolanda, for all practical purposes, carried on the business as it was always carried out "as if dissolution had never occurred".

Notably, RUPA had replaced the United Partnership Act (**UPA**) in the year 2010.  The UPA, which was in effect before then, was less specific on this issue providing generally in Section 31(4) that by agreement the remaining partners may continue the partnership business despite the death of a partner.  This means that the partnership may continue without the deceased partner.  (see UPA Section 31(4) Maryland 1997, ch. 654, § 2; 1998, ch. 743, §§ 1, 3.)

This also means that Yolanda, pursuant to MD law, may sign documents on behalf of her partner.

### *Immediate steps taken to address latent defect*

Another case cited by BTT as being on-point is also off-point.  In *Rushmore Recoveries X, LLC v Skolnick* 2007 NY Slip Op 51041(U) [15 Misc 3d 1139(A)] the court opines:

> While the Plaintiff alleges that it is the assignee of this account, the Plaintiff fails to provide proper proof of the alleged assignment sufficient to establish its standing herein. The Plaintiff has made no effort to authenticate the alleged assignments, NYCTL 1998-2 Trust v. Santiago, 30 AD3d 572, 817 NYS2d 368 (2nd Dept. 2006); and, there is a brake in the chain of the assignments from Citibank down to the Plaintiff. The purported assignment from NCOP Capital, Inc. to New Century Financial Services, Inc., Plaintiff's alleged assignor, is not signed at all on behalf of NCOP Capital, Inc. There being no competent proof that the assignment to New Century Financial Services, Inc. was valid, the Plaintiff cannot establish the validity of the assignment from New Century Financial Services, Inc. to the Plaintiff, preventing [*4]the granting of summary judgment for this reason as well. TPZ Corp. v. Dabbs, 25 AD3d 787, 808 NYS2d 746 (2nd Dept. 2006); Citibank (South Dakota), N.A. v. Martin, 11 Misc 3d 219, 807 NYS2d 284 (Civ.Ct. NY Co. 2005)

Here it is clear, if nothing else, that Yolanda took immediate steps to authenticate the assignments the very same moment that BTT made her aware of the need to set the record straight.  The *nunc pro tunc* filings show this.[1]  USPTO protocol permits that mistakes made by an applicant can be corrected.  Pursuant to Section §7 (15 U.S.C. §1057) *Certificates of registration* (h) *Correction of applicant's mistake* permits for corrections to be made to certificates of registration upon a showing "that such mistake occurred in good faith through the fault of the applicant". (**see Exhibit #5**)  Section §7 (15 U.S.C. §1057) *Certificates of registration* (h) *Correction of applicant's mistake* reads as follows:

> "Whenever a mistake has been made in a registration and a showing has been made that such mistake occurred in good faith through the fault of the applicant, the Director is authorized to issue a certificate of correction or, in his discretion, a new certificate upon the payment of the prescribed fee".

---

[1] It must be noted here that Mr. Jeffrey Kramer has been associated with BTT since the year 2009.  Despite his abundant dealings with BTT and with the very core terms and effects of the agreement between the parties he has only as of just last year become aware of the latent defects in the chain of title of the trademarks in question.

Yolanda has not, and BTT, does not accuse her of deliberately trying to deceive the record when she made recorded a mistaken filing in 2010 that purported to assign Marks owned by her husband to the Maryland corporation.  Given the current perfection of the chain of title this was nothing more than a mistake.  It of significant note that Yolanda, and her husband before her, made contracts with 3rd parties under BOTH a corporate entity and as an individual. This imprudence defeats personal immunity and attaches personal liability to the individual named in the contracts.  This indicates a profound lack of awareness of some basic principles of law which could, and it is argued here, did lead to some of the filing mistakes made by Yolanda. Here inclusion of herself in the contract between the parties in addition to her corporate entity, and as a party to this lawsuit, may after all is said and done be her saving grace since by doing so she is able to include by default all that may be presumed to be owned by her.  In BTT's response to Yolanda's mistaken 2010 filing, BTT doesn't miss a beat and records its security agreement with *Transcience* and Yolanda.[2]  Yolanda signs that security agreement as recorded with the **USPTO** twice; on behalf of BOTH the corporation and as an individual. (**see Exhibit #6**)

It is of important note (noting that all these notes are important) that BTT had performed not 1 but 2 depositions of Yolanda.  The second one was focused almost entirely on these same very issues now before the Court affording BTT every opportunity catch her in any sort of misrepresentation.  BTT, after interrogating Yolanda to its maximum effort twice, does not allege or bring up any contradiction produced at either of those depositions.

