**Exhibit #5**

## Affidavit of William Timmons

I, WILLIAM TIMMONS, declare as follows:

1. My name is William Timmons.

2. The facts stated herein are within my personal knowledge and I further affirmatively state that, if sworn as a witness, I could and would competently testify thereto.

3. I am an attorney licensed to practice law in the State of New York.

4. I maintain an office located at 25 Candee Avenue, Sayville, NY 11782.

5. Yolanda von Braunhut is the current owner of all the intellectual property, common law rights, and concomitant goodwill that relates or is otherwise in any way associated with the product known to the world as SEA-MONKEYS®.

6. The following US trademarks that relate to the SEA-MONKEYS® name brand are registered with the United States Patent and Trademark Office (**USPTO**):

    a. Word Mark: "**SEA-MONKEYS**"; USPTO Serial Number: 72161791; USPTO Registration Number: 0769332;

    b. Word Mark: **SEA-MONKEYS**; USPTO Serial Number: 76136804; USPTO Registration Number: 2485247;

    c. Word Mark: **INSTANT LIFE**; USPTO Serial Number: 72161789; USPTO Registration Number: 0769330;

    d. Word Mark: **INSTANT PETS**; USPTO Serial Number: 72456406; USPTO Registration Number: 999873;

    e. Word Mark: **OCEAN ZOO**; USPTO Serial Number: 76137530; USPTO Registration Number: 2509518;

    f. Drawing: **HATCHED EGG DESIGN**; USPTO Serial Number: 72161790; USPTO Registration Number: 769331.

7. Yolanda has retained my legal services to, among other things, update certificates of registration records maintained by the **USPTO** to reflect that she is the current owner of title of the forenamed Marks.

## Affidavit of William Timmons

8. Yolanda resides at 6200 Chapmans Landing Road, Indian Head, MD 20640-3040.
9. Yolanda is set to celebrate her 70th birthday on the date of April 16th 2017.
10. The SEA-MONKEYS® product was created by Yolanda's late husband and business partner Harold von Braunhut in the early 1960's.
11. Harold and Yolanda were married on February 14th 1980 in NYC.
12. On or about the date of October 14th 2000 Harold and Yolanda formed a partnership in the State of Maryland named "Harold & Yolanda".
13. Pursuant to this partnership Harold and Yolanda agreed that all of the intellectual property and corporate interests owned by either of them from that point forward would then be owned by the partnership.
14. Harold died on Thanksgiving night of the year 2003.
15. After Harold died the ownership to all domestic and foreign trademarks relating to the SEA-MONKEYS® product were effectively transferred to Yolanda pursuant to her partnership with Harold.
16. No other party has made a claim of ownership to any of the trademarks and the associated goodwill that relate to the SEA-MONKEYS® business.
17. Yolanda continued to pay the renewal fees for all of the registered trademarks that relate to the SEA-MONKEYS® business when they were due for renewal.
18. Harold had historically used a legal consultant for these purposes that would provide notice as to when trademarks came due for re-registration.
19. Harold took care of this part of the SEA-MONKEYS® business when he was alive.
20. Yolanda continued to use a legal consultant to notice her of trademark re-registrations and trademark assignments when they came due or were otherwise necessary or requested to be performed.
21. Yolanda continues to use all of the above named trademarks in commerce.

Affidavit of William Timmons                                              Page 2

## Affidavit of William Timmons

22. By her own admission, Yolanda knew and knows very little about **USPTO** procedures and protocol OR about Maryland estates law.

23. It has been brought to Yolanda's attention that certain filings she made with the **USPTO** were in error.

24. Among these errors made by her was a filing made by her with the **USPTO** as the executrix of Harold's estate purporting to assign registrations owned by Harold von Braunhut to the Transcience Corporation, a Maryland Corporation, recorded on January 25th 2010.

25. Yolanda did not procure the proper letters of administration as required by Maryland estates law needed to act on behalf of Harold's estate.

26. She was not aware of these mistakes at the time the filing was made.

27. She did not prepare the paperwork that she signed at that time.

28. While she does not specifically recall signing that document filed with the **USPTO**, noting that she does not dispute that she signed it, she believes that she was informed at the time of signing that her signature was required pursuant to standard operating procedures regarding trademarks.