## *Incontestability of the Marks*

In the current action, and in advance of trial now set for May 1st 2017, the Defendant has launched a frontal assault on the issue of the validity of the Plaintiffs domestic trademarks relating to the Sea-Monkeys® name brand.  The Defendant claims that not only did not the Plaintiffs NOT own the Marks at the time this lawsuit was initiated but also that Plaintiffs did not own the Marks at the time of the formation of the agreement between the parties.

Plaintiffs have asserted that they are the owners of ALL the trademarks relating to the Sea-Monkeys® name brand.  There are in fact 6 such domestic US registrations.  All 6 are registered with the USPTO.  All fees are up to date.  All 6 are current and in "LIVE" status as

---

[2] Mr. Kramer himself is included in documents recorded with the USPTO memorializing this transaction.

entered into the USPTO's Trademark Electronic Search System (TESS).  All 6 have been registered for more than 5 years (the youngest from 2000 and the oldest circa 1964).  All 6 are indisputably still in use in commerce.

Section 1065 of the 1947 Lanham Act provides as follows:

**§1065 Incontestability of right to use mark under certain conditions**

"…the right of the owner to use such registered mark in commerce for the goods or services on or in connection with which such registered mark has been in continuous use for five consecutive years subsequent to the date of such registration and is still in use in commerce, shall be incontestable…"

All 6 Marks can therefore deemed to be incontestable pursuant to Section 1065 and the owner of the Mark can use the registration, or proof thereof, as evidence of the validity of the registered mark.

Section 1115(b) of the 1947 Lanham Act provides as follows:

**§1115 Registration on principal register as evidence of exclusive right to use mark; defenses**

*(b) Incontestability; defenses*
To the extent that the right to use the registered mark has become incontestable under section 1065 of this title, the registration shall be conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce.

Incontestability, despite the absoluteness of the word as applied in the statute can still, nonetheless, be attacked by an alleged infringer based upon any of 9 enumerated defenses or defects as the statute so says:

"Such conclusive evidence of the right to use the registered mark shall be subject to proof of infringement as defined in section 1114 of this title, and shall be subject to the following defenses or defects:"

Of these 9 the Defendant avers that the 1st may apply, namely:

"(1) That the registration or the incontestable right to use the mark was obtained fraudulently;"

## _Lack of Fraud_

The Defendant has brought to the abundant attention of the Court (and the Plaintiffs) the previous defects in the long chain of title of the Sea-Monkeys® Marks owned by the Plaintiffs. Upon immediate detection the Plaintiffs took affirmative ameliorative action to repair such defects as provided for by the rules and protocol of the USPTO.  The _nunc pro tunc_ (now as then) filings made by the Plaintiffs and permitted by the USPTO appropriately updated the USPTO record such that now the USPTO record shows that the Sea-Monkeys® Marks (all 6) belong to Yolanda von Braunhut (**see Exhibits #2-#4**).

While the Defendant complains loudly of the inconsistencies it notes (or rather had noted before the chain of title was fully repaired) the Defendant complains more of a lack of attention to detail than anything that amounts to fraud.  Yolanda did not gain any benefit or suffer anyone any loss from the title being left as it was or having it properly updated (as she eventually did with the _nunc pro tunc_ filings).

Fraud in the legal context contains 5 well known elements:

> (1) a false statement of a material fact,
> (2) knowledge on the part of the defendant that the statement is untrue,
> (3) intent on the part of the defendant to deceive the alleged victim,
> (4) justifiable reliance by the alleged victim on the statement, and
> (5) injury to the alleged victim as a result.