29. A subsequent assignment made by the Transcience Corporation to assignee Big Time Toys, LLC (BTT) pursuant to a security agreement that was signed by Yolanda BOTH as president of Transcience and as an individual was recorded with the **USPTO** on June 4, 2010.

30. The security agreement that the Transcience Corporation made with BTT and that was recorded on June 4, 2010 was made between BTT and BOTH the Transcience Corporation and Yolanda von Braunhut (as an individual) as is reflected in the record of that assignment.

31. Notably, Yolanda is the owner of all the corporate interests formerly owned by the Maryland partnership of Harold & Yolanda including all interests relating to both the NY and MD Transcience Corporation.

32. Additionally, Yolanda made renewal filings of all 6 above named trademarks in the year 2014 (and/or at other times) that were in error

## Affidavit of William Timmons

because they did not reflect, or otherwise update the record to reflect, that all 6 of these trademarks were in fact assigned to her in the year 2003 by the partnership of Harold & Yolanda.

33. She was not aware that there were any mistakes made in those filings at the time the filings were made.

34. In March of the year 2016, after Yolanda became aware of these mistakes she empowered her attorney [namely myself, William Timmons, Esq.] to make 3 *nunc pro tunc* filings with the **USPTO** with regard to each of the above named 6 trademarks with the intent to set the record straight to reflect the current and proper chain of title for each of these trademarks.

35. Section §7 (15 U.S.C. §1057) *Certificates of registration* (h) *Correction of applicant's mistake* permits for corrections to be made to certificates of registration upon a showing "that such mistake occurred in good faith through the fault of the applicant".

36. Section §7 (15 U.S.C. §1057) *Certificates of registration* (h) *Correction of applicant's mistake* reads as follows: "Whenever a mistake has been made in a registration and a showing has been made that such mistake occurred in good faith through the fault of the applicant, the Director is authorized to issue a certificate of correction or, in his discretion, a new certificate upon the payment of the prescribed fee".

37. There is no doubt that should Yolanda ever elect to sell, transfer, or otherwise assign all right, title, and interest to any or all of the trademarks that relate to the SEA-MONKEYS® business that she will be able to convey clear and unequivocal title to such.

38. I am now requesting of the **USPTO** pursuant to Section 7 of the Trademark Act of 1946, as Amended §7 (15 U.S.C. §1057), for all the above reasons, for the Director to issue new certificates of registration for the said registrations showing title to be solely in Yolanda's name, namely, Yolanda von Braunhut.

# Affidavit of William Timmons

I declare under penalty of perjury under the laws of the United States of America that the foregoing to the best of my knowledge is true and correct.

Executed this 13th day of April 2017

at Sayville, New York

_____
William Timmons

4/13/17
Date

Sworn to before me this
13th day of April 2017

_____
Notary Public

BARBARA BONVENTRE
Notary Public, State of New York
No. 01BO6047622
Qualified in Suffolk County
Commission Expires Sept. 5, 2018

Affidavit of William Timmons

Signature Page

**Exhibit #6**

# TRADEMARK SECURITY AGREEMENT

This TRADEMARK SECURITY AGREEMENT (the "Agreement") is made as of the 25th day of May, 2010, by BIG TIME TOYS, LLC, a Tennessee limited liability company, headquartered at 708 Berry Road, Nashville, TN 37204 ("BTT"), YOLANDA von BRAUNHUT, an individual with an address at 6200 Chapman's Landing Road, Indian Head, MD 20640-3040 ("YvB"), TRANSCIENCE CORPORATION, a Maryland corporation with offices and principal place of business at 6200 Chapman's Landing Road, Indian Head, MD 20640-3040 ("Transcience" and, together with YvB, individually, a "Grantor" and collectively, the "Grantors").

WITNESSETH:

WHEREAS, the Grantors and BTT have entered into that certain Purchase Agreement and Amendment to License Agreement, dated as of May 1, 2009 (the "Purchase Agreement"), pursuant to which BTT exercised an option to purchase certain intellectual property rights, including the goodwill of Grantors' business, subject to the terms and conditions specified therein; and

WHEREAS, pursuant to the Purchase Agreement, each Grantor shall retain legal title to the purchased intellectual property rights until such time as BTT shall have paid the Initial Purchase Price; and