Here, in the current context, the Defendant does not allege and cannot, even if it tried to, establish knowledge, intent, or injury.  To that end the Marks in question must not only be deemed valid but also must be unquestionably adjudged to be owned personally by Yolanda von Braunhut.  It is with great paradoxical effect that BTT continues to sell what it also argues doesn't exist.  BTT only came into contact with these Marks via Yolanda.  Yolanda continues to pay for their upkeep, continues to keep them registered with the **USPTO**, and continues to sell them via her mail order business.  If these trademarks are not owned by Yolanda then who owns them?  Yolanda is the only person.  She is the only possible owner to all of the corporate interests, she is the executrix of her husband's estate, she is the surviving partner of her husband, she is herself as an individual.  There is not the slightest inkling of fraud performed or contemplated by her anywhere to be found.

This is important because of the recent holding in *In re Bose Corporation*, 91 U.S.P.Q.2d 1938 (Fed. Cir. 2009), *cited in Patsy's Italian Restaurant, Inc. v. Banas*, 658 F.3d 254, 271 (2d Cir. 2011).  In *Bose* the court overturned a decision made by the Trademark Trial and Appeal Board as follows:

> The Trademark Trial and Appeal Board ("Board") found that Bose Corporation ("Bose") committed fraud on the United States Patent and Trademark Office ("PTO") in renewing Registration No. 1,633,789 for the trademark WAVE. *Bose Corp. v. Hexawave, Inc.*, 88 USPQ2d 1332, 1338 (T.T.A.B. 2007). Bose appeals the Board's order cancelling the registration in its entirety. Because there is no substantial evidence that Bose intended to deceive the PTO in the renewal process, we reverse and remand.

The court further held that:

> By equating "should have known" of the falsity with a subjective intent, the Board erroneously lowered the fraud standard to a simple negligence standard. *See Ileto v. Glock, Inc.*, 565 F.3d 1126, 1155 (9th Cir. 2009) ("Knowing conduct thus stands in contrast to negligent conduct, which typically requires only that the defendant knew or *should have known* each of the facts that made his act or omission unlawful. . . ."); *see also Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 642, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999)

## *Conclusion*

In this case before the Court it is abundantly clear that Yolanda did not make the mistakes she made with her filings with the USPTO knowingly.  There was no benefit to her to make such a mistake.  In fact, with respect to this particular mistake there can only be grief.  Her conduct can therefore in no way to be deemed "knowing conduct".  The USPTO recognizes that mistaken filings are inevitably made.  To that effect it provides for the same *nunc pro tunc* remedy that Yolanda performed as soon as the mistake was brought to her attention..

The current chain of title as set forth by Yolanda in her *nunc pro tunc* filings is believable because it is true.  For all these reasons the Court should adjudge that all the trademarks in question are valid AND that Yolanda is the true and rightful owner of the same.

## **Defendant's Point 2:**
**Plaintiff must be prohibited from alleging counterfeiting;**

Yolanda has set forth a preemptive position relative to this issue in one of her motions *in limine*.  Because BTT is admittedly manufacturing pouches in China without the bargained for trade secrets it stands to reason that if the trier of fact finds that the contract does not apply the

pouch payments to the Initial Purchase Price (IPP) then it MUST be concluded that BTT is counterfeiting the product.

For this reason Yolanda, understanding the full weight and consequence of the word "counterfeit", asks for permission of the Court to qualify the word with the "alleged" placed before it with regard to its usage at trial.

If the trier fact finds against her then she will cease to make this allegation of BTT ever again.  If the trier of fact finds in her favor she will need to make it known to the world that a false product was and still might be on the market.  She will need to take such measures to rehabilitate the name brand.

**Defendant's Point 3:**
***Plaintiff cannot raise the issue of licensee estoppel***

As this issue brought by BTT is one and the same with the ownership and validity of the Marks in question Plaintiff stands by its assertions and arguments that she is the sole and unequivocal owner of ALL the Marks that relate to the Sea-Monkeys® name brand.

**Defendant's Point 4:**
***Plaintiff unjust enrichment claim must be dismissed;***

As this issue brought by BTT is one and the same with the ownership and validity of the Marks in question Plaintiff stands by its assertions and arguments that she is the sole and unequivocal owner of ALL the Marks that relate to the Sea-Monkeys® name brand.