WHEREAS, it is a condition to the Purchase Agreement that each Grantor shall have granted the security interests contemplated by this Agreement to BTT to secure the performance of all obligations of each Grantor to BTT pursuant to the Purchase Agreement and License Agreement (as defined in the Purchase Agreement), including the obligations to deliver to BTT or its designee title to the Trade Secrets, Licensed Products and Sea-Monkeys® Properties and all of the information, documents and materials (including, without limitation, the Trade Secrets disclosures) deposited with the Escrow Holder (as defined in the Purchase Agreement), and to vest in BTT all right, title and interest in and to all Licensed Products and Sea-Monkeys® Properties, free and clear of any and all liens, claims and encumbrances of any kind (collectively, the "Obligations"), upon BTT's payment of the final installment of the Initial Purchase Price payable under Section 2.2(a) of the Purchase Agreement;

NOW, THEREFORE, for and in consideration of the foregoing and of any financial accommodations or extensions of credit (including, without limitation, the payments of the Minimum Royalties pursuant to the Purchase Agreement and License Agreement), now or hereafter made to or for the benefit of each Grantor by BTT in connection with the transactions contemplated by the Purchase Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

Section 1. <u>Defined Terms</u>. Unless otherwise defined herein, each capitalized term used herein that is defined in the Purchase Agreement shall have the meaning specified for such term in the Purchase Agreement.

Section 2. <u>Incorporation of the Purchase Agreement</u>. The Purchase Agreement and the terms and provisions thereof are hereby incorporated herein in their entirety by this reference thereto.

Section 3. <u>Security Interest in Trademarks</u>. To secure the prompt and complete observance and performance of, the Obligations of each Grantor to BTT, each Grantor hereby grants, assigns, hypothecates, mortgages, conveys and transfers to BTT, for its benefit, a security interest in all of its rights, title and interest in, to and under the following, whether now owned or existing or hereafter arising or acquired and wheresoever located:

(a) trademarks, registered trademarks, trademark applications, service marks, registered service marks and service mark applications, including, without limitation, the trademarks, registered trademarks, trademark applications, service marks, registered service marks and service mark applications listed on <u>Schedule "A"</u>, attached hereto and made a part hereof, and (i) all renewals thereof, (ii) all income, royalties, damages and payments now and hereafter due and/or payable under and with respect thereto, including, without limitation, payments under all licenses entered into in connection therewith and damages and payments for past or future infringements or dilutions thereof, (iii) the right to sue for past, present and future infringements and dilutions thereof, (iv) the goodwill of the Grantors' business symbolized by the foregoing and connected therewith, and (v) all of each Grantor's rights corresponding thereto throughout the world (all of the foregoing trademarks, registered trademarks and trademark applications, and service marks, registered service marks and service mark applications, together with the items described in clauses (i) through (v) in this subparagraph (a), are hereinafter individually and/or collectively referred to as the "<u>Trademarks</u>"); and

(b) rights under or interest in any trademark license agreements or service mark license agreements with any other party, whether the Grantor is a licensee or licensor under any such license agreement, including, without limitation, those trademark license agreements and service mark license agreements listed on <u>Schedule "B"</u>, attached hereto and made a part hereof, together with any goodwill connected with and symbolized by any such trademark license agreements or service mark license agreements, and the right to prepare for sale and sell any and all inventory now or hereafter owned by each Grantor and now or hereafter covered by such licenses (all of the foregoing are hereinafter referred to collectively as the "<u>Licenses</u>").

Section 4. <u>Restrictions on Future Agreements</u>. Each Grantor shall not enter into any agreement, including, without limitation, any license agreement, which is inconsistent with this Agreement, the Purchase Agreement and License Agreement, and each Grantor further covenants and agrees that it shall not take any action, and it shall use its best efforts not to permit

any action to be taken by others, including, without limitation, licensees, or fail to take any action, which would in any respect affect the validity or enforcement of the rights transferred to BTT under this Agreement, the Purchase Agreement and License Agreement or the rights associated with the Trademarks or the Licenses.