**Defendant's Point 5:**
***Plaintiff is precluded from introducing any testimony/evidence related to Beth Harwell;***

The Plaintiff understands the reasonableness of this request as set forth by BTT.  Plaintiff makes a reciprocal request that BTT be precluded from introducing any testimony or evidence of allegations relating to the character or political beliefs of her husband Harold von Braunhut.  BTT in its proposed *vor dire* had taken liberty to bring up such allegations of Harold in its submission to the Court.  Plaintiff did, over the course of Discovery discover materials that indicated that Ms. Harwell was a shareholder of BTT.  She was therefore identified as a person

of interest.  However, upon further review it was determined that she was of no further interest at that time.  Accordingly, Plaintiff understands the reasonableness of this request.

## Defendant's Point 6:
### Plaintiff is not entitled to punitive damages;

Yolanda represents that it is without question that the pleadings set forth by her for trademark infringement are inclusive of both federal and state claims.  It is commonly known that the federal registration of any Mark with the **USPTO** is founded upon the Mark having been used in the stream of commerce in such a way that the common law of the several states has already attached before registration is even permitted.  It is without question that if Plaintiff had instead initiated action against BTT in courts of New York State with the same language as is used in Plaintiff's 2nd Amended Complaint that the common law trademark infringement would be deemed to have been appropriately pled.

Furthermore, Plaintiff put BTT on notice of the joint claim in her answer to BTT's Interrogatory #14 requesting that Plaintiffs:  "Quantify, describe and explain any and all monetary damages claimed by plaintiffs" when she responded, with among other things, as follows:

> "Plaintiffs pursuant to the count of trademark infringement as set forth in Plaintiffs' 2nd Amended Complaint will pursue the full measure of any and all punitive damages as the Court and/or trial jury sees fit to justify as an award to Plaintiffs in the best interests of Justice in accordance with federal trademark common law and the trademark common law of the State of New York."

No exception was made by BTT at that time or any point thereafter until now.  No FRCP Rule 12(e) motion was made requesting a more definite statement.

While Plaintiff intends to fully prosecute BTT pursuant to the forms of relief detailed in the Lanham Act the issue of whether or not the common law of NYS has been properly pled is only relevant to the issue of the inclusion of punitive damages as a measure of damages against BTT.  While there are no punitive damages assessable under the Lanham Act for trademark infringement punitive damages are awardable under NYS common law for trademark infringemnt. see *Getty Petroleum Corp. v. Island Transportation Corp.*, 878 F.2d 650, 657 (2d

Cir. 1989) (citing *Borkowski v. Borkowski*, 39 N.Y.2d 982, 983 (1976)); *Roy Export Co. v. CBS, Inc.*, 672 F.2d 1095, 1106 (2d Cir.), cert. denied, 459 U.S. 826, 103 S.Ct. 60 (1982).

The Plaintiffs have all along complained to the Court that the actions of BTT were so deleterious so as to trigger such damages.  In Plaintiffs 2nd Amended Complaint the Plaintiffs clearly claim "punitive damages" as remedies sought on pages 24(7) and 26(6).  Because these damages cannot be sought under the Lanham Act then it must be presumed that they are sought pursuant to NYS common law.  In its motion for dismissal, many months ago, BTT did not specifically address the issue of punitive damages despite the fact that punitive damages were clearly articulated all throughout the Complaint(s).  In the Court's September 23rd 2014 Opinion and Order (see Document 42 as filed with ECF) the Court rules that the trademark infringement count is NOT dismissed.  Of further note is the fact that in that same order the Court while also denying dismissal of the count for unjust enrichment also affirms that punitive damages are not attainable for that count consistent with the laws of NYS.  If there was no other basis for punitive damages to remain in the suit then why then did BTT not move to do so.

In the complaint the Plaintiffs assert  in paragraph #145 that "Plaintiffs own *all* [emphasis added] trademarks for the Sea-Monkeys® product. (**see Exhibit A; sub-exhibits A thru D**)".  In accordance with this, and for all the aforenoted reasons the Court should find that NYS common law trademark infringement, as pled in a court sitting in New York, attaches as a matter of law to a claim for trademark infringement pursuant to the Lanham Act.  Because punitive damages are, in fact, assessable under the common law of NYS for trademark infringement then punitive damages must be included as a potential measure of damages as against BTT.