Section 5.   New Trademarks and Licenses.  Each Grantor represents and warrants that; (a) the Trademarks listed on Schedule "A" include all of the trademarks, registered trademarks, trademark applications, service marks, registered service marks and service mark applications owned or held by each Grantor as of May 1, 2009 and through and including the date hereof, (b) the Licenses listed on Schedule "B" include all of the trademark license agreements and service mark license agreements under which each Grantor is the licensee or licensor and (c) no liens, claims or security interests in such Trademarks and Licenses have been granted by any Grantor to any Person other than BTT.  If, prior to the termination of this Agreement, a Grantor shall (x) obtain rights to any new trademarks, registered trademarks, trademark applications, service marks, registered service marks or service mark applications, (y) become entitled to the benefit of any trademarks, registered trademarks, trademark applications, trademark licenses, trademark license renewals, service marks, registered service marks, service mark applications, service mark licenses or service mark license renewals whether as licensee or licensor, or (z) enter into any new trademark license agreement or service mark license agreement, the provisions of this Agreement above shall automatically apply thereto.  Each Grantor shall give to BTT written notice of events set forth in this Section 5 promptly after the occurrence thereof, but in any event not less frequently than on a quarterly basis.  Each Grantor hereby authorizes BTT to modify this Agreement unilaterally (1) by amending Schedule "A" to include any future trademarks, registered trademarks, trademark applications, service marks, registered service marks and service mark applications and by amending Schedule "B" to include any future trademark and license agreements and service mark license agreements, and (2) by filing, in addition to and not in substitution for this Agreement, a duplicate original of this Agreement containing on Schedules "A" or "B" thereto, as the case may be, such future trademarks, registered trademarks, trademark applications, service marks, registered service marks and service mark applications, and trademark license agreements and service mark license agreements.

Section 6.   Royalties.  Each Grantor hereby agrees that the use by BTT of the Trademarks and Licenses as authorized hereunder in connection with BTT's exercise of its rights and remedies under this Agreement or pursuant to the Purchase Agreement shall be coexisting with such Grantor's rights thereunder and with respect thereto, if any, and without any liability for royalties or other related charges from BTT, except to the extent provided by the Purchase Agreement.

Section 7.   Right to Inspect; Further Assignments and Security Interests.  BTT may at all reasonable times, upon twenty four (24) hours notice (and at any time following a Grantor's failure to perform any Obligation of it), have access to, examine, audit, make copies (at such Grantor's expense) and extracts from and inspect such Grantor's premises and examine such Grantor's books, records and operations relating to the Trademarks and Licenses; provided, that in conducting such inspections and examinations, BTT shall use reasonable efforts not to disturb unnecessarily the conduct of such Grantor's ordinary business operations.  Each Grantor agrees

TRADEMARK
REEL: 004219 FRAME: 0549

that she or it shall not sell or assign its interests in, or grant any license under, the Trademarks or the Licenses.

Section 8. <u>Nature and Continuation of BTT's Security Interest; Termination of BTT's Security Interest</u>. This Agreement shall create a continuing security interest in the Trademarks and Licenses and shall terminate upon the earlier to occur of: (a) the vesting in BTT of title to the Trade Secrets, Licensed Products and Sea-Monkeys® Properties and all of the information, documents and materials (including, without limitation, the Trade Secrets disclosures) deposited with the Escrow Holder, including all right, title and interest in and to all Licensed Products and Sea-Monkeys® Properties, free and clear of any and all liens, claims and encumbrances of any kind; or (b) the termination of the Purchase Agreement. When this Agreement has been terminated, BTT shall promptly execute and deliver to each Grantor all termination statements and other instruments as may be necessary or proper to terminate BTT's security interest in the Trademarks and the Licenses.

Section 9. <u>Duties of each Grantor</u>. Each Grantor shall have the duty to: (a) prosecute diligently any trademark application or service mark application that is part of the Trademarks pending as of the date hereof or hereafter until the termination of this Agreement, (b) make application for trademarks or service marks, and (c) take all reasonable and necessary action to preserve and maintain all of such Grantor's rights in the Trademarks including, without limitation, making timely filings for renewals and extensions and diligently monitoring unauthorized use thereof. Each Grantor further agrees that she or it shall (x) not abandon any Trademark or License without the prior written consent of BTT, and (y) use her or its best efforts to maintain in full force and effect the Trademarks and the Licenses. Any expenses incurred in connection with the foregoing shall be borne by the Grantor. Without limiting the generality of the foregoing, BTT shall be under no obligation to take any steps necessary to preserve rights in the Trademarks or Licenses against any other parties, but BTT may, at its option, and all expenses incurred in connection therewith shall be for the sole account of such Grantor and shall be added to the Obligations secured hereby.