**Defendant's Point 7:**
*Plaintiff's trademark damages must be limited;*

BTT, in persistent and chronic denial that it has done anything wrong, desires to limit its liability with respect to the doubling or tripling of damages pursuant to the Lanham Act and to eliminate its exposure to attorney's fees and costs.  Yolanda, from the get-go has complained vociferously of the egregious cutthroat capitalist actions taken by BTT virtually at every stage of her relationship with it.  Most egregious of all is BTT's manufacturing of Sea-Monkeys® pouches (or rather what it passed and still passes off as Sea-Monkeys®) in China contemporaneous to when the lawsuit was served upon it.  BTT kept this clandestine operation a secret from Yolanda until in the very last submission to the Court regarding replies and responses to her motion for a preliminary injunction.

It is extremely important to note that in this last submission to the Court before the Court resigned itself to making its 9-23-14 Opinion and Order (see Document 42) that BTT reveals for the first time that it had made the unilateral decision to begin manufacturing the pouches in China WITHOUT the trade secrets.  These trade secrets were developed over many years of trial and error and were in essence the basis for the long term success of the Sea-Monkeys® name brand over the decades.

By making the contention to the Court that BTT had already satisfied its contractual obligation relative to the IPP the Court was then beholden to deny the preliminary injunction on the ground that it was untimely.  Had BTT not made the assertion that it had satisfied its IPP obligation then the Court likely may have GRANTED the preliminary injunction on the grounds that this new reverse engineering project being just recently disclosed was timely.

It is for this reason that the entire dispute between the parties will come down to how the jury decides relative to the issue of whether or not the contract applies the pouch payments to the IPP or not.

If the jury decides in favor of BTT on that issue then the issue of whether or not the trademark infringement damages are enhanced or not is moot.  If, however, the trier of fact determines that the contract means that only the royalty payments apply to the IPP then BTT has exposed itself to great and grave liability.  The decision to manufacture pouches without the trade secrets, if the jury finds that Yolanda's interpretation is correct, can be seen as nothing short of diabolical.

The issue as to what is exceptional or not is well visited within the Second Circuit.  If the jury finds that Yolanda's interpretation is the correct interpretation of the agreement between the parties then this case will stand for a definition so far beyond exceptional that it will likely be inapplicable to all other cases.

### Applicable Legal Standards for willfulness

The court in *Beastie Boys, et al., V. Monster Energy Company*, 112 F.Supp.3d 31 (2015) defined "exceptional cases" as follows:

> The Second Circuit has defined "exceptional cases" as ones involving fraud, bad faith, or willfulness. *See Patsy's Brand, Inc. v. I.O.B. Realty, Inc.,* 317 F.3d 209, 221 (2d Cir.2003) (citing *Bambu Sales, Inc. v. Ozak Trading Inc.,* 58 F.3d 849, 854 (2d Cir.1995); *Twin Peaks Prods. v. Publ'ns Int'l, Ltd.,* 996 F.2d 1366, 1383 (2d Cir.1993)); *see also, e.g., Keystone Global LLC v. Auto Essentials, Inc.,* No. 12 Civ. 9077(DLC), 2015 WL 224359, at *7 (S.D.N.Y. Jan. 16, 2015); *Leviton Mfg. Co. v. Fastmac Performance Upgrades, Inc.,* No. 13 Civ. 1629(LGS)(SN), 2014 WL 2653116, at *8 (S.D.N.Y. Feb. 28, 2014) (collecting cases).

In the current instance, in the event that BTT's interpretation of the agreement between the parties is found by the jury to be lacking, the jury may also find to be here a sinister nexus of fraud, bad faith, AND willfulness.  In BTT's letter to the Court dated April 10, 2017 (Document 177), referencing the attached exhibit on page 5, an officer of BTT named J. P. O'Rourke seemingly brazenly categorizes core terms of the agreement between the parties as "individual preferences" and unnecessary "secret formulas".  Mr. O'Rourke proposes unilaterally that "the only long term solution" is to make the entire product including the pouches (eggs and food) in China.  This is what BTT did in fact do less than a year later without any further discussion, notice, or permission from Yolanda.  If the jury determines that the pouches do not count to the IPP then this message on its own may be concluded to confer willfulness upon BTT.