Section 10. <u>BTT's Right to Sue</u>. Upon the failure of any Grantor to perform any Obligation, BTT shall have the right, but shall not be obligated, to bring suit in its own name to enforce the Trademarks and the Licenses and, if BTT shall commence any such suit, such Grantor shall, at the request of BTT, do any and all lawful acts and execute any and all proper documents required by BTT in aid of such enforcement. Each Grantor shall be obligated to, jointly and severally, and shall upon demand, promptly reimburse BTT for all costs and expenses incurred by BTT in the exercise of its rights under this Agreement (including, without limitation, reasonable fees and expenses of attorneys and paralegals for BTT).

Section 11. <u>Waivers</u>. BTT's failure, at any time or times hereafter, to require strict performance by either Grantor of any provision of this Agreement shall not waive, affect or diminish any right of BTT thereafter to demand strict compliance and performance therewith nor shall any course of dealing between a Grantor and BTT have such effect. No single or partial exercise of any right hereunder shall preclude any other or further exercise thereof or the exercise of any other right. None of the undertakings, agreements, warranties, covenants and representations of either Grantor contained in this Agreement shall be deemed to have been

TRADEMARK
REEL: 004219 FRAME: 0550

suspended or waived by BTT unless such suspension or waiver is in writing signed by an officer of BTT and directed to a Grantor specifying such suspension or waiver.

Section 12.  **Cumulative Remedies, Power of Attorney**.  BTT shall have, in addition to all other rights and remedies given it by the terms of this Agreement and the Purchase Agreement, all rights and remedies allowed by law and the rights and remedies of a secured party under the UCC, as enacted in any jurisdiction in which the Trademarks or the Licenses may be located or deemed located.  Upon the failure by any Grantor to deliver to and vest in BTT all right, title and interest in and to all Licensed Products and Sea-Monkeys® Properties, free and clear of any and all liens, claims and encumbrances of any kind, upon BTT's payment of the final installment of the Initial Purchase Price payable under Section 2.2(a) of the Purchase Agreement, each Grantor agrees to execute and deliver to BTT or any such transferee all such agreements, documents and instruments as may be necessary, in BTT's sole discretion, to effect such assignment, conveyance and transfer.  All of BTT's rights and remedies with respect to the Trademarks and the Licenses, whether established hereby, by any other agreements or by law, shall be cumulative and may be exercised separately or concurrently.  Notwithstanding anything set forth herein to the contrary, it is hereby expressly agreed that upon the failure of any Grantor to perform any Obligation required of it, BTT may exercise any of the rights and remedies provided in this Agreement and the Purchase Agreement.

Section 13.  **Fees and Expenses**.  Each Grantor, jointly and severally, shall be obligated to pay, and shall pay on demand all reasonable expenses of BTT in connection with BTT's exercise, preservation or enforcement of any of its rights, remedies or options under this Agreement, including, without limitation, reasonable fees of outside legal counsel or the allocated costs of in-house legal counsel, accounting, consulting, brokerage or other similar professional fees or expenses, and any reasonable fees or expenses associated with travel or other costs relating to any appraisals or examinations conducted in connection with the transactions contemplated hereby, by the Purchase Agreement and the License Agreement, and the amount of all such expenses shall, until paid, bear interest at the prime rate plus two percent and be a part of the Obligations.

Section 14.  **Successors and Assigns**.  This Agreement shall be binding upon each Grantor and its and/or her successors and assigns, and shall inure to the benefit of BTT and its nominees, successors and assigns.  Each Grantor's successors and assigns shall include, without limitation, a receiver, trustee or debtor-in-possession of or for any Grantor; provided, however, that each Grantor shall not voluntarily assign or transfer its rights or obligations hereunder without BTT's prior written consent, to be exercised in BTT's sole discretion.

Section 15.  **Amendments**.  No amendment or waiver of any provision of this Agreement, nor consent to any departure by any Grantor herefrom, shall in any event be effective unless the same shall be effected in writing and duly executed between each Grantor and BTT.