### Attorney's fees and Costs

Under the Lanham Act, "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). "The decision whether or not to award such fees [] rests within the broad discretion of the district judge." *Microban Prods. Co. v. API Indus., Inc.,* No. 14 Civ. 41(KPF), 2014 WL 1856471, at *23 (S.D.N.Y. May 8, 2014) (quoting *George Basch Co.,* 968 F.2d at 1543) (alteration in original).

Furthermore in *Beastie Boys, et al., V. Monster Energy Company*, 112 F.Supp.3d 31 (2015) the court held that:

> As courts in this Circuit have repeatedly held, a defendant's willful infringement supports an award of attorneys' fees to a prevailing plaintiff. *See, e.g., Kepner-Tregoe, Inc. v. Vroom,* 186 F.3d 283, 289 (2d Cir.1999); *Hounddog Prods., L.L.C. v. Empire Film Grp., Inc.,* 826 F.Supp.2d 619, 634 (S.D.N.Y.2011); *Nature's Enters., Inc. v. Pearson,* No. 08 Civ. 8549(JGK), 2010 WL 447377, at *9 (S.D.N.Y. Feb. 9, 2010); *Manno v. Tenn. Prod. Ctr., Inc.,* 657 F.Supp.2d 425, 435 (S.D.N.Y.2009). Courts have awarded fees based on willfulness even where the infringement was reckless rather than knowing. In *Design Resources, Inc. v. John Wolf Decorative Fabrics,* for example, the defendant obtained samples of plaintiff's fabrics and commissioned a studio to create similar patterns. No. 83 Civ. 7606(CBM), 1985 WL 2445, at *2 (S.D.N.Y. Sept. 5, 1985).

For all the above reasons it is argued here that not only should damages pursuant to federal or state trademark infringement NOT be limited but that they may in fact be mandated to be maximized in the event that the jury determines that Yolanda's interpretation of the agreement between the parties is correct.

## Defendant's Point 8:
### *Plaintiff's unjust enrichment damages must be limited to those costs that are certain and traceable.*

BTT in its accounting reports and other discovered documents has boldly declared, and presumably will continue to do so, that it has NEVER turned a profit with all its business dealings relating to the Sea-Monkeys® name brand.  In fact, BTT apparently wants to report that it lost almost 2 million dollars over the course of its association with the product.

Yolanda, in great contrast, has maintained that this product has ALWAYS been very lucrative for her and previously for her and her husband and partner.  Plaintiff asserts that the damages sustained by her and to her name brand as detailed all throughout Discovery are most appropriately a product of the money that she would have made had BTT exited the playing field at the time of the effective termination of the agreement between the parties.

The 2009 Amendment itself provides lucid guidance to the assessment of potential liability as against BTT in the event that it is found by the trier of fact that the agreement between the parties was effectively terminated in January 2013 pursuant to the terms of the agreement after BTT had failed cure its well noted and known default.

Section 2.3. <u>Minimum Annual Sales</u>. of the 2009 Amendment reads as follows:

"In the event BTT fails to generate $3,000,000 in Gross Sales of Licensed Product for any such calendar year….YvB [Yolanda] shall have the right to provide written notice to BTT of their intent to terminate this Agreement"

By any measure of means this clause having been incorporated and agreed to in the agreement between the parties serves to put BTT on notice that, in the event that the payments for pouches made to Yolanda for the pouches do NOT apply to the attainment of the Initial purchase Price, that the amount of 3 million dollars a year represents a fairly certain and reasonable forecast of its liability.

It goes without saying that the Plaintiff had brought this amount to the abundant attention of BTT over the course of Discovery.  It is also of note that the 2007 Agreement in Section 1. D. (vii) states:

"EI's [the licensee immediately preceding BTT] sales of Licensed Products over the twelve (12) months ended December 31, 2006 exceeded $3,4000,000."

To that end, Plaintiff requests that these numbers, in the event of ultimate liability incurred by BTT, be deemed on their own to be "certain and traceable" and that they be the starting point in any assessment of damages caused by BTT.