Section 16.  **Notices, Written; Effective Date**.  Unless otherwise indicated differently, all notices, payments, requests, reports, information or demands which any party hereto may desire or may be required to give to any other party hereunder, shall be in writing and shall be

TRADEMARK
REEL: 004219 FRAME: 0551

personally delivered or sent by confirmed telecopier, by a nationally recognized overnight delivery service, or first-class certified or registered United States mail, postage prepaid, return receipt requested, and sent to the party at its address appearing below, or such other address as any party shall hereafter inform the other party hereto by written notice given as aforesaid:

If to a Grantor:

Mail and Messenger:  Transcience Corporation
Yolanda von Braunhut
6200 Chapmans Landing Road
Indian Head, MD 20640-3040
Attn.: President

If to BTT:

Mail and Messenger:  Big Time Toys, LLC
708 Berry Road
Nashville, TN 37204
Attn.: President

All notices, payments, requests, reports, information or demands so given shall be deemed effective upon receipt. A failure to send the requisite copies does not invalidate an otherwise properly sent notice to a Grantor and/or BTT.

Section 17.  <u>Execution in Counterparts</u>.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

Section 18.  <u>Further Indemnification</u>.  Each Grantor, jointly and severally, agrees to pay and to save BTT harmless from any and all liabilities with respect to, or resulting from any delay in paying, any and all excise, sales or other similar taxes which may be payable or determined to be payable with respect to any of the transactions contemplated by this Agreement.

Section 19.  <u>Headings</u>.  Section headings used in this Agreement are for convenience of reference only and shall not affect the construction of this Agreement.

Section 20.  <u>Joint And Several Nature of Obligations</u>.  In the event that this Agreement is executed by more than one party as a Grantor, the rights, liabilities and obligations of such parties is joint and several.

Section 21.  <u>GOVERNING LAW, SEVERABILITY</u>.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HERETO SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO THE PRINCIPLES OF CONFLICT OF LAWS THEREUNDER. WHEREVER POSSIBLE, EACH PROVISION OF THIS AGREEMENT SHALL BE INTERPRETED IN SUCH MANNER AS TO BE EFFECTIVE AND VALID UNDER APPLICABLE LAW, BUT IF ANY PROVISION OF THIS AGREEMENT SHALL BE PROHIBITED BY OR INVALID UNDER APPLICABLE LAW, SUCH PROVISION SHALL BE INEFFECTIVE TO THE EXTENT OF SUCH PROHIBITION OR INVALIDITY, WITHOUT INVALIDATING THE REMAINDER OF SUCH PROVISION OR THE REMAINING PROVISIONS OF THIS AGREEMENT.

Section 22. **JURY TRIAL**. EACH GRANTOR AND BTT (BY ACCEPTANCE OF THIS AGREEMENT) MUTUALLY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY CLAIM BASED HEREON, ARISING OUT OF, UNDER OR IN CONNECTION HEREWITH OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY, INCLUDING, WITHOUT LIMITATION, ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS OR ACTIONS OF BTT, AND AGREE THAT NEITHER PARTY WILL SEEK TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED. EXCEPT AS PROHIBITED BY LAW, EACH GRANTOR HEREBY WAIVES ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY LITIGATION OR PROCEEDING ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES OR ANY DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES. THE GRANTOR CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF BTT HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT BTT WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER. THIS WAIVER CONSTITUTES A MATERIAL INDUCEMENT FOR BTT TO ACCEPT THIS AGREEMENT.

SECTION 23. **WAIVER OF BOND**. EACH GRANTOR WAIVES THE POSTING OF ANY BOND OTHERWISE REQUIRED OF ANY PARTY HERETO IN CONNECTION WITH ANY JUDICIAL PROCESS OR OTHER PROCEEDING TO ENFORCE ANY JUDGMENT OR OTHER COURT ORDER ENTERED IN FAVOR OF SUCH PARTY, OR TO ENFORCE BY SPECIFIC PERFORMANCE, TEMPORARY RESTRAINING ORDER, PRELIMINARY OR PERMANENT INJUNCTION IN CONNECTION WITH THIS AGREEMENT, THE PURCHASE AGREEMENT OR THE LICENSE AGREEMENT.

**REMAINDER OF PAGE INTENTIONALLY LEFT BLANK
SIGNATURE PAGE TO FOLLOW**

**TRADEMARK
REEL: 004219 FRAME: 0553**

IN WITNESS WHEREOF, each Grantor has caused this Agreement to be duly executed and delivered, all as of the date first above written.

GRANTORS:

TRANSCIENCE CORPORATION

By: _____
Yolanda von Braunhut
President


YOLANDA VON BRAUNHUT

By: _____
Yolanda von Braunhut


ACCEPTED AND AGREED:
BIG TIME TOYS, LLC

By: _____
Sam K. Harwell, CEO