## Miscellaneous Point - Defendant's Motion to Quash:
### Defendant's Motion to Quash the Testimony of Mr. Kramer

Similar to the rebuttal produced in response to the licensee estoppell and unjust enrichment (Points 3 + 4 above) is Plaintiff's response to Defendant's Motion to Quash the testimony of Jeffrey Kramer.  such that this issue is one and the same with the ownership and validity of the Marks in question Plaintiff stands by its assertions and arguments that she is the sole and unequivocal owner of ALL the Marks that relate to the Sea-Monkeys® name brand.

Mr. Kramer's testimony is only required in the event that the Marks are somehow still at issue at the trial.  It is undeniable that Mr. Kramer had made filings with the **USPTO** in the year 2010 that were contemporaneous with the mistaken filing recorded by Yolanda in that same year.

It is of relevance as to what Mr. Kramer had known about the status of the Marks at that time.  As Yolanda has no clear recollection of how or why she made the mistaken filing it is

unknown if Mr. Kramer may have brought that issue to her or her attorneys at that time.  It is most certain that she did not endeavor to make this filing on her own.

In addition, Mr. Kramer would useful as a witness to attest to BTT's understanding of the status quo at the time the parties first entered into agreement or any point thereafter.  There is, after all, an inferred duty of due diligence with regard to the confirmation of proper chain of title.

Once again, this is only necessary should the Court permit entry of the issue of the ownership of the Marks into the trial.  If that issue is put to rest, one way or the other, there will either be no need for the trial or no need for Mr. Kramer's testimony.

## CONCLUSION

For the aforementioned arguments and reasons Plaintiff Yolanda von Braunhut requests that the Court Order that:

- ALL the trademarks in question are valid AND that Yolanda is the true and rightful owner of the same, that

- Yolanda's use the word "alleged" in front of the word "counterfeit" at trial; that

- her unjust enrichment claim NOT be dismissed; that

- both parties be precluded from introducing any testimony/evidence related to Beth Harwell or to the character or alleged political beliefs of Harold von Braunhut; that

- Plaintiff is entitled to punitive damages; that

- Plaintiff's trademark damages NOT be limited; that

- Plaintiff's unjust enrichment damages NOT be limited AND that

- in the event that the ownership or validity of Plaintiff's trademarks are questioned that Mr. Kramer be made available as a witness.


Respectfully submitted by:

*s/ William Timmons*
William Timmons, Esq.
25 Candee Ave., Sayville, NY 11782
(631) 750-5980
*Attorney for Plaintiff Yolanda von Braunhut*
Dated:  April 17th 2017

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

—————————————————————x
                       :

TRANSCIENCE *et al*             :
            Plaintiffs    :     Index No.:    13-cv-6642 (ER)
                       :
      -versus-          :
                       :     **Plaintiff's Responses to**
BIG TIME TOYS, LLC       :     **Defendant's Motions *in limine***
            Defendant    :
—————————————————————x
—————————————————————x
                       :

BIG TIME TOYS, LLC       :
            Plaintiffs    :
                       :
      -versus-          :
                       :
TRANSCIENCE *et al*             :
            Defendant    :
—————————————————————x

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on or about April 17th 2017, I caused a true and correct copy of the foregoing **Plaintiff's Responses to Defendant's Motions *in limine*** to be filed with the Clerk of the Court for Southern District of New York (**SDNY**) via the Electronic Case Filling (**ECF**) system of the **SDNY** thereby giving service of notice to:

Epstein Becker & Green, P.C.
ATTN:  Sheila A. Woolson & Jeffrey G. Kramer (*pro hac vice*)
One Gateway Center, 13th Floor
Newark, NJ  07102
Tel:  (973) 639-8268
swoolson@ebglaw.com
jkramer@ebglaw.com
*Attorneys for Defendant BTT Big Time Toys, LLC*


By: *s/ William Timmons*
William Timmons, Esq.
25 Candee Avenue
Sayville, New York 11782
(631) 750-5980
*Attorney for Plaintiff Yolanda von Braunhut*


Dated:  April 17th 2